IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CAIR FOUNDATION, INC., d/b/a
COUNCIL ON AMERICAN-ISLAMIC
RELATIONS, & CAIR,

    Plaintiff,

v.

ASMA LORI HAIDRI SAROYA a.ka. LORI
SAROYA, ASMA SAROYA, LORI HAIDRI,
LORI HAIDRI-SAROYA, & LH,

    Defendant.

Civil Action No: _0:21-cv-01267_____

## COMPLAINT

Plaintiff, CAIR FOUNDATION, INC., d/b/a Council on American-Islamic Relations and CAIR ("CAIR"), files this complaint against Defendant Asma Lori Saroya ("Saroya"), a former CAIR employee, for (1) defamation; (2) defamation per se; (3) tortious interference with business relationships; and (4) misappropriation of confidential information.  In support thereof, CAIR alleges as follows:

## INTRODUCTION

1.    CAIR is the nation's largest grass-roots Muslim civil rights and advocacy organization.  CAIR is headquartered on Capitol Hill in Washington, D.C.  It has 26 regional affiliates nationwide, including CAIR Minnesota, which is headquartered in Minneapolis, Minnesota.

2.      Since its establishment in 1994, CAIR has worked to promote a positive image of Islam and Muslims in America.  Its mission is to enhance understanding of Islam, encourage dialogue, protect civil liberties, empower American Muslims, and build coalitions that promote justice and mutual understanding.

3.      CAIR's litigation and civil rights department counsels, mediates, and advocates on behalf of Muslims and others who have experienced religious discrimination, defamation, or hate crimes.  The department works to protect and defend the constitutional rights of American Muslims, thereby supporting the rights of all Americans.

4.      CAIR is headquartered on Capitol Hill in Washington, D.C.  That office is known as CAIR-National.[1]

5.      CAIR's chapters are wholly separate legal entities from CAIR-National.

6.      Defendant Saroya once worked for CAIR-Minnesota.  Saroya was also a former CAIR-National Chapter Development Director and a former national board member.

7.      Saroya has not been affiliated with CAIR since 2018.

8.      In 2021, Saroya founded a "competing" organization: the "American Muslim Civil Rights Center" in Minneapolis.

9.      Saroya also claims to be a "diversity trainer, civil rights activist, [and] nonprofit leader."  See Saroya's website, attached hereto as **Exhibit A.**

10.     Saroya holds a bachelor's degree from St. Catherine University in St. Paul, Minnesota, as well as a law degree from Mitchell Hamline School of Law in St. Paul, Minnesota.

---

[1] For this *Complaint*, CAIR and CAIR-National may be used interchangeably.

11.     Since her departure from CAIR in 2018, Saroya has been actively engaging in a systemic and continuous internet smear campaign to damage CAIR's reputation and to cause CAIR severe economic harm.

12.     For several years, Saroya published false statements about CAIR on multiple public social media platforms and websites using various forms of her name, initials, and pseudonyms.

13.     Hiding behind anonymity, Saroya's false and defamatory lies have likely been viewed by many thousands of individuals domestically and abroad.

14.     In addition to her internet harassment campaign, Saroya misappropriated confidential information that she obtained during her employment with CAIR and is using that confidential information to send hateful and false allegations against CAIR to CAIR's partners, donors, and religious leaders.

15.     Saroya has targeted her disparaging messages to local news organizations and asked those news organizations to cease writing positive articles about CAIR and its mission to cultivate and promote positive American and Islamic relationships.

16.     Saroya has published hundreds of disturbingly false allegations against CAIR on the internet and in specific targeted communications over the course of several years.

17.     Saroya knew her false statements would be read by people around the world and reported on in the news media, and, as a result, that CAIR would be subjected to threats of violence from extremist organizations and suffer economic and reputational harm.

18.     Saroya's malicious, public attack on CAIR had no purpose other than to attempt to destroy CAIR's reputation and to induce and coerce CAIR's partners, donors, and religious leaders to discontinue their relationships with CAIR and any corresponding charitable giving or funding.

19.     Saroya seemingly hopes to destroy CAIR and steer those donors to her own "American Muslim Civil Rights Center" in Minnesota.

20.     Due to her defamatory publications and tortious interference, CAIR's reputation in the community and its business relationships have been damaged.

21.     Saroya's defamatory messages are now being used by anti-Muslim and anti-Islamic extremists to further discriminate against and alienate the population of individuals that Saroya claimed to be protecting as an employee of CAIR.

22.     In 2019, Saroya even retained a well-known Islamophobic and anti-Muslim attorney, who, on Saroya's behalf, threatened to move the United States Attorney General to classify CAIR as a foreign agent and to file a lawsuit against CAIR claiming that CAIR committed racketeering, wire fraud, mail fraud, embezzlement, threats, blackmail, obtaining donations under threat, laundering of foreign funds, conspiracy with criminals, fraud against the United States, conspiracy with outlawed groups and violent individuals, and other criminal and terroristic acts.

23.     Saroya's public lies are damaging CAIR and the American Muslim community in ways that are significant and long lasting.

24.     The examples of Saroya's unlawful conduct set forth herein can in no way capture the breadth of Saroya's obsessive, defamatory postings against her former employer.

**JURISDICTION**

25.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy in this matter exceeds $75,000 and the action is between citizens of different states.

26.     This Court has personal jurisdiction over Defendant because she is a citizen of the state of Minnesota.

27.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b), because the Defendant is subject to personal jurisdiction in this District and because many of the acts complained of giving rise to the claims herein occurred in this District.

## THE PARTIES

28.     CAIR is a non-profit 501(c)(3) corporation incorporated in the District of Columbia with its headquarters and principal place of business located at 453 New Jersey Avenue, S.E., Washington, D.C., 20003.

29.     Saroya is a former employee of CAIR and is a citizen and resident of the State of Minnesota.  Saroya uses many versions of her birth name in her publications, including "Lori Saroya," "Asma Saroya," "Lori Haidri," "LH," and "Lori Haidri-Saroya."  For the purpose of this *Complaint*, all references to any of these names refer to Defendant Saroya.

## FACTS

30.     In 2007, Saroya became employed by CAIR-Minnesota and served as the Chapter's Executive Director.

31.     She remained in that position until she began her employment with CAIR-National on or about March 2, 2016.

32.     At CAIR-National, she served as CAIR's National Chapter Development Director.

33.     Saroya also served on CAIR's Board of Directors.

34.     At the outset of her employment with CAIR, and as a condition thereof, Saroya executed a *Confidentiality and Nondisclosure Agreement ("Agreement")*.  See Saroya's Confidentiality Agreement, attached hereto as **Exhibit B.**

35.     Pursuant to the *Agreement*, Saroya agreed to preserve the confidentiality of CAIR's confidential information, including presentation and training manuals, legal research, marketing materials, mailing lists, donor or supporter information, business plans, and any other valuable information or practices of CAIR ("Confidential Information").  Id.

36.     In the *Agreement*, Saroya:

- Acknowledged the confidential nature of CAIR's Confidential Information, including information that CAIR maintained and safeguarded regarding its donors and supporters;
- Promised not to disclose CAIR's Confidential Information to third parties;
- Promised to return CAIR's Confidential Information in her possession upon the termination of her employment;
- Promised not use the Confidential Information in any way except for the purposes authorized by CAIR; and
- Agreed to use her best efforts to prevent and protect the Confidential Information from falling into the public domain.

Id.

37.     After securing Saroya's agreement to comply with these important obligations, CAIR gave Saroya access to CAIR's Confidential Information, including access to donors and supporters.

38.     Saroya's employment at CAIR-National was fraught with complaints, issues, and conflicts.

39.     Over the course of her two-year employment, multiple employees—both at CAIR-National and the various CAIR chapters—registered complaints against Saroya.  These complaints alleged that Saroya: (1) acted aggressively and with hostility towards other CAIR staff members, including female staffers; (2) appeared to be unable to properly manage and deal with conflicts; and (3) routinely attempted to "order around staff" whom she did not supervise.

40.     As a result of these complaints, Nihad Awad ("Awad"), CAIR's National Executive Director, requested that Saroya attend conflict resolution training in December 2016.

6

41.     Saroya's hostile behavior towards CAIR employees only escalated.

42.     After receiving multiple complaints from CAIR staff members regarding Saroya's interactions with them, Awad issued to Saroya a written warning regarding her mistreatment of her fellow employees on August 4, 2017.

43.     The warning informed Saroya that her behavior was crippling CAIR's ability to properly function as an organization.

44.     Awad ordered Saroya to complete conflict resolution training within sixty days.

45.     Despite the written warning, Saroya's misconduct escalated.

46.     On January 1, 2018, a female chapter staffer filed a formal complaint against Saroya alleging that Saroya's behavior was creating a hostile work environment and a culture of fear in the workplace.

47.     Due to Saroya's alleged harassment, the female staffer stated that she was concerned for her physical safety and considering filing a restraining order against Saroya.

48.     After receiving the female staffer's formal written complaint against Saroya for workplace harassment, CAIR-National launched an investigation into the allegations.

49.     On January 13, 2018, amid this investigation, Saroya abruptly announced that she intended to resign and that her resignation would be effective May 11, 2018.

50.     In or around May 2018, just prior to her agreed upon resignation date, Saroya attended a CAIR retreat.  During that retreat, Saroya was observed screaming at her staff and behaving unprofessionally.  Some of her staff members were in tears.  That evening, Awad pulled Saroya aside and admonished her for her behavior

51.     Saroya's employment ended on May 11, 2018.

### Saroya Resigns from CAIR and Begins a Defamation
### Campaign Aimed at Destroying the National Organization

52.     Almost immediately upon resigning from CAIR in May 2018, Saroya started a defamation campaign aimed solely at destroying her former employer's reputation and funding base in every way possible.  She continues her war on CAIR to this day.

53.     Saroya's coordinated attack has taken place and is continuing to take place on three separate and distinct fronts:

    i.  Saroya attempted to destroy CAIR-National's relationship with its affiliated chapters by falsely claiming that CAIR-National was not disbursing grant funds intended for the chapters;

    ii.  Saroya is attempting to destroy CAIR-National's reputation in the community by publishing a numerous hateful and disparaging statements about CAIR online using various social media platforms; and

    iii.  Saroya is attempting to destroy CAIR's relationship with its donors and event partners by contacting these organizations and accusing CAIR of committing civil and criminal misconduct.

### Saroya Defames CAIR to CAIR Chapters

54.     In June 2018, Saroya attempted to use defamatory statements related to grant disbursements to destroy CAIR-National's relationship with its affiliate chapters and one of its donors, Solidarity Giving.  Solidarity Giving is an "advised fund" of Silicon Valley Community Foundation.

55.     It is aimed at supporting organizations that advance social justice, promote civil engagement, and serve threatened communities around the country.

56.     During Saroya's employment with CAIR, Solidarity Giving awarded CAIR two grants: a $100,000 grant for general support and a $500,000 grant earmarked for chapter support. As the former National Chapter Development Director, Saroya was responsible for the administration of the chapter support grant from its inception until her resignation.

57.     In June 2018, just a month after resigning her employment from CAIR-National, Saroya emailed staff members of various CAIR chapters across the country and falsely stated that:

> a.  Solidarity Giving required the grant funds to be given directly to chapters (as opposed to being used by CAIR-National for chapter development);
>
> b.  CAIR is holding on to the money to spend it on itself and has refused to disperse it to the chapters;
>
> c.  during her employment, she had attempted to disburse the funds to chapters, but was prevented from doing so by the then CAIR controller and Executive Director Awad; and
>
> d.  she attempted to use the money to hold conferences for the chapters, but CAIR did not permit her to do so.

See Saroya's June 2018 emails to chapters, attached hereto as **Exhibit C**.

58.     Saroya sent the communication to several chapter leaders and staff members, including staff members at CAIR-Greater Los Angeles, CAIR-Ohio, and CAIR-Georgia, to name a few.

59.     At the time Saroya made each of these remarks related to the grant, she knew them to be false.  Her intent behind making the false statements was to damage CAIR's relationship with its affiliate chapters and Solidarity Giving.

60.     Specifically, as administrator of the chapter grant, Saroya was aware that the grant documents were given for "general support of the chapters."  During her employment with CAIR, Saroya had budgeted a portion of the funds to be used to hire a CAIR-National chapter outreach coordinator and to offer seminars across the country.  Had she believed the money to be for cash payments to chapters, Saroya would not have recommended hiring a CAIR-National employee or offering seminars.  Accordingly, when she stated that CAIR was required to give the funds directly to the chapters, she knew that statement was false.

61.     Additionally, during Saroya's employment with CAIR, CAIR used the grant to hold two significant trainings for chapter staff.  CAIR-National paid for all of its chapters to travel to San Francisco for one training conference and to Washington, D.C. for a second training conference.  The trainings, both of which Saroya was integral in planning, cost over $100,000.  In addition to these conferences, CAIR-National also hired a developer to create a national civil rights database for its chapters and paid for Dropbox licensing for all chapters.  The grant that Saroya administered paid for both the chapter trainings and the database.  When Saroya stated that CAIR-National was holding onto the grant to use the money for itself, Saroya knew that statement was false.  When she stated that CAIR-National prevented her from putting on conferences for the chapters, she knew that statement to be false as well.

62.     In her publications to the chapter representatives, Saroya instructed CAIR chapter representatives to contact Solidarity Giving directly.

63.     Saroya gave this instruction so that her defamatory publications could be further disseminated, intending to irreparably harm and tortiously interfere with CAIR's contractual and business relationship with Solidarity Giving.

10

64.     On October 18, 2018, Saroya contacted Silicon Valley Community Foundation
directly through the pseudonym "Ahmed Vali" about CAIR's use of the grant and requested that
the foundation open a formal investigation into CAIR-National and its use of the grant funding.
See October 18, 2018 email, attached hereto as **Exhibit D**.

65.     Unquestionably, Saroya's false accusations damaged CAIR's reputation.

66.     Saroya's attempts to damage CAIR's relationship with its chapters and Solidarity
Giving was only the first of many steps in Saroya's planned attack.

**Saroya Defames CAIR on Social Media and Public Websites**

67.     After learning of Saroya's false accusations regarding the grant funding, CAIR sent
Saroya a cease and desist letter.

68.     In response to and in retaliation for the cease and desist, Saroya started her internet
defamation campaign and began continuously and systematically publishing false statements
online accusing CAIR of criminal and civil misconduct.

69.     Saroya's social media and internet smear campaign against CAIR takes several
forms:

     a.     Saroya has published disparaging remarks about CAIR on her personal public
Facebook page and the Facebook pages of several CAIR chapters, strategic
partners, and donors;

     b.     Saroya has published disparaging remarks about CAIR on several internet "blogs"
under her given and/or marital name as well as under several pseudonyms;

     c.     Saroya has published disparaging "comments" on online newspaper articles
written about CAIR or quoting CAIR staff members; and

d.  Saroya has created email and social media accounts under different names and is

currently using those accounts to send disparaging publications about CAIR to

CAIR partners and donors.

**Saroya's Public Facebook Harassment**

70.     With respect to Saroya's first form of harassment, Saroya published statements on her

personal Facebook page and the Facebook pages of several partners and donors under the names

"Lori Haidri-Saroya" and "Lori Haidri."  The profile pictures for Lori Haidri-Saroya and Lori

Haidri are identical.  The owner and publisher of these two accounts is Saroya.

71.     Saroya's false accusations take many forms.

72.     In one online post published in the fall of 2018, Saroya claimed that CAIR owed her

"nearly $30,000 in unpaid, wages, bonus, and reimbursements" post-employment:



73.     At the time the above screenshot was captured, only four hours after Saroya published

the statement, at least eight individuals had viewed it.

74.     CAIR does not currently owe and did not owe Saroya $30,000 in unpaid wages, bonuses, and reimbursements.

75.     In fact, on October 31, 2020, Saroya filed a claim for these alleged "unpaid wages, bonus, and reimbursement" with the Washington D.C. Department of Employment Services.  On February 8, 2021, the Department denied and dismissed Saroya's complaint in its entirety finding that Saroya "was paid for all hours worked during her tenure with [CAIR]" and that she was "not owed for any unpaid wages."  See Washington, D.C. Department of Employment's Initial Determination, attached hereto as **Exhibit E**.  With respect to Saroya's specific claim for 2016 – 2018 reimbursements, the Department found that "there is an email dated December 31, 2016 from [Saroya] that she would like her 2016 expense reimbursements classified as donations" and "there is no proof of [Saroya's] 2018 reimbursements actually being submitted to [CAIR]."  Id.

76.     CAIR did not owe Saroya "$30,000 in unpaid wages, bonuses, and reimbursements" at the conclusion of her employment.  At the time Saroya published the aforementioned statement, she knew it to be false or made it with reckless disregard for the truth or falsity of the statement.

77.     Upon information and belief, Saroya made several posts in the summer and fall of 2018 claiming that CAIR owed her unpaid wages.

78.     When CAIR continued to operate despite her reputational damage and harm, Saroya escalated her allegations and started accusing CAIR of discrimination, retaliation, sexual harassment, and creating a hostile work environment.

79.     Specifically, in a separate Facebook publication, Saroya accused CAIR of "gender discrimination, religious discrimination, sexual harassment, retaliation, hostile work environment, union busting, financial mismanagement, lack of board oversight, and board incompetence…" and that CAIR owed her "over $20,000."



**Lori Haidri**

CAIR has a pattern of discriminating against and mistreating their own employees, especially women. Donor funds are directly going to pay for attorneys to suppress, silence, and intimidate those who have been treated unjustly.

I was with CAIR for nearly 12 years in various roles: chapter founder, chapter executive director, national board member, and national chapter director. I witnessed gender and religious discrimination, sexual harassment, retaliation, hostile work environment, union busting, financial mismanagement, lack of board oversight, board incompetence, and other serious issues at CAIR. When I resigned, they asked me to sign a non-disparagement agreement. When I refused, they withheld my pay, bonus, and reimbursements. Today, CAIR owes me over $20,000.

80.     CAIR does not use attorneys to "suppress, silence, and intimate" its employees, nor does it engage in a pattern discriminating, harassing, or retaliating against its employees or mistreating them.  CAIR merely sent Saroya a cease and desist after she emailed chapters falsely claiming that CAIR-National had mismanaged its grant funding.

81.     At the time Saroya published these statements, she knew them to be false or made these statements with reckless disregard for their truth or falsity.

82.     Intending to increase her audience, Saroya also began publishing statements on the

public Facebook pages of various CAIR chapters.  For example, in September 2018, Saroya

accused CAIR-National of "dysfunction" and "abuse" and made similar accusations regarding

her alleged unpaid wages in a statement that she published on CAIR-Sacramento Valley's public

Facebook page:





83.     At the time Saroya published the above statement, she knew the allegations contained

therein were false or made with reckless disregard for their truth or falsity.

84.     That same month, in a separate publication on one of her personal pages, Saroya

again accused CAIR-National of being "mismanaged" and "ineffective," and falsely stated its

leaders were "corrupt":

85.     Aside from posting this statement on her personal Facebook page, she also posted it to the Facebook page of CAIR-Oklahoma's Executive Director.

86.     CAIR-Oklahoma's Executive Director had to "block" Saroya from continuing to harass CAIR using his Facebook page.

87.     At the time Saroya made the aforementioned statements, including that CAIR-National is "mismanaged, ineffective," and "corrupt," she knew them to be false or made them with reckless disregard for their truth or falsity.

88.     In another posting published on or about September 30, 2018, Saroya falsely accused leaders of CAIR-National of being "perpetrators of injustice" and claimed that CAIR discriminated against, "directly harmed," and "abused" its employees:



89.     At the time Saroya published the above statements, including the accusation that CAIR "abuse[d]" its employees (a criminal act), she knew them to be false or made them with reckless disregard for their truth or falsity.

90.     Saroya's crusade to destroy CAIR's reputation in the community continued into 2019 as well.  In or around February 2019, Saroya published the following statement on her public Facebook page again falsely claiming that CAIR owed her $30,000 in unpaid wages, bonuses, and reimbursements:



91.     At the time Saroya made the statement regarding her "unpaid wages," she knew it to be false or made it with reckless disregard for its truth or falsity.

92.    On or about March 4 and 5, 2019, she published similar allegations on her public

Facebook page:



Lori Haidri-Saroya
March 4 at 8:08 PM · 👥

Despite how challenging the past two years were, and the additional stress I experienced over the past 9 months trying to get my funds, a nagging question keeps coming up: If CAIR National can retaliate against me and treat me like this after I founded one of the strongest CAIR chapters, was a chapter executive director, served on the CAIR National board, was a senior staff member at CAIR National, and dedicated 11 years of my life and career to this organization- how do they treat other people? Did they also withhold wages, bonus, and reimbursements from other employees after they resigned- people who weren't in a position to lose their money, didn't know their legal rights, couldn't afford to hire an attorney, didn't know how to file with the EEOC or navigate the legal system, and just had too much to lose for speaking out? I fully recognize my privilege and my responsibility. Did I do what others (apart from the sincere people at CAIR-MN) are doing right now: look the other way while being fully aware of the dysfunction and incompetency at CAIR National?

👍❤ 16

     👍 Like          💬 Comment

Lori Haidri-Saroya
Yesterday at 8:28 AM · 👥

I don't usually tell people this, but one year before I joined as an employee, I was on the CAIR National board. Quite frankly, it's embarrassing. I wish I could say that the most incompetent thing they did was forget to ask me to sign a confidentiality agreement as a new board member, but it's worse. Much worse. In my opinion, the CAIR National board does not provide proper oversight and governance to the organization. I question board dynamics and authority when the founder and executive director is a voting member of the board- and has been for the past 25 years. This leads to a culture where people don't feel ownership/authority and simply look the other way. Did the CAIR National board look the other way when CAIR National lost its 501c3 status for not filing 990s over several consecutive years? Did the CAIR National board look the other way when there were allegations of illicit affairs and temporary marriages? Did the CAIR National board look the other way when questionable expenses and random donations appeared on the organization's financial statements? Did the CAIR National board look the other way when three years of CAIR National's financial statements allegedly disappeared? Did the CAIR National board look the other way when a former staff member allegedly reimbursed the organization financially long after his employment at CAIR National had ended? Did the CAIR National board look the other way when a board member literally fell asleep during several board meetings?

I'm contemplating two things: 1) Does CAIR create more victims than it helps? and 2) Does CAIR do more harm than good, whether it's the continuous negative portrayal of Muslims as victims in the media, lack of strategy, sometimes screwing up people's discrimination cases, providing inconsistent services, the all-male press conferences, failure to build a legitimate nationwide infrastructure (according to their website, they have executive directors in approximately 15 states), lack of community engagement on the national level, not having a seat at many tables despite being around for 25 years and having an office a few blocks from the US Capitol, and so much more. We deserve better as a community.

👍❤ 15                                                    15 Comments

93.     Based on the number of "reactions" listed at the bottom of each of the March 2019 Facebook posts, at least thirty separate individuals viewed the allegations within 24 hours of them being published.

94.     At the time Saroya published the now familiar accusations, she knew them to be false or made the statements with reckless disregard for their truth or falsity.

**Saroya Retains a Well-known Islamophobe to Represent Her in a Purported Lawsuit against CAIR**

95.     In or around July 2019, Saroya hired a well-known anti-Muslim and Islamophobic attorney to represent her.

96.     Specifically, on July 5, 2019, CAIR received a demand letter from Saroya's attorney.

97.     The demand letter purported to be Ms. Saroya's attempts to resolve her wage grievances with CAIR.

98.     Saroya (through counsel) threatened to move the United States Attorney General to classify CAIR as a foreign agent and to file a lawsuit against CAIR claiming that CAIR committed racketeering, wire-fraud, mail fraud, embezzlement, threats, blackmail, obtaining donations under threat, laundering of foreign funds, conspiracy with criminals, fraud against the United States, conspiracy with outlawed groups and violent individuals, and other criminal and terrorist acts.

99.     Saroya's demand letter also included a threat by her attorney to file a racketeering complaint he previously drafted against CAIR, which was attached to Saroya's demand letter. That complaint claimed that CAIR: (1) is working in concert with Hamas, the Muslim Brotherhood and various terror groups and individuals "in an association-in-fact enterprise" that promotes terror; (2) raises "money for ostensible civil rights activities… when in fact the self-proclaimed [sic] charity is designed to promote the terror agenda of Hamas;" (3) is involved in a

"conspiracy that violated the rights of Jews and Christians by targeting them for economic harm, murder, and other harms due to their religion"; (4) is illegally acting as a foreign agent and concealing funding from overseas in violation of its tax exempt status; (5) is part of a "conspiracy that intends to eliminate the United States Constitution and replace it with Sharia law;" and (6) is raising money to support a violent jihad, among a host of other harmful and false accusations of criminal conduct.

100.    Saroya's attorney concluded his letter by demanding several hundred thousands of dollars on Saroya's behalf.

101.    CAIR did not acquiesce to what it perceived as an extortion attempt.

**Saroya Continues Forward on Her Mission to Damage CAIR**

102.    Saroya continued to disseminate her publications to a wide audience in 2019. In September and October 2019, she published statements on public Facebook pages falsely accusing CAIR of discriminating against and mistreating its employees, and reiterating her lie about being owed $20,000.

103.    In October 2019, Saroya stated the following:



**Lori Haidri**
I was with **#CAIR** for nearly 12 years in various roles: chapter founder, chapter executive director, national board member, and national chapter director. I witnessed gender and religious discrimination, sexual harassment, retaliation, hostile work environment, union busting, financial mismanagement, lack of board oversight, board incompetence, and other serious issues at CAIR. When I resigned, they asked me to sign a non-disparagement agreement. When I refused, they withheld my pay, bonus, and reimbursements. Today, CAIR owes me over $20,000.

They have a pattern of discriminating and mistreating their own employees, especially women. Donor funds are directly going to pay for attorneys to suppress, silence, and intimidate those who have been treated unjustly.

There are many people who have been directly harmed by CAIR. The "CAIR Sexism Documentation Project" currently has 35 members, mostly women, who share their experiences of facing discrimination, and other abuses, by the nation's largest Muslim civil rights organization.

Chapters are very capable of standing up for justice, but they look the other way and do nothing when their national leaders are the perpetrators of injustice.

Ultimately, nothing good can come out of corruption and injustice. The community deserves a legitimate civil rights and Muslim organization that treats all people with the respect and dignity they deserve. **#CAIRSnapshots**

8 hrs    Like    Reply    More

104.    CAIR did not engage in a pattern of discriminating and mistreating its own employees.  It does not "suppress, silence, or intimidate" its employees.

105.    At the time Saroya made these statements, among others, she knew them to be false or made them with reckless disregard for their truth or falsity.

106.    As demonstrated by the communication above, Saroya often employed the use of hashtags (#) to ensure that, if the public ever searched for "CAIR" or "CAIRSnapshots" within the Facebook platform, her disparaging remarks would be included as a search hit.

107.    In October 2019, Saroya published another defamatory statement on CAIR's event page promoting its 25th Annual Gala, stating in part:

> Last year, I said goodbye to CAIR National and all their dysfunction and abuse- and resigned from my job as Chapter Director. It was the most empowering feeling- and I got a small glimpse into how people might feel when they finally end an abusive relationship, or get freed from prison, or leave a cult. But I should have known it was too good to be true. I wasn't really free from CAIR because they withheld my pay, bonus, and reimbursements. Today, they still owe me over $20,000 in pay and reimbursements, plus attorney's fees.
> …
>
> There are many people who have been directly harmed. The "CAIR Sexism Documentation Project" currently has 35 members, mostly women, who share their experiences of facing discrimination, and other abuses, by the nation's largest Muslim civil rights organization. https://www.facebook.com/groups/2228298364100050/ Employment discrimination lawsuit filed against CAIR-CA. SEE: https://www.docdroid.net/FjATdM9/onlinedocument.pdf?fbclid=IwAR3kblVLDu8oXfJi23uudSNdl10_b9nlYmbLFptZPvyaYYSyd_s5OCddSVg
> …
>
> I worked with CAIR in various capacities for 11 years, chapter founder, chapter executive director, national board member, and national chapter director and I'm convinced that CAIR creates more victims than it helps. It does more harm than good, whether it's the continuous negative portrayal of Muslims as victims in the media, lack of strategy, making serious mistakes on people's cases, providing inconsistent services, the all-male press conferences, failure to build a legitimate nationwide infrastructure, lack of community engagement on the national level, not having a seat at many tables despite being around for 25 years and having an office a few blocks from the US Capitol, and so much more.

21

<u>See</u> Saroya's full publication, attached hereto as **Exhibit F**.

108.   At the time Saroya made the above statement, with her now copy and paste

defamatory allegations, she knew her publication was false or made it with reckless disregard for

its truth or falsity.

109.   Saroya continued to claim that "[d]onor funds are directly going to pay for attorneys

to suppress, silence, and intimidate those who have been treated unjustly":



110.    At the time Saroya published the aforementioned statement, she knew it to be false or made it with reckless disregard for its truth or falsity.

**Saroya Publishes Defamatory Statements as Comments to Online Newspaper Articles**

111.    Aside from her Facebook bullying campaign, Saroya also began publishing defamatory material as "comments" to various internet articles that mentioned CAIR's work in the Muslim community.

112.    A history of her online "comments" can be found on her personal "Disqus" website.

113.    "Disqus" is a blog comment hosting service.  Saroya's username for the Disqus site is "LS," her initials.  Her "profile" picture on the Disqus website is the same picture that she uses on her personal Facebook page.  The profile picture is of Saroya.

114.    As of March 22, 2021, Saroya's Disqus website shows that she posted defamatory comments on at least seven different internet articles reporting on CAIR's activities, Muslim-American relations, and international affairs.  <u>See</u> Saroya's Disqus blog and corresponding internet comments, attached hereto as **Exhibit G**.

115.    At least five of these comments were posted to articles that were published from January 2020 – March 2020.

116.    As an example of her obsessive misconduct, in a comment to an article published on January 28, 2020, Saroya stated that "CAIR creates more victims than it helps.  It does more harm than good, whether it's the continuous negative portrayal of Muslims as victims in the media, lack of strategy, making serious mistakes on people's [legal] cases, providing inconsistent services…."  <u>See</u> *Local immigration advocates speak on SCOTUS 'public charge' ruling*, January 28, 2020, WBFO NPR, attached hereto as **Exhibit G.1**.

117.   CAIR does not continuously portray Muslims negatively in the community; nor does it "mak[e] serious mistakes" on its clients' legal matters.

118.   At the time Saroya published the above statement, she knew it was false or made it with reckless disregard for its truth or falsity.

119.   In a comment to an article published February 21, 2020, Saroya also accused CAIR of accepting "international funding through their Washington Trust Foundation," implying that CAIR is funded by foreign governments or terrorist organizations.  See *Muslim advocates demand Bloomberg apologize for NYPD spying program*, February 21, 2020, Religious News Network, attached hereto as **Exhibit G.2**.

120.   CAIR does not accept funding from terrorist organizations.

121.   At the time Saroya published the statement, she knew it was false or made it with reckless disregard for its truth or falsity.

122.   In a comment to an article published on March 3, 2020, Saroya stated that CAIR was an "incompetent and toxic organization," that engaged in "sexual abuse and exploitation," and "financial abuse and mismanagement."  See *Chu, Murphy, Feinstein, and Neguse lead effort to block President Trump's expanded 'Muslim ban*,' March 3, 2020, City News Service, attached hereto as **Exhibit G.3**.  The comment has since been deleted from website.

123.   CAIR does not engage in systemic gender discrimination, "sexual abuse and exploitation," or "financial abuse and mismanagement."

124.   In fact, women play a critical role at CAIR.  Specifically, CAIR's National Board Chair, Chief Operating Officer, General Counsel and National Litigation & Civil Rights Director, Human Resources Director, Controller, and Chapter Relations Manager are all women. In fact, more than two thirds of CAIR-National's staff are managed by women.  Additionally, a

recent diversity survey indicated that women hold more than half of CAIR affiliate positions

nationally.

125.    At the time Saroya published the above statements, she knew they were false or made

them with reckless disregard for their truth or falsity.

### Saroya Sends Targeted Defamatory Publications to CAIR's
### Partners, Donors, and Religious Leaders

126.    Perhaps not seeing the result she wanted – a total destruction of CAIR – Saroya's

defamatory conduct appeared to intensify in 2020 when she began sending targeted email

communications to CAIR's partners, donors, and religious leaders.

127.    In or around January 2020, Saroya contacted a religious leader who was serving as

Executive Director of "As the Spirit Moves Us" in Portland, Oregon.  The religious leader was

scheduled to speak at an upcoming CAIR-Oregon event.

128.    In an attempt to interfere with CAIR and CAIR-Oregon's advancement and

development efforts, Saroya sent the following message (in part) to the religious leader via

Facebook:

> CAIR Council on American-Islamic Relations has a pattern of discriminating against
> and mistreating their own employees, especially #women.
>
> There are issues of religious #discrimination, sexual #harassment, #retaliation,
> #hostile work environment, #union busting, financial #mismanagement, lack of board
> oversight, board #incompetence, and other serious issues at CAIR. Donor funds are
> directly going to pay for attorneys to suppress, silence, and intimidate those who have
> been treated unjustly.
>
> There are many people who have been directly harmed by #CAIR. The CAIR Sexism
> Documentation Project currently has 35 members, mostly women, who share their
> experiences of facing discrimination, and other abuses, by the nation's largest
> Muslim civil rights organization.
> https://www.facebook.com/groups/2228298364100050/
>
> …
>
> Some of the local funds that chapters raise goes directly to National as part of chapter

affiliation fees. And when you are the national founder, national board member with no term limits, and national executive director, you have immense power on how that money is spent- including buying yourself a brand new SUV, paying expensive DC lawyers to shut down staff efforts to unionize, hiring attorneys to harass and intimidate women who ask for equal pay and report abuse and sexual harassment, etc. Chapters are aware of the issues but look the other way and do nothing.

…

CAIR creates more victims than it helps. It does more harm than good, whether it's the continuous negative portrayal of Muslims as victims in the media, lack of strategy, making serious mistakes on people's cases, providing inconsistent services, the all-male press conferences, failure to build a legitimate nationwide infrastructure, lack of community engagement on the national level, not having a seat at many tables despite being around for 25 years and having an office a few blocks from the US Capitol, and so much more.

Ultimately, nothing good can come out of corruption and injustice. The community deserves a legitimate civil rights and Muslim organization that treats all people with the respect and dignity they deserve.

See Saroya's January 2020 email to religious leader, attached hereto as **Exhibit H**.

129.     Upon information and belief, Saroya sent similar disparaging messages to other attendees of the CAIR-Oregon event.

130.     In addition to interfering with CAIR-Oregon's development efforts, Saroya contacted donors of CAIR-Oklahoma around this same time and accused CAIR of the same above-described conduct.

131.     In or around March 2020, Soraya published her defamatory statements on the founder of the Maryland Commission on Civil Rights' Facebook page.  The Maryland Commission on Civil Rights and CAIR have partnered together to provide trainings about religious accommodations for Muslims in the workplace.  Saroya titled the message "Your partnership with CAIR is troubling" and stated the following, in part:

------------
CAIR has serious issues of religious and gender discrimination, sexual abuse and exploitation, retaliation, union busting, hostile work environment, financial abuse and mismanagement- including losing their 501c3 and issues with their

26

Washington Trust Foundation entity receiving international donations- board incompetence, tokenism, and more.

CAIR does more harm than good, whether it's the continuous negative portrayal of Muslims as victims in the media, lack of strategy, making serious mistakes on people's cases, the all-male press conferences, providing inconsistent services, lack of transparency around international funding sources and agendas, the embarrassing media spokespeople, failure to build a legitimate nationwide infrastructure, being a laughing stock on Capitol Hill despite having an office a few blocks from the U.S. Capitol, lack of community engagement on the national level, and, after 26 years, not having a seat at MANY tables (including the Leadership Conference on Civil and Human Rights, which brings together 200+ national civil rights organizations).

CAIR Sexism Documentation Project
https://www.facebook.com/groups/2228298364100050/

….

As you're considering which nonprofits to support and donate to, please be diligent- do your research and ask the tough questions. Is your money really helping to empower people in the community who have been discriminated against, or are you empowering a multi-million dollar organization that discriminates against its own community and further victimizes people who seek their help? Is your money going to pay an attorney to fight for people's rights to practice their faith or is your money going to pay an attorney to suppress, silence, and intimidate those who have been treated unjustly? Are you supporting legitimate, sincere advocates for justice or those who support the status quo and cowardly look the other way when the injustice is committed by their own national leaders?

#CAIR is a corrupt and unethical organization that does not speak for American Muslims. A true civil rights organization would treat all people with the respect and dignity they deserve.

See March 2020 Facebook message to the Maryland Commission on Human Rights, attached hereto as **Exhibit I**.

132.    In June 2020, she published similar sentiments on the public Facebook page of another one of CAIR's partners, JetPac.

27

133.    JetPac is a non-profit organization aimed at giving American Muslim organizers, candidates, and communities the tools and training they need to increase civil engagement and public service.

134.    In her publication, Saroya accused CAIR-National of discrimination, retaliation, and physically threatening conduct:



135.    Based on the number of reactions Saroya's inciting accusations garnered at the time the screen shot was taken, at least fifty-five individuals had viewed the defamatory material within approximately 24 hours of its publication.

136.    Upon information and belief, Saroya used Facebook to send similar defamatory communications to dozens of CAIR's religious and non-profit partners.

137.    At the time Saroya made these accusations, including these specific communications outlined above, she knew them to be false or acted with reckless disregard to their truth or falsity.

138.    Her conduct was designed to permanently sever CAIR's relationship with these organizations while Saroya was developing her own donor dependent organization.

### Saroya Misappropriates CAIR's Confidential Information and Sends Defamatory Publications to CAIR's Partners, Donors, and Religious Leaders Anonymously, but her True Identity is Clear

139.    Upon information and belief, Saroya confiscated CAIR's Confidential Information, specifically information related to its donors and supporters.

140.    Saroya used and is continuing to use that Confidential Information to contact the individual representatives for CAIR's donors and supporters to publish her defamatory diatribe and tortiously interfere with CAIR's contracts and business relations.

141.    In recent months, Saroya has become more cautious about her attacks.  She has stopped using and completely deleted and/or "deactivated" her personal Facebook page, and is now hiding behind a "secret identity."

142.     In or around October 2020, Saroya began sending her repetitious creed to CAIR's partners, donors, and religious leaders anonymously via the email address "muslimsdocumentingsexism@gmail.com."

143.    Upon information and belief, Saroya controls the "Muslims Documenting Sexism" account and is using the account to continue her harassment and defamation campaign against CAIR anonymously and encourage CAIR's peers to discontinue their business partnerships with the organization.

144.    Specifically, on October 24, 2020, "Muslims Documenting Sexism" sent an email to a representative of CAIR's partner organization, the National Affiliate of Muslim Lawyers.

145.    Saroya obtained the representative's email address through the misappropriated CAIR Confidential Information.

146.    The email publication is nearly identical to the content of Saroya's many emails, internet comments, and Facebook posts.  The email states:

> **From:** Muslims Documenting Sexism <muslimsdocumenting@gmail.com>
> **Sent:** Saturday, October 24, 2020 8:32 PM
> **To:** <[REDACTED]>
> **Subject:** Important- your partnership with CAIR
>
> Hello,
> Please don't partner with the Council on American-Islamic Relations (CAIR) or their chapters. We urge you to investigate these allegations.
>
> We have documented a pattern of discrimination and abuse inside CAIR www.cair.com. These incidents were brought to the attention of CAIR's leadership and the National Council, a national entity made up of leaders from every chapter. Instead of investigating the issues and taking serious steps to remedy them, CAIR has threatened legal action against those who speak out. This further victimizes and silences individuals.
>
> Over 35 former employees and board members have alleged numerous issues inside CAIR, including:
>
> - Sexual harassment, abuse, and exploitation
>
> - Gender discrimination
>
> - Religious discrimination (Jewish, Shia Muslim, & Christian employees)
>
> - Retaliation; hostile work environment
>
> - Interference with staff efforts to unionize/union busting
>
> - Tokenism
>
> - Board incompetence and lack of board oversight
>
> - Financial abuse and mismanagement

There are many people who have been directly harmed by CAIR. The CAIR Sexism Documentation Project is a support group for women, and a few men, to share their experience at CAIR.

Despite efforts to intimidate and silence women, there have been several lawsuits against CAIR. In 2019, an employment discrimination lawsuit was filed against CAIR-California for gender discrimination. This case was settled and the CAIR-San Diego executive director is no longer employed there. SEE:

https://www.docdroid.net/FjATdM9/onlinedocument.pdf?fbclid=IwAR1uMMCaznSystm ODEn10py3_qHMJsye9r4fkLKCYyecJ4dYzKVIWbbrVGI

Many believe that the CAIR board does not provide proper oversight to the organization. CAIR's national founder is also the full-time paid executive director and a voting board member. He has allegedly been a voting board member for 25+ years and does not have a term limit.

The lack of board oversight has led to some serious issues inside CAIR:

• Lost 501c3 nonprofit status for not filing 990s over several consecutive years

• A former accountant stole funds and it took him over 10 years to reimburse the organization

• Brand new SUV and monthly insurance payments for the executive director/founder/board member

• CAIR is missing three years of financial statements, there are allegations that it was destroyed intentionally

• Lack of transparency around CAIR's Washington Trust Foundation (WTF) entity receiving international donations that are funneled to CAIR. WTF allegedly owns CAIR's multimillion dollar building on Capitol Hill in Washington, DC. CAIR's executive director/founder/board member signed 990s for both CAIR and WTF and is allegedly paid by both entities.

A prominent Muslim community leader, and former CAIR-New Jersey executive director, shared his experience at CAIR: "I do not recommend donating your money to CAIR-NJ. I believe there may be a warrant out for the arrest of a former CAIR-NJ board member, who served as this organization's treasurer, for stealing CAIR-NJ money by writing himself checks. Donors should definitely question whether their charity is legitimately being used to do civil rights advocacy, how this was allowed to happen, and whether the organzation is being fully transparent. Full disclosure: I am a former Executive Director of CAIR-NJ and found the board leadership to be quite inadequate and corrupt at the

expense of the community and even moreso at the expense of its staff."
SEE: https://www.facebook.com/pg/CAIRNewJersey/reviews/?ref=page_internal

From 2016-2018, CAIR spent hundreds of thousands of dollars on attorney's fees to shut down staff efforts to unionize. No staff vote to unionize took place. All 7 employees who were leading the effort to unionize were either terminated or resigned. CAIR got away with union busting because the NLRB ruled that CAIR is a religious organization. Is CAIR really a religious organization or a civil rights organization?

Unfortunately, CAIR does more harm than good, whether it's the continuous negative portrayal of Muslims as victims in the media, lack of strategy, making serious mistakes on people's cases, the Muslim Ban lawsuit fiasco, the all-male press conferences, refusal to stand up for civil rights for all, lack of transparency around international funding sources and agendas, the embarrassing media spokespeople, failure to build a legitimate nationwide infrastructure, the one-person departments and offices, lack of influence on Capitol Hill despite having an office a few blocks from the U.S. Capitol, lack of community engagement nationally, and, after 26 years, not having a seat at MANY tables- including the Leadership Conference on Civil and Human Rights, which brings together 200+ national civil rights organizations. CAIR needs to stop hiding behind Islamophobia and get its act together.

Please be diligent- do your research and ask the tough questions. Is the community really helping to empower people who have been discriminated against, or are they empowering a multi-million dollar organization that discriminates against its own community and further victimizes people who seek their help? Are their donations going to pay an attorney to fight for people's rights to practice their faith or are they instead paying an attorney to suppress, silence, and intimidate other Muslims (CAIR employees) who have been treated unjustly? Are they supporting competent and principled advocates for justice or those who support the status quo and look the other way when the civil rights abuse is taking place inside their own organization?

*Due to personal safety concerns and legal threats from CAIR's attorneys, our group members need to remain anonymous. Thank you for your understanding. We trust that you will do a thorough investigation into these allegations.*

147.    At the time Saroya published the diatribe to the representative, she knew the allegations contained therein were false or made them with reckless disregard for their truth or falsity.

148.    To be clear, the alleged thirty-five victims of sexual harassment have not asserted any allegations to CAIR-National.  CAIR-National has made several attempts to learn the identities of the alleged women so that it could investigate the alleged misconduct and take corrective

action immediately if necessary.  CAIR has even hired an outside law firm to investigate the Facebook group's claims.

149.    The group, however, is "closed," meaning that no member of CAIR or even the general public can enter into the group and determine that it is what it purports to be.

150.    No complaints of systemic discrimination/harassment/retaliation were filed with CAIR-National.

151.    Pursuant to CAIR's policies, any allegation or formal complaint made from an affiliate chapter staff or board member about another affiliate chapter staff or board member should have been reported to CAIR's Compliance Director.

152.    If such a complaint was made to CAIR's Compliance Director, the Director would have opened a case and collected information regarding the allegations.  Thereafter, the appropriate individual(s) at the relevant CAIR chapter, depending on the nature of the complaint, would have been notified of the information and of their duty to conduct an investigation rooted in CAIR's best practices.  CAIR would have provided a determined window of time to conduct the investigation and report back to CAIR.  If an appropriate investigation did not take place, CAIR would have the opportunity to sanction the chapter.

153.    Saroya's statement that CAIR was "aware of a pattern of discrimination and abuse inside CAIR" and did nothing to investigate the allegations, was false.  As a long-time employee of CAIR and board member, she knew the statement was false at the time she made it.

154.    Upon information and belief, Saroya has used the Muslims Documenting Sexism Gmail address to send dozens, if not hundreds, of similar emails to other CAIR supporters and donors.  Saroya obtained CAIR partners' and donors' identities and email addresses through her misappropriated CAIR Confidential Information.

155.    Specifically, Saroya sent near identical communications to CAIR's partners and donors using the "Muslims Documenting Sexism" Gmail on the following occasions:

    a.    October 5, 2020, to a Maryland mosque leader.  In the introduction to Saroya's well-known attack, she stated:

> Please, please don't partner with the Council on American-Islamic Relations (CAIR) or their chapters. We have documented a pattern of discrimination and abuse inside CAIR. These incidents were brought to the attention of CAIR's leadership and the National Council, a national entity made up of leaders from each chapter. Instead of investigating the issues and taking serious steps to remedy them, CAIR has threatened legal action to those who speak out publicly. This further victimizes and silences individuals.

See October 5, 2020 to Maryland mosque, attached hereto as **Exhibit J**.

    b.    October 5, 2020, Saroya sent the same email referenced above to the *Pacific Northwest Family Circle* ("*PNWFC*"), a community action group in Oregon that partners with CAIR.  See October 5, 2020 correspondence to *PNWFC*, attached hereto as **Exhibit K.**

    c.    November 4, 2020, to *Count Every Vote Maryland*.  In the introduction to the diatribe, Saroya urges the organization not to include CAIR at a speaking engagement after the organization announced CAIR's inclusion.  See November 4, 2020 correspondence to *Count Every Vote Maryland*, attached hereto as **Exhibit L**.  Saroya intended the communication to damage CAIR's relationship with *Count Every Vote Maryland*.

    d.    November 9, 2020, to members of the Executive Committee and multiple partners at Graydon Law.  CAIR's Board of Director Chair, Roula Allouch ("Allouch"), is also an attorney at Graydon Law.  See November 9, 2020 correspondence to Graydon Law, attached hereto as **Exhibit M**.  Upon information and belief,

Saroya sent similar communications multiple Graydon Law attorneys.  Saroya intended the communication to damage Allouch's employment at her firm.  Saroya also sent similar communications to organizations that Allouch volunteers with as well.

e.  November 14, 2020 to the *Florida Counsel on Churches*.  In the introduction to the diatribe, Saroya states "please, please don't partner with [CAIR]."  <u>See</u> November 14, 2020 correspondence to *Florida Counsel on Churches*, attached hereto as **Exhibit N.**  Saroya intended the communication to sever CAIR's relationship with its religious partner.

f.  December 18, 2020, to CAIR's coalition partner *Indivisible*.  *Indivisible* is Maryland advocacy group focused on combating racism in the community.  In the introduction to the regular allegations, Saroya stated the following:

> You are doing important work and this is a very important topic. We want to bring this information to your attention concerning your partnership with the Council on American Islamic Relations (CAIR).  CAIR does not speak for American Muslims and many will tell you that they only show up for the media. They are good at sending press releases and jumping on current events, but this does not translate into actual work and credibility in the community.  We don't trust them to provide accurate information. For example, if you look at the national office's annual civil rights report, the number of reported hate crimes and discrimination cases in each state will sometimes differ than what the CAIR state office reports in their local annual report. We don't know if this is a result of exaggeration, mismanagement, or miscommunication.  What we do know is that there are trust, credibility, accuracy, and fairness issues when it comes to quoting CAIR in the media as a legitimate source or partnering with them. We urge you to investigate the serious allegations below.

<u>See</u> December 18, 2020 correspondence to *Indivisible*, attached hereto as **Exhibit O**.

156.	Saroya continues her attack to this day.

157.	On April 29, 2021, Saroya sent the same email correspondence to the co-founder and CEO of the *Academy of Muslim Achievement*.  See April 29, 2021 correspondence to *Academy of Muslim Achievement*, attached hereto as **Exhibit P.**  Saroya began the publication with, "[p]lease don't provide the Council on American Islamic Relations (CAIR) and their chapters publicity and partnership."  Id.

158.	Each of these email communications, sent to the individual representatives of CAIR's partners, donors, and religious leaders, of which there are numerous, repeats the same lies as those contained on her previous public Facebook posts.

159.	Saroya used CAIR's Confidential Information to obtain the personal email addresses for representatives of these various organizations and published the defamatory diatribe to an unknown amount of CAIR's partners, donors, and religious leaders.

160.	At the time Saroya published the communications, she knew the allegations contained therein were false or she made the allegations with reckless disregard for their truth or falsity.

161.	The publications were clearly made to sever the ties between CAIR and its partners, a result that would cripple CAIR's ability to effectively fundraise and carry out its mission.

**Misconduct Continues to Harm CAIR**

162.	As a result of Saroya's statements, CAIR has lost multiple partners, donors, and religious leaders.

163.	The loss of its donors has led to a significant decrease in its funding.

36

164.     Additionally, Saroya's statements are now being used by Islamophobic, extremist organizations to perpetuate continued hate against Muslims in America.

165.     For example, Saroya's diatribe was republished by "Bare Naked Islam" on October 27, 2019, in an article titled "Why did more than 120 members of Congress send congratulations letters to designated terrorist group CAIR on its 25th anniversary?"  See Bare Naked Islam article, attached hereto as **Exhibit Q**.

## CAUSES OF ACTION

### Count I: Defamation

166.     CAIR restates and re-alleges every allegation contained in the preceding paragraphs as if set for fully herein.

167.     In Minnesota, defamation consists of four elements: (1) the defendant made a false and defamatory statement about the plaintiff; (2) the statement was an unprivileged publication to a third party; (3) the statement had a tendency to harm plaintiff's reputation in the community; and (4) the defendant was at fault.

168.     Between May 2018 and the date of this filing, as documented in this complaint, Saroya made false and defamatory statements regarding CAIR on many occasions.

169.     She accused CAIR of, *inter alia*, failing to pay her wages, committing systemic abuses against its employees, failing to investigate claims of abuse, committing financial misconduct, and other business torts.

170.     The statements were not privileged.

171.     Saroya made the statements on her public Facebook page, CAIR chapter public Facebook pages, and the Facebook pages of individual CAIR partners, donors, and affiliates.

172.     The statements were also made on online newspaper articles, available to the general public.

173.     Saroya used "hashtags" to make sure that when the general public searched for CAIR, her false allegations would come up a search "hit."

174.     She published her allegations online over and over and over again intending for the allegations to be widely disseminated and repeated.

175.     She also targeted CAIR's donors to ensure that they would view the false allegations if her public attack failed to reach them.

176.     Saroya's statements clearly identified CAIR and it was apparent on its face to those who read the statements that Saroya's defamatory statements were about CAIR.

177.     At the time Saroya made these allegations, she knew they were false.

178.     When she had no direct or indirect connection to the miscellaneous allegations she lodged (i.e.; union busting, financial mismanagement, sexual abuse and exploitation, financial exploitation, systemic discrimination/harassment), then Saroya acted in reckless disregard of the truth or falsity of her statements because she had no way of knowing whether the incidents she discussed occurred.

179.     Saroya chose to defame and disparage CAIR to a world-wide audience.

180.     By continuously attacking CAIR with false allegations on different internet fronts, Saroya acted with actual malice.

181.     Saroya's false statements harmed CAIR's reputation in the community, subjecting it to hatred and contempt and discouraged its partners, donors, and religious leaders from associating with and donating to CAIR.

182.    As a result, CAIR has suffered and will continue to suffer harm in an amount to be proven at trial that exceeds $75,000.

## Count II: Defamation Per Se

183.    CAIR restates and re-alleges every allegation contained in the preceding paragraphs as if set for fully herein.

184.    The prima facie elements for a defamation per se claim are nearly identical to a defamation claim, except that harm is not a required element of proof because harm from the statement is presumed.  Harm is presumed in instances where a statement concerns a person's or organization's business, trade, or professional conduct.  Harm is also presumed in instances where a statement accuses a person or organization of committing a crime.

185.    Saroya's publications include false accusations that CAIR committed a crime: e.g., "sexual abuse and exploitation" and "financial exploitation."

186.    Saroya's publications include false statements about CAIR's business and professional misconduct.

187.    Because Saroya's statements accuse CAIR of committing criminal and professional misconduct, Saroya's publications are defamatory per se.

## Count III: Tortious Interference with Business Relationships

188.    CAIR restates and re-alleges every allegation contained in the preceding paragraphs as if set for fully herein.

189.    To establish a claim of tortious interference with prospective business relationships, the plaintiff must prove that the defendant intentionally and improperly induced a third party not to enter into or continue a business relationship.

190.     Saroya intentionally and improperly interfered with CAIR's prospective business relationships by using her defamatory communications to induce CAIR's partners, donors, and religious leaders identified above to discontinue their existing relationships with CAIR.

191.     Saroya used CAIR's Confidential Information to target her defamatory communications to individuals and organizations that Saroya knew were a part of CAIR's fundraising and outreach efforts.

192.     In those communications, she specifically asked those organizations to discontinue their relationships with CAIR.

193.     As a result of Saroya's actions, CAIR has suffered and will continue to suffer damages in an amount to be proven at trial that exceeds $75,000.

## Count IV: Breach of Contract

194.     CAIR restates and re-alleges every allegation contained in the preceding paragraphs as if set for fully herein.

195.     To establish a prima facie breach of contract claim, the plaintiff must prove: (1) formation of a contract; (2) performance by plaintiff; and (3) breach by the defendant.

196.     Saroya entered into a valid and enforceable agreement with CAIR as a condition of her employment at CAIR-National.

197.     Pursuant to her *Agreement*, Saroya agreed to maintain the confidentiality of CAIR's Confidential Information, which included its partner/donor identities.  She also agreed not to use the Confidential Information for any purpose other than at the request of CAIR and to return the Confidential Information at the conclusion of her employment.

198.   Saroya breached her contractual obligations by retaining CAIR's Confidential Information post-employment and using that Confidential Information to send targeted defamatory communications to CAIR's donors.

199.   As a direct result of Saroya's actions, CAIR has suffered and will continue to suffer damages in an amount to be proven at trial that exceeds $75,000.

**COUNT V: Injunctive Relief**

200.   CAIR restates and re-alleges every allegation contained in the preceding paragraphs as if set for fully herein.

201.   Saroya's systemic attack against CAIR and its mission began in 2018 and continues to this day.

202.   The reputational harm is so severe that mere monetary damages alone cannot adequately remedy the injury CAIR has suffered and continues to suffer.

203.   To make CAIR whole, Saroya must be ordered to:

a.   remove all defamatory social media publications made by Saroya under her given name or any of her pseudonyms;

b.   issue a retraction for all defamatory publications;

c.   cease and desist from any further defamation of CAIR in any form on any platform; and

d.   return to CAIR all Confidential Information in her possession, custody, and control.

## PRAYER FOR RELIEF

**WHEREFORE**, CAIR respectfully requests the Court issue the following relief:

1.      Compensatory damages in an amount to be proven at trial;

2.      Injunctive relief as outlined above;

3.      Pre-judgment and post-judgment interest;

4.      Attorney's fees and cost of suit; and

5.      For such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

CAIR demands a trial by jury on all causes so triable.

This the 22nd day of May, 2021

Respectfully submitted,

Carl E. Christensen, Esq.
CHRISTENSEN LAW OFFICE PLLC
800 Washington Avenue North
Suite 704
Minneapolis, MN 55401

*Counsel for Plaintiff*
*Council on American-Islamic Relations*

OF COUNSEL
RUBIN FORTUNATO & HARBISON PC

Michael J. Fortunato, Esq.
*pro hac vice requested*
Cynthia B. Morgan, Esq.
*pro hac vice requested*
10 South Leopard Road
Paoli, Pennsylvania 19301
(610) 408-2005/2022
mfortunato@rubinfortunato.com
cmorgan@rubinfortunato.com