IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CAIR FOUNDATION, INC., d/b/a
COUNCIL ON AMERICAN-ISLAMIC
RELATIONS, & CAIR,

              Plaintiff,

v.

ASMA LORI HAIDRI SAROYA a.k.a.
LORI SAROYA, ASMA SAROYA,
LORI HAIDRI, LORI HAIDRI-
SAROYA, & LH,

              Defendant.

Civil Action No.:  0:21-cv-01267

## DEFENDANT LORI SAROYA'S ANSWER TO THE COMPLAINT

## INTRODUCTION

CAIR and its Foundation (collectively "CAIR"), hold themselves out publicly as a civil rights organization, while simultaneously engaging in egregious and rampant sexual discrimination, sexual harassment, sexual assault and religious discrimination, and retaliation against those who have either been victimized by such conduct or who have expressed concerns about it.  It spends substantial amounts of donors' money in order to threaten, intimidate and sue those who have the courage to speak about CAIR's culture of discrimination and misogyny, and to attempt to force them to sign agreements by which Muslims around the country, especially women, "sell" their rights to express their concerns about CAIR's practices and agree never to discuss them.  A growing number of former

CAIR employees and employees of CAIR's "affiliates" around the country are speaking out about CAIR's practices. CAIR spends considerable amounts of resources provided by unsuspecting donors, whom CAIR seeks to keep in the dark, attempting to suppress those individuals. Indeed, CAIR has been sued in courts in various American jurisdictions by those who have been victimized by CAIR officials.  Just weeks ago, National Public Radio published an exposé regarding well-documented and egregious assault by a CAIR official in Florida, Hassan Shibly.[1]

The ground-breaking article also highlighted allegations against CAIR National and its complicity in ignoring misconduct by CAIR leaders and its mistreatment of its own staff. In particular it referenced a notorious and well-document series of events in 2017, when multiple staff were forced out of the organization for attempting to unionize. Former CAIR employees and employees of CAIR affiliates, which operate in many instances as de facto subsidiaries of CAIR, controlled by CAIR and, in particular, by its Executive Director, Nihad Awad, have grown increasingly outspoken about other egregious and improper conduct within CAIR leadership.  This includes retaliation against CAIR civil rights staff who attempted to unionize, forcing CAIR employees to sign non-disclosure agreements that would silence them for the rest of their lives regarding misconduct within CAIR, eyebrow-raising financial mismanagement which included, inter alia, hiding from its own Board the sources, nature and magnitude of massive foreign funding of CAIR, problems with "missing" financial records, the failure to file tax returns, and other tax

---

[1] *See* https://www.npr.org/2021/04/15/984572867/muslim-civil-rights-leader-accused-of-harassment-misconduct.

improprieties. It includes sanctioning the illegal and unethical unauthorized practice of law. It includes discriminating against Shia Muslims, as well as against Christians and Jews, and condoning and covering up hate speech.

CAIR's instant lawsuit against Ms. Saroya arises from her own refusal to be bullied into staying silent about the harassing, discriminatory, dishonest and, in certain cases, abusive conduct by CAIR leaders, and CAIR's heavy-handed and intimidating tactics aimed at covering it up, personally observed by Ms. Saroya.  This was a profound disappointment to Ms. Saroya, who co-founded the Minnesota chapter of CAIR, had been repeatedly praised by CAIR leadership for her devotion and skill, and who had given most of her adult life to the organization in hopes that it would fulfill its professed civil rights mission.

Ms. Saroya is a highly respected and accomplished community leader who has a proven track record as a champion of civil rights and female empowerment.  As an American Muslim woman working for many years in a heavily patriarchal organization such as CAIR, she was forced to endure and witness unethical, and at times illegal, conduct. Her courage and principled leadership meant that despite threats and intimidation tactics, she continued to stay focused on her goal of creating civil rights resources for Muslims in every state.

The final straw came in May 2018, when CAIR's Executive Director, Mr. Awad, who is married with children, engaged in the most recent instance in a pattern of unwelcome and highly inappropriate conduct towards Ms. Saroya, which she deflected and did not accept. Days later he continued this conduct, following her around the site of a

conference, insisting on sitting next to her every time she moved to a different seat, and pursuing her at the conference. This was the culmination of conduct by Mr. Awad and others at CAIR that had sickened, disappointed and angered Ms. Saroya, who had observed a toxic culture at the highest levels of the organization and at certain CAIR chapters overseen by CAIR, a culture which was exacerbated by a culture of impunity. Ms. Saroya informed Mr. Awad that she intended to leave CAIR. Mr. Awad implored her to stay, and offered her a promotion if she would do so. When Ms. Saroya told him that she had made her mind up, Mr. Awad asked that she come to see him in his office so that she could "sign some papers," which Ms. Saroya knew would be papers that would purport to buy her silence about CAIR. She informed him that she knew that the organization compelled others to sign such agreements, and that no amount of money would suffice to force her to surrender her right to speak truthfully about CAIR. Mr. Awad replied that Ms. Saroya should know that "CAIR is a very powerful organization," a statement that Ms. Saroya took, and which was intended, as a threat. Despite the threat, Ms. Saroya refused to sign documents surrendering her right to speak, even though CAIR owed her back wages and other compensation.

Ms. Saroya thereupon resigned from CAIR, even though Mr. Awad, who had told her that she was "the best Chapter Development Director [of CAIR] that we have ever had and will ever have," asked her to stay. She requested that CAIR pay her earned back wages and other compensation and, when it refused, filed a complaint with the D.C. Office of Wage-Hour (OWH), which was denied on procedural grounds at a time when she was ill and was unable to prosecute her claims properly.

When she was at CAIR, Ms. Saroya had witnessed and knew of some cases of sexually inappropriate behavior, sexual harassment, and discrimination, but when she left, she was shocked at the sheer number of women, past and present, who revealed their appalling experiences at CAIR National and affiliate chapters in a number of CAIR victim support groups and other channels she joined after her departure from CAIR.

Ms. Saroya, who like so many other former (and present) CAIR employees is mindful of CAIR's resources, including massive foreign funding of unknown and often concealed origins, is wary of its power. Nevertheless, she has been one of a growing number of such individuals to speak out about the sexual harassment, sexual discrimination, sexual assault, retaliation and other problems that are rampant within the organization.

Because CAIR knew that it did, in fact, owe Ms. Saroya, the back wages and compensation that she maintained it owed her, it reached out directly, through an attorney named Faisal Gill, to offer to pay her the money it owed her, doing so on December 21, 2020. However, CAIR's payment to Ms. Saroya of the money it owed her was contingent upon her agreeing not to make "negative" statements about CAIR. On November 12, 2020, Ms. Saroya had written to a CAIR lawyer named Faisal Gill "to request a private meeting with the National Council via Zoom (with at least 75% in attendance) to share a report on the civil rights abuses inside CAIR and recommendations. Both the report and presentation will remain confidential." On November 24, 2020, Ms. Saroya wrote again to Mr. Gill stating "I would like to present a confidential report on allegations of civil rights abuse inside CAIR to CAIR's leadership. In the spirit of compromise, I will let you determine

whether that includes the National Council, CAIR-MN or some other committee."

On December 1, 2020, precisely because CAIR knew that it did in fact owe Ms. Saroya the back wages and compensation that she maintained it owed her, it reached out to her to offer to pay her the money it owed her, but sought to make this payment contingent upon her agreement not to make any "negative" statements about CAIR. Ms. Saroya did not agree to this.

CAIR continued to attempt to condition its payment of the compensation it owed her on Ms. Saroya's agreement to stay silent about what she knew and had observed about sexual harassment, discrimination, misogyny, retaliation and other misconduct at CAIR, including at its highest levels. In late April, 2021, CAIR attempted to condition its payment to Ms. Saroya of the funds it knew it owed her on an agreement by her to refrain from stating anything "negative" about CAIR, an agreement to remove from social media anything critical of CAIR and, indeed, an agreement to recant her past criticisms of CAIR. It demanded that she sign a draconian document that would take away her right to free expression, which so clearly evidences CAIR's ongoing attempt to stifle criticism and keep its misconduct hidden from public view that it is worthy of quoting in full the pertinent language to which CAIR demanded Ms. Saroya agree as a condition of her simply receiving what it knew she was owed:

> 8.   NON-DISPARAGEMENT.   After the Effective Date of this Agreement Ms. Saroya agrees not to make any statement or digital content or cause anyone else to make statements or digital content that are intended to become public, or that should reasonably be expected to become public, and that criticizes, ridicules, disparages or is otherwise derogatory of CAIR or that characterizes CAIR in a negative light.  In the case of statements about CAIR, Ms. Saroya agrees that this non-disparagement provision extends to

CAIR's subsidiaries, affiliates, and present and former employees, officers, directors and affiliate employees, officers, and directors. Ms. Saroya shall not make any derogatory or negative statements about her employment at CAIR, her time as a Board member with CAIR, or the circumstances of her leaving CAIR. Ms. Saroya agrees to take down any and all public comments, posts, stories, writings, digital content, and all other information about CAIR that were published on social media and all other mediums, whether published in her name, anonymously, or under a pseudonym, that cast CAIR and/or its subsidiaries, affiliates, and present and former employees, officers and directors and present and former affiliate employees, officers and directors in a negative light, including, but not limited to posts, comments, stories, groups, and/or pages on Facebook, Twitter or Instagram, or any other similar content or medium. Ms. Saroya shall also delete the Facebook groups launched with the titles "CAIR Sexism Project," "CAIRLESSNESS," the Google Docs "Evaluation Committee," the Instagram group @CSDocuProject, and the email account muslimsdocumenting@gmail.com. Such statements and content necessarily include, but are not limited to, the statements attached as Exhibit A. Ms. Saroya shall also formally retract all statements made about CAIR and/or its subsidiaries, affiliates, and present and former employees, officers, directors and affiliate employees, by publishing to her Facebook, Twitter, and Instagram, which shall not be subsequently deleted. The retraction shall be approved by CAIR and incorporated into this Agreement prior to publishing. This does not preclude Ms. Saroya from making general statements about CAIR's positions on national events.

See **Exhibit 1**.

Unwilling to be silenced and to have the growing number of former CAIR employees and volunteers around the country be silenced by CAIR, Ms. Saroya has continued to express her views about the discriminatory, abusive, and dishonest conduct at CAIR's highest levels. The National Public Radio report about CAIR's Executive Director in Florida and evidence of complicity by the National office was published on April 15, 2021. This lawsuit against Ms. Saroya followed, with the obvious purpose of retaliating against her for the expression of her Constitutionally-protected views about CAIR, and intimidating her and others around the country in order to silence women and others who

have had the courage to speak out about CAIR's activities. The statements that have been made by Ms. Saroya and others about CAIR, and about Mr. Awad, are not only Constitutionally-protected.  They are also true. By this meritless lawsuit, CAIR hopes to stop Muslims and others who have devoted themselves to civil rights from speaking out about CAIR, and to keep women's rights and civil rights organizations from doing the same, all the while shutting down journalists who may be interested in exposing CAIR from doing so.

As a practicing Muslim, Ms. Saroya felt religiously bound to expose injustice and wrongdoing – including financial misconduct. The latter is extremely important in the context that CAIR is a 'Zakat-approved' charity – which means it is a beneficiary of the duty on all Muslims to give away a certain amount of their income annually.  If Ms. Saroya had personal knowledge that money was being misused or that a zakat-funded charity was mistreating its staff and behaving in an un-Islamic way, then she would be complicit if she remained silent.  This duty weighed heavily on her conscience and dictated her subsequent conduct – particularly in informing unsuspecting community members and other organizations about the true nature of CAIR.

## ANSWERS TO NUMBERED PARAGRAPHS

Lori Saroya, for her Answer to the Complaint of Plaintiff, denies each and every allegation unless specifically admitted, qualified or otherwise answered herein. Ms. Saroya states and alleges as follows:

1.    Ms. Saroya admits that CAIR does purport to be a Muslim "civil rights and advocacy organization."  However, as numerous lawsuits against CAIR from around the

country, and the personal observations of former CAIR employees and employees of CAIR affiliates from around the country attest, it is an organization which purports to champion civil rights everywhere except within its own organization, where it regularly violates them.  The entities which CAIR describes as "affiliates" in many cases operate as de facto subsidiaries, controlled by CAIR National, which controls their public statements, requires that these "affiliates" report to its National office, funds the "affiliates," requires in turn that the "affiliates" make payments to CAIR National and have approval rights over the hiring within the "affiliates."  She admits that CAIR has a chapter in Minnesota, which she founded, and is without sufficient information to enable her to admit or deny how many state chapters it currently has.  She admits that its national office is in Washington, D.C.

2.      Ms. Saroya admits that CAIR professes to serve the purposes identified in this paragraph.  However, all too often it works not only to discourage civil rights but to violate them, and to prevent those who wish to see civil rights respected from doing so, including by conduct aimed at intimidating them and, indeed, retaliating against them.  Its conduct is all too often discriminatory, and tends to promote discrimination by silencing those who point it out and try to remedy it.  By so doing, and by a culture of misogyny and non-transparency, by financial mismanagement and violations of good governance, it too often discredits itself and the causes that it professes to seek to serve.

3.      Denied. As stated, and as set forth herein, CAIR too often engages in discrimination, and then seeks to cover it up, or perpetuate it by seeking to silence and retaliate against those who have either been victimized by it or who have raised concerns about it.

4.    Admitted.

5.    Ms. Saroya is without information sufficient to admit or deny this allegation. However, as set forth in Paragraph 1, supra, the "affiliates" or "chapters," as they are sometimes referred to, are generally controlled or sought to be controlled by CAIR's national office.

6.    Ms. Saroya did not merely "work for" CAIR-Minnesota; she co-founded it. Ms. Saroya's title at CAIR National was changed from Chapter Development Director to Chapter Director on August 18, 2017.  The remainder of this paragraph is admitted.

7.    Admitted.

8.    Ms. Saroya admits that in 2021 she founded the American Muslim Civil Rights Center in Minneapolis, an intersectional civil rights group that is creating the nation's first Muslim civil rights museum, but denies that it constitutes a "competing" organization vis-à-vis CAIR.

9.    Ms. Saroya is, indeed, a diversity trainer, civil rights activist and non-profit leader.  Ms. Saroya's well-documented record of achievement is well-known to CAIR.

10.    Admitted.  Over the years Ms. Saroya has been widely recognized in these roles with countless fellowships, awards and commendations to her name.

11.    Ms. Saroya denies that she has engaged in any form of "systemic [sic] and continuous internet smear campaign to damage CAIR's reputation" or to cause it severe economic harm.  What she has sought to do, rather, is to express her views about the sexual harassment, discrimination, misogyny, retaliation, dishonesty and, indeed, corruption at the highest levels of CAIR and among many of its leaders, and to do her part to support the

many former CAIR employees around the country who have had occasion to see this kind of misconduct first hand, and who have had the courage to persist in speaking up despite CAIR's efforts to intimidate them.

12.     Ms. Saroya denies that she has "published false statements" about CAIR. Quite to the contrary, she has expressed views about the conduct she observed and, in important ways, experienced during the over ten (10) years that she worked for CAIR, views that are supported by facts.

13.     Ms. Saroya denies that she has "hid[den] behind anonymity"; indeed, CAIR repeatedly tried to demand that she withdraw, delete and even recant statements that Ms. Saroya made and which CAIR knew she had made.  CAIR's efforts to intimidate Ms. Saroya and so many others into staying silent about what they knew about CAIR have, indeed, been made precisely because CAIR knew what these individuals knew: that CAIR has violated or sought to violate the civil rights of its employees and former employees, that its leaders have subjected employees (and others) to sexual harassment, sexual assault, gender discrimination and retaliation, that CAIR maintains a culture of misogyny, that it has been dishonest and misleading with its donors, whose contributions it has frequently misused for the purpose of silencing critics, that its leadership has been dishonest with and breached its fiduciary duties to the CAIR Board, that it has violated basic rules of good governance and mismanaged the enterprise, all to the detriment of the causes about which it professes to care.  Indeed, in important ways, CAIR has been a sham, holding itself out as a civil rights organization while coldly disregarding the civil rights of its employees, including but not limited to women.

14.    Denied.

15.    Denied.  CAIR has taken pains to "sell" a story about itself to news media which is in important ways fraudulent, and to prevent news media from knowing the truth about it.

16.    Denied.

17.    Denied. Ms. Saroya has made no "false statements" about CAIR.  Moreover, CAIR's pattern is to justify its conduct aimed at intimidating and bullying critics into silence by accusing those who are telling the truth about it of causing CAIR to be "subjected to threats of violence from extremist organizations and suffer economic and reputational harm."  This is pure fraud on CAIR's part, committed by an organization that simply hopes that it can deflect attention from the way it conducts itself and avoid scrutiny by progressives, civil rights groups, women's rights groups, civil libertarians, communities of color and the news media, lest those groups and communities have a "window" into the improper conduct that is rampant through the organization.

Further, it can fairly be said that CAIR does not have a "reputation" to protect because for many years it has been accused by critics of being a corrupt organization that has links to terrorist groups.  These claims are widely accessible on the internet and have been viewed by millions not thousands.  Those are not claims that Ms. Saroya has been interested in promoting, but they are clearly extremely damaging.  Here, it has chosen to victimize a highly respected female Muslim community leader precisely because it believes it can bully her into silence.

18.    Denied.

12

19.    Denied.

20.    Denied.   CAIR's reputation in the community has likely been harmed because it appears that CAIR does not care about the employees, volunteers, and community members who experienced harassment, gender discrimination, sexual assault, misogyny, retaliation or threatened retaliation by CAIR. Many victims of CAIR left feeling "disenchanted," "hurt," and "broken."   Further, CAIR has issued public statements referring to women's experiences at CAIR as "blatant falsehoods" and "smear campaigns" without even speaking to them.   Despite numerous community leaders volunteering their time, CAIR has refused to even create an independent and impartial panel to properly and fully investigate and remedy serious problems inside CAIR. On April 16, 2021, a coalition "representing former CAIR employees, board members, and community members who have been victimized by CAIR leaders" issued a press release calling on the resignation of senior leadership at CAIR for a "pattern of covering up abuse and blanket denials."  See **Exhibit 2**.

21.    Denied.  Ms. Saroya is not a member of any anti-Muslim and anti-Islamic extremist groups and does not control their activities or messaging.   Ms. Saroya has volunteered her time helping CAIR victims precisely because she cares about protecting their well-being and does not want them to feel alienated from the Muslim community.

22.    Denied.  Whenever someone whom CAIR has sought to intimidate or bully, or whom CAIR has sued or threatened to sue, hires an attorney to defend herself, CAIR's response, straight from its "playbook," is to accuse the attorney of being "Islamophobic and anti-Muslim."  By doing so it hopes to deflect attention from the conduct that it has

engaged in, and the damning evidence about that conduct. With respect to CAIR's concern that it will be prosecuted criminally or sued civilly for "racketeering, wire fraud, mail fraud, embezzlement, threats, blackmail, obtaining donations under threat, laundering of foreign funds, conspiracy with criminals, fraud against the United States, conspiracy with outlawed groups and violent individuals," it suffices to say that CAIR has long had issues with federal law enforcement agencies, and that its history of failing to file tax returns, "losing" financial records and keeping information about the sources of its foreign funds secret, including from its own Board, has not been helpful to its reputation.

23.     Denied that Ms. Saroya has told "lies," whether publicly or privately, about CAIR. Indeed, it is CAIR that has harmed and continues to discredit both itself and the Muslim community by its misconduct, including its attempts to coerce those who have been harmed by its misconduct into staying silent. Its conduct has spawned a growing number of public lawsuits, many of them by CAIR's own staff and volunteers. By way of example only, *Lopez v. CAIR,* 826 F.3d 492 (2016) and *Saiyed v. CAIR*, 346 F.Supp.3d 88 (2018) both involved the unauthorized practice of law by a CAIR employee who held himself out as a civil rights lawyer when he was not an attorney and accepted fees for his "legal services," conduct which was disregarded by CAIR. *Afshan v. CAIR-California*, Case No. 37-2021-00000977-CU-WT-CTL, involved allegations by a female public policy coordinator of CAIR's San Diego office alleging gender discrimination and harassment, as well as religious discrimination against Shia Muslims and Jews. *Arani v. CAIR-California,* Case No. 37-2019-00021331-CU-MC-CTL, involved allegations of gender discrimination

by a female attorney, who also alleged religious discrimination against Shia Muslims and non-Muslims.

CAIR's conduct and its attempt to hide it has led to a number of websites and social media accounts around the country utilized by former CAIR employees who share information about their own experiences at CAIR - experiences which reflect extremely poorly on CAIR's leadership. These websites include https://wecair.net/ and http://reformcair.com, and social media accounts include https://www.instagram.com/cairvictimsforum, https://twitter.com/wecaircoalition, and https://twitter.com/altciarnational. These websites and accounts attract significant attention in substantial part because a growing number of American Muslims have experienced first-hand, or heard about, a culture of misconduct and retaliation at CAIR.

On April 15, 2021, National Public Radio, as a result of the groundbreaking work of Muslim-American journalist Leila Fadel, published a well-documented report about allegations of physical and emotional abuse on the part of the head of CAIR's Florida chapter, Hassan Shibly and about misconduct by CAIR National. NPR interviewed "18 former employees at the national office and several prominent chapters who said there was a general lack of accountability when it came to perceived gender bias, religious bias or mismanagement" at CAIR. The NPR report, based on interviews with a series of women who had been victimized by Shibly, internal CAIR documents, social media posts and emails, portray CAIR's Florida leader "as a man who used his position to seduce women and bully critics with impunity." The individuals interviewed by NPR stated that his actions "were shrouded by a culture of silence," and that "when concerned parties brought

15

allegations to senior CAIR officials in Washington, D.C. and Florida...there was little, if any, follow up action," even though CAIR leaders were aware of Shibly's conduct over four (4) years before he resigned.   The NPR report quoted former CAIR National Chairman, Dr. Parvez Ahmed, who left the organization over ten years ago and has been critical of CAIR's treatment of women, as stating:   "The leadership of CAIR owes the community an explanation as to who knew what and when and how those complaints were handled."

This is a far-too-familiar story for innumerable former, and present, CAIR employees and volunteers, who know the truth about the organization, and who, like so many others, are concerned that it is CAIR that is damaging the Muslim community and its reputation, not those who have the courage to speak up about CAIR's conduct despite threats by CAIR to damage them in retaliation for doing so.

By way of example only, just two weeks after the attack on New York on September 11, 2001, journalist Jake Tapper wrote a piece for Salon entitled "Islam's Flawed Spokesmen."   In his piece, Tapper, now at CNN, wrote that CAIR "in particular would not be chosen as representatives by many Muslims.   In fact, there are those in American Muslim communities… who consider CAIR [and another organization] to be part of the problem."   Tapper quoted Ali Asani, a distinguished Professor of Islamic Studies at Harvard University, as saying that:   "There is general concern among Muslim intellectuals about how not only CAIR but some of these other organizations are claiming to speak in

the name of the Muslim community…"[2]

24.     Denied.

## JURISDICTION

25.     Admitted.

26.     Admitted.

27.     Admitted.

## THE PARTIES

28.     Ms. Saroya lacks information sufficient to admit or deny this allegation.

29.     The first sentence in this paragraph is admitted. Indeed, Ms. Saroya is a co-founder and former Executive Director of CAIR-Minnesota, a former CAIR-National Board Member, and former member of CAIR-National's senior leadership team. Ms. Saroya further admits that she has at times used her maiden name, her middle name or her married name or variants thereof as appropriate.

## FACTS

30.      Ms. Saroya admits that she was one of the principal founders of CAIR-Minnesota in 2007 and that she thereafter served as its Executive Director until 2015.

31.      Admitted in part and denied in part. Ms. Saroya transitioned out of her Executive Director position at CAIR-Minnesota in 2015 to complete the Minnesota-based Bush Foundation fellowship she had been awarded. She served on the CAIR National Board in 2015 before she began her employment with CAIR-National on March 3, 2016.

---

[2] *See* https://ww.salon.com/2001/09/26/muslims_2/.

32.     Admitted.  As part of her annual evaluation, Ms. Saroya received a promotion in title and it was changed to Chapter Director in August 2017.

33.     Ms. Saroya admits that she was appointed by CAIR's Executive Director, Nihad Awad, to serve on CAIR's national board and that she served in that capacity for approximately one year. It was because of her reputation and achievements that she was invited to serve on the CAIR National Board and that she was thereafter appointed to a senior Director role at the National office.

34.     Ms. Saroya admits that in or about March 2016 she was required to sign and accordingly did sign the document attached to the Complaint as Exhibit B. However, the confidentiality provisions which purport to be contained in that document are void as against public policy.  Further, Ms. Saroya did not sign a confidentiality and non-disclosure agreement as a CAIR-MN employee or as a CAIR-National board member.

35.     Denied.  The provisions in the document, which is void as against public policy, speak for themselves.

36.     Denied.  The document, which speaks for itself and which could theoretically only relate to certain limited kinds of information that truly represent "confidential information" learned after Ms. Saroya's execution of the document and not before, is in any event void as against public policy.

37.     Denied.  Ms. Saroya further states that Mr. Awad, CAIR's Executive Director, kept information about CAIR's international donors, who supplied a massive amount of CAIR's funding, secret, even keeping it hidden from CAIR's Board of Directors, according to certain members of that Board. Members of that Board expressed concern to

Ms. Saroya, who was a member of that Board, that Mr. Awad was secretive about whom he met with on his numerous international trips, what the purpose of those trips was, and the identity and affiliation of international donors. Ms. Saroya was generally not provided access to donors and supporters of CAIR that Mr. Awad wished to keep to himself.

38.   Denied insofar as this purports to refer to complaints and issues regarding Ms. Saroya.  However, in her capacity as Executive Director of CAIR-Minnesota, Board Member of CAIR National and then as Chapter Director at CAIR National, Ms. Saroya did have reason to learn about a steady stream of complaints about sexual harassment, gender discrimination, sexual assault, misogyny, retaliation or threatened retaliation by CAIR, financial improprieties, lack of transparency with CAIR chapters and even the CAIR Board of Directors, and tax issues, as well as the organized effort by CAIR leadership to retaliate against CAIR civil rights staffers for attempting to organize a union to protect their rights and the sanctioning of the unauthorized practice of law by a CAIR employee posing as a lawyer.

39.   Denied.  It was the Executive Director, Mr. Awad, who himself told Ms. Saroya that she was "the best Chapter Development Director that we have ever had and will ever have," a statement that he made to her in or about February 2017, nearly a year after she joined CAIR National, at a retreat she created and organized for CAIR's Executive Directors.  Indeed, it was the same Mr. Awad who, when Ms. Saroya told him in May 2018, after the latest in a pattern of unwelcome, inappropriate, and offensive conduct by him toward her led her to tell him that she was resigning, implored her to stay.

40.     Denied that the meeting Mr. Awad asked Ms. Saroya to attend was "as a result of these complaints."   Instead, Mr. Awad was unhappy that Ms. Saroya had repeatedly asked CAIR to investigate allegations into sexual assault and harassment and other forms of abuse by Hassan Shibly, the head of CAIR's Florida office who was the subject of this past April's expose of CAIR by National Public Radio.  Mr. Awad and his fellow leaders at CAIR opposed any investigation into the allegations into Shibly, and opposed taking any action at all regarding these egregious, and well-supported allegations. On July 16, 2016, Ms. Saroya indicated in an email to Mr. Awad that she intended to resign over CAIR's refusal to take any action at all regarding the evidence of Shibly's mistreatment of women and others.  Two days later, Ms. Saroya informed IT Director Omar Ali that she intended to resign from CAIR and gave him instructions on handling her email account after her departure.  She also wrote to Mr. Ali:  "Good news for me- will never have to deal with Hassan Shibly again" and "[Shibly's] being allowed to host an [Executive Director] retreat when there are serious allegations against him.  It's not right and not fair to the other chapters who have no clue [about allegations of secret marriages and sexual misconduct against him]."  Mr. Awad begged Ms. Saroya not to resign, referring to her as his "friend" and mentee, and, ultimately, she did not resign for another year and a half.  She did not attend the "conflict resolution training" that Mr. Awad had asked her to attend in response to her raising her concerns about Shibly's misconduct and the need for CAIR to hold him accountable for it.

41.     Denied.

42.     Ms. Saroya admits that she received an email from Mr. Awad on or about August 4, 2017 complaining about what he described as issues with CAIR staff.  In fact, however, these admonitions were because Ms. Saroya had raised issues about the evidence of unethical and potentially illegal conduct by Shibly in CAIR's Florida office and Zainab Chaudry of CAIR's Maryland office.  Indeed, she had received a cease and desist demand from Shibly seeking to prevent her, in her role as CAIR Chapter Director, from investigating allegations of his "secret marriages" and sexual exploitation of women - including women who attended CAIR events. Mr. Awad and, of course Shibly and Chaudry, were upset that Ms. Saroya stated that the evidence of misconduct by each of them was sharply inconsistent with the values that CAIR held itself out as holding. Notably, it was during the same year that Mr. Awad pronounced Ms. Saroya "the best Chapter Development Director that CAIR has ever had or ever will have," and the same year that she was given a very positive review. Only 14 days after the "warning,"  Ms. Saroya received a promotion in title and pay raise.  An August 18, 2017 email from Mr. Awad stated:  "I am writing to let you know that based on your performance evaluation of 2016 and our discussion, we are raising your gross annual salary to $92,000… Your new title will be Chapter Director.  We appreciate your hard work and dedication to CAIR." See **Exhibit 3**.  And nine months later, in May 2018, Mr. Awad begged her not to resign from CAIR, and offered to give her a promotion if she agreed to stay.

43.     Ms. Saroya admits that the August 4, 2017 email from Mr. Awad stated: "Sr. Lori, you are a valuable staff to our national team, but I am concerned that your interactions with other staff are crippling our ability to properly function as an organization,

as interdepartmental cooperation is essential to the proper functioning of our organization."
This statement reflected Mr. Awad's clear desire that Ms. Saroya stay silent about the
misconduct of Shibly and Chaudry, which he and certain others on the CAIR leadership
team would have preferred to remain swept under the rug.

44.     Ms. Saroya admits that Mr. Awad instructed her to attend a "conflict
resolution training" whose purpose, in effect, was to counsel Ms. Saroya that she should
not be vocal about the misconduct or unethical behavior of top CAIR officials.

45.     Denied.  The appropriate raising of the issues by Ms. Saroya, which ranged
from sexual assault and harassment on the part of Shibly to corporate mismanagement and
unauthorized practice of law on the part of Chaudry does not in any way, shape or form
constitute "misconduct" on the part of Ms. Saroya.

46.     Ms. Saroya is without information sufficient to admit or deny this; however,
she states that such a complaint may have been made by Chaudry, who believed that Ms.
Saroya should have stayed silent about Chaudry's misconduct.   In fact, Ms. Saroya
forwarded to Mr. Awad a community complaint against Chaudry on November 19, 2017.
Ms. Saroya is aware of several other complaints filed against Chaudry for misconduct,
mismanagement, and unprofessionalism, including by IT Director Omar Ali and
Compliance Attorney Danette Zaghari-Mask.

47.     Ms. Saroya is without information sufficient to admit or deny this paragraph,
but any such allegation, if made, would be preposterous.  There has never been any
restraining order issued against Ms. Saroya.

48.    Ms. Saroya is without information sufficient to admit or deny this paragraph, as no one spoke to her about such a thing.  If any such investigation was conducted, however, it apparently did not affect CAIR leadership's strong desire to have her stay in her position, which they expressed repeatedly during this period as before and afterward.

49.    Ms. Saroya admits that in or about January 2018, disgusted with the culture of discrimination, harassment, misogyny, retaliation against employees who expressed concerns about the conduct of CAIR officials and unethical behavior, she announced that she intended to resign from CAIR.  Mr. Awad called Ms. Saroya and begged her to stay, asking her to consider the effect that her departure would have on CAIR staff.  Ms. Saroya reconsidered, and in response to Mr. Awad's personal request that she remain for the good of the organization, said that she would remain at CAIR for the time being.

50.    Denied.  Ms. Saroya did not simply attend the retreat, she came up with the idea for it, created the project plan, and led her department to organize and run the week-long CAIR Civil Rights Educational Tour in Alabama.  Ms. Saroya was not "admonished" at the retreat.  Instead, she was pulled aside by Mr. Awad and praised for creating a successful retreat - the first of its kind at CAIR.  Mr. Awad asked Ms. Saroya to manage similar retreats for Muslim community leaders.  Further, it was at the CAIR retreat that Mr. Awad's unwelcome, inappropriate and offensive behavior toward Ms. Saroya reached a point where she decided that she would in fact resign.  Prior to that point, Mr. Awad, Ms. Saroya's supervisor, had on various occasions asked her out to a personal lunch with him, asked her to put away her notebook and stop talking about work, and insisted on driving her back to her hotel during conferences and retreats.  In May, 2018, while out of town on

a work trip, Mr. Awad asked Ms. Saroya to meet him in the hotel lobby at midnight. When she complied, he said to her with a smile "Do you know that [other CAIR employees] think there is something going on between us?" This latest escalation of Mr. Awad's shocking and repulsive behavior led Ms. Saroya to realize she needed to leave CAIR for her own safety and well-being.

A few days later, Ms. Saroya informed Mr. Awad that she was indeed resigning. He implored her to stay, and offered her a promotion if she did. She declined. He told her that in that event she should come to see him in his office so that she could "sign some documents," referring to documents which, she knew, would require her to agree to never say anything negative about CAIR. In this it was clear to Ms. Saroya that Mr. Awad wanted her to keep his own misconduct hidden and was personally motivated to silence her. She replied that she would not agree to sign such documents for any amount of money which, she said, she knew others had been coerced into signing.

Mr. Awad responded "CAIR is a very powerful organization," which was obviously intended as a threat to coerce Ms. Saroya into signing what he wanted her to sign, rather than face consequences. Nevertheless, Ms. Saroya did not sign, and left CAIR. In a post to Facebook, Ms. Saroya described her experience leaving CAIR: "It was the most empowering feeling - and I got a small glimpse into how people might feel when they finally end an abusive relationship, or get freed from prison, or leave a cult."

51.    Admitted that Ms. Saroya resigned on that date. Further answering, Ms. Saroya states that upon her resignation, she received praise and statements of appreciation by CAIR leaders, including by Mr. Awad himself. See **Exhibit 4**.

24

52.     Denied.

53.     Denied.

54.     Denied. Ms. Saroya built the relationship between CAIR and Solidarity Giving and transitioned the relationship that she built to Mr. Awad when she resigned from CAIR.

55.     Ms. Saroya is without information to enable her to admit or deny this paragraph.

56.     Ms. Saroya admits the first sentence of this paragraph, except that the figure cited by CAIR is incorrect.  She further states that CAIR National wrongfully appropriated the funds that were awarded for the purpose of assisting the local CAIR chapters for its own purpose, violating the intent and the spirit of the awards, if not their express terms. This was done over the objection of Ms. Saroya, who was to have been responsible for the administration of the funds wrongfully taken from CAIR chapters by CAIR's National office, with the knowledge and at the instruction of Mr. Awad.

57.     Ms. Saroya denies that any of the statements that she made about the misappropriation by CAIR's national office of funds earmarked for CAIR chapters were false. On the contrary, they were accurate.

58.     Admitted.

59.     Denied.

60.     Denied that the statements that Ms. Saroya made about what CAIR's misappropriation of funds earmarked for CAIR chapters were false, let alone that she "knew" they were false.

61.    Denied that the statements that Ms. Saroya made about CAIR's misappropriation of funds earmarked for CAIR chapters were false, let alone that she "knew" they were false.

62.    Denied that Ms. Saroya gave any instructions, but admitted that Ms. Saroya provided the Solidarity Giving representative's contact information, as listed on the foundation's website.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Denied.

67.    Denied that Ms. Saroya made "false accusations."  Further answering, Ms. Saroya states that the purpose of CAIR's cease and desist letter was to try to intimidate her into agreeing to stay silent about the civil rights violations, discrimination, harassment, misogyny, retaliation, dishonesty, financial improprieties and shoddy corporate governance practiced at CAIR.  Ms. Saroya refused to agree to stay silent.

68.    Denied.  Ms. Saroya denies that she has made "false statements" about CAIR, or that she engaged in a "defamation campaign."

69.    Denied.  Further answering, she denies that the statements she made were "disparaging"; rather, they were truthful accounts of her own experiences and observations during over ten years associated with CAIR, and an expression of her views about the severe civil rights and other problems with the organization.

70.     Ms. Saroya denies that she has engaged in any form of "harassment," a curious choice of words given CAIR's demonstrable history of engaging in harassment and of shielding those responsible for it.  She admits that she has at various times used her middle name and her maiden name in her postings.

71.     Denied.

72.     Admitted.   Further answering, Ms. Saroya states that this was true, as reflected in CAIR making two partial payments to her shortly after she made the online post asking for the "nearly $30,000 in unpaid wages, bonus, and reimbursements."  The payments were made by CAIR-National on November 14, 2018, six months after Ms. Saroya's resignation. Indeed, the two checks by CAIR to Ms. Saroya stated in the memo lines (1) "retro pay" and (2) "bonus."  Ms. Saroya further states that CAIR repeatedly offered to make the remaining payments to her that they knew she was due — albeit trying to condition their payments to her of these sums on her agreement to stay silent about CAIR, and, indeed, to retract the statements that she made about CAIR's wrongful conduct.

73.     Ms. Saroya is without information sufficient to enable her to admit or deny this paragraph.

74.     Denied.  CAIR still owes Ms. Saroya money in unpaid reimbursements and indeed, has effectively admitted as much, offering to pay her what she was owed if she agreed not to make any statements that CAIR regarded as "negative" about CAIR, that she "remove" statements that she had made which CAIR regarded as critical and that she "recant" prior criticisms of CAIR.  Ms. Saroya refused to accede to this outrageous, but sadly typical, attempt by CAIR to suppress criticism of it.

75.     The complaint was only for the unpaid reimbursements, as CAIR paid the missing wages and bonus in November 2018, six months after her resignation. Ms. Saroya admits that the "Initial Determination" was provided, which speaks for itself. She further states that serious medical issues made it impossible for her to assemble and submit the full set of documentation, or to appeal the Initial Determination to the next level, on a timely basis.  However, that CAIR did indeed owe her these sums and knew that it owed her these sums is illustrated by its subsequent offer to pay them to her—contingent on her agreeing to not ever criticize CAIR, to "remove" past criticisms and to "recant" those prior criticisms, an egregious if typical attempt by CAIR to bully employees and former employees into surrendering their rights.

76.     Denied.

77.     Ms. Saroya admits that she did indeed make truthful statements about CAIR's withholding of monies due her, statements that CAIR effectively confirmed were true when it made partial payments to her six months after her resignation, and offered to stop withholding the remaining funds on the condition that Ms. Saroya cease any criticism of CAIR, "remove" any criticisms from social media and recant any prior criticisms of CAIR.

78.     Denied.  CAIR has not suffered "reputational damage and harm" other than by its own conduct over the years, including sexual harassment, gender discrimination, sexual assault and the indulgence of the same, retaliation, systemic misogyny, the toleration and perpetuation of unethical conduct, financial mismanagement and the misleading of donors, poor governance and discrimination against Shia Muslims, Christians, Jews and

others, apart from other conduct.  This conduct has been the subject of attention by law enforcement, non-profits, the media and others for years. Ms. Saroya did not "escalate" the making of "allegations"; rather, like many others who have shared her experience, she refused to be cowed by CAIR and communicated her criticisms of CAIR to the community in appropriate ways.

79.    Ms. Saroya admits that she published the referenced Facebook posting, which is both accurate and based on evidence.

80.    Denied.  This conduct is precisely what CAIR does do, what it did with respect to Ms. Saroya and what it has done and does with respect to innumerable other CAIR employees or former CAIR employees and volunteer board members.  By way of example only, CAIR National forced its Dallas chapter into rescinding a job offer made to a Christian woman, who was hired and had announced her new role as Executive Director of CAIR's Dallas chapter. Mr. Awad asked Ms. Saroya to "research" the new employee, which was not done for other chapter executive directors recently hired.  Mr. Awad was upset that the new Dallas employee spoke openly online about being a survivor of domestic violence.  CAIR National's attorney came up with an "alternate" story of the events and told the local chapter to offer the woman a payoff using an NDA in exchange for her silence on the religious and gender discrimination she faced.

A copy of an email sent by CAIR's compliance attorney to the CAIR-Dallas Board Chair and Vice Chair is set forth verbatim below:

From: Danette Zaghari-Mask
Sent: Tuesday, March 20, 2018 6:09:27 PM
To: Suhaib Allababidi; Marwa Elbially
Subject: Re: Following up, CAIR DFW
Asalaamu'Alaikum,

She is looking for financial compensation. The most serious risk she
presents right now is in the form of public pressure and defamatory speech
against DFW.
RECOMMENDATION:
ASAP, an attorney needs to offer her a sum of money (I suggest 10K in two
installments (5K each) separated by 5 months) with a non-disclosure
agreement. It also needs to be made clear to her that, again, she was asked to
come at the same rate of pay in a different role that fit within her niche of
expertise. Also, she was not discriminated against as a non-Muslim, however,
because she didn't have a demonstrated record of interest in civil rights to
serve as the executive director for a major metropolitan area at a civil rights
organization.

Marwa, if I can get you a template of a non-disclosure agreement, can you
modify it for TX and be in contact with her?

Danette Zaghari-Mask
Nonprofit and Compliance Attorney
Council on American Islamic Relations
dzaghari-mask@cair.com
(202) 909-3508

This obviously makes a mockery of CAIR's false claim that "it does not use attorneys" to "suppress, silence, and intimidate" women into signing NDA's.  A copy of this email is additionally attached hereto as **<u>Exhibit 5</u>**.

81.  Denied.

82.  Ms. Saroya admits that she published the referenced message, which is supported by evidence and which is a well-founded expression of her views.

83.  Denied.

84.  Ms. Saroya admits that she published the referenced message, which is supported by an extraordinary quantum of evidence and which is a well-founded expression of her views.

85.  Admitted.

86.  Ms. Saroya lacks the information sufficient to admit or deny this paragraph.

87.     Denied.

88.     Ms. Saroya admits that she published the referenced message, but denies that it was false.  Further answering, she states that the message speaks for itself.

89.     Denied.  Many female CAIR employees, board members, and volunteers, including Ms. Saroya, were regularly "yelled at," and verbally and emotionally abused by CAIR leaders. In a formal complaint to the CAIR National Board in or around May 2017, Ms. Saroya shared her concerns about the aggressive behavior of a CAIR National employee:  "There were four instances during the National Council Meeting weekend when [name omitted]'s demeanor became scary and it appeared that he was going to get physically violent.  Five different people, including me, witnessed this. All five of us met him for the first time this weekend."

90.     Ms. Saroya admits that she posted the referenced message, which is supported by evidence and which is a well-founded expression of her views. Otherwise, the allegation is denied.

91.     Denied.

92.     Ms. Saroya admits that she posted the referenced message, which is supported by evidence and which is a well-founded expression of her views

93.     Ms. Saroya is without information sufficient to admit or deny this paragraph.

94.     Denied.

95.     Denied.   CAIR's well-worn, predictable and inaccurate accusations that lawyers who defend the rights of those whom it has bullied or mistreated are "anti-Muslim and Islamophobic" are nothing more than efforts to mislead the Muslim community

regarding CAIR's conduct. The lawyer is Jewish. Hate and bigotry against people of the Jewish faith has been a recognized problem within CAIR for many years. By way of example only, one highly respected and accomplished Jewish attorney at a CAIR chapter, upon his resignation, widely circulated a memo detailing numerous instances of anti-Semitism he observed and experienced at CAIR.  Ms. Saroya witnessed several of these incidents, including when two different CAIR chapter board chairs posted bigoted videos and articles to a CAIR nationwide forum. When the chapter employee complained and raised concerns of anti-Semitism, there was silence from CAIR's top leaders.  Ironically, one CAIR leader asserted that it was within the board chairs' free speech rights to post bigoted videos and articles on the CAIR forum.

96.    Ms. Saroya admits that her attorney sent CAIR a demand letter in or about July 2019.

97.    Denied that the letter "purports" to do anything, and further answering, Ms. Saroya states that it speaks for itself.

98.    Ms. Saroya states that the letter speaks for itself, and otherwise denies this paragraph.

99.    Ms. Saroya states that the letter speaks for itself, and otherwise denies this paragraph.

100.    Ms. Saroya states that the letter speaks for itself and otherwise denies this paragraph.

101.    Ms. Saroya is without sufficient information to admit or deny this paragraph, but denies that she engaged in "extortion."

102.    Denied. A CAIR chapter has graciously offered to reimburse Ms. Saroya for the nearly $20,000 CAIR-National still owes her in unpaid reimbursements.

103.    Admitted.

104.    Denied. CAIR certainly does engage in a pattern of discrimination and mistreatment, and certainly does, or attempts to, suppress, silence or intimidate its employees.

105.    Denied.

106.    Ms. Saroya admits that she used the social media device known as "hashtags" in some of her social media postings, but otherwise denies this paragraph.

107.    Ms. Saroya admits that she made the statement attached as Exhibit F to the Complaint, which contains well-founded expressions of her views. She denies that these were defamatory but, further answering, states that they were accurate.

108.    Denied.

109.    Ms. Saroya admits that she made the statement referenced in this paragraph, and, answering further, states that, as the evidence will show, it is indeed the case that "donor funds are directly going to pay for attorneys to suppress, silence and intimidate those who have been treated unjustly."  Indeed, the efforts to coerce her into signing a statement disavowing and recanting accurate statements she had made about CAIR, using internal and external attorneys paid for by unsuspecting donor money, as a condition to CAIR paying her what it knew it owed her is an example precisely of this.

110.    Denied.

111.    Ms. Saroya denies that she engaged in a "bullying" campaign against CAIR which, as Mr. Awad told her in threatening her in May 2018, is "a very powerful organization." The only bullying that has occurred is that by CAIR, as this very lawsuit reflects. She likewise denies that her statements were "defamatory"; what they were was accurate and well-founded.

112.    Ms. Saroya is without information sufficient to admit or deny this paragraph.

113.    Ms. Saroya is without information sufficient to admit or deny the first sentence in this paragraph. She admits the remainder of the paragraph.

114.    Ms. Saroya denies that she has posted "defamatory" comments, but admits that she has posted accurate ones. She is without sufficient information to admit or deny the allegation that seven of her comments appeared on a website as of March 22, 2021.

115.    Ms. Saroya is without sufficient information to admit or deny this paragraph.

116.    Ms. Saroya denies that the communication of well-founded criticisms of CAIR constitutes "misconduct" of any kind, let alone "obsessive misconduct," but admits that she expressed the views that are reflected in this paragraph, views that are factually-based and well-founded. In fact, many people inside and outside CAIR question CAIR leaders' lack of strategic planning and thoughtful approach to civil rights issues facing American Muslims. For example, former CAIR-Dallas Executive Director Alia Salem wrote on November 28, 2016: "I have really been thinking about our approach to things. Especially 15 years post 9/11 what do we really have to show for our work if we look at this high level. We made a name for CAIR. Did we help or harm our community in the process?"

117.   Denied. Ms. Saroya has numerous examples of internal complaints of CAIR staff making "serious mistakes" on legal matters.  In response to a CAIR-Connecticut case involving a "well known activist...arrested and charged with lying to the FBI," CAIR National Litigation Director and Acting Civil Rights Director Lena Masri wrote:  "This is definitely not authorized to go out. I realize I'm reading this late, and this has probably been communicated already.  I'm also seriously concerned about potential unauthorized practice of law issues here."   On April 6, 2017, CAIR-New York submitted a formal complaint to the CAIR National Board regarding an "urgent need to address unethical conduct by CAIR National's Legal Department and concerns relating to *Sarsour v. Trump*," referring to it as "irreparably flawed litigation strategy." Copies of these two documents are attached hereto as **Exhibit 6** and **Exhibit 7**, respectively.

118.   Denied.

119.   Ms. Saroya admits that she has expressed the view that CAIR received international funding through its foundation, and that that view is well-founded and a matter of public knowledge. CAIR has historically received a massive amount of funding that comes directly or indirectly from outside of America, but has denied and/or minimized this fact when questioned by chapter leaders and community members.  For example, on December 15, 2020, CAIR National Board Chair Roula Allouch issued a community-wide statement in which she declared:  "We do not accept foreign funding."  On April 11, 2018, CAIR's communications department sent Ms. Saroya "excerpts from [the] 2018 annual report, 2018 civil rights report and the web site with language related to what CAIR is and what it does."  It states: "Almost all of CAIR's funding comes from individual Americans

of all faiths and backgrounds."  The truth about CAIR's massive international funding has been confirmed by respected Muslim community leader and former CAIR National board chair, Dr Parvez Ahmed, who was quoted in the NPR article.  He has previously revealed that he went on an international fundraising trip with Mr. Awad during his tenure as board chair and it made him feel nervous and uneasy about CAIR's affiliations.  Ms. Saroya denies that this particular statement "implies" that CAIR "is funded by foreign governments or terrorist organizations," though for the purposes of this Answer she reserves judgment on whether that is the case.

120.   Ms. Saroya is at present without sufficient knowledge to admit or deny this paragraph.

121.   Denied.

122.   Since the comment has apparently been deleted from the website, according to CAIR, Ms. Saroya is without sufficient information to admit or deny this paragraph. However, she certainly does believe, and has no doubt expressed the view, that CAIR operates as an incompetent and in many respects a toxic organization, that it has indulged and looked the other way at sexual abuse and exploitation—as National Public Radio found in its April 2021 expose—and that CAIR has been guilty of financial abuse and mismanagement, all views that are supported by what Ms. Saroya—and others—personally observed while at CAIR.  With respect to sexual abuse and exploitation, the cases of CAIR officials Hassan Shibly, Dawud Walid and Ahmed Bedier are obvious examples that CAIR leaders have been aware of for many years.

123.   Denied.

124.    Denied that women have played a critical role at CAIR. On the contrary, during Ms. Saroya's time at CAIR, women did not play a significant leadership role at CAIR National, and were routinely treated in a dismissive way, part of a culture of misogyny that encompassed gender discrimination, the indulgence of sexual harassment and the exclusion of women from positions of national leadership.  This has been confirmed by women who worked or volunteered at CAIR before her time and after.

125.    Denied.

126.    Denied.

127.    Denied.

128.    Ms. Saroya admits that she forwarded a Facebook message that in part contained this statement, which from her own experience and observations is true and well-supported.  Otherwise denied.

129.    Ms. Saroya admits that she has communicated similar statements that are in her opinion accurate and well-supported, and reflect incidents she experienced and witnessed during her over ten (10) years at CAIR.  However, she is without information sufficient to admit or deny the remainder of the paragraph.

130.    Ms. Saroya admits that she has communicated criticisms of CAIR that are in her opinion accurate and well-supported. Like many others who have had personal experience with CAIR, Ms. Saroya can safely say that CAIR's record is one that reflects sexual harassment, gender discrimination, corruption and mismanagement. However, she is without information that would enable her to know who were donors of CAIR-Oklahoma.

131.    Ms. Saroya admits that she has communicated criticisms of CAIR that are in her opinion accurate and well-supported, and reflect incidents she experienced and witnessed during her over ten (10) years at CAIR.  However, she is without information sufficient to admit or deny the remainder of the paragraph.

132.    Ms. Saroya admits that she has communicated the content identified above on the Facebook pages of individuals and organizations who may or may not have been aware of the extent of CAIR's troubled record, but is without sufficient information to admit or deny that this included JetPac.

133.    Ms. Saroya is without information to admit or deny this paragraph.

134.    Ms. Saroya states that the communication speaks for itself; the characterization that she "accused" CAIR is denied. However, the statements made in this posting are well-founded.

135.    Ms. Saroya denies that she has made "inciting accusations" or that this was "defamatory material."  She is without information sufficient to admit or deny the number of views at any particular time.

136.    Ms. Saroya admits that she has communicated her views regarding CAIR on social media.  She denies that these views are "defamatory"; rather, they are well-founded. She is without information sufficient to admit or deny the number of "CAIR's religions and non-profit partners" received or read her communications.

137.    Denied.

138.    Denied.

139.    Denied.

140.   Denied.

141.   Ms. Saroya denies that she has engaged in "attacks."   Rather, her communications of criticisms of CAIR are just that, and are well-founded and based on her own personal experience and that of many others.   She admits that she has expressed support for those who have had the courage to stand up to CAIR's attempts to bully them into silence.   Otherwise, this paragraph is denied.

142.   Ms. Saroya does not understand what CAIR means by the word "creed," and therefore is unable to admit or deny this paragraph. She admits that she and others around the country that have experienced and observed CAIR's discrimination, bullying and attempts to silence critics, as well as its mismanagement and dishonesty, have utilized the Internet to share their experiences and support one another.

143.   Denied.

144.   Ms. Saroya is without sufficient information to admit or deny this allegation

145.   Denied.

146.   Ms. Saroya admits that the evidence about CAIR's harassment, abuse and exploitation, gender and religious discrimination, retaliation and creation of a hostile work environment, interference with civil rights staff's efforts to unionize, withholding of information by leadership from the board supposedly overseeing leadership, and financial improprieties that is set forth in this communication is well-known to former and present CAIR employees, and has been the subject in one way or another of innumerable communications by a large number of former CAIR employees, including her.   She also admits that those employees have been, and continue to be, fearful of their own personal

safety and concerned about CAIR using its enormous financial resources to file lawsuits like the instant one.  Otherwise, denied.

147.    Denied.

148.    The first sentence in this paragraph is denied.  Any attempts by CAIR to learn the identities of these individuals were made not to learn the facts and take corrective action, but to consider and implement retaliatory steps against them and to ensure, if possible, that these individuals did not speak publicly, or further, about CAIR.  This present lawsuit initiated against Ms. Saroya, and other legal intimidation initiated against other women by CAIR leaders, explains why many victims of CAIR do not come forward.  Ms. Saroya is without sufficient information to confirm or deny the remainder of this paragraph.

149.    It is admitted that the group is "closed" in order to protect the safety of victims of CAIR, some of whom suffered sexual abuse, and so that those who have experienced or observed CAIR's conduct can share information and obtain psychological support without fear of retaliation of the very sort that this lawsuit constitutes.

150.    Denied.

151.    Denied.  The position of CAIR Compliance Director did not exist until recently.

152.    Denied.  CAIR's system was one aimed at retaliating against those who presented evidence of misconduct, not at investigating that evidence and taking corrective action.

153.    Denied.  Ms. Saroya asked the CAIR board to do a "workplace culture study" in 2016, to address concerns from female employees at CAIR National, and repeatedly brought issues of discrimination and abuse inside CAIR to the attention of CAIR leaders.

154.    Ms. Saroya admits that she has shared information about her experiences on that Gmail account. The paragraph is otherwise denied.

155.    Ms. Saroya is without information sufficient to confirm or deny to whom communications she initiated were ultimately transmitted. However, she admits that the views expressed in these alleged communications reflect her own views, and are well-supported by her experiences and observations during her tenure at CAIR.  Otherwise, denied.

156.    Ms. Saroya denies that her communications constitute "attacks."  Rather, they are the Constitutionally-protected expression of her views of CAIR, views that are grounded in her own personal experience and observations, and that of numerous others.

157.    Ms. Saroya is without information sufficient to confirm or deny to whom communications she initiated were ultimately transmitted.  However, she admits that the views expressed in these alleged communications reflect her own views, and are well-supported by her experiences and observations during her tenure at CAIR. Otherwise, denied.

158.    Denied.

159.    Denied.

160.    Denied.

161.    Denied.

162.    Denied.

163.    Denied.

164.    Denied.

165.    Denied that Ms. Saroya has engaged in a "diatribe." Ms. Saroya is without sufficient information to admit or deny what was republished where or when.

## CAUSES OF ACTION

### Count I:  Defamation

166.    Ms. Saroya restates and incorporates her answers to paragraphs 1 through 165 herein.

167.    This paragraph constitutes an assertion of law to which no response is required.

168.    Denied.

169.    Ms. Saroya admits that she has asserted that CAIR failed to pay her full wages and other compensation, and that it has a sorry record of engaging in wrongful conduct directed at present and former employees, that it has engaged in and indulged abuse and that it has engaged in other forms of dishonest and wrongful activity.  She denies that she has accused CAIR of "business torts."

170.    Denied.  Among other privileges, Ms. Saroya's statements were privileged under the First Amendment to the United States Constitution.

171.    Ms. Saroya admits that she has expressed her Constitutionally-protected views.  She is without sufficient knowledge as to the identity of every individual or organization that ended up receiving these communications. Otherwise, denied.

172.    Admitted.

173.    Denied.

174.    Denied.

175.    Denied.

176.    Ms. Saroya admits that she made numerous statements about CAIR.  She denies that they were false or defamatory.

177.    Denied.

178.    Denied.

179.    Denied.

180.    Denied.

181.    Denied.

182.    Denied.

## Count II:  Defamation Per Se

183.    Ms. Saroya restates and incorporates her answers to paragraphs 1-182 herein.

184.    This paragraph is an assertion of law to which no response is required.

185.    Denied that these communications include "false accusations," and denied that they accuse CAIR of a "crime," though the evidence may well support the conclusion that CAIR has indeed engaged in criminal activity.  For example, a former CAIR chapter executive director published the following public statement:   "I do not recommend donating your money to [CAIR chapter].  I believe there may be a warrant out for the arrest of a former [CAIR chapter] board member, who served as this organization's treasurer, for stealing [CAIR chapter] money by writing himself checks. Donors should definitely

question whether their charity is legitimately being used to do civil rights advocacy, how this was allowed to happen, and whether the organization is being fully transparent.  Full disclosure: I am a former Executive Director of [CAIR chapter] and found the board leadership to be quite inadequate and corrupt at the expense of the community and even more so at the expense of its staff."   A copy of this post is attached hereto as **Exhibit 8**.

In a separate post, he wrote:  "In 2011 when CAIR National lost its nonprofit status, our local chapter board president came with a $20,000-dollar check from some donor who owns a [country] company and wanted to donate to CAIR National - but because they wanted the tax exemption... [CAIR leader] had him (donor) write the check to [CAIR chapter] so we would funnel the money back to CAIR National."

186.   Denied.

187.   Denied.

### Count III:  Tortious Interference with Business Relationships

188.   Ms. Saroya restates and incorporates her answers to paragraphs 1-187 herein.

189.   This paragraph is an assertion of law to which no response is required.

190.   Denied.

191.   Denied.

192.   Denied.

193.   Denied.

### Count IV:  Breach of Contract

194.   Ms. Saroya restates and incorporates her answers to paragraphs 1-193 herein.

195.   This paragraph is an assertion of law to which no response is required.

196.    Denied.

197.    Ms. Saroya denies that the confidentiality provisions of her employee agreement are valid and enforceable and states that, indeed, they are void as against public policy.

198.    Ms. Saroya denies that any confidentiality provisions of her employee agreement are valid and enforceable, and states that, indeed, they are void as against public policy.  She states further that, even were they valid and enforceable, she has not violated them.

199.    Denied.

### COUNT V:  Injunctive Relief

200.    Ms. Saroya restates and incorporates her answers to paragraphs 1-199 herein.

201.    Denied.

202.    Denied.

203.    Denied. Ms. Saroya further states that this count is contrary to the First Amendment of the United States Constitution, and would contravene well-established precedent of the United States Supreme Court.

### **AFFIRMATIVE DEFENSES**

Ms. Saroya hereby asserts the following affirmative defenses and reserves her right to assert in the future such additional defenses as may become available or apparent during discovery or through other pretrial proceedings.  The assertion of any defense as an affirmative defense herein is not, and is not intended as, an admission that Ms. Saroya has the burden of proof on any such defense or on any related element of the Plaintiff's claims.

### First Affirmative Defense

Plaintiff fails to state a claim, in whole or in part, upon which relief can be granted.

### Second Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the statute of limitations.

### Third Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the First Amendment of the United States Constitution and Article 1, Section 3 of the Minnesota State Constitution.

### Fourth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because they rely on statements that are not defamatory.

### Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because they are based on statements of opinion that are privileged and protected under the First Amendment of the U.S. Constitution and Article 1, Section 3 of the Minnesota State Constitution.

### Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because, they are based on statements that are true or substantially true.

### Seventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because plaintiff is a public figure and, as such, cannot establish that any alleged statements were made with knowledge of their falsity or in reckless disregard as to their truth or falsity, or otherwise were published with actual malice.

## Eighth Affirmative Defense

Plaintiff's claims are barred because to the extent that it has suffered any damages, including damage to its reputation, such damages were the result of its own conduct or the conduct of those acting at its direction and control, or other third parties.

## Ninth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by its own misconduct and unclean hands.

## Tenth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## Eleventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Defendant's actions were justified.

## Twelfth Affirmative Defense

Plaintiff's claims are barred because the confidentiality agreement is unconscionable, illegal, and void and unenforceable as a matter of public policy.

## Thirteenth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because it has suffered no damages, including no damage to its reputation.

## Fourteenth Affirmative Defense

Plaintiff's claims are barred because to the extent that it has suffered any damages, including damage to its reputation, it has failed to mitigate such damages.

**Fifteenth Affirmative Defense**

Plaintiff's claims and request for relief are barred, in whole or in part, because they constitute an impermissible prior restraint of speech in violation of the First Amendment of the U.S. Constitution and the Minnesota State Constitution.

**JURY DEMAND**

Ms. Saroya demands a trial by jury on all issues and claims so triable.

**CONCLUSION**

WHEREFORE, Ms. Saroya respectfully requests that this Court dismiss Plaintiff's claims in their entirety, enter judgment in favor of Ms. Saroya on all counts, award Ms. Saroya her costs and attorneys' fees, and grant such other and further relief as this Court deems appropriate.

Dated: June 11, 2021 **SAUL EWING ARNSTEIN & LEHR, LLP**

By _  s/ Alain Baudry_
Alain M. Baudry (MN #186685)
Steven C. Kerbaugh (MN #0390429)
33 South Sixth Street, Suite 4750
Minneapolis, MN 55402
Telephone: (612) 225-2946
Facsimile: (612) 677-3844
Email:  alain.baudry@saul.com
Email:  skerbaugh@saul.com

Jeffrey S. Robbins (*Pro Hac Admission Pending*)
Joseph D. Lipchitz (*Pro Hac Admission Pending*)
SAUL EWING ARNSTEIN & LEHR, LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
Telephone: (617) 723-3300
Facsimile: (617) 723-4151
Email:  jeffrey.robbins@saul.com
Email:  joseph.lipschitz@saul.com

*Attorneys for Defendant Lori Saroya*