IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CAIR FOUNDATION, INC., d/b/a
COUNCIL ON AMERICAN-ISLAMIC
RELATIONS & CAIR,

   Plaintiff,

v.

ASMA LORI HAIDRI SAROYA a.k.a. LORI
SAROYA, ASMA SAROYA, LORI HAIDRI,
LORI HAIDRI-SAROYA, & LH,

   Defendant.

Civil Action No.: 0:21-cv-01267 (SRN/TNL)

**MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO COMPEL**

Plaintiff CAIR Foundation Inc., d/b/a Council on American-Islamic Relations & CAIR

("CAIR"), hereby files this *Opposition* to Defendant, Asma Lori Haidri Saroya's ("Saroya"),

*Motion to Compel* and, in support thereof, avers the following:

## <u>INTRODUCTION</u>

This matter stems from Saroya's systemic defamatory attacks against her former

employer CAIR and her misappropriation of CAIR's confidential and proprietary information.

In the three years since her employment with CAIR ended, Saroya has published hundreds, if not

thousands, of defamatory statements related to CAIR on social media websites and other web-

based platforms, as well as through targeted email and social media communications to CAIR's

partners and donors, its employees' relatives, and its Board members' private employers.

Despite Saroya's categorization otherwise in her *Motion to Compel*, the accusations for which

CAIR seeks relief were not lodged at any individual CAIR chapter organizations or any other

third-party affiliate organizations.  Saroya specifically accused CAIR, the national organization,

of, *inter alia*, sexually abusing, sexually harassing, and discriminating against its employees.

CAIR, the national organization, filed this lawsuit and is the only plaintiff in this litigation. Accordingly, Saroya cannot defend her unfounded and salacious accusations against CAIR by asserting that a chapter organization or a third-party affiliate organization committed the listed offenses.

Despite the limited nature of the litigation, Saroya has engaged in discovery tactics that can only be viewed as intentionally vexatious and harassing. Without question, Saroya's *First Set of Document Requests* ("Document Requests") were interposed to harass CAIR and needlessly increase the cost of litigation. Considering the needs of the case and the issues at stake, the Document Requests are, as a whole, unreasonable and unduly burdensome. Responding to the Document Requests as written would cost considerable expensive to CAIR and the burden of responding to the Requests outweighs any tangential relevance. By way of example, Saroya requested all documents that refer to, relate to, or "in any way concern" her for a 10-year time period (Document Request Nos. 1 and 2); all documents that refer to, relate to, or reflect any donations to CAIR, the Washington Trust Foundation, Inc. ("WTFI"), or the CAIR Action Network, Inc. ("CAIR Action Network") for the same 10 years (Document Request Nos. 4 and 23); all documents that refer to, relate to, or reflect any lawsuits or administrative claims filed by any person, entity, or agency against CAIR, WTFI, CAIR Action Network, or any chapter or affiliate for any reason, again over a 10-year time period (Document Request Nos. 5 and 6); all documents referring or relating to or reflecting any communication between CAIR, WTFI, or CAIR Action Network, Inc. and Metropolitan Property Management, Inc. (Document Request No. 41); and any contributions or grants to Greater Washington LLC of Delaware or to Zahara Investment Corporation (Document Request Nos. 43). Saroya also requested that CAIR produce documents that relate to or refer to 17 individuals over the 10 year time period, only one

of whom ever worked for CAIR and some of whom are not even completely identified in the requests (Document Request Nos. 23 and 24). At the time Saroya lodged these Requests, and many others, she knew they were unreasonable and that they would create an unfair burden on CAIR; indeed, the entire purpose of her requests, and her discovery strategy as a whole, is to effectuate that result.

Because Saroya seeks broad-based discovery from a myriad of different third party entities and requests that searches be conducted for documents related to individuals who never even worked at CAIR, CAIR was forced to object to the vast majority of Saroya's requests, and to maintain those objections now. Although CAIR was under no obligation to narrow the scope of Saroya's exceedingly overbroad requests, CAIR, following Saroya's express instruction to do so, strove to narrow the requests to seek acceptable discovery nonetheless.[1] To that end, CAIR agreed to produce, has produced, and will continue to produce documents and information related to it. Specifically, CAIR agreed to produce documents related to all lawsuits, administrative claims, settlement agreements, complaints, and allegations lodged against it by its employees related to discrimination, harassment, and retaliation for a 5-year time period (the subject of Saroya's defamatory communications). It also agreed to search its executive leadership for electronically-sourced information using the terms, "complain," "investigate," "sex," "harass," "gender," "discrimination," "retaliation," "hostile," "abuse," "victim," and "assault" for that same time period. To the extent responsive, non-privileged documents and information are recovered, CAIR will supplement its document production.

---

[1] See Kerbaugh Declaration Exhibit A at Saroya's Instructions ("To the extent CAIR objects to any request set forth below on the basis of a contention that it is overbroad for any reason, please respond to that request as narrowed in such a way as to render it not overbroad and state the extent to which CAIR has narrowed the request for purposes of the response").

Saroya accused CAIR, the national organization, of engaging in misconduct. The scope of her discovery should be limited to discovering the truth or falsity of those allegations. Allegations against CAIR cannot be proven true through the conduct of other third party entities. Accordingly, Saroya's *Motion to Compel* should be denied in its entirety.

## SAROYA'S VEXACIOUS DISCOVERY STRATEGY

To fully understand Saroya's abuse of the discovery process, a bigger picture must be painted. CAIR's mission to protect the civil rights of Muslims in America, counter bigotry, and advocate for justice, has made it the prime target for many anti-Muslim hate groups over the past 25 years. CAIR employees and leaders are routinely subjected to attacks and death threats. Numerous individuals have attempted to have CAIR labeled a terrorist organization, embroiling CAIR in years of litigation. Saroya's discovery requests are directly related to one of those prior matters, as opposed to this one.

In 2008, Daniel Horowitz, Esq. filed a complaint on behalf Michael Savage in the United States District Court for the Northern District of California (Case No. C 07-6076 SI) claiming that CAIR: (1) is working in concert with Hamas, the Muslim Brotherhood and various terror groups and individuals "in an association-in-fact enterprise" that promotes terror; (2) raises "money for ostensible civil rights activities... when in fact the self-proclaimed [sic] charity is designed to promote the terror agenda of Hamas;" (3) is involved in a "conspiracy that violated the rights of Jews and Christians by targeting them for economic harm, murder, and other harms due to their religion"; (4) is illegally acting as a foreign agent and concealing funding from overseas in violation of its tax exempt status; (5) is part of a "conspiracy that intends to eliminate the United States Constitution and replace it with Sharia law;" and (6) is raising money to support a violent jihad, among a host of other harmful and false accusations of criminal conduct.

4

<u>See</u> Michael Savage's Third Amended Complaint, attached hereto as Exhibit A.  These allegations, among others, had no basis in law or fact and were purely inflammatory.  The District Court ultimately dismissed Mr. Savage's complaint.  <u>See</u> Order of Dismissal, attached hereto as Exhibit B.

On July 5, 2019, Mr. Horowitz authored a demand letter to CAIR on Saroya's behalf.  The letter purported to be about Saroya's alleged wage claim, but in it, Mr. Horowitz threatened to file the same failed lawsuit against CAIR on Ms. Saroya's behalf that Mr. Savage had filed claiming that CAIR is a terrorist organization.  <u>See e.g.</u>, CAIR's *Complaint* at ¶¶ 95 – 101.  Mr. Horowitz concluded his letter by demanding several hundred thousands of dollars in exchange for Saroya's agreement not to file the terrorist complaint.  <u>Id</u>. at ¶ 100.  CAIR did not acquiesce to what it perceived to be an extortion attempt, and Saroya never filed the complaint.  <u>Id</u>. at ¶ 101.

In an attempt to inject the same baseless claims and threats purportedly made in connection with her wage claim into this litigation, on August 10, 2021, without providing advance notice to CAIR's counsel, Saroya served a *Subpoena Duces Tecum* on Mr. Horowitz, seeking, *inter alia*, all documents related to any litigation in which he was involved, all Internal Revenue Service, Department of Justice, Department of Homeland Security, and Federal Bureau of Investigation documents related to CAIR in his possession, and all documents obtained pursuant to his Freedom of Information Act requests.  <u>See</u> Horowitz *Subpoena Duces Tecum*, attached hereto as Exhibit C.  In response to this subpoena, Mr. Horowitz has produced over 30,000 pages of discovery to Saroya.

Saroya's threat to file Mr. Savage's failed complaint against CAIR is relevant to the instant *Motion to Compel* because it provides this Court with the backdrop necessary to

understand the motivation behind Saroya's Document Requests. Saroya's Document Requests do <u>not</u> pertain solely to the claims and defenses of the instant litigation, as required by Rule 26(b) of the Federal Rules, and instead seek far broader discovery related to CAIR, its property interests, and its donors. Many of the requests at issue were interposed for an improper purpose, namely to harass CAIR, further promulgate Saroya's and others' "CAIR is a terrorist organization" agenda, and needlessly increase the cost of litigation.

Saroya's *Motion* should be denied because discovery must be reasonable. Here, CAIR has agreed to investigate, search for, and produce the discovery reasonably related to the issues in this lawsuit. It should not be compelled to produce anything further.

**A.      CAIR Should Not Be Ordered to Produce Documents Related to Third Party Entities Because Saroya's Defamatory Statements Attacked CAIR Not These Third Party Entities.**

This discovery dispute primarily centers around Saroya's requests for discovery related to CAIR chapter organizations and to other third party corporations, which Saroya dubs "National Affiliates," namely WTFI and the CAIR Action Network. CAIR Action Network is no longer in existence and is now known as WTFI. It will be referred to herein as "WTFI". CAIR objected to producing documents related to these third party entities, because this lawsuit charges Saroya with defaming CAIR, not these separate entities, and, therefore, documents related to any "affiliate" and/or chapter organization are not relevant to the parties' claims or defenses and not proportional to the needs of the case. CAIR also objected to these requests because such discovery is likely to cause an undue burden and expense on CAIR that greatly outweighs any purported benefit to the discovery.

Saroya spends the bulk of her *Motion to Compel* arguing that CAIR should be forced to produce these documents because CAIR has access to or control over the documents possessed

by these third party entities.  But Saroya's *Motion* misses the point.  CAIR should not be compelled to produce the documents related to the 22 CAIR chapter organizations and WTFI because Saroya did not accuse these 23 separate entities of engaging in rampant sexual abuse and exploitation of their employees.  Instead, she published statements accusing CAIR of committing misconduct against *its* employees.  Indeed, in many of her communications she either specifically refers to CAIR-National as the perpetrator of the misconduct or distinguishes CAIR and its conduct from the conduct of CAIR chapter organizations.  See e.g., CAIR's *Complaint* at ¶¶ 72, 82, 84, 88, 90, 92, 107, 128, 134, 146, and 155.  At no point does she accuse WTFI of sexually abusing or discriminating against *its* employees.  CAIR, not any affiliate or chapter organization, accuses Saroya of defaming it, and CAIR, not any affiliate or chapter, bears the burden of proving the Saroya's statements are false.

Truth is an absolute defense to defamation, and Saroya has asserted "truth" as an affirmative defense in the instant litigation.  See Saroya's *Answer* at p. 46.  CAIR does not dispute that Saroya is entitled to discovery pertaining to the truth or falsity of her statements, but Saroya's statements accusing CAIR, the national organization, of misconduct cannot be proven true or false by the conduct of any of CAIR's chapters or affiliates.  As a result, CAIR objected to producing discovery related the 22 chapters and WTFI because that discovery is simply not related to the claims and defenses of the instant litigation.  Saroya's own actions during the course of discovery belie her assertion that discovery from all 22 chapters is relevant, as she sent document subpoenas to only 10 of those chapter organizations.

Additionally, Saroya's accusation that CAIR merely submitted "boilerplate" objections related to the production of documents belonging to these third parties and then "dust[ed] off the predictable, wearisome and incorrect line that she is engaged in a 'fishing expedition'" has no

basis in fact or reality.  The law is well-settled that while "the standard of relevance in the context of discovery is broader than in the context of admissibility…this often intoned legal tenet should not be misapplied so as to allow fishing expeditions discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992) (internal citations omitted).  This Court has "its own independent obligation under Rule 1 to assure that discovery in this case does not become a fishing expedition but instead is focused on matters for which there is some foundation in the record." Grupo Petrotemex, S.A. De C.V. v. Polymetrix AG, No. 16-cv-2401 (SRN/HB), 2019 U.S. Dist. LEXIS 87594, at *7 (D. Minn. May 24, 2019); see also Shukh v. Seagate Tech., LLC, 295 F.R.D. 228, 238 (D. Minn. 2013) ("Magistrate Judge properly concluded that such broad discovery requests constituted a fishing expedition, not necessarily directed at obtaining relevant materials"); Perry v. Best Lock Corp., No. IP 98-936-C H/G, 1999 U.S. Dist. LEXIS 23601, at *8-9 (S.D. Ind. Jan. 21, 1999) (quashing subpoenas that "look like nothing more than a fishing expedition, or, more accurately, an exercise in swamp-dredging and muck-racking").  Accordingly, this Court is well-within its authority to limit Saroya's fishing expedition.

Saroya's Document Requests pertaining to the chapter organizations and WTFI go far beyond the claims and defenses in this case.  This Court should deny Saroya's *Motion to Compel* with respect to any request seeking documents and information from the chapter organizations, WTFI, or any other third party affiliate.

**B.    CAIR Should Not Be Ordered to Produce Documents in the Possession, Custody, or Control of Third Party Entities.**

Notwithstanding the fact that CAIR chapter organizations and WTFI are not parties to this lawsuit and that Saroya has not lodged any claims against them, Saroya continues to take the position that she should be permitted to seek discovery related to and in the possession of these entities. In support of her argument, she expends a great deal of energy attempting to show that CAIR has a relationship with its chapter organizations and WTFI.  But again, she misses the point.  CAIR does not deny that it has a relationship with the chapter organizations or WTFI. Rather, CAIR denies that it has lawful access to many of the documents in the possession of the 22 different chapter organizations, operating through 33 different office locations, and WTFI, and asserts that Saroya's alleged benefits of such discovery are outweighed by the burdens and expenses involved.

CAIR's headquarters and principal place of business is located in Washington, D.C.  See Affidavit of Lena Masri, Esq., attached hereto as Exhibit D at ¶ 1.  CAIR has one other outreach office, which is in Maryland.  Id. at ¶ 3.  CAIR employs 26 individuals at its office in Washington D.C. and one individual at its outreach office in Maryland.  Id. at ¶ 4.  CAIR is affiliated with 22 independent regional organizations nationwide.  Id. at ¶ 5.  These regional organizations are known as "chapters."  Id.  Some of these chapters have multiple branch offices within a particular region.  Id.  In total, CAIR is affiliated with 22 chapters and 33 individual offices.  Id.  These offices are named after the city or state they represent (e.g., CAIR-Minnesota; CAIR-Philadelphia).  Id.  CAIR's relationship with the chapter organizations is governed by individual affiliation and license agreements between CAIR and each of its chapters.  Id. at ¶ 6. Although each affiliation and license agreement is unique, in general, the agreements operate as follows: in exchange for a fee, CAIR licenses its chapter organizations to use its federally

registered trademark and conduct chapter business in support of CAIR's central mission.  Id. at ¶ 7.  The chapters themselves are wholly separate legal entities.  Id. at ¶ 8.

Each chapter is required to maintain separate corporate status, status as a 501(c)(3) exempt non-profit organization, separate liability insurance, and separate professional liability insurance for all attorney employees.  Id. at ¶ 9.  Each chapter has its own governance structure, generally consisting of a governing board and an Executive Director and its own Board of Directors.  Id. at ¶ 10.  A chapter's Executive Director governs the day to day operations of the chapter, while the Board of Directors are charged with the legal governance and strategic planning.  Id. at ¶ 11.  CAIR does not employ individuals at any chapter and it does not have the power to hire, fire, or alter the employment status of an employee at the chapter level.  Id. at ¶ 12.  It likewise does not have authority to police, manage, control, or otherwise control the day to day actions of chapter employees.  Id. at ¶ 13.  Chapters lease or own their own properties, maintain their own payroll, bookkeeping, insurance policies, and manage their own operating expenses.  Id. at ¶ 14.  CAIR has no control over any chapter's lease, bank accounts, payroll, bookkeeping, insurance policies, or operating expenses.  Id. at ¶ 15.

CAIR does provide certain services to the chapters.  Id. at ¶ 16.  CAIR provides @cair.com email addresses to chapter employees and board members.  Id. at ¶ 17.  CAIR has access to these email communications; however, its permission to access these emails is restricted and can only be exercised based upon a reasonable suspicion of misuse or wrongdoing by the chapter employee and if certain stringent approvals are met.  Id. at ¶ 18.  In the absence of suspected email misuse or wrongdoing or the requisite approvals, CAIR does not have any contractual or other legal basis to access chapter employees' email correspondence.  Id. at 19.

CAIR does not have access to the chapter organization's individual servers or any

documents stored outside of the @cair.com email platform.  Id. at ¶ 20.  CAIR does not have

access to the business, proprietary and confidential information of any chapter.  Id. at ¶ 21.

CAIR does not have physical access to any chapter offices.  Id. at ¶ 22.  Accordingly, CAIR has

no independent lawful right of access to chapter documents that Saroya seeks.

CAIR is affiliated with WTFI; however, it likewise has no lawful access to the

documents in WTFI's possession.  WTFI is a completely separate corporate entity.  Id. at ¶ 24.

CAIR does not share an address with WTFI, nor does it share any employees with WTFI.[2]  Id. at

¶ 26.  CAIR does not have the authority to hire, fire or otherwise police, manage, or control the

day to day activities of WTFI employees.  Id. at ¶ 27.   Although Nihad Awad sits on the Boards

of both CAIR and WTFI, Mr. Awad is not a member of WTFI's Board as a representative of

CAIR.  His role in each organization is distinct.  Id. at ¶ 28.  Mr. Awad is the only CAIR board

member who sits on the Board of both CAIR and WTFI.  Id. at ¶ 29.  Mr. Awad has a fiduciary

duty to keep confidential information he learns through his capacity as a CAIR board member;

and therefore, does not share that information with WTFI.  Id. at ¶ 31.  WTFI's President is Esam

Omeish.  Id. at ¶ 32.  WTFI does not use CAIR's email server or any of CAIR's IT services.  Id.

---

[2] Saroya's reference to the attorney-client privilege document she misappropriated from CAIR
upon her termination was made in bad faith.  The report referenced is labeled as "Confidential
Communication," "Attorney-Client Privileged," and "Attorney Work Product."  It is a
communication from legal counsel to its client for the purpose of rendering legal advice.  Ms.
Saroya obtained the report when she was sitting on CAIR's Board of Directors.  The law is well-
settled that the distribution within a corporation of legal advice received from counsel does not
vitiate the attorney-client privilege.  Indeed, courts have expressly held that communications
among corporate officers, directors, and employees who are not lawyers are still privileged if
their discussions relay or transmit advice received from an attorney.  See Hudock v. LG Elecs.
U.S.A., Inc., No. 0:16-cv-1220-JRT-KMM, 2019 U.S. Dist. LEXIS 190611, at *7 (D. Minn.
Nov. 4, 2019) (collecting cases).  The privilege provides absolute protection from the disclosure
of the confidential communication between the attorney and his client, including disclosure to
this Court.  As the client, CAIR holds this privilege and does not consent to Saroya's publication
of the Report in any forum.

at ¶ 33.  CAIR does not have access to the business, proprietary and confidential information of WTFI.  Id. at ¶ 35.  CAIR has no control over WTFI's lease, bank accounts, payroll, bookkeeping, insurance policies, or operating expenses.  Id. at ¶ 36.  CAIR does not have physical access to WTFI's office.  Id. at ¶ 37.  Based on the foregoing, CAIR has no independent lawful right of access to the majority of the documents that Saroya seeks.

Additionally, responding to Saroya's requests for chapter organization documents and documents in the possession of other third party affiliates would be burdensome because it would require CAIR to expend unreasonable time, effort, and money to travel to all 33 chapter office locations and WTFI to search for responsive hardcopy materials and conduct email review on the chapters' and WTFI's individual email servers, the scope of which would be astronomical because Saroya has never even lodged any specific accusations and has never identified any specific perpetrators, alleged victims, or incidents to support her defamatory statements.  As a result, to prepare its response to the Document Requests as written, CAIR would need to conduct email review on every single current and former employee of CAIR, the 22 individual CAIR chapter organizations, and WTFI for a 10-year time period.

Although CAIR has requested that Saroya provide it with information as to why each chapter organization and WTFI is relevant to the instant lawsuit, including any information pertaining to specific instances that Saroya claims to have knowledge about, Saroya has declined.  Likewise, when CAIR requested that Saroya respond to its efforts to meet and confer on electronically-sourced information ("ESI") custodians, time periods, and search terms, Saroya also declined.  Instead, Saroya sent subpoenas to 10 chapter organizations and WTFI for the same documents that it seeks to obtain from CAIR.

Saroya's *Motion to Compel* documents related to and possessed by CAIR chapter organizations and WFTI should be denied because: (1) CAIR does not have access to documents belonging to chapter organizations or WTFI; (2) Saroya already subpoenaed several chapters and WTFI and is now seeking duplicative discovery from CAIR; and (3) forcing CAIR to search 34 (33 chapter office locations and WTFI) separate locations and multiple different email servers for responsive information is an undue burden that outweighs any benefit to the discovery.  See FRCP 26(b)(2)(C).

**D.      CAIR Should Not Be Ordered to Identify its Donors**

Saroya claims that she is entitled to obtain the identity of every single individual or entity who has donated to CAIR, any CAIR chapter organization, or WTFI for the past 10 years because CAIR asserted that "Saroya defamed them [sic] by making certain statements about their solicitation and acceptance of foreign funds."  Saroya's assertion is incorrect.  CAIR claimed that Saroya's *implication* that it solicited international funding and was therefore funded by terrorist organizations was false.  See *Complaint* at ¶¶ 120 ("CAIR does not accept funding from terrorist organizations).  To be clear, CAIR's defamation claim is not based on Saroya's statements related to domestic or international funding.  Were CAIR's defamation claim to be based on Saroya's statements related to funding, Saroya still would not be entitled to seek discovery on the identity of donors to CAIR chapter organizations or WTFI because Saroya's statements about CAIR cannot be proved or disproved by conduct of a third party.

**DOCUMENT REQUESTS AT ISSUE**

Saroya grouped the Document Requests at issue into categories using self-serving and largely inaccurate headings.  To add insult to prejudicial injury, the majority of the Document Requests are summarized in a manner designed to intentionally mislead this Court into granting

requests that are improper on their face.  Saroya's decision to intentionally misrepresent the scope of her Requests to this Court is an act of bad faith and should be recognized for what it is. Nevertheless, for ease of review, CAIR will respond to each of Saroya's categories of disputed documents.  As described below, many of the Document Requests at issue seek patently irrelevant discovery.  Saroya's *Motion to Compel* should be denied.

A.    **"Information pertaining to the truth of the statements relating to sexual misconduct, gender and religious discrimination, and retaliation within CAIR." (Request Nos. 3, 5 – 10, 13 – 15, 32, 42, 50)**

In her *Motion to Compel*, Saroya claims that Document Request Nos. 3, 5-10, 13-15, 32, 42, 50 seek "information pertaining to the truth of the statements relating to sexual misconduct, gender and religious discrimination, and retaliation within CAIR."  Saroya's statement is patently false.  Instead, these requests seek far broader discovery, including: "all documents…relating to…any committee appointed by CAIR to evaluate financial, management, governance…" (Document Request No. 3); "all documents…relating to…any lawsuits of administrative claims filed by any person or entity" against CAIR, WTFI, any chapter organization, and/or any affiliate organization (Document Request Nos. 5 & 6); "all documents…relating to…any settlement agreements [proposed or executed]" between CAIR and WTFI and any present or former employees (Document Request Nos. 7 and 8); all documents relating to any allegations by present or former employee of CAIR, WTFI, any chapter organization, and/or any affiliate organization of "gender or sexual discrimination, sexual harassment or assault or retaliation" (Document Request Nos. 9, 10, 13, 14, and 50); all documents related to Hassan Shibly and/or Imran Shibly (Document Request Nos. 15 and 42); and all documents relating to the testimony of any officer or employee of CAIR of WTFI in any judicial or administrative proceeding (Document Request No. 32).

CAIR objected to these Requests for a variety of reasons, but the overarching objection to the Requests is that they require CAIR to search for, review, and produce discovery pertaining to CAIR chapter organizations and WTFI, which, for all the reasons stated above, is discovery that is not likely to lead to admissible evidence. Saroya cannot defend her false accusations against CAIR by claiming that some other individual or entity engaged in the conduct that she describes. Either the statements against CAIR, the national organization, are true or they are false. But Saroya cannot prove the truth or the statements through the actions of third party entities. Hassan Shibly, whom Saroya bases a myriad of requests around, has never been employed by CAIR. His wife, Imran Shibly, who accused Mr. Shibly of committing misconduct, has never been employed by CAIR. To CAIR's knowledge, no CAIR employee has ever asserted that Mr. Shibly discriminated against, harassed, or retaliated against them. Mr. Shibly served as CAIR-Florida's Executive Director and was employed solely by CAIR-Florida. Accordingly, documents and information related to Hassan Shibly are not relevant to Saroya's claims against CAIR.

Additionally, Saroya's requests for all documents related to CAIR's "governance," all documents related to any lawsuit ever filed against CAIR by any individual person or entity without limitation as to the subject-matter of the litigation, and the testimony of any individual ever employed by CAIR in any proceeding regardless of whether that proceeding even involves the individual's employment at CAIR clearly seek documents that are not relevant to the claims and defenses at issue in the instant litigation. Saroya has charged CAIR with discrimination, harassment, abuse, and retaliation against its employees. Instead of tailoring her requests to seek information related to these claims, Saroya requests all testimony of any CAIR employee (even if that employee was testifying in a completely personal litigation), all documents related to any

lawsuit ever filed against CAIR (even if the lawsuit was not filed by a CAIR employee), and all

Board meeting minutes pertaining to "governance," which would be every Board meeting as

"governance" is the Board's purpose.  Such Discovery Requests are not likely to lead to the

discovery of admissible information and are not tailored to the claims and defenses of the instant

litigation.  CAIR also maintains that it does not have lawful access to the documents in the

possession of CAIR chapter organizations or WTFI.

Notwithstanding CAIR's objections to the Requests, CAIR agreed to produce non-

privileged documents and information related to lawsuits, administrative claims, complaints, and

allegations lodged by any employee of CAIR or a CAIR chapter asserting discrimination, sexual

harassment, or retaliation against CAIR or any CAIR employee, officer, or director from 2016

through 2021.  It also agreed search for electronically-stored information for the same time period.

CAIR provided its list of search terms to Saroya on October 15, 2021.  Saroya did not agree to the

terms, but has not proposed any additional terms.  Because CAIR has agreed to produce the *relevant*

documents and information responsive these Requests, Saroya's *Motion to Compel* should be

denied.

**B.**    **"Information pertaining to the truth of the statements regarding CAIR engaging in Union Busting." (Request Nos. 19, 55)**

Document Request Nos. 19 and 55 seek all documents referring or relating to filings by

CAIR or WTFI with the National Labor Relations Board (Document Request No. 19) and all

documents referring or relating to or reflecting the effort by any employees of CAIR or WTFI to

unionize (Document Request No. 55).  For the reasons stated above, CAIR objected to producing

documents regarding employees of WTFI, but agreed to produce documents related to its

employees.  Because Saroya accused CAIR of "engaging in union busting" with its employees,

the truth or falsity of Saroya's statement cannot be garnered from documents related to any third

parties.  Accordingly, CAIR appropriately narrowed the scope of the Request and should not be ordered to expand its production further.

**C.     "Information pertaining to the truth of statements relating to CAIR's financial and corporate mismanagement, corruption and other misconduct." (Request Nos. 17, 18, 23, 26- 29, 31, 34-41, 43-45, 48, 50-54)**

Saroya categorized a broad range of her Discovery Requests as "information pertaining to the truth of statements relating to CAIR's financial and corporate mismanagement, corruption and other misconduct" and then intentionally generalized the Requests in a manner specifically designed to hide their breadth from this Court.  Specifically, under the guise of proving the truth of her defamatory statements related to CAIR's alleged discrimination, harassment, and retaliation, Saroya asserts that she is entitled to "all documents referring to…or constituting communications between [CAIR] and [WTFI] and (1) the United States Department of Justice; (2) the Federal Bureau of Investigation; (3) the Department of Homeland Security; or (4) the United States Department of Treasury" regardless of the subject matter of the communication (Document Request No. 17); "all documents referring to…or constituting filings made to the Internal Revenue Service by [CAIR and WTFI]" again regardless of subject matter or purpose (Document Request No. 18); all "documents referring to or reflecting the total yearly amount of donations" to CAIR and WTFI for 10 years (Document Request No. 23); "all documents referring to or constituting communications between any employee of [CAIR and WTFI] and any member of the Board of Directors of any of those organizations regarding fundraising, donations or contributions to any of those organizations" (Document Request No. 29); "all documents referring or relating to or constituting consulting reports, internal or external investigative reports or other reviews relating in any way to the management" of CAIR or WTFI (Document Request Nos. 31, 37-38); all communications between CAIR and WTFI and any

media relations personnel regardless of subject-matter (Document Request No. 34); all
documents that refer to agreements between CAIR and WTFI and "Celestium Consulting LLC"
(Document Request No. 35); all documents referring or relating to regular meetings or
conference calls with CAIR's Executive Director, CAIR chapter officials or CAIR senior staff"
regardless of the subject matter of the discussions (Document Request No 36); "all minutes or
notes taken by CAIR officers at meetings of the CAIR National Council" regardless of the
subject matter of the discussions (Document Request No. 39); "all documents referring or
relating to or reflecting any communication between [CAIR and WTFI] and Metropolitan
Property Management, Inc. (Document Request No. 41); "all documents referring or relating to
or reflecting contributions or grants to Greater Washington LLC of Delaware or to Zahara
Investment Corporation" (Document Request No. 43); "all documents referring or relating to or
reflecting or constituting financial reports or annual reports, whether in draft or final form,
prepared by or on behalf of [CAIR or WTFI] and CAIR National Legal Defense Fund, Inc."
(Document Request No. 44); "all documents referring or relating to or reflecting meetings or
communications regarding fundraising, donations, contributions or grants with any of the
following individuals Yasin Aktay, Mehmet Gormez, Serdar Kilic, Mehdi Eker or Ali Sarikaya"
(Document Request No. 45); "all documents referring or relating to or reflecting the acquisition
of real property in the United States by [CAIR and WTFI] and the Greater Washington LLC of
Delaware or Zahara Investment Corporation" (Document Request No. 48); "all documents
referring or relating to or reflecting or constituting draft or actual budgets prepared by or on
behalf of [CAIR and WTFI]." (Document Request No. 51); all CAIR and WTFI tax filings
(Document Request No. 52); all document reflecting compensation paid to officers and directors

of CAIR and WTFI (Document Request No. 53); and all documents referring to or constituting communications relating to the practice of law by four individuals (Document Request No. 54).

CAIR objected to, *inter alia*, the scope of these Requests because it is clear, based on the plain language of the Requests, that Saroya promulgated these Requests merely to harass CAIR. Prior to opening the doors of discovery, Saroya is required to make a threshold showing of relevance. Hofer v. Mack Trucks, Inc., 981 F.2d 377, 380 (8th Cir. 1992). District Courts must remain reluctant to allow any party to "roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." Onwuka v. Fed. Express Corp., 178 F.R.D. 508, 516 (D. Minn. 1997) (quoting Carlson Cos., Inc. v. Sperry & Hutchinson Co., 374 F. Supp. 1080, 1089 (D. Minn. 1974)). It is not enough for Saroya to broadly state that documents responsive to the above Requests relate to CAIR's financial and corporate mismanagement, corruption, and other misconduct without providing any explanation for why that is so. Saroya is essentially seeking every single communication between CAIR and WTFI, every single communication between CAIR officials and CAIR chapter officials, every single communication with or filing made to a government agency, all compensation documents, and all documents related to CAIR and WTFI's property interests (if any), without ever asserting one single fact to support discovery on these topics. Because Saroya has not made even a threshold showing of relevance, her *Motion* with respect to these Requests should be denied.

With respect to Request Nos. 26 – 28, CAIR has already agreed to produce its policies related to discrimination, harassment, and retaliation that were applicable during Saroya's employment at CAIR. Its document retention policies have no relevance to the instant litigation. With respect to Request No. 40, CAIR already agreed to produce and has produced documents

related to Saroya's personal grievances with Zanah Chaudry. CAIR maintains that Saroya has not met the threshold relevance requirement necessary to discover any documents related to Ms. Chaudry that do not involve Saroya's specific allegations or grievances.

**D.    "Information pertaining to the truth of the statements relating to CAIR's Foreign Funding." (Request Nos. 4, 22, 30, 33, 46-47, and 49)**

Saroya claims that she is entitled to know the identity of every single individual and entity who has ever donated to CAIR or WTFI for the past 10 years (Document Request No. 4, 22, 30) and all communications related to donations to CAIR and WTFI (Document Request No. 33, 46 – 47, and 49). As discussed above, Saroya claims that she is entitled to know the identities of every single individual or entity who has donated to CAIR, any CAIR chapter organization, or WTFI for the past 10 years based on her assertion that CAIR has charged Saroya with defaming it via statements related to the solicitation of foreign funds. However, Saroya's underlying assertion is incorrect. CAIR claims that Saroya's *implication* that it solicited international funding and was therefore funded by terrorist organizations was false. See *Complaint* at ¶¶ 120 ("CAIR does not accept funding from terrorist organizations). To be clear, CAIR's defamation claim is not based on Saroya's statements related to domestic or international funding. Accordingly, discovery related to these topics is not relevant and need not be produced.

**E.    "Information Pertaining to CAIR's Pattern and Practice of Retaliating against Individuals Who Have Been Victimized by Misconduct or Expressed Concerns about it." (Request Nos. 11, 12, 58)**

Document Request Nos. 11, 12, and 58 seek all documents referring or relating to or reflecting or constituting "threatened litigation" or "complaints" or "claims" of defamation or cease and desist demands communicated by CAIR, any CAIR chapter organization, or any affiliate organization, including WTFI over a ten year time period. CAIR objected to producing

documents related to CAIR chapter organizations, WTFI, or any other third party affiliates because documents related to these third party entities have no bearing on the truth or falsity of Saroya's statements regarding CAIR. CAIR agreed to produce all documents responsive to these Requests that relate specifically to Saroya and her defamatory communications. Additionally, CAIR agreed to produce documents related to all lawsuits, administrative claims, complaints, or allegations lodged against it related to discrimination, harassment, or retaliation. Accordingly, CAIR should not be compelled to produce any additional documents in response to these Requests.

**F.** **"Information Pertaining to Individuals Believed to have information relating to the Truth of Allegedly Actionable Statements." (Request Nos. 16, 21-22, 24-25)**

Saroya broadly claims that Request Nos. 16, 21-22, 24, and 25 relate to "individuals believed to have information relating to misconduct within the CAIR organization," but fails to actually inform the Court of the language or even accurate nature of these Requests. The majority of the individuals referred to in these Requests are not and never were CAIR employees, and Saroya fails to explain how any of the individuals listed in these Requests are specifically related to her defamatory statements or CAIR in general.

Request No. 21 seeks "all documents referring or relating to or reflecting or constituting communications between any of the following individuals and any person or entity in any way related to claims, complaints of allegations of gender or sexual discrimination, sexual harassment or retaliation: (1) Ahmed Bedier; (2) Hassan Shibly; (3) Dawud Walid; (4) Zahra Billoo; (5) Imraan Siddiqi; (6) Iftekhar Hussain; or (7) Julia Shearson." None of these individuals have ever been employed at CAIR and, for all the reasons discussed above, Saroya cannot prove the truth or falsity of her accusations against CAIR through the conduct of third parties. Accordingly, this Request is not likely to yield relevant discovery.

21

Document Request No. 16 seeks "all documents referring or relating to or reflecting or concerning Hassan Shibly, Mejgan Afghan, Susanne Arani, Rifat Malik, or Karen Hernandez." As with Request No. 21, none of the individuals listed in the Request are current or former employees of CAIR and none have lodged any claims, complaints, or allegations against the national organization. However, each of the individuals listed was employed at a CAIR chapter organization. Accordingly, responding to the Request as written would require CAIR to travel to the five chapter organizations (spanning from Pennsylvania to California) and search for and produce nearly single document ever sent to or from these 5 employees along with any other document that relates to them in any way for a 10-year time period. Because none of these individuals were ever employed by CAIR and because none of these individuals has ever asserted claims of discrimination, harassment, or retaliation against the national entity, Saroya's Request is not relevant to the parties' claims or defenses in the instant litigation.

Saroya claims that Document Request No. 22 involved "individuals believed to have information relating to misconduct within the CAIR organization." But this statement, like so many others in her *Motion*, is false. Instead, Document Request No. 22 seeks "all documents referring or relating to or listing or reflecting the names of every contributor to [CAIR and WTFI]. in an amount over $2500 for every year since 2011." The names of CAIR's and WTFI's donors have no bearing on claims, complaints, or allegations of discrimination, harassment or retaliation and this Request should be denied.

Document Request No. 24 seeks "all documents referring or relating to any of the following individuals: (1) Jinan Shbat; (2) Tannaz Hannadi; (3) Miriam Amer; (4) Parvez Ahmed; (5) Sara Sheikh; (6) Michaela Corning; (7) Jessica Wayman; (8) Corina Chang; (9) Alicia Hernandez Strong; (10) Arsalan Iftikhar; (11) Ahmed Bedier; and/or (12) Omer Subhani."

Document Request No 25 seeks "all documents referring or relating to any of the following individuals: (1) Issameldin Mohamed; (2) Sister Taqwa; (3) Ahmed Obaid; (4) Kadiatu Korama and/or Chokri el-Kotel."  CAIR objected to these Requests based on, *inter alia*, relevance and scope.  First, as with Request Nos. 16 and 21, the vast majority of these individuals have never worked for CAIR or even a CAIR chapter organization.  Some of them cannot be identified because their name is partial ("Sister Taqwa") or CAIR simply does not recognize to whom Saroya is referring.  Additionally, because Saroya seeks all documents that "refer" or "relate" to 17 individuals, none of whom are named in CAIR's *Complaint* or Saroya's *Answer*, CAIR would need to search each of its employees email boxes and physical offices for documents referring or relating to these individuals.  Although CAIR requested specific information related to each of these individuals during its meet and confer conference with Saroya's counsel, Saroya provided none.  In fact, Saroya refused to even fully identify "Sister Taqwa" and appeared not to have any knowledge as to the identity of several other individuals or why they were included in Document Requests.  Saroya's entire 30-page *Motion to Compel* is devoid of an explanation as to why documents related to these 17 individuals are relevant to the claims and defenses of this case, and Saroya does not identify any of these individuals as persons having knowledge about the instant litigation in her *Initial Disclosures*.  Absent a specific showing by Saroya as to how each of these individuals is related to Saroya's claims that CAIR, the national organization, engaged in discrimination, sexual abuse and harassment, and/or retaliation, Saroya's *Motion to Compel* with respect to these Requests should be denied.

**G.    "Information Pertaining to CAIR's Purported Damages."**
       **(Request No. 56-57)**

CAIR agrees to produce documents and information sufficient to show the decrease in donations because of Saroya's defamatory publications.

**H.    "Information Pertaining to Saroya and the Relationship between Parties."**
**(Request Nos. 1-2, 59-62)**

Saroya claims that Document Request Nos. 1 – 2 and 59 – 62 relate directly to

"information pertaining to Saroya and the relationship between the parties" which Saroya asserts

is relevant because CAIR made allegations relating to Saroya's "deficient work performance and

misconduct." But CAIR has not claimed that Saroya's work performance was "deficient," and

her assertion otherwise in the instant *Motion* is just one more example of Saroya's attempts to

trick this Honorable Court into ordering discovery that Saroya is not entitled to receive. Instead,

CAIR stated that Saroya's employment at CAIR was fraught complaints, issues, and conflicts,

*see Complaint* at ¶ 38. Saroya's employment was fraught with complaints, issues, and conflicts

with her colleagues and CAIR chapter employees. CAIR already agreed to produce documents

and information related to Saroya's altercations with her co-workers, and Saroya's Discovery

Requests go far beyond the bounds of proving or disproving this assertion.

Specifically, Saroya asserts that she is entitled to "all documents referring or relating

to…or in any way concerning Lori Saroya" (Document Request No. 1), "all documents referring

or relating to or reflecting Lori Saroya's (1) co-founding of, volunteer efforts for or employment

by the Minnesota Chapter of CAIR; (2) employment by CAIR; or (3) appointment to or service

on CAIR's Board" (Document Request No. 2), "all documents referring or relating to or

reflecting or constituting communications between any officer, employee or director, past or

present, of CAIR, the Washington Trust Foundation, or the CAIR National Action Network and

Lori Saroya" (Document Request No. 61), and "all documents referring or relating to or

reflecting or constituting communications by any officer, employee or director, past or present,

of CAIR, the Washington Trust Foundation, or the CAIR National Action Network referring to

or regarding Lori Saroya." (Document Request No. 62).

CAIR objected to these Requests on grounds that they are overbroad and unduly burdensome, and to that extent seek documents that are not relevant to the parties claims and defenses, because responding to these Requests would require CAIR to produce, *inter alia*: (1) all correspondence ever sent to or from Saroya during her employment at CAIR, (2) all correspondence sent between CAIR, on the one hand, and Saroya, on the other hand, during Saroya's employment at CAIR-Minnesota, (3) all correspondence between CAIR and any chapter organization or other third party that in anyway referenced, related to, or concerned Saroya, (4) all correspondence sent between employees of the chapter organizations or WTFI that referenced, related to, or concerned Saroya, and (5) all the work Saroya completed during her employment at CAIR, including grants she secured, donor information, chapter information, board communication, and all other proprietary and confidential business records that Saroya had involvement in while employed.  Without doubt, Requiring ESI and document collection of this magnitude would impose an undue burden and cost on CAIR that greatly outweighs any benefit. Additionally, CAIR objected to these Requests because many of the requested documents are already within the possession and control of Saroya as Saroya downloaded every single email contained within her CAIR email inbox prior to her departure and retained those emails after her employment ended, which is evidenced by the myriad of confidential documents that Saroya attached to the instant *Motion to Compel*.

Notwithstanding CAIR's objections and breathtakingly burdensome and harassing Discovery Requests, CAIR agreed to produce: (1) employment/Personnel records pertaining to Saroya's employment at CAIR; (2) all complaints registered by or against Saroya during her employment at CAIR, including complaints against Saroya regarding her harassment of CAIR employees; (3) documents related to Saroya's performance at CAIR (CAIR also agreed to search

for electronic documents and proposed search terms); and (4) Saroya's defamatory statements against CAIR.  Additionally, in response to Document Request Nos. 59 and 60, CAIR agreed to produce statements issued by it to any chapter or third-party organizations relating to Saroya's defamatory communications and the instant lawsuit and relevant, non-privileged documents referring, relating to, and constituting evidence of Saroya's harassment and abusive conduct towards her coworkers, chapter organizations, and other third-party individuals and organizations.  CAIR produced many of these documents on October 22, 2021 and will continue to supplement its document production as additional documents and information are discovered. Accordingly, CAIR has satisfied its obligation pursuant to these Requests and the Court should not compel CAIR to produce any additional information.

## CONCLUSION

Wherefore, for all the foregoing reasons, CAIR respectfully requests that Saroya's *Motion to Compel* be denied in its entirety.

Dated: October 25, 2021

**CHRISTENSEN LAW OFFICE PLLC**

By  Carl E. Christensen (MN #0350412)
    800 Washington Avenue North, Suite 704
    Minneapolis, MN 55401
    Telephone: (612) 823-4016
    Facsimile: (612) 823-4777
    Email:  carl@clawoffice.com

    and

**RUBIN FORTUNATO & HARBISON, P.C.**

_____
Michael J. Fortunato (*admitted pro hac vice*)
Cynthia B. Morgan (*admitted pro hac vice*)
1200 Liberty Ridge Drive, Suite 220
Wayne, PA  19087
Telephone: (610) 408-2005/2022
Facsimile: (610) 408-9000
Email:  mfortunato@rubinfortunato.com
Email:  cmorgan@rubinfortunato.com

*Attorneys for Plaintiff CAIR Foundation, Inc., d/b/a*
*Council on American-Islamic Relations, & CAIR*

Exhibit "A"

Daniel A. Horowitz Cal. State Bar No. 92400
Attorney at Law
P.O. Box 1547
Lafayette, California 94549
(925) 283-1863


Attorney for Plaintiff


# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA


MICHAEL SAVAGE,
aka (Michael Weiner)

       Plaintiff,

vs.

Counsel on American-Islamic
Relations, Inc.,  Council on
American Islamic Relations
Action Network Inc., Council on
American Islamic Relations
of Santa Clara Inc., and Does
3-100

No.  C 07-06076SI

Defendants.
_____
_____/

## *MICHAEL SAVAGE'S THIRD*

## *AMENDED COMPLAINT*

1

# *INTRODUCTORY PARAGRAPHS*

## *THE PARTIES*

1.

Michael Weiner is the radio show star of The Michael Savage Show" where he uses the name "Michael Savage". He is hereinafter referred to as "Michael Savage" as this is the name used in the public arena. Michael Savage is the owner of copyright interests in his show, "The Michael Savage Show" also known as "The Savage Nation".

2.

"The Savage Nation" is a nationally syndicated radio show that reaches over eight million listeners per week. There is a related website, www.MichaelSavage.com which receives 2.3 million page views per month. The radio show originates in San Francisco, California.

3.

"The Savage Nation" is unique among so-called "Talk Radio" in that it combines serious intellectual analysis with dramatic and emotional soul baring that the show advertises as "Psychological Nudity". This performance aspect of the show is critical in that it conveys an emotional power and a fundamental honesty that is meaningful to the listening audience.[1]

4.

The Council on American Islamic Relations, Inc. is a non-profit corporation with branches throughout the United States.  The branch incorporated in the District of Columbia is sometimes referred to as CAIR-National.   This lawsuit is directed against both specific CAIR

---

[1]Performance has greater protection than News.  "Copying a news broadcast may have a stronger claim to fair use than copying a motion picture."); 3 Nimmer on Copyright § 13.05[A][2] (Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F.2d 1148, 1154 (9th Cir. 1986))

2

entities as well as CAIR as a national organization. The group as a whole is referred to as CAIR. Paragraphs 636-640 describe CAIR in terms of being "the enterprise" which has been corrupted by Hamas and other terror leaders. CAIR is also viewed as a member of a larger enterprise dedicated to international terror. Plaintiff asserts that both are true and that both establish a basis for RICO liability under 18 U.S.C. 1962(c) & 1962 (c) & (d). Therefore, this pleading provides a basis for finding that CAIR is both a corrupted legitimate entity as well as being a "union or group of individuals associated in fact although not a legal entity." 18 USC 1961 (4).

5.

CAIR, Hamas, the Muslim Brotherhood and the various terror groups (and individuals described herein) work in an association-in-fact enterprise. This enterprise which promotes terror and related political activities possesses a continuity of structure and personnel; a common or shared purpose; and an ascertainable structure distinct from that inherent in the pattern of racketeering. (Diamonds Plus, Inc. v. Kolber, 960 F.2d 765, 769 (8th Cir. 1992)). It is possible to describe and plaintiff herein alleges that there are numerous association-in-fact enterprises. Hamas and the Muslim Brotherhood are one such group. Hamas itself as it is structure is itself such a group. The broader enterprise with various separate entities is yet another. All are alleged herein to be generically "the enterprise" as these forms have the common purpose and come together in ways and times that suit their criminal purposes.

6.

Plaintiff sues individually the following CAIR entities.

1. Council on American Islamic Relations Inc. believed to be incorporated in the District of Columbia, aka CAIR-National.

2. Council on American Islamic Relations Action Network incorporated in the District of Columbia.

3. Council on American Islamic Relations of Santa Clara Inc. aka CAIR-California.

4. Council on American Islamic Relations, Inc. incorporated in Garland, Texas.

This lawsuit generically names all defendants and all CAIR groups as "CAIR" on the information and belief that although incorporated separately, all groups are part of the main

3

organization, CAIR-National which, as further alleged herein is part of Hamas and the Muslim Brotherhood.

7.

The true names of Does 3-100 are presently unknown, therefore plaintiff sues them by their fictitious name.

## *FEDERAL JURISDICTION*

8.

This lawsuit raises a federal issue arising out of federal statute (RICO violations). In addition, the CAIR group most directly associated with the operation of the website that is at the core of the copyright infringement case, is a Santa Clara based organization. The "CAIR" website owned by this group lists this as the "San Francisco Bay Area" chapter of CAIR. San Francisco and Santa Clara, California are within the jurisdiction of the United States District Court, Northern District of California. Further, the CEO of the Santa Clara based group is on the "national board" of the entity that identifies itself as the Washington, D.C. based group. Finally, the founder of the Washington D.C. based CAIR served on the Board of Directors of the Santa Clara based CAIR in 1998, 2000, 2001 and perhaps in other years as well.

9.

Michael Savage broadcasts out of a studio and at a radio station located in San Francisco, California.

## *STANDING*

1. Economic Harm to Michael Savage

10.

Michael Savage been injured in both his business or property and has suffered specific concrete losses. (Oscar v. Univ. Students Coop. Ass'n, 965 F.2d 783, 785 (9th Cir. 1992)). These losses include lost advertisers and advertising revenue due to the RICO predicate acts

1    committed by CAIR directly against Savage.  The value of Michael Savage as a performer and

2    his radio program as a marketable entity has been diminished due to the RICO predicate acts

3    committed by CAIR directly against Savage. The value lost is in excess of $ 1,000,000.

4

5                                        11.

6          CAIR's own website touts the damage caused to Michael Savage due to the conduct of

7    CAIR.  The confirm damages caused by the decision of Sprint to ensure that ads previously run

8    on the radio show are not run again.  The website of Chicago CAIR touts the losses of more than

9    a million dollars in advertising revenue noting that "...companies such as Wal-Mart Stores Inc.,

10   GEICO insurance company and Sprint Nextel Corp. have removed their ads from the show ..."

11                                       12.

12         Michael Savage's programming for purposes of resale, his ability to market books and

13   media has been reduced due to the RICO predicate acts committed by CAIR directly against

14   Savage.

15                                       13.

16         Michael Savage has incurred costs and attorney's fees in order to protect is property both

17   tangible and intangible from damage by the Hobbs Act extortion(s) of CAIR.  The losses are in

18   excess of $ 200,000 and are continuing.

19   2. CAIR's RICO Predicate Conduct Which Directly Harmed  Savage

20                                       14.

21         The wrongful conduct of CAIR includes use of enterprise resources, enterprise funds and

22   funds from the Hamas Conspiracy to commit acts in furtherance of the RICO conspiracy.  Those

23   acts include but are not limited to:

24              A . Publishing excerpts of his radio show with a CAIR created context substituted

25              for the true context in order to damage Savage's property. (Hobbs Act violation)

26              B.  Organizing groups to further publish excerpts of his radio show and to do by

27              proxy the matters set forth in this paragraph. This was done to damage the value

28              of Savage's property. (Hobbs Act Violation)

                                          5

C. Incorrectly portraying the views of Michael Savage as to the Muslim religion, Muslim immigration and other issues of concern to Muslim Americans. This includes statements that are incorrect and constitute libel as they were made with actual malice as CAIR knew that the statements were untrue (and/or acted in reckless disregard as to whether the statement was false or not). This was done to damage the value of Savage's property. (Hobbs Act Violation)

D. Misrepresenting past statements and past positions taken by Michael Savage. This was done to damage the value of Savage's property. (Hobbs Act Violation)

E. Leading threatening attacks on advertisers of Michael Savage forcing some of them to withdraw their advertising. (Hobbs Act Violation)

F. Threatening potential advertisers and current advertisers. (Hobbs Act Violation)

G. Criminally violated Copyright law (RICO predicate) by expropriating Michael Savage's show content for its own use including profit and to raise funds for the criminal enterprise and without a "fair use" purpose.[2] (Hobbs Act Violation)

H. Raising money for ostensible civil rights activities and in the guise of opposing Michael Savage when in fact the self proclaimed charity is designed to promote the terror agenda of Hamas. (Mail Fraud & Wire Fraud, both Hobbs Act Violations)

I. Raising money for the criminal enterprise by attacking Michael Savage as set forth herein while pretending to act for a civil rights purpose. (Mail Fraud & Wire Fraud, both Hobbs Act Violations)

3. Hobbs Act Violation for Extortion re: Intangible Property Rights
(18 U.S.C. 1962 (c) & (d)

15.

The Hobbs Act extortion is a RICO predicate. These acts violated 18 U.S.C. 1962 (c) and to the extent that it was part of the conspiracy alleged herein, it also violated 18 U.S.C. 1962 (d)

---

[2]Included to preserve this issue in this context for potential appellate review.

6

It consists of the taking of the property of Michael Savage in the following ways:

A. Taking of his advertising revenue by driving advertisers from his show.

B. Interfering with his ability to solicit business from advertisers. (See: United States v Tropiano (1969, CA2 Conn) 418 F2d 1069 where interference with the right of trash removal dealer to solicit accounts of potential customers constituted a taking of property within the Hobbs Act.)

C. Damaging his property e.g. the market value of Michael Savage and his radio show.

D. Interfering with his intangible property right to democratic participation in politics and political expression. (See: United States v Local 560 of Int'l Bhd. of Teamsters (1985, CA3 NJ) 780 F2d 267 where Union members had an intangible property right to democratic participation in affairs of their union and the denial of that right was considered extortable "property" for purposes of Hobbs Act. The case notes that the Act's language makes no distinction between tangible and intangible property.) See also: United States v Debs (1991, CA6 Mich) 949 F2d 199; United States v Gotti (2006, CA2 NY) 459 F3d 296.

E. Interfering with Savage's right to contract with parties of his choosing. See: United States v Vigil (2007, DC NM) 478 F Supp 2d 1285.

F. Interfering with Savage's right to make business decisions free from outside pressure. See: United States v Vigil (2007, DC NM) 478 F Supp 2d 1285.

16.

To the extent that Michael Savage fought CAIR and did not surrender his rights voluntarily, the crimes are attempted Hobbs Act violations and are still RICO predicate Acts.

17.

The extortions relating to tangible and intangible rights included threats of economic harm (done in various ways) unless Michael Savage capitulated to the demands of CAIR. Later in this complaint, CAIR's attempts (and successes) in this type of extortion against public figures and ordinary Americans is detailed.

**Other RICO Violations and Savage's Damages as an American Citizen**

7

(18 U.S.C. 1962 (c) & (d)

18.

The conspiracy and enterprise target Americans for harm.  Michael Savage was harmed by additional RICO violations by CAIR as are all Americans.  The acts of CAIR violated 18 U.S.C. 1962 (c) and when done in conspiracy with others it violated 18 U.S.C. 1962 (d).  Among those acts directly committed by CAIR are the following.

19.

Violations by CAIR of 18 USC 1503 (relating to obstruction of justice), 18 USC 1510 (relating to obstruction of criminal investigations), 18 USC 1511 (relating to the obstruction of State or local law enforcement) among other violations.

20.

Further the acts of CAIR alleged herein contributed to a conspiracy that violated the civil rights of Jews and Christians by targeting them for economic harm, murder, and other harms due to their religion.

21.

Michael Savage was injured due to CAIR's participation in the conspiracy (such conspiracy committing numerous RICO predicate violations) and by acts of CAIR that were themselves RICO predicate acts.  (Beck v. Prupis, 529 U.S. 494, 495 (U.S. 2000)).

22.

The RICO predicate acts committed against Michael Savage were committed within ten years from the dates set forth herein as the dates that harm was caused to Michael Savage.  The conspiracy has been continuous since its inception as has the enterprise.

23.

The purpose of taking away advertisers was to cause economic harm to Michael Savage and they did cause economic harm in excess of $ 1,000,000.

24.

The taking of the advertisers was done to prevent Michael Savage and others from interfering with the conduct of the criminal conspiracy.  It was done to silence Americans who

8

vocally oppose the conspiracy. It was done to raise money for CAIR which was then used to further the goals of the conspiracy. It was done to create a false aura of being a charity so that CAIR could then operate as a conspirator without detection.

### Material Support for Terror

#### 25.

CAIR in its actions against Michael Savage, in its fund raising and in its conduct overall, provides material support for terror. This is done intentionally and it is a crime. Such conduct is not protected by the First Amendment.

**IRS Fraud**

#### 26.

Major funding for CAIR, comes from overseas. The source and nature of these funds have been hidden by CAIR. (See paragraphs 32-44; 612-623)

#### 27.

This violates the tax exempt status of the group because CAIR is not only receiving this foreign money, it is disguising its source while illegally acting as a Foreign Agent without registering and while claiming a tax exempt status.

**Failure to Register as a Foreign Agent**

#### 28.

CAIR has not registered as a Foreign Agent.[3]

#### 29.

CAIR illegally evades paying taxes on the foreign money that it receives since it pretends to be acting as a charity when it is not.

#### 30.

_____

[3]The Foreign Agents Registration Act (FARA) was passed in 1938 in an attempt to limit the influence of German agents in the U.S.. FARA registrants must disclose the names of each individual person they lobby in any branch of government along with the date of the contact. Also disclosed are any efforts outside of lobbying to influence the public at large. FARA disclosures also must contain the actual legal agreement between the two parties.

CAIR then reinvests this money in the Hamas conspiracy and in activities such as its attacks on Michael Savage. The attacks on Michael Savage then raise more money for the conspiracy. CAIR is therefore both hiding the source and purpose of the money and reinvesting it in the criminal conspiracy. This is money laundering and tax evasion.

31.

CAIR is therefore using the attack on Michael Savage to help create a false charitable front in order to hide its money laundering activities.

## BRIEF OVERVIEW OF CAIR'S FOREIGN FUNDING

32.

CAIR is a foreign agent of Hamas, Saudi businessmen, Kuwaiti's and the Royal Family of Dubai. Its actions against Michael Savage promote these interests as well as the interests of foreign terrorist groups. It is not a Muslim civil rights organization.

33.

Before CAIR was created, its partner group, the IAP was funded by its parent, Hamas through Hamas leader Abu Marzook. CAIR was founded by numerous terror affiliated individuals including those who operated the IAP. A third group, the Holy Land Foundation had similar funding sources. The groups cross funded each other, raised funds for each other and shared directorships.

34.

Exhibit 1 (9/11 36) shows that the IAP received $ 858,185.00 from Hamas operative Marzook from 1986 to 1992. This document which is an exhibit of the United States government in United States v. Holy Land Foundation, Case No. 3:04-CR 240-G is also supported by the testimony at the trial.

35.

Exhibit 2 (see last page) shows that this same Marzook gave $ 210,000 cash to the Holy Land Foundation in 1992. The Holy Land Foundation was the charity arm of Hamas in America.

36.

CAIR received money at its inception from the HLF by wire transfer (Exhibit 3).

37.

Since that time it has received massive influxes of money from foreign sources.

38.

In 2005, CAIR's Washington branch received a donation of $ 1,366,466 from a Saudi Arabian named Adnan Bogary. This was a major portion of the listed budget for that year. (Exhibit 4, front page and page 9 of 2005 Tax Return)

39.

**Alwaleed Bin Talal** of Saudi Arabia gifted $500,000 toward CAIR's library book initiative, called 'Islamic Culture & Civilization,' which began in September of 2002.   The books distributed were virulently anti-Semitic.

40.

In June 2003 funding for CAIR's Washington, D.C. headquarters was subsidized by a $250,000 grant from the Islamic Development Bank, an international financing organization based in Jeddah and run by a Saudi national, Dr. Ahmad Mohamed Ali.

41.

This bank manages the Al-Quds and the Al-Aqsa Funds, which are funds established by twelve Arab countries in order to provide financial support to the Palestinian intifada and provide money to the families of Palestinian homicide bombers.

42.

In November 2002 the World Association for Muslim Youth (WAMY),  a Saudi government-funded organization responsible for radical, Wahhabi proselytizing and recruitment, gave financial support for a 2002 CAIR weekly advertising campaign in American publications. This gift to CAIR is valued at $1.04 million.

43.

The Foreign Agents Registration Act (FARA) was enacted in 1938. FARA is a disclosure statute that requires persons acting as agents of foreign principals in a political or quasi-political capacity to make periodic public disclosure of their relationship with the foreign principal, as

11

well as activities, receipts and disbursements in support of those activities.  Disclosure of the required information facilitates evaluation by the government and the American people of the statements and activities of such persons in light of their function as foreign agents. The FARA Registration Unit of the Counterespionage Section (CES) in the National Security Division (NSD) is responsible for the administration and enforcement of the Act.

44.

CAIR is a foreign agent and has violated the law by not registering under the act and by not paying taxes on the money received from these foreign sources.

## THE FIRST AMENDMENT DOES NOT PROTECT
## CAIR'S CRIMINAL CONDUCT

45.

CAIR was formed by Hamas to be a tool in a conspiracy which imperils public safety, peace and order.  Speech and expression in furtherance of this type of criminal conspiracy is not protected by the First Amendment. (*United States v. Dickens,* 695 F.2d 765, 772 (3d Cir. 1982), cert. denied, 460 U.S. 1092, 103 S. Ct. 1792, 76 L. Ed. 2d 359 (1983); *Northeast Women's Center Inc.,* 886 F2d 1342, 1349).

46.

CAIR is part of a conspiracy that intends to eliminate the United States Constitution and replace it with Sharia law.  Murder, terror and other RICO predicate acts are the tools of this conspiracy.   Therefore, this lawsuit is not addressing the speech aspect of CAIR's conduct but instead addresses the intentionally intimidating conduct of CAIR that is spoken or printed. (See e.g. Virginia v. Black, 538 U.S. 343 (2003) holding that the statutory prohibition of cross-burning with the intent to intimidate did not violate respondents' right to freedom of speech, since the statute banned intentional intimidating conduct rather than expression.

12

47.

CAIR's role is to represent Hamas in America but to pretend to be a civil rights organization so that Americans and American Muslims in particular will not know their true identity and motives.  This is explained in detail later in the complaint.

48.

The conduct of CAIR against Michael Savage is not protected by the First Amendment because "... the First Amendment in its full sweep does not protect one in speech, publication, or assembly in furtherance of a conspiracy to promote evasion of an act reasonably designed to protect the Government against destruction by military force. Cf. Schenck v. United States[4] ... (Kiyoshi Okamoto v. United States, 152 F.2d 905, 907 (10th Cir. 1945))

49.

CAIR fills a role in the conspiracy which includes the following:

A.  Promotion of individuals and organizations which actively promote and carry out terror.

B.  Evading immigration law by establishing false charities to allow Hamas operatives to enter the United States under the auspices of working for these charities.

C. Raising money that supports Hamas and its terror activities.

D. Funding the families of homicide bombers as a reward for the commission of murder.

E. Providing legal representation for Hamas operatives in the United States.

F. Promoting Hamas operatives into positions of power in the Muslim community.

G. Providing media support for Hamas terrorists arrested or exposed in the United States.

H. Silencing U.S. critics of Hamas and Islamic terrorists.

I. Intimidating U.S. politicians who oppose Hamas and Islamic terrorists.

J. Providing funding and support for terrorists in the United States when such terrorists or terrorist organizations are exposed in the media or charged with terror related crimes.

_____

[4]247 U.S. 47 (1919)

13

K. Communicating through media and through private channels the policies and instructions of Hamas to operatives in the United States.

L. Recruiting Americans to join Hamas.

M. Silences American critics of Hamas through lawsuits and/or threats of lawsuits filed without any chance of success knowing that the lawsuits cannot prevail but that there will be a chilling effect due to the inability of ordinary Americans to defend the lawsuits.

N. Causing economic harm to coerce American media and political figures who express views in opposition to Hamas or its positions so as to silence them.

O. Interfering with investigations into terrorist activities.

P. Silencing private citizens by initiating legal actions against those who wish to report suspicious activity that they believe may be linked to terror.

Q. Interfering with and impeding law enforcement investigations of terror activities and terror crimes.

50.

The conduct directed against Michael Savage was specifically designed to harm a critic of violent Jihad, to raise money to support violent Jihad and to promote a false image of CAIR as a civil rights organization which it is not. That false image is necessary to allow CAIR to carry out illegal conduct without detection.

51.

Salinas v. United States, 522 U.S. 22, 63-64 (1997) held that "[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." *Id.* at 64

52.

CAIR's conduct against Michael Savage is part of a larger picture of conduct that is not protected by the First Amendment.

53.

CAIR seeks to end constitutional government in the United States and its conduct against Michael Savage is part of a multi-front attack on the United States by violent Islamic groups.

14

54.

CAIR has no civil rights purpose.  CAIR's sole purpose from the moment it was incorporated has been to achieve the goals of Hamas.   This complaint will show how CAIR is Hamas.

55.

The goals of Hamas are listed in the Hamas Charter, attached hereto as Exhibit 5 and include but are not limited to the following:

The Prophet, Allah's prayer and peace be upon him, says: "The hour of judgment shall not come until the **Muslims fight the Jews and kill them**, so that the Jews hide behind trees and stones, and each tree and stone will say: 'Oh Muslim, oh servant of **Allah, there is a Jew behind me, come and kill him**,' except for the Gharqad tree, for it is the tree of the Jews." (Recorded in the Hadith collections of Bukhari and Muslim).

(Charter - Article 7 - final paragraph, emphasis added)

The initiatives, the so-called peace solutions, and the international conferences for resolving the Palestinian problem stand in contradiction to the principles of the Islamic Resistance Movement ...

(Article 13)

"By the name of Him who holds Muhammad's soul in His hand, **I wish to launch an attack for the sake of Allah and be killed and attack again and be killed and attack again and be killed**." (Recorded in the Hadith collections of Bukhari and Muslim)

(Article 15, Emphasis added)

With money **they have taken control of the world media** - news agencies, the press, publishing houses, broadcasting services, etc. With money they sparked

15

revolutions in various countries around the world in order to serve their interests and to reap profits. **They were behind the French Revolution and the Communist Revolution** and [they are behind] most of the revolutions about which we hear from time to time here and there. **With money they have formed secret organizations, all over the world, in order to destroy [those countries'] societies** and to serve the Zionists' interests, such as the Freemasons, the Rotary Clubs, the Lions, the Sons of the Covenant [i.e. B'nei B'rith], etc. All of these are organizations of espionage and sabotage.

(Article 22, Emphasis added)[5]

56.

They were [also] behind World War II, through which they reaped enormous profits from commerce in war materials and paved the way for the establishment of their state.

(Article 22)[6]

57.

The attack against Michael Savage was done in part to disguise these (and other) true beliefs and true purposes of CAIR.

---

[5]This is similar to the language of Adolph Hitler:
That is why the Jewish state-which should be the living organism for preserving and increasing a race-is completely unlimited as to territory. For a state formation to have a definite spatial setting always presupposes an idealistic attitude on the part of the state-race, and especially a correct interpretation of the concept of work. In the exact measure in which this attitude is lacking, any attempt at forming, even of preserving, a spatially delimited state fails. And thus the basis on which alone culture can arise is lacking.
(Mein Kampf)

[6]This is similar to the Protocols of the Elders of Zion.
Throughout all Europe, and by means of relations with Europe, in other continents also, we must create ferments, discords and hostility. Therein we gain a double advantage. In the first place we keep in check all countries, for they will know that we have the power whenever we like to create disorders or to restore order. All these countries are accustomed to see in us an indispensable force of coercion. In the second place, by our intrigues we shall tangle up all the threads which we have stretched into the cabinets of all States by means of the political, by economic treaties, or loan obligations.
(Protocol 7)

16

58.

The conduct of CAIR against Michael Savage and the conduct of CAIR as set forth in great detail herein, was never intended to advance the civil rights of Muslims. It was always intended to advance the interests of Hamas and those interests are terrorist interests. There is no western concept of civil rights in the Hamas philosophy. Civil rights to Hamas is Sharia law and Sharia law does not recognize civil rights as Americans understand them.

59.

In disguising their purpose, CAIR increases the value of its services to the conspiracy.

60.

By falsely claiming to be a civil rights group, CAIR provides cover for its propaganda activities in support of the conspiracy. While the web pages relating to Michael Savage purport to seek interfaith cooperation to fight bigotry, CAIR is actively sponsoring Nazi like propagandists whose job is to recruit violent terrorists and to subvert world opinion so that terror attacks will be tolerated.

### *CAIR AS THE AMERICAN PROPAGANDA TOOL FOR HAMAS*

61.

This complaint details how Hamas formed CAIR in order to promote violent Jihad.

62.

The formation of CAIR in 1994 can be viewed as a tactical change by Hamas. The tactic(s) of CAIR were conceived of first and then the form of CAIR was conceived in order to effectuate the new tactics of Hamas. Although the tactics were new the goals never have changed.

63.

If President Clinton had not successfully negotiated an Israeli-Palestinian peace agreement, CAIR may never have been formed and a U.S. presence of Hamas would have proceeded using the existing political arms of Hamas that had been in existence prior to 1994.

64.

There were three active Hamas organizations started by Hamas in the late 1980's, prior to

17

CAIR's formation.  Only two of those groups had significant activity.

65.

The International Association for Palestine (IAP) was the radical recruiting arm of Hamas.  The Holy Land Foundation was the charitable arm of Hamas which raised funds in the United States for use in Palestine.

66.

The FBI has seized documents from a group called the Palestine Committee which is a group of Hamas conspirators whose job was to establish a Hamas presence in the United States. (This complaint will trace how Hamas itself is part of the Muslim Brotherhood and these men were also members of that group).

67.

The memos of those conspirators show the illegal purpose of the Muslim Brotherhood and Hamas.  Later in this complaint the same conspirators formed CAIR to advance these same goals of the Palestine Committee.

\

68.

Exhibit 6 is an English translation of an Internal Memo of the Palestine Committee that predates the formal incorporation of CAIR.  At page 11, it details how the American Jihad is to be fought on various fronts.  The document states that their "job is to make the Palestinian cause victorious and to support it with what it needs of media, money, men and all of that."

69.

Despite the understanding of the need to mobilize "media" to support the cause, little media was done by Hamas prior to the formation of CAIR in 1994.

70.

One of the key reasons that CAIR was formed was so that Hamas could use the American media to promote its terror agenda.  (This complaint explains how.)

71.

The use of media to support terrorism is an act in furtherance of a criminal conspiracy and

18

is not protected by the First Amendment.

72.

The Internal Memo also speaks of strengthening ties with the Ikhwan of the Shamm countries. The Ikhwan movement, is a militant extension of Wahhabism, founded in 1913. (Page 13, item 8). It talks about having the "Ikhwan" increase financial support so that the "brothers in charge of Palestine action can fulfill the work requirements." "[T]he work requirements" include terror.

73.

The document also specifically references Hamas, on page 14, item 17, "Asking the countries to increase the financial and moral support for Hamas.

74.

This was the ongoing conspiracy when CAIR was formed in 1994. However, CAIR didn't join the conspiracy in 1994, it already was part of the conspiracy. It was simply a tool created by Hamas to present a false civil rights mask to the American public.

75.

CAIR is no more a real civil rights organization than the actors in Star Wars are real Wookies.

76.

The actions of CAIR are not constitutionally protected because they were designed to imperil public safety, peace and order as they had criminal goals as set forth herein. Michael Savage was damaged personally and financially so that a criminal conspiracy and criminal enterprise could advance its illegal goals. This is not protected speech. (Northeast Women's Center Inc. 868 F.2d 1342, 1349)

77.

This complaint analogizes the work of CAIR and its spokespersons to the work of Josef Goebbels. Like CAIR, Goebbels used propaganda to silence dissent, promote the Nazi cause, ease the minds of the population to genocide and to promote the overall goals of Hitler's regime.

78.

19

Goebbels escaped prosecution at Nuremberg by committing suicide before his capture, but the tribunal prosecuted other propagandists for war crimes including Hans Fritzsche, one of the individuals chiefly responsible for Nazi newspaper and radio propaganda.

79.

The prosecutor at the tribunal explained that Fritzsche was not on trial as a journalist. "Fritzsche is not in the dock as a free journalist but as a propagandist who helped substantially to tighten the Nazi stranglehold over the German people, who made the excesses of the conspirators palatable to the German people, who goaded the German nation to fury and crime against people they were told by him were subhuman.

80.

The prosecutor stated that: "Without the propaganda apparatus of the Nazi State, the world would not have suffered the catastrophe of these years, and it is because of Fritzsche's role in behalf of the Nazi conspirators, and their deceitful and barbarous practices, that he is called to account before the International Military Tribunal."

81.

Plaintiff invokes this international law precedent and the simple fact that extortion, extortion to violate 18 USC 1951, and providing material support for murder, terror and other RICO act violations is not protected speech.

### *EXAMPLES OF CAIR USING PROPAGANDA TO SUPPORT TERROR*

### *Dehumanization of Jews by CAIR*

82.

One of the tools of Hamas is to degrade Jews in the eyes of the world and in the eyes of the Muslim population so that the world will be silent and allow harm to come to Jews. The degrading is also aimed at recruiting people to harm Jews. This is one of CAIR's actual goals,

20

1    not civil rights and not interface understanding.

2                                    83.

3          CAIR promotes appearances of terrorists and terror apologists the way that Bill Graham

4    promoted rock stars.  The goal of CAIR is to dehumanize Jews and to radicalize Americans,

5    especially Muslim American youth so that they will financially support and join in Jihad[7].  This

6    is part of their role in the conspiracy and violates 18 U.S.C. 1962 (c) and (d).   Examples include

7    but are not limited to the following.

8

9                   **- "Jews [are the] Descendants of the Apes"**

10                                   84.

11         In 1998 the three Hamas formed groups, the Islamic Association for Palestine (IAP),

12   CAIR and the Holy Land Foundation, sponsored at conference at Brooklyn College in Brooklyn,

13   New York.  A featured speaker told the audience in Arabic:

14         "The Jews distort words from their meanings. . . . They killed the prophets and

15         worshiped idols. . . . Allah says he who equips a warrior of Jihad is like the one

16         who makes Jihad himself."  Ghoneim then reminded the audience of the Jews'

17         "infidelity," "stealth," and "deceit," and told the audience that the Israeli/Palestine

18         conflict was fundamentally not a dispute over land, but over belief: "Suppose the

19         Jews said 'Palestine you [Muslims] can take it.' Would it then be ok? What would

20         we tell them? No! . . . The problem is belief, it is not a problem of land." Ghoneim

21         then led his rapt audience, which numbered as many as five hundred, in a special

22         song, with the audience responsively repeating each refrain:

23   Transcript [Translated from Arabic]:

24   No to the Jews Descendants of the Apes

25   We vow to return Despite the obstacles (CHORUS)

26   _____

27         [7]Jihad in this complaint denotes activity designed to forcibly impose Sharia law on others.
     It is not meant to denote the alternative view of the word which involves a non-violent spiritual
28   journey.

                                     21

The collaborators have sold The Land of Ascension

Without Shame They bowed to the Jews

(Chorus)

"Oh Ben Gurion" Zion is ours

[Line is unclear]

A mean Jew (Chorus)

Generations have past Refusing humiliation

The heroes attacked The heroes of steadfastness

(Chorus)

85.

**Wagdi Ghunaym**

In 1998, CAIR co-hosted an event at which an Egyptian Islamist[8] leader, Wagdi Ghunaym, declared Jews to be the "descendants of the apes."[9]

86.

**Yusef Islam**

In 1996, Yusuf Islam—the Muslim convert formerly known as the singer Cat Stevens—gave a keynote speech at a CAIR event. The contents of the speech itself are not known but Islam wrote a pamphlet published by the Islamic Association of Palestine.

The Jews seem neither to respect God nor his Creation. Their own holy books contain the curse of God brought upon them by their prophets on account of their disobedience to Him and mischief in the earth. We have seen the disrespect for religion displayed by those who consider themselves to be "God's Chosen

---

[8]"Islamist" is used in this complaint as defined in the Merriam Webster Online dictionary: 2. a popular reform movement advocating the reordering of government and society in accordance with laws prescribed by Islam." It is not used to signify someone who simply follows the religion without this political agenda.

[9]This was not intended as an endorsement of Darwin.

People."[10]

87.

In September of 2002, the Council on American-Islamic Relations (CAIR) began an ambitious project, whereby thousands of libraries across America would be provided with sets of books promoting Islam. The books included a version of the Quran that was banned by the Los Angeles school system for having anti-Semitic commentaries. Among the commentaries in the book are the following:

The Jews in their arrogance claimed that all wisdom and all knowledge of Allah were enclosed in their hearts… Their claim was not only arrogance but blasphemy."

88.

CAIR is using its persona as a Muslim civil rights organization to silence Michael Savage. However, as set forth herein, there is no civil rights concept involved in what they are doing. CAIR does not believe in civil rights. CAIR is Hamas and they believe only in Sharia law where civil rights as Americans know them, do not exist.

89.

With the real purpose established, CAIR has no First Amendment purpose. CAIR is attacking Michael Savage economically and by libel, slander and statements that place him in a false light. They are doing this to give breathing room to their criminal conspiracy. They are also doing this to raise money for Hamas.

90.

---

[10]Following 9/11, Yusuf Islam seemed to return to his "Peace Train" roots, stating:

"I wish to express my heartfelt horror at the indiscriminate terrorist attacks committed against innocent people of the United States yesterday. While it is still not clear who carried out the attack, it must be stated that no right-thinking follower of Islam could possibly condone such an action."

He has never publically apologized for his statements about Jews.

This conduct of CAIR constitutes extortion.  Michael Savage is being attacked financially and personally unless and until he modifies his speech or makes statements acceptable to CAIR. CAIR is committing this extortion in order to violate Michael Savages First Amendment speech rights because CAIR believes that its religion requires this.  However, there is no exception to the Hobbs Act, permitting extortion for a religious purpose. (See *United States v. Starks*, 515 F.2d 112, 124 (3d Cir. 1975))

91.

The ultimate goal of CAIR is to steal our freedom and not our money.  It is a well-established precedent holding that lack of economic motive does not constitute a defense to Hobbs Act crimes.  *See United States v. Starks, 515 F.2d 112, 124 (3d Cir. 1975)*; Northeast at 1350.

92.

Michael Savage is not the only public person to assert that CAIR has ties to terror. Senator Charles Schumer has described CAIR as an organization "which we know has ties to terrorism." (Sept. 10, 2003)

93.

Senator Dick Durbin (Democrat, Illinois) observed that CAIR is "unusual in its extreme rhetoric and its associations with groups that are suspect."

94.

In 2006, Senator Barbara Boxer withdrew a "certificate of accomplishment" to be awarded to Sacramento activist Basim Elkarra after she learned that he serves as an official with the Council on American-Islamic Relations (CAIR).  Senator Boxer directed her staff to look into CAIR, and Senator Boxer then "expressed concern" about past statements and actions by the group, as well as assertions by some law enforcement officials that it "gives aid to international terrorist groups".

## CAIR'S PROPAGANDA IS USED TO EXTORT
## THE UNITED STATES & ISRAEL

24

95.

Terror bombings by Hamas have an obvious goal of both killing and creating fear.  There is an extortion that accompanies terror bombings and CAIR has an important role in that extortion.

96.

Once the target population is afraid, the terrorist needs to tell the population what it can do to avoid further acts of terror.   The point of terror is not only to create fear, but to then use that fear to accomplish a goal.

97.

CAIR's job is to dictate the terms of the terrorists.  In doing so CAIR violates 18 U.S.C. 1962(c) and as done in conspiracy, 18 U.S.C. 1962(d).

98.

CAIR representatives regularly appear on national television and in the press following terror attacks.

99.

CAIR attempts to monopolize television time so that other Muslim groups cannot speak to the American public.  CAIR does this so that only the Hamas voice can be heard.

100.

The domination of the media by CAIR is done under the false pretense of being a moderate Muslim civil rights group.  In fact, when CAIR sends representatives to appear on television following terror attacks it has just the opposite purpose.  CAIR is intending to dictate terms of surrender.

101.

CAIR's demands are couched in vague terms of bridging gaps of "misunderstanding" but always, in every single case, CAIR also states the demands of Hamas or other terrorists.  The demands always, ultimately blame the victim for the attack and demand that America changes its conduct internationally in order to avoid the same terror attacks on our soil. (Or repeated terror attacks if the terrorism is U.S. based).

25

102.

Plaintiff notes that couching extortion demands in so-called reasonable terms is a standard tactic of criminals.

"The more vague and general the terms of the extortion demand the greater the the better it would subserve the purpose of the accuser in magnifying the fears of his victim, and the better also it would serve to protect him in the event of the failure to accomplish his extortion and of a prosecution for his attempted crime." (People v. Sanders, supra, at pp. 749–750; see People v. Massengale (1968) 261 Cal. App. 2d 758, 764–765 [68 Cal. Rptr. 415].)

(*Flatley v. Mauro*, 39 Cal. 4th 299, 328 (Cal. 2006))

103.

CAIR's propaganda as set forth above is designed to work in tandem with statements made by Hamas or by related terrorists who are part of the enterprise and conspiracy.

104.

The actual terrorists take credit for murders to bring glory to themselves and their groups. This promotes their group and helps recruit money and additional terrorists. It also instills fear in the victims. It then falls upon CAIR and other groups, to reduce fear in exchange for concessions.

105.

Without the CAIR portion of this terror, the extortions would be far less effective.

106.

Exhibit 7, Video 1 is from the Hamas website (in February 2006) published the video of Adham Ahmad Hujyla Abu Jandal which he prepared before he murdered civilians by blowing himself up on December 7, 2004. In the video he states:

"My message to the loathed Jews is that there is no god but Allah [and] we will chase you everywhere! We are a nation that drinks blood, and we know that there is no blood better than the blood of Jews. We will not leave you alone until we have quenched our thirst with your blood, and our children's thirst with your

26

blood. We will not leave until you leave the Muslim countries..."

The same publicity arm published the following video by Reem Riyashi which she prepared before her murder attack on January 14, 2004.  This was published on the Hamas website in January 2004.

107.

Another killer, posted her video and states "I am the Shahida Reem Saleh Riyashi. I hoped that the shredded limbs of my body would be shrapnel, tearing the Zionists to pieces, knocking on Heaven's door with the skulls of Zionists...

"How often I spoke to my soul, 'O soul, if you loathe the Zionists, enemies of my religion, my blood shall be my path to march to Heaven. Since 8th grade I have striven, seeking people daily to guide, listen and help me...

"How often I dreamed, how often I desired to carry out a Shahada-seeking [suicide] operation inside Israel, and by perseverance, and with Allah's grace, my wish was fulfilled as I wanted.

108.

Exhibit 8, Video 2 is a video produced by Hamas, of a daughter honoring her mother and her mother's act of terror.

109.

Another video from Hamas television has the children of homicide bomber Rim Al-Riyashi, interviewed on Hamas television. They are asked "How many Jews did Mama kill?". This aired March 8, 2007.

110.

These are the types of statements that can be heard from many speakers at CAIR conventions and conventions of other Hamas groups in America, (as cited herein).  (See for example, Exhibit 48, a video of a speech made at a CAIR convention that encourages women to be shivs for Islam.)

111.

CAIR promotes the training speeches that are then mimicked by young homicide bombers

27

such as those above. It then fulfills the other part of its role by bemoaning the killings and dictating terms. The changing roles of CAIR seem inexplicable to Americans who tend to accept CAIR as the civil rights group that they see on CNN. They do not normally reconcile the "civil rights group" with the psychological training of homicide bombers but they are tied to that as well, both directly and through its partners the IAP and Hamas. In the end, it is all the act of one entity, Hamas.

112.

The conduct then of CAIR is illegal as a matter of law and cannot be made legal by invoking the First Amendment. One cannot conspire to commit crimes and then sanitize the crime by crying "First Amendment". CAIR at all times has criminal intent and no intent to promote civil rights.

### NOERR PENNINGTON ANALYSIS OF CAIR LAWSUITS

113.

The attack on Michael Savage is part of an organized campaign to illegally intimidate Americans. Among the silencing tactics of CAIR/Hamas is economic warfare by filing of lawsuits that can never win but which terrorize the victim and threaten the victim with economic ruin, even if they win. This conduct is part of CAIR's role to further the conspiracy in violation of 18 U.S.C. 1962(c) & (d).

114.

CAIR has filed many lawsuits against United States citizens for the purpose of frightening them and causing economic harm due to the mere filing of the lawsuit (even though the lawsuits lack any potential merit). These lawsuits were "sham" lawsuits as they had no objective possibility of succeeding and CAIR had no genuine desire to seek judicial relief. *(Prof'l Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (U.S. 1993)

115.

The lawsuits are designed to silence critics of Hamas terror activities just as the economic attack on Michael Savage was done to silence media critics of violent in the name of Islam.

116.

One of the tools of Hamas in silencing those who oppose killing and terror is to target people who cannot afford to defend lawsuits.

117.

The attack on Savage was against advertisers because Savage was perceived as having sufficient funds to fight a lawsuit. The lawsuits are generally directed at people who cannot afford to fight a lawsuit. Therefore, tactically, CAIR picks the most economically damaging process so that they can maximize harm to their victims.

118.

CAIR never intended the lawsuits herein to reach any stage where relief would be granted. The cases were without legal merit and CAIR knew that they were without legal merit.

119.

The sole purpose was to use the lawsuits as a threat and as economic coercion so that critics of CAIR, Hamas and violence in the name of Islam would be silenced. Examples are:

**Andrew Whitehead**

120

On March 31, 2004, CAIR sued Andrew Whitehead, an individual with limited financial resources. Whitehead operated a website highly critical of CAIR. This website exposed CAIR's ties to Hamas.

121.

Whitehead's website contained absolutely true and correct allegations against CAIR. CAIR knew that the allegations were true and correct. Therefore, CAIR's lawsuit for libel (and libel related causes of action) could never have succeeded and CAIR knew this.

122.

Further, the website content was protected by the First Amendment and CAIR had no objective basis to believe that any matter on the website was outside the realm of First Amendment protections.

123.

CAIR filed the lawsuit solely to intimidate Whitehead and to intimidate the tens of thousands of people who viewed his website daily.

124.

CAIR miscalculated, as Andrew Whitehead received free legal assistance and vigorously fought the lawsuit.

125.

CAIR dismissed the lawsuit when discovery focused on the truth of the allegations as to CAIR's connection to Hamas and other terror groups. The website now contains the same materials that were the subject of the sham lawsuit.

**Young American Foundation**

126.

The YAF is a conservative student group.

127.

Robert Spencer is an author and lecturer whose speciality is Islam and Terrorism.

128.

The YAF sponsored a speech by Robert Spencer. The speech was titled "The Truth About the Council on American Islamic Relations". The speech was to focus on the connections between CAIR and CAIR's leadership to terrorists.

129.

Prior to the speech, CAIR had an attorney who rents space from CAIR at its national headquarters, write a threatening letter to YAF in an attempt to violate the First Amendment rights of YAF and Robert Spencer. (Exhibit 10).

130.

The letter libeled Robert Spencer by falsely claiming that Spencer was a bigot.

131.

The letter libeled Robert Spencer by falsely claiming that he had made many false and defamatory statements.

30

132.

Under threat of litigation, the attorney demanded that the speech be cancelled.

133.

This threat was an attempt to interfere with the First Amendment rights of the YAF and Robert Spencer. The threats had no legal basis. They were simply threats that a sham lawsuit lacking any objective or subjective merit would be filed.

134.

The YAF went forward with the lecture and CAIR never filed suit.

**Sara Townsley - Cornell Student Newspaper**

135.

Sara Townsley was a columnist of the Cornell University student newspaper.

136.

On Oct. 19, 2004 Ms. Townsley wrote an article, titled "A Vote for Kerry is a Vote for the Enemy." As part of her argument, Ms. Townsley stated that CAIR officials "have defended suicide bombers, funneled money to Hamas, and at least five of its leaders have been deported, indicted, or convicted on terrorism charges."

137.

All of the statements made by Ms. Townsley about CAIR were true and correct.

138.

The day that the article was published, CAIR sent a letter which attacked Ms. Townsley stating that:

"Ms. Townsley uses regurgitated smears against CAIR from right-wing websites and noted Islamophobes such as Daniel Pipes and Steven Emerson"

139.

CAIR then attempted to interfere with the First Amendment rights of the Cornell newspaper and Ms. Townsley by demanding the column's immediate removal and apologies for

31

"these vicious attacks". CAIR further demanded permission to submit an oped.

140.

The CAIR letter also threatened that "If you elect to publish or distribute this confidential letter to any person or entity in any form; suit will be filed forthwith." A demand letter and threats to the press is not a "confidential letter" and the threat was meant for intimidation purposes only.

141.

The Cornell Daily Sun refused to be intimidated but like Michael Savage[11], offered CAIR the opportunity to write a response. CAIR refused and threatened a lawsuit which was never filed.

142.

**Congressman Cass Ballenger**

On October 3, 2003, Congressman Cass Ballenger allegedly told a reporter that CAIR is the fundraising arm for Hezbollah.

143.

CAIR does in fact assist Hezbollah but their primary fundraising is for Hamas. However, the error in identifying which terror group CAIR funds is not objectively or subjectively a slander.

144.

Congressman Cass Ballenger as a member of Congress is immune from suit for expressing his views on matters of national security. The lawsuit had no objective chance of success and it was dismissed because members of Congress are protected in their job related speech.

145.

This sham lawsuit for slander was filed against Congressman Ballanger for intimidation

---

[11]On the air, Michael Savage offered to have a discussion with CAIR director Hooper, on air.

32

purposes.

146.

The lawsuit was a misguided attempt by CAIR to extend their intimidation from the private sector to Congress.  While it was a miscalculation to believe that any U.S. Congressman would bow to pressure from a foreign terror group, CAIR thought that it could intimidate the Congressman.

147.

The lawsuit was dismissed.  In any case, even if the matter had gone to trial there was no slander.  Congressman Ballanger's statement was fundamentally correct.   A copy of the dismissal order from U.S. District Court Judge Richard Leon (USDC Dist. Columbia) is attached as Exhibit 9.

**David Frum - Canadian Columnist**

148.

David Frum is a former White House speech writer and at all times relevant to this section of the complaint Frum was a writer for Canada's National Post newspaper.  Frum was served by CAIR with a notice of libel.

149.

CAIR accused Frum of having written previously in the National Post an article that characterizes CAIR (in the words of the notice served on him) as "an unscrupulous, Islamist, extremist sympathetic group in Canada supporting terrorism".

150.

The statements by Frum are and were true but under Canada's libel laws, the burden of proof is on the writer, not the subject of the statement.  CAIR Canada sued Frum.

151.

The case settled with Frum making a public statement that included the statement that CAIR-Canada was a civil rights organization.

**Flying Imam Case**

33

152.

**Omar Shahin (Shaheen)** is a so called "Sensitivity Trainer" for CAIR-Arizona and former Arizona Coordinator of IAP's (dissolved) sister organization, the Holy Land Foundation for Relief and Development (HLF).

153.

On November 20, 2006, Shahin, along with five other imams started to pray just outside the boarding ramp of their flight.

154.

Once on the plane, each of the men switched their seats for no apparent reason. They also were not sitting together.

155.

They then demanded seatbelt extenders, although none of them seemed to need one. Seatbelt extenders can be used as weapons.

156.

This behavior terrified passengers who contacted the crew. The Captain made the decision to ask them to leave the plane until their behavior could be clarified.

157.

The conduct was a set up. The Imams had been deliberately provocative.

158.

CAIR then represented the Imams in a lawsuit. They threatened suit not only against the airline itself but against the passengers who reported the suspicious behavior.

159.

The Imams and CAIR then did the publicity tour.

160.

Shahin chortled, "[I]f they don't trust the security, this is their problem, not our problem." (statement by Omar Shahin, made during November 2006 teleconference discussing legal action(s) to be taken by flying imams).

34

161.

When the CAIR lawyers threatened to sue the ordinary passengers they did this as a threat to all U.S. citizens.  They intended to chill the reporting of suspicious behavior.

162.

There was no objective possibility that CAIR or its plaintiffs could ever prevail in a lawsuit against any of the defendants.

161.

The lawsuit was and is a sham, designed to weaken protections against airline terror by making passengers and crew less likely to report obviously suspicious activity.

162.

In this lawsuit CAIR used its false persona as a civil rights organization to pursue goals which were illegal and not protected by the First Amendment.

## CAIR INTIMIDATION OF VOCAL CRITICS OF VIOLENCE
## IN THE NAME OF ISLAM
## ATTACKS ON PUBLIC / QUASI PUBLIC FIGURES

163.

By attacking public figures and threatening them economically, CAIR sends a message to citizens of the United States that CAIR is more powerful than iconic American media figures. This is part of CAIR's role to further the goals of the conspiracy and violates 18 U.S.C. 1962(c) & (d).

164.

By falsely relying upon a civil rights persona, CAIR intimidates these public figures by threatening to wrongfully paint them as racist, when in fact the public figures are simply expressing points of view in opposition to violence in the name of Islam.

165.

Some examples are:

**Paul Harvey**

On December 4, 2003, ABC radio personality Paul Harvey, described the vicious nature of cock fighting in Iraq, then commented:

"Add to the [Iraqi] thirst for blood, a religion which encourages killing, and it is entirely understandable if Americans came to this bloody party unprepared."

166.

CAIR responded a day later with a demand for "an on-air apology." CAIR then issued a call to its supporters to contact Harvey's advertising sponsors to press them to pull their ads "until Harvey responds to Muslim concerns."

167.

Paul Harvey quickly and publicly retracted his remarks.

**Mike Frazier**

168.

CAIR resorted to another form of intimidation versus Florida radio show host and Baptist pastor Mike Frazier.

169.

Frazier had criticized local and state officials in September 2004 for attending a CAIR awards dinner because, as he put it, "If these people would have bothered to check CAIR out beforehand they would have seen that it is a radical group."

170.

CAIR made public pronouncements against him and within a month, he received six death threats and forty-seven threatening phone calls, was accosted by strangers, was labeled an "extremist" and a "fundamentalist zealot," and accused of "propagating fear, terror and disunity" by the St. Petersburg Times.

**Simon Wiesenthal Center**

171.

In 1998, the Simon Wiesenthal Center juxtaposed a picture of the Ayatollah Khomeini next to Adolf Hitler, for a Reader's Digest article titled, "The Global War on Christians,".

172.

36

CAIR came to the aid of the Ayatollah using the same tired bias claim. CAIR alleged that the Wiesenthal Center article "smears Islam" by citing well-documented cases of Christian persecution. CAIR's Nihad Awad faulted the Reader's Digest for leaving the impression that Islam somehow encourages or permits rape[12], kidnaping, torture, and forced conversion."

**Captain Edwina McCall**

173.

In December 2003, CAIR ruined the career of an army officer and nurse, Captain Edwina McCall, who had treated American soldiers wounded in Iraq and Afghanistan but ended up resigning under a cloud of suspicion.

174.

Captain McCall used her military e-mail address on an Internet discussion board concerning the Islamist agenda.

175.

Seizing on this error (in using the military email), CAIR sent the comments to the secretary of defense, calling attention to her allegedly "bigoted anti-Muslim comments" and demanding that her "extremist and Islamophobic views" be investigated and then followed by "appropriate action."

176.

The Army immediately cast the officer under suspicion, leading her to resign from a career she had loved.

**Dr. Laura Schlessinger**

177.

Another victim of a criminal boycott threat is radio show host, Dr. Laura Schlessinger. Dr. Schlessinger is the mother of a U.S. soldier who was deployed in Iraq and who has now

---

[12]Rape is forbidden under Sharia law and a women can seek prosecution if and only if the man confesses or four men (not people, men), see the actual penetration. It is estimated that 1/4 of the women in prison in Pakistan are rape victims who dared come forward but could not "prove" rape. They were then imprisoned for adultery.

returned home safely.

178.

While her son was in combat, Dr. Laura received a call from a student who questioned whether she should be forced by her school to go to a Mosque in order to learn "tolerance".   Dr. Laura stated:

"This is a class on morals. What is the point of going to a mosque? ... You're joking of course. How many Americans have tortured and murdered Muslims. I think you ought to stand up against this class and this teacher. This is despicable. You tell him you are willing to go to the mosque only if it is one that has done its best to rout out terrorists in its midst.

179.

CAIR then attacked "Dr. Laura" and threatened a boycott of her advertisers.  This is structurally what CAIR has done to Michael Savage.

180.

Dr. Laura Schlessinger faced an economic onslaught funded by millions of dollars of Saudi and other money.  She stood alone against an organized attack with foreign funding.  As the Hamas charter states:

Our struggle against the Jews is very great and very serious. It needs all sincere efforts. It is a step that inevitably should be followed by other steps. The Movement is but one squadron that should be supported by more and more squadrons from this vast Arab and Islamic world, until the enemy is vanquished and Allah's victory is realized.

180.

Dr. Laura was not fighting a civil rights issue.  She was targeted by the representatives of Hamas, Saudi Wahabism and other radical groups.

**Michael Graham**

181.

38

On July 25, 2005, Radio Talk Show host, Michael Graham was fired from his job due to the threats made by CAIR against his station.

182.

Michael Graham had stated that Islam was "a terrorist organization" and that moderate Muslims are those who only want to kill Jews" and that "the problem is not extremism. The problem is Islam."

**David Harris**

183.

The Canadian Council on American-Islamic Relations (CAIR-CAN), sued David Harris for statements made on Ottawa radio station CFRA.

184.

David Harris is a lawyer involved in criminal and national security matters, David Harris is Director of the International and Terrorist Intelligence Program, INSIGNIS Strategic Research Inc. He is a former Chief of Strategic Planning of the Canadian Security Intelligence Service (CSIS).

185.

As a commentator on terrorism and national security, and witness at Congressional subcommittee hearings in Washington, his analyses have received international media attention.

186.

David Harris has been quoted in the New York Times, The Washington Post, and international news services, Mr. Harris has appeared on programs ranging from television's "America's Most Wanted," CBS's "60 Minutes," "NBC Dateline" and "The Today Show," to "The CBS News with Dan Rather" and CNN's "Wolf Blitzer Reports".

187.

Harris had accurately stated that "there are a number of officials and former officials of CAIR-USA who are now in custody and who are serving sentences on terrorist-related offences,

39

to which. I might add, they have pleaded guilty."

188.

Despite Canada's backwards libel laws that favor plaintiffs, the case was dismissed by the Ontario Superior Court of Justice on April 12, 2006.

**Shawn Steel**

_____189.

In May, 1998, Shawn Steel, a prominent attorney and one of the longest serving members of the California Republican party, spoke to a University of Southern California student group at a "support our troops" rally".

190.

He applauded the success of our troops and then stated that "The Islamic community has a cancer growing within it, which hates Jews, hates freedom, and hates Western society...the disease within Islam must be rectified".

191.

Just as CAIR has misquoted Michael Savage (at the bottom of the web page that attacks the radio segment that is the subject of this lawsuit), CAIR misquoted Shawn Steel.

192.

CAIR called his statements "anti-Muslim bigotry spewed by a minority of hate-mongers....". CAIR led a national campaign against Steel which resulted in hundreds of threatening and hate filled letters being sent to him.

### *HAMAS IS NOT JUST IN ISRAEL & PALESTINE*

193.

CAIR is Hamas in America and Hamas is an international terror organization.

40

194.

Hamas is listed as a terrorist organization by Canada, Israel, Japan, and the United States,

195.

Hamas is banned in Jordan, Australia and the United Kingdom.

196.

The European Union lists Hamas as a group 'involved in terrorist attacks' and has implemented restrictive measures against Hamas.

## 1. The Muslim Brotherhood - The Mothership of Terror

197.

Hamas, and therefore CAIR, is part of a broader organization called "The Muslim Brotherhood".

198.

The Muslim Brotherhood is an Islamist group that was formed in 1938 based upon the political structures of the emerging Italian and German fascist movements.

199.

The Muslim Brotherhood started in Egypt, but quickly grew to be an organization without borders. Like fascism and communism, the Brotherhood was a movement that sought to grow beyond its national borders.

200.

Like the fascists and communists, the Brotherhood exercised power utilizing a strong centralized command that established locally based organizations which espoused a populist philosophy. The populist philosophy was tailored to the specific issues of the group that they sought to recruit. This political effort was combined with a violent cadre of enforcers. The

41

violence often mixed with a utilization of the legitimate political process.

201.

This is the tactical strategy that led Hitler to power in Germany and Mussolini to power in Italy. It has not succeeded in Egypt although the Brotherhood has had significant power at various times.

202.

While emulating Mussolini and Hitler, the Muslim Brotherhood differed from Italian fascism and German National Socialism because its unifying principle was not nationalism but Internationalism. In that sense it was more like communism which crossed borders by espousing a common creed. In the case of the Muslim Brotherhood, that creed was a radical and highly politicized version of Islam.

203.

The Brotherhood was not the only group to draw on the teachings of fascism. During this same time period, the Mufti of Palestine was a supporter of Hitler and by 1941 he had moved to Berlin where he advocated the extermination of the Jews. In fact, after visiting Auschwitz, the Mufti criticized the Germans for killing too slowly.

204.

The political structures and virulently anti-Semitic rhetoric of those times has pervaded the development of radical Islam and it persists in the structures and ideology of today.

205.

Due to its borderless ideology, the Muslim Brotherhood has expanded itself organically by forming national groups that had an Islamist philosophy mixed with a nationalist agenda.

206.

The Muslim Brotherhood entered Palestine in 1983 by forming a group named Hamas. In the same fashion, Hamas entered the United States forming several groups including the

42

International Association for Palestine (IAP) and the Holy Land Foundation (HLP). In 1993 they formed a group that would disguise its radical origins and named it CAIR.

207.

Despite differing public faces, each group exists for a single internal purpose, to the promote the ideology and goals of the Brotherhood. CAIR uses a particular populist approach which includes the guise of being a civil rights organization. However, as shown by their own documents and words, CAIR has never had an intention of promoting civil rights. Its only intention is promoting the conspiracy to impose Sharia law on the world. To CAIR's controlling members, Sharia law imposed on the world is the only civil rights that have any meaning or importance.

**2. Hamas - An Offshoot of the Muslim Brotherhood**

208.

Inherent in the philosophy of the group and its offshoots is the dedication to Jihad and an unwillingness to compromise with respect to Israel. .

209.

The unwillingness to compromise is the reason that the Brotherhood assassinated Anwar Sadat shortly after his courageous attempt at peace that won him the Nobel Peace prize for his role in the 1978 Camp David Accords and 1979 peace treaty.

300.

Sadat was assassinated by the Muslim Brotherhood on October 6, 1981. The assassination was an extreme response to the advance of the peace process. Thirteen years later, again in response to peace, CAIR was formed in order to destroy the peace process. This is fully detailed later in this complaint.

301.

Just as the connection of CAIR to Hamas is well documented (and much of the evidence

is set forth later herein), the allegations that Hamas answers to the Muslim Brotherhood is also well documented. The Hamas charter itself openly recites its relationship to the Muslim Brotherhood:

Article Two:

The Islamic Resistance Movement is one of the wings of Muslim Brotherhood in Palestine. Muslim Brotherhood Movement is a universal organization which constitutes the largest Islamic movement in modern times. It is characterized by its deep understanding, accurate comprehension and its complete embrace of all Islamic concepts of all aspects of life, culture, creed, politics, economics, education, society, justice and judgment, the spreading of Islam, education, art, information, science of the occult and conversion to Islam.

302.

The Hamas charter is focused on Israel as Hamas is based in the Palestine territories. It does not hide its violent Jihadist character.

Article Eight:

Allah is its target, the Prophet is its model, the Koran its constitution: Jihad is its path and death for the sake of Allah is the loftiest of its wishes.

303.

Hamas' charter calls for the destruction of the State of Israel and its replacement with a Palestinian Islamic state in the area that is now Israel, the West Bank, and the Gaza Strip.

304.

Hamas works with other terror groups in Israel and the Palestine Territories to promote murder. Hamas alone, and in conjunction with other groups, is responsible for thousands of killings that have taken place. CAIR is part of the Hamas conspiracy and CAIR is responsible for most of those deaths through the work of Hamas in the Middle East, and CAIR in the United

44

States.  The conspiracy is not just within the organization, as set forth herein, the enterprise is far reaching and includes groups associated with but not part of Hamas, CAIR or the Muslim Brotherhood.

305.

Since September 2000, terrorists in and around Israel, a majority of whom are affiliated with Hamas, have perpetrated at least 425 terror attacks which resulted in the death of 1,154 people.  Exhibit 11 is a list of these killings.  Each of these killings are overt acts committed in furtherance of the conspiracy herein.

306.

The present conflict between the PLO and Hamas did not always exist in its present form and cooperation among terror groups at the expense of the United States was and still is common.

307.

The Hamas Conspiracy worked with the PLO when they both sponsored terror as their primary means of achieving political ends (and when it was in Hamas' interest to do so).

308.

For example, December 14, 1998 President William Clinton, Israeli Prime Minister Benjamin Netanyahu and Palestinian Authority President Yasser Arafat met in an effort to continue the peace process that President Clinton had initiated.  Following that visit, Arafat released 21 prominent terrorists from custody.  Some were part of Islamic Jihad, but most were Hamas, as follows:

1. Ziad Abu al-Ghal - head of the Islamic Jihad's military wing in Gaza, he was responsible for numerous terrorist attacks. He appears on the joint Israeli-Palestinian list of wanted fugitives to be detained. At the end of December 1998, he was released on "holiday leave" for several days

45

and has not returned to prison.

2. Mehdi Inbatawi - senior Islamic Jihad terrorist from Ramallah. One of the organization's top figures in Judea and Samaria. Detained by the Palestinian Authority in November 1998. He was set free in mid-January for Id al-Fitr (a Muslim holiday).

3. Muhammad Abu al-Ghal - Islamic Jihad terrorist and participant in terror activity who was detained by the Preventive Security Service at the end of October, 1998. He appears on the joint Israeli-Palestinian list of wanted fugitives to be detained. He was released in mid-December 1998.

4. Arafat Kuwasmeh - senior Hamas terrorist from the Hebron area and participant in terror activity, released by Jibril Rajoub's Preventive Security Service on December 18, 1998. Assistant to Hassan Salameh, mastermind of suicide bombings in Israel in February-March 1996 (which killed 60 people) including the February 25, 1996 attack on bus #18 which killed 3 Americans: Ira Weinstein, Matthew Eisenfeld and Sara Duker. He appears on the joint Israeli-Palestinian list of wanted fugitives to be detained.

5. Mahmoud al-Batash - Hamas terrorist detained by the Palestinian General Intelligence Service in October 1998 for serving as liaison between Hamas leadership abroad and terrorists in the territories. Appears to have been released recently.

6. Yusuf Abu Heen - senior Hamas terrorist and participant in terror activity who maintained contact with Hamas leadership abroad and was involved in several bomb attacks. Set free recently.

7. Abdallah Shami - one of Islamic Jihad's most prominent figures in Gaza. Shami was detained by the PA on the eve of President Bill Clinton's December 1998 trip to the region after he publicly announced "Clinton should get a bullet in his head when he arrives here." Shami has also been involved in the planning and preparation of attacks against Israel. Set free in mid-January for Id al-Fitr (a Muslim holiday).

8. Subhi Kapisha - Hamas terrorist from Hebron and participant in terror activity who is on the

46

joint Israeli-Palestinian list of fugitives to be detained. He was arrested by Jibril Rajoub's Preventive Security Service on October 4, 1998, but set free on December 20, 1998.

9. Tariq Ja'abri - terrorist detained by Jirbil Rajoub's Preventive Security Service on October 4, 1998 in the wake of the grenade attack in Hebron. Set free on December 20, 1998.

10. Hassam Alimani - senior Hamas terrorist and arms dealer, freed by the PA's Military Intelligence on December 19, 1998. A member of the Awadallah brothers' terror unit (prior to their deaths in September 1998) which masterminded the July 30, 1997 bombing in Jerusalem that killed 15 people, including Leah Stern, an American-Israeli formerly of New Jersey.

11. Muhammad Jarar - Islamic Jihad terrorist from Jenin. Detained by Jibril Rajoub's Preventive Security Service on November 7, 1998. Set free on December 20, 1998.

12. Majd Abu Khadija - Hamas terrorist detained by the Palestinian General Intelligence Service as part of the Wye-mandated security work plan for the month of November 1998. Recently set free.

13. Jihad Suwiti - senior Hamas terrorist who served as a deputy to Hassan Salameh, the mastermind of the wave of suicide bombings in Israel in February-March 1996 (which killed 60 people) including the February 25, 1996 attack on bus #18 in Jerusalem which killed 3 Americans: Matthew Eisenfeld and Sara Duker (students at New York's Jewish Theological Seminary) and Ira Weinstein. He is on the joint Israeli-Palestinian list of wanted fugitives to be detained.

14. Mahmoud Kashef - Hamas terrorist and participant in terror activity who was detained by the Palestinian General Intelligence Service after the attack in Gush Katif. Set free in mid-December 1998.

15. Abd al-Hakim Mana'amah - one of Hamas' founders, and escort to Sheikh Yassin. He was detained by the Preventive Security Service after the car bomb attack in Gush Katif and set free on December 31, 1998.

16. Khaled Gharab - Hamas terrorist involved in the preparation of attacks. He was detained by

the Preventive Security Service and set free around December 19, 1998.

17. Talal al-Baz - senior Hamas terrorist from Kalkilya who headed the organization's military wing in the city. He assisted the Awadallah brothers' terror unit (prior to their deaths in September 1998) which masterminded the July 30, 1997 bombing in Jerusalem that killed 15 people, including Leah Stern, an American-Israeli formerly of New Jersey.

18. Ziad Basisi - Islamic Jihad terrorist from Tulkarem who was among the group's leaders at A-Najah University in Shechem (Nablus). He was involved with the Dakah brothers (see below). Detained by the Palestinian Authority in October 1998.

19. Assad Dakah - senior Islamic Jihad terrorist from Tulkarem who maintained contact with other members of the group throughout the territories. Belonged to a terror unit that was planning to carry out attacks. Detained by the Palestinian Authority in October 1998.

20. Muhammad Dakah - Islamic Jihad terrorist from Tulkarem, brother of Assad Dakah. Detained in October 1998 for planning to carrying out attacks.

21. Bashir Daher-Yaseed - Hamas terrorist and student at A-Najah University in Shechem (Nablus), assisted wanted fugitive Mahmoud Abu Hanoud, ringleader of the terrorists who set off bombs in Jerusalem on July 30, 1997 (which killed 15 people, including Leah Stern, an American-Israeli formerly of New Jersey) and on September 4, 1997 (which killed 5 people, including 14-year old Yael Botwin, an American-Israeli originally from California).

309.

This type of cross-group cooperation defines the criminal enterprise in a way that goes beyond that of the CAIR, Hamas, and the Muslim Brotherhood group. Many other examples are set forth herein.                                                    310.

The inter-relation between numerous terror groups in conspiracy with each other and in cooperation in a criminal enterprise, is contained in the criminal indictment in U.S. v. Holy Land Foundation. A true and correct copy of that Indictment is attached hereto as Exhibit 12. CAIR is an unindicted co-conspirator in that case. Plaintiff asserts that the allegations in that complaint

48

are true and incorporates them by this reference.

### 3. Hamas Designated as a Terror Group

311.

When the United States has sufficient reliable information establishing Hamas ties, it designates the groups or individuals as terrorist organizations. Exhibit 13 is a copy of a press release from the United States Treasury dated August 22, 2003. This document designated five Hamas related charities and six senior Hamas leaders as Specially Designated Global Terrorists (SDGTs). That fact sheet attached to that press release notes:

> HAMAS is a terrorist organization that has intentionally killed hundreds of innocent civilians and continues to kill and maim with the aim of terrorizing a civilian population. HAMAS was formed in 1987 as an outgrowth of the Palestinian branch of the Muslim Brotherhood.

312.

The SDGT designation freezes the assets of the terror group in the U.S. and such a designation means that Americans cannot engage in transactions with such groups or individuals.

313.

The United States has consistently recognized that Hamas is opposed to peace in the Mideast and that it will use violence to accomplish that goal.

Exhibit 13 specifically references and reasserts the status of Hamas as a terror group stating:

> By claiming responsibility for the despicable act of terror on August 19, Hamas has reaffirmed that it is a terrorist organization committed to violence against Israelis and to undermining progress toward peace between Israel and the

49

Palestinian people," President Bush stated.

And

> "Hamas' leaders and those who provide their funding again have the blood of innocents on their hands," U.S. Treasury Secretary John Snow stated. "Empty words cannot wash them clean. As they resist the road map for peace, Hamas is devastating the dreams of the Palestinian people for freedom, prosperity, and an independent state."

314.

The document identifies terrorist persons and terrorist charities including:

1. **Sheik Ahmed Yassin**, the leader of Hamas in Gaza. As set forth herein, until his death, CAIR was charged with using their propaganda machinery for his personal benefit.

2. **Imad Khalil Al-Alami,** a member of the Hamas Political Bureau in Damascus, Syria.

3. **Usama Hamdan**, a senior Hamas leader in Lebanon. According to the United States Treasury, Hamdan received support from KindHearts. Kindhearts is a fake charity with CAIR affiliations (as set forth more fully herein).

4. **Khalid Mishaal**, head of the Hamas Political Bureau and Executive Committee in Damascus, Syria.

5. **Musa Abu Marzouk**, Deputy Chief of the Political Bureau in Syria. Marzook provided major funding to CAIR's related organization the IAP.

6. **Abdel Aziz Rantisi**, a Hamas leader in Gaza reporting to Sheik Yassin.

315.

CAIR pretends not to be Hamas because if it admitted its identity it would be barred from the activities set forth herein just as Hamas itself is banned from those activities.

**4. Takeyya**

50

316.

CAIR and Hamas have no difficulty understanding the American belief in the peaceful resolution of disputes, the rule of law and other American principles. Tactics which are illegal under U.S. law are legitimate under the principles adhered to by CAIR/Hamas and their co-conspirators.

317.

To promote their cause they are willing to use tactics which they deem necessary to advance their cause. These tactics include murder and terror. It also includes "takeyya".

318.

Takeyya is winning by lying. Takeyya is morally permitted in the Hamas/CAIR belief system as they believe that it is religiously mandated.

319.

The lies permitted under Takeyya are not selfish lies for personal profit but lies to protect the religion, to protect oneself or others, or to promote the goals of the religion (including its political goals).

320.

This is not a completely alien concept to Americans, as transgressions against the law are often sanctioned to benefit the greater good. However, the application of Takeyya as used by CAIR and Hamas arises from a belief that we are already at war. CAIR and Hamas are fighting the crusaders in Palestine. For this reason, Takeyya is used frequently because to CAIR and Hamas they are under attack by the Crusaders, the Jewish conspiracy and others.

321.

Therefore the formation of a group such as CAIR with a false purpose and a hidden terror agenda is considered moral and proper as CAIR is intended to fool Americans (infidels) and (according to their beliefs) to benefit the righteous (Hamas which they believe represents

Muslims).

322.

This Takeyya is part of the tactic of using victims such as Michael Savage, Laura Schlessinger and others to promote the Takeyya that CAIR is a Muslim civil rights organization and that it's purpose is to fight hate in order to promote righteousness. Unfortunately, hatred to Hamas is the invasion of the Crusaders and Jews and righteousness to Hamas and CAIR means murder in the name of a higher power.

323.

It is this disdain for the Infidel that allows CAIR to operate on two tracks. There is the public image created using Takeyya which is designed to create a civil rights mask which CAIR uses to promote its real purpose, the second track, of supporting violent Jihad.

324.

Plaintiff's claim that CAIR's civil rights mask is false is shown by its formative documents and the statements of its founders which are cited herein.

**5. CAIR's Support for Hamas Founder Sheik Ahmed Yassin**

325.

CAIR's formative meetings and documents show that its purpose is to support terror and terrorists. For example, one of its stated tasks upon formation was to provide media support for Hamas founder, and designated terrorist Sheik Ahmed Yassin.

326.

Sheik Ahmed Yassin who was designated as a terrorist in Exhibit 13, was the major author of the Hamas charter.

327.

The 1991 By-Laws of the Palestine Committee of the Muslim Brotherhood has as one of its stated goals, providing public support for this terrorist. (Exhibit 14, page 12)

328.

The By-Laws discusses the three groups already formed to do the work of the Muslim Brotherhood.  It discusses the IAP, the Occupied Land Foundation (which later is named the Holy Land Foundation), the United Association for Studies and Research (which did very little) and it then speaks in future terms of forming a group which later was formed under the name CAIR.

5- Issues relating to political work and foreign relations: (It is a committee which operates through the Association for now. It is hoped that it will become an official organization for political work and its headquarters will be in Washington, God's willing. It represents the political aspect to support the cause politically on the American front).

(Exhibit 14, p. 9)

### HOW HAMAS CAME TO AMERICA

329.

In 1988 there was a visit to the United States by the head of the Muslim Brotherhood. He held a meeting with his U.S. based supporters in order to form a "Palestine Committee" whose purpose was "to serve the Muslim cause in Palestine and on the American front."   (Exhibit 14, p. 11)

330.

1988 is also the year that the Occupied Land Fund (later the Holy Land Foundation) was formed.  The Holy Land Foundation (HLF) was the largest charitable branch of the Hamas conspiracy.   Its charity work was in fact simply fundraising for Hamas, and CAIR participated in this fundraising.

331.

53

The Palestine Committee consisted of members from Hamas. This group then formed several Hamas organizations in the United States.   Each of the formed organizations had a different task and a different persona but each was just Hamas with a different face. Among the groups formed were the HLF and the Islamic Association for Palestine (IAP).[13]

### *VIOLENCE IS A TOOL OF THE PALESTINE COMMITTEE*

332.

To Hamas there is no ideological difference between Gaza and Brooklyn, the only difference is tactics.  The ultimate goal is world domination.

333.

Exhibit 6 is the October 1992 internal memo of the Palestine Committee.   This document is important because it continues the conspiracy through the same groups and same structure as outlined in the By Laws (Exhibit 14).  The memo is more clear than the By-Laws in detailing the violent goals of the conspiracy.

334.

Exhibit 6 starts by referencing its dedication to violent Jihad, saluting the martyrs who spilled their blood to free Palestine from the Christians.

"Palestine is the one whose land leader hero Saladin cleansed from the defilement of the Crusaders..."

335.

The document then emphasizes how Palestine is ground zero for the battle to rid the world of crusaders, Jews and other enemies.

_____

[13]Further, there is evidence in the record that, at the same time Hamas was funding HLF, it was also funding a network of organizations connected to HLF. There is evidence that at least one of these organizations, Islamic Association for Palestine ("IAP"), has acted in support of Hamas.  (Holy Land Found. for Relief & Dev. v. Ashcroft, 219 F. Supp. 2d 57, 70 (D.D.C. 2002) fn. 16, opinion written by the Honorable Gladys Kessler).

54

"Palestine is a land which God the Almighty has honored with the blood of the Companions which watered its soil" the memo continues. It then traces those who carried the battle forward linking the historic victories to those of the founder of the Muslim Brotherhood, Hassan al-Banna and then linking it to themselves, the Muslim Brotherhood of today.

And

"Palestine is the land which moved from one honor to another by the arrival of the 20th century innovator, martyr Imam Hassan al-Banna, and they transferred to it the Muslim Brotherhood Movement ..."

336.

The talk of armies and battles continues and the document graphically reveals the Committee's ultimate goal.

"...to liberate its land from the abomination and the defilement of the children of the Jews..."

337.

Americans can take no comfort in hoping that the battle remains in Israel and the Middle East. Exhibit 6 makes it clear that the Jew is a danger throughout the world and the struggle is global.

The danger of the Jew is a danger to their "resources, religion, traditions, influence and political entity." For this reason, the struggle become global and "no Arab or Muslim nation or a nation with an impact on international politics has not been affected by this struggle." Clearly the U.S. is a nation with an "impact on international politics". They see their Jihad as worldwide. It is a fight for their very survival and they see the battle as "Jihad for victory or martyrdom."

338.

55

Exhibit 6 specifically details how the Muslim Brotherhood forms itself into terror groups within various host countries.  It explains that "a resolution was issued ... to form 'Palestine Committees' in all the Arab, the Islamic and the Western Nations...".

**Presence in the United States Prior to the Oslo Peace Crisis**

339.

Exhibit 6 states that the "movement" has opened offices in various countries and that they are related to each other.  This is an acknowledgment that the U.S. based group is part of the international conspiracy.

340.

The role of the United States based groups is to supply the conspiracy "with what it needs of media, money, men and all of that."  (Exhibit 6)

**The IAP - Hamas' Openly Radical Voice for Recruitment of American Youth**

341.

Prior to the outbreak of peace under President Clinton, Hamas was content with groups that resembled Hamas and which were identifiably Hamas.

342.

The Islamic Association For Palestine ("IAP") is a Texas corporation. IAP was originally incorporated in Illinois in 1981, but it was dissolved in 1991 for failure to file an annual report. IAP was also incorporated in California in 1986, but its corporate status there was frozen in 1988 for failure to pay a franchise tax.

343.

IAP incorporated as a separate entity in Texas in 1993. IAP activities was a major fund-raiser and financier for the network of organizations which support Hamas's terrorist activities.   As set forth more fully herein, the IAP was designed to be radical in appearance so that young American radicals would be drawn to the group.

344.

Page 14 of the English translation of Exhibit 6 shows that by 1992, the IAP's role was to focus on radicalizing youth. This focus on radicalizing youth appears to be a standard practice.

> The president of the Islamic Association for Palestine is considered a member in the youths organizations section which is affiliated with the executive office and is treated like other organizations (such as the Association, the Students' Society and the Malaysian Students' Society...).

345.

According to an August 14, 2001 Immigration and Naturalization Services report, IAP's work consisted of "publishing and distributing HAMAS communiqués printed on IAP letterhead, as well as other written documentation to include the HAMAS charter and glory records [a list of terrorist attacks that HAMAS had carried out against Israeli civilians, which are tributes to HAMAS' violent 'successes.'"

346.

The same INS report stated that the IAP had received "approximately $490,000 from Mousa Abu Marzook during the period in which designated terrorist Marzook held his admitted role as a HAMAS leader."

**Marzook is a Major Hamas Operative**

347.

Mousa Mohammed Abu Marzook ("Marzook"), a/k/a Abu Omar Musa, is a native of Gaza who resided in the United States from 1973 to 1993. He received permanent resident alien status in 1990.

348.

As set forth herein, Marzook is personally involved with Hamas in the Palestine territories and with the funding of Hamas groups such as the IAP and CAIR.

57

349.

Marzook has admitted his membership in Hamas.  In fact, in an article by Marzook published in the July 22, 2007 newsletter of Rev. Jeremiah Wright's church, he admits his Hamas position.

350.

Marzook served for many years as the admitted leader of the political wing of Hamas in the United States. Marzook traveled between the United States and the Middle East, appointed Hamas military commanders, and used his personal bank account to distribute funds to these Hamas operatives.

351.

From 1993 to 1995, Marzook resided principally in Jordan, which deported him in June 1995 for his involvement in Hamas. In July 1995, U.S. Customs Service and U.S. Immigration and Naturalization Service officials arrested Marzook, at the request of the Israeli government, as he attempted to reenter the United States. In May 1996, a United States District Court ordered Marzook's extradition to Israel to stand trial for offenses connected to Hamas-sponsored terrorism, including murder, attempted murder, and conspiracy. The Israeli government thereafter dropped its request for extradition.

352.

Marzook was deported to Jordan in 1997. In 1999, he was deported from Jordan when Jordan's King Abdullah closed the Hamas Political  Bureau headquarters in Amman and deported the leadership of the movement, including Marzook. Marzook is alleged to be currently living in the United Arab Emirates or Syria. [14]

---

[14]The record contains evidence that Marzook has been the leader of the political wing of Hamas since at least 1991. See A.R. 73-74, 639-78. In 1996, a federal court determined that Marzook should be extradited to Israel to face murder charges resulting from his alleged terrorist activity. See A.R. 269-91, 324-32; see also  Marzook v. Christopher, 924 F. Supp. 565 (S.D.N.Y. 1996). (*Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 70 (D.D.C. 2002)

353.

The IAP was always open in its terror orientation.

354.

It is this open Jihadism that is discussed at the 1993 Philadelphia meeting as a valuable contribution of the IAP.   For this reason the conspirators agreed to keep the IAP radical and form a separate group to have an American face.  While CAIR (as set forth herein), regularly hosted public speakers who urged Jihad and compared Jews to apes, the IAP's teachings were almost lock step in line with the Hamas Charter.

355.

For example, at its 1989 convention in Kansas City the IAP was addressed by a veiled terrorist who recounted the sabotaging of a bus that killed 16 people in Israel.

356.

One year later, at another IAP conference in Kansas City, leaders who were openly

---

fn. 16, opinion written by the Honorable Gladys Kessler).

I believe there well may be sufficient evidence to establish probable cause that Abu Marzook would be liable under New York State penal laws. The Israeli evidence shows that, with knowledge that the military wing of Hamas planned terrorist acts, see infra pp. 47-59, Abu Marzook not only chose the head of the military wing of Hamas, but also gave him money to finance such operations. See infra pp. 53-59, & 60-61. It is the Israeli position, which stands unrefuted, that the crimes detailed in the Extradition Request all flowed from this activity. This would appear sufficient for accomplice liability under New York law, since it could be said that Abu Marzook "solicited, requested, commanded, [or] importuned . . . such conduct." N.Y. Penal Law § 20.00 (McKinney's 1987) (accessorial liability). Moreover, the evidence supports a reasonable inference that Abu Marzook recklessly engaged in conduct which created a grave risk of death to another person under circumstances evincing a depraved indifference to human life. Thus, the mental culpability required by New York's murder, manslaughter, and assault statutes is present. See N.Y. Penal Law §§ 125.25 (murder 2 [degrees] ), 125.15 (manslaughter 2 [degrees] ), 125.20 (manslaughter 1 [degrees] ), 120.05 (assault 2 [degrees] ), 120.10 (assault 1 [degrees] ) (McKinney's 1987).
(*Marzook v. Christopher (In re Marzook),* 924 F. Supp. 565, 573 (D.N.Y. 1996), Opinion written by the Honorable Kevin Duffey)

59

members of the Muslim Brotherhood and Hamas were featured guests.

**Holy Land Foundation Raising Money for Hamas**

357.

Prior to CAIR the other major Hamas face in America was one of a charity.

358.

Unknown to most Americans who contributed to this charity, the money funded the Hamas violent agenda, homicide bombers and other acts of terrorism.

359.

Hamas often operates "on two tracks: a violent one and a peaceful one (electioneering, charity, provision of social services). If you give money (or raise money to be given) for the teaching of arithmetic to children in an elementary school run by Hamas, you are providing material support to a terrorist organization even though you are not providing direct support to any terrorist acts. Singh-Kaur v. Ashcroft, 385 F.3d 293, 299-300 (3d Cir. 2004); Humanitarian Law Project v. Gonzales, 380 F. Supp. 2d 1134, 1137 (C.D. Cal 2005). (*Mohammad Azam Hussain v. Michael B. Mukasey, Attorney General of the United States*, Respondent, Court of Appeals for the 7 Circuit, 2008 U.S. App. LEXIS 4798 Pps. 12-13)

360.

As the Board of Immigration Appeals pointed out in In re S-K-, 23 I.&N. Dec. 936, 944 (BIA 2006), "Especially where assistance as fungible as money is concerned, [requiring] such a link would not be in keeping with the purpose of the material support provision, as it would enable a terrorist organization to solicit funds for an ostensibly benign purpose, and then transfer other equivalent funds in its possession to promote its terrorist activities."

361.

60

The direct fundraising arm of the Palestine Committee was a so called charity named the "Holy Land Foundation" (HLF).  This group claimed to raise money for the poor in Palestine.  In reality it funded the Hamas infrastructure in Palestine, recruited, distributed food to promote Hamas and gave money to the families of terrorists and homicide bombers.[15]

362.

In U.S. v. Holy Land Foundation criminal case, prosecution expert Matthew Levitt explained how even the money Hamas uses for traditional charitable purposes is perverted to support the terror organization.

Q. And you discussed how the zakat committees and HAMAS through the social wing aided the Palestinian people. But individuals not affiliated with zakat committees themselves, how did they return the aid? What did they do in return for it?

A.  As I said earlier, it creates a sense of indebtedness. And if a person is a taxi driver and they are asked to deliver a package somewhere they don't ask. They do it. If they are asked to shelter someone in their house overnight, they do it. It creates a sense of indebtedness that HAMAS is able to call upon.

Q Does that all further HAMAS's ultimate goal?

A Yes.

(RT 168:12-24)

363.

A. Again, these are part of the HAMAS overt activities, and so HAMAS charity committees tend to be decorated with the posters of suicide bombers. They will

---

[15](*Mohammad Azam Hussain v. Michael B. Mukasey, Attorney General of the United States*, Respondent, Court of Appeals for the 7 Circuit, 2008 U.S. App. LEXIS 4798 Pps. 12-13)

tend to be in areas where they distribute these posters cards, key chains. They will
employ people known to be associated with HAMAS, sometimes even members
of the HAMAS military wing, Qassam Brigades. Before they were banned by the
Israelis, they would be very open about it. They would come to the Israelis
seeking to open an HAMAS facility.

(RT 160:1-10)

364.

It is this populism combined with deliberate impoverishment of the Palestinian people
that Hamas uses to build power and to recruit for its ultimate goal of global warfare.

365.

There was a third group formed by Hamas which preceded CAIR. This group was called
the United Association for Studies and Research, (UASR). It was founded in Chicago in 1989 by
Hamas operative Mousa Abu Marzook. It was designed as a think tank and information resource.
This group was never very active and was ultimately superseded by CAIR.

366.

Until 1993 the need to establish an additional Americanized organization was referenced
in various documents but the actual formation of CAIR was delayed until the crisis of the Oslo
Peace accords.

### THE OSLO CRISIS - PEACE THREATENS

367.

In late 1993, President William Clinton seemed to have achieved the impossible. He had
convinced, cajoled, threatened and finally succeeded in getting Israel and the PLO to sign a peace
agreement.

368.

At a public ceremony in Washington D.C. on September 13, 1993, Mahmoud Abbas

62

signed the peace agreement for the Palestine Liberation Organization and Shimon Peres signed for the State of Israel.

369.

While most of the world was excited and hopeful, Hamas members were terrified that peace might actually be achieved.

370.

As stated in the Hamas charter, "The initiatives, the so-called peace solutions, and the international conferences for resolving the Palestinian problem stand in contradiction to the principles of the Islamic Resistance Movement ...  (Article 13)

371.

If there is peace, Hamas cannot exist as Hamas.  Their very charter requires a Jew free[16] Middle East.  If that is abandoned, their founding purpose is lost.

### *EMERGENCY MEETING IN PHILADELPHIA - 1993*

372.

Following the Oslo Accords, an emergency meeting of the Hamas Palestine Committee was held at the Marriot Hotel in Philadelphia.   Unknown to the members of the Palestine Committee, the FBI was there, recording much of the proceedings.

373.

The ground rules of the meeting were quickly established.  The group had to devise a strategy to derail the peace process.

374.

To hide their terror links, the members agreed not to use the name "Hamas" but instead to

---

[16]It is not clear if Hamas recognizes the right of Jews to live as Dhimmis', a second class status which has striking similarities to the "Jim Crow" South combined with a written body of law sanctifying this treatment.

63

substitute name "Samah" or "Sister Samah".  "Samah" is "Hamas" spelled backwards.

375.

The group agreed that it needed to attack the peace from all sides.

376

The need for a public voice in America was discussed.  The group bemoaned those Muslims who were working with Jews and feared that cooperation would continue.  They discussed how to break these growing ties.

377.

They discussed the IAP and whether they should modify its role as a strident, radical voice.  The consensus was that the IAP could not temper its rhetoric without risking loss of its credibility among the radicals that it was trying to recruit.

378.

They focused on a major problem with fighting peace within the United States.  They knew that Americans and specifically, the vast majority of American Muslims would reject them if they used their genuine Hamas rhetoric.

379.

As one of the participants phrased it, "...we cannot use the same poetic Arabic style when addressing the American mentality ... the Americans will not understand it ... "I cannot say to him that I am Hamas".

380.

This deception is an institutionalized part of Hamas politics.  The tactical lie to advance the greater good is called Takeyya.  There is no moral wrong in Takeyya.  It is a necessity just as terrorism is a necessity to free the world from the Christian Crusaders and the descendants of pigs and apes.  In Hamas cult like ideology, tactics which to Americans might seem immoral are moral if they advance the lofty goal of imposing Islam and Sharia on the world.

64

381.

For this reason, there were no moral arguments made during the 1993 Philadelphia
conference, the only discussions were tactical.

382.

Much of the discussion focused on advancing the Hamas agenda while appearing not to
be terrorists. As shown in Exhibit 16 a participant focused the problem.

"Because for the American organizations, if you're against peace, you're a
terrorist."

383.

Omar Ahmad, who is one of the founders of CAIR and who CAIR now identifies as their
"Chairman Emeritus", was at the meeting.   Also at the meeting was CAIR co-founder and
current Executive Director Nihad Awad.

384.

During the discussion of tactics, Shukri Baker of the Holy Land Foundation posed a
question to Ahmad.  He asked whether the American group should be "focusing on the U.S. front
or should focus be on the domestic front?"  (Note: The "domestic front" means Palestine as these
participants identify Palestine and not the United States as their home.)  (Exhibit 17)

385.

Baker then got more specific and asked, "...should the organizations exist to serve
the Movement inside or...for building a strong community, a politically active one, one
which we use and establish our roots in America..."  (Note: "The Movement inside" means the
work of Hamas in Palestine.  Inside means Palestine.)  (Exhibit 18)

386.

Responding to these questions Omar Ahmad replied:

65

"I believe that we are a service organization for the inside. All of our work is for Palestine. All of the work for Palestine is 75-25, 75% for the inside..." (Exhibit 19)

387.

Omar Ahmad has stated that Islam isn't in America to be equal to any other faith but to become dominant. "The Koran, the Muslim book of scripture, should be the highest authority in America, and Islam the only accepted religion on Earth" (Lisa Gardiner, San Ramon Valley Herald, article titled: American Muslim leader urges faithful to spread Islam's message, July 4, 1998)

388.

His position that "[a]ll of our work is for Palestine" means just that. CAIR was formed to advance the goals of Hamas in Palestine and not to advance the interests of American Muslims. As such, it was never intended to be an American Civil Rights charity, it always was a foreign agent which needed to register as such. Of course, since it is a foreign agent for an illegal terrorist group such registration would prevent it from being active in this country.

## DECEIVING THE AMERICAN MUSLIM COMMUNITY

389.

The great fear of the conspirators was the American Muslim community.

390.

They recognized that American Muslims would reject the goals of Hamas if these goals were known.

## THE CHARITY MASK

391.

In order to deceive American Muslims, Ahmad proposed creating a false Muslim Civil Rights face to disguise the true nature of the Hamas group. He cited a genuine Muslim civil rights group (founded by Dr. James Zogby) and said that they could imitate that group.

392.

Exhibit 20 contains the explicit statement that there needs to be a "neutral" entity because "[i]t is known who we are".

> .. In my opinion, we **must form a new organization** for activism
>
> which will be neutral because we are placed in a corner, we are place in a corner.
>
> **It is known who we are, we are marked** and I believe that there should be a new
>
> neutral organization **which works on both sides** ...  (Emphasis added)

393.

While they have chosen to act like Zogby's Anti Discrimination Committee, they specifically avow that they do not want to become like it. (Exhibit 21)

394.

They discuss how their Islamic views cannot be openly admitted with respect to the new group.

> This is the point. As an American organization, we cannot adopt this stuff or add
>
> it to our goals. This stuff. .., in the eighties, we at the [Islamic] Association for
>
> Palestine] wrote that ... UI. I mean ..., we cannot include this kind of stuff
>
> officially in our papers.

and

> ..., I'm telling you about things in the heart ..., the goals you're talking about are in
>
> the heart but, can I write them down or can I support our brothers. We cannot
>
> write them down.
>
> (Exhibit 22)

395.

The group discusses a "front" group.  They use the very literal meaning of a front group as fighting on the American front.

> It will be made up of some of our people, our beloved ones,
>
> and let's not hoist a large Islamic flag and let's not be barbaric-talking. We will
>
> remain a front so that if the thing happens, we will benefit from the new
>
> happenings instead of having all of our organizations classified and exposed".

67

(Exhibit 23)

and

"They might start media organizations abroad, they might start a media

organization in America as America now is a front for them.

(Exhibit 23)

396.

Omar Ahmad suggested that the new group should "develop and do things like that so

that the community feels that we're defending them...". [The use of the words "feels like"

emphasizes the fact that this is a facade to cover what CAIR actually was formed to accomplish.]

(Exhibit 24)

397.

The conspirators are aware that their work as Hamas would be illegal.

Samah[17] ..., Samah is classified as a terrorist [organization]. By constitution, by

law, if I wanted to adopt its work, they kick me out, they kick me out of this

country, my brother. By God, they would take away my U.S, citizenship and tell

me

"Go away". I'm telling you ... (Exhibit 25)

398.

The financial discussions underscore how the "charity" is a fraud and the entire goal is to

fund Hamas.

399.

The Committee discussed how to balance their funding for Hamas on the "inside" with

the wasteful use of money for charity.  The head of the HLF, Shukri Abu Baker stated that "we

give the Islamists $100,000 and we give others 5,000."

400.

---

[17] The conspirators agreed to refer to Hamas as "Samah" or "Sister Samah" to make it
more difficult for people overhearing their conversations to understand that they are Hamas.

68

Shukri Abu Baker noted that the charity work was a waste because it generated no value
to Hamas in terms of propaganda.

> "Even children's daycare centers...we discover that their Dawa'a[18] value is close to
> zero...What have we benefitted from that? The same thing applies to orphans
> sponsorships; we spend hundreds of thousands of dollars over this program but,
> there is no Dawa'a[19] use for it..."

401.

However, Baker recognized that they must "maintain a balance," so that HLF can "stay
on its legal track as far as charitable projects are concerned without going after a sentiment which
could harm the Foundation legally..."   The HLF at this time was raising money in the United
States and funding terror in Israel and the Palestine Territories.

402.

With stunning honesty one of the speakers jokingly contrasted the groups real purpose
with its public image. He comments that the radical thoughts are correct but that expressing them
so that others know the truth, was wrong.

> No, my brother. There are things I can warn against such as... I won't be naive to
> the point of telling the American "It is my right to enslave your daughter and...",
> like what Omar Abdel Rahman did in Detroit and said that "America will be a
> plunder for us".  His words are correct [Laughter and UI brief group comments].
> No, really. It was wrong.

(Exhibit 26)

403.

The participants were laughing because they agreed.  In fact, CAIR co-founder, Nihad
Awad then stated:

---

[18]Dawa'a means issuing a summons or making an invitation; to summon, to invite.

[19]Dawa'a may be considered, preaching, the way to preach, use of logic, what quran says
about preaching or in the context above, propaganda for the benefit of Hamas.

By G_d, by G_d, I don't see any embarrassment in speaking about Islamic Sharia

... (Exhibit 26)

404.

To Awad, the "right" to "enslave your daughter" and to "plunder" America is their goal since some version of these is contained in his concept of Sharia law.

405.

As agreement was reached on the structure and role of the American faced organization (which became CAIR) the participants voiced fears the truth would be uncovered.   Ironically, they feared that their subterfuge would be exposed by who else, but the Jews.

As far as charity work, money comes mainly from the Islamic

community. It won't give you much of anything, to you in particular because it is

true you could deceive it with an assumed name but then it will recognize you.

And the Jewish media now focuses on these things. (Exhibit 27)

406.

Of course, since this group sees Jews everywhere and behind everything, one might expect that anyone who exposes them is either a Jew or secret Jew or in conspiracy with the Jew or perhaps just "a crusader".

### *CAIR COMES ALIVE*

407.

Stitched together by committees starting with Philadelphia group in 1993 and through additional meetings of the Palestine Committee, CAIR was brought to life on September 15, 1994.

408.

Unlike Victor Frankenstein who assembled the creature that looked bad but was created with the intent to do good, CAIR was formed to look good but to participate in a crime of international proportions.

409.

Exhibit 28 is a 7/30/1994 meeting agenda of the Palestine Committee from 1994.  The

70

document now lists CAIR as one of the four Hamas groups in America. This document predates the formal incorporation of CAIR. (The very first page of this Exhibit is the original Arabic but CAIR can be seen clearly in English letters, along with UASR, HLF and IAP.

410.

This 7/30/1994 meeting agenda formalizes the discussions from the 1993 Philadelphia meeting. Since the formation of CAIR arose due to the peace crisis, the 1993 agenda focuses on those issues. One of the major fears expressed in the agenda is that following the Oslo accords, Jews and Muslims are actually getting along.

>"In the name of God, the Beneficent, the Merciful "Confronting the Zionist infiltration to normalize relations with the Muslims in America" The Islamic and Arabic world is **being overrun by a vigorous campaign to normalize the relations between the Muslims and the Arabs from one side, and the Zionist entity from another side."** (Emphasis added)

411.

The document emphasizes how this is an abandonment of their principles and so called religious beliefs.

412.

The agenda outlines many of the same points made in the formative 1993 Philadelphia meeting. The Committee describes how it needs to harness America to promote its terror agenda worldwide.

413.

The agenda gets more specific however. It speaks about using the new group to provide information to its operatives using both public and private messages.

414.

The public and private messages communicated by CAIR on behalf of Hamas are the work of a foreign agent and not a Muslim civil rights group. (NSD) is responsible for the administration and enforcement of the Act.

415.

71

The messages are intended to "activate" the conspiracy members and are not intended to advance the civil rights of Muslim Americans.

416.

The document discusses the "need for trained resources in the media and political fields". The purpose is not civil rights, it is to advance the interests of Hamas worldwide and to organize and communicate with Hamas members in the United States.

No doubt **America is the ideal location to train the necessary resources to support the Movement worldwide** with its need from brothers who are trained in different fields -Administrative-Media-Political and others.

3- Activate and deepen the work of the Islamic organizations working for Palestine. **The existing organizations need resources** and a Brotherly depth which cares for the work of these organizations, strengthens them and which is built on advancing them forward.

4- **Information and its role in activating** the Brothers:

We need a channel that would deliver general and **private information** to the Brothers who are concerned with the Palestinian Cause who are its children in order to be able to keep up with their Cause which facilitates their service to it. (Emphasis added)

417.

CAIR members are often seen on CNN commenting on world events. As shown by the minutes of this meeting, CAIR sees CNN as an electronic message board to communicate the Hamas viewpoint to Americans and to put out the party line to Hamas operatives throughout the United States. Access to CNN is gained by pretending to be a Muslim civil rights group.

418.

The agenda discusses a "Confrontation" plan. This plan includes silencing non-Hamas, American Muslims and to "stop normalization".

419.

To stop normalization Hamas must activate "the Association [IAP] and its publications to take up its media role in this area." This means that the IAP will use a strident, powerful Islamist voice which will be broadcast to the Muslim community while CAIR continues to speak with the American voice.

72

420.

The agenda emphasizes that despite its American face, this American movement is "not a separate movement from the mother Group."

421.

This new group, not separate from "the mother Group" does not view civil rights the way that American view civil rights. To CAIR, Hamas, the IAP, the HLF, civil rights is achieved by establishing Sharia law in land watered by the blood of the martyrs.

The 1st characteristic: is the fact that Palestine is a cause with a special Islamic status as it has Al-Aqsa mosque, third among the mosques which are to be visited. And it has the honorable Rock. It is the land of the Night Journey and the Ascension. It is the land of the great crowd and it is a holy and a blessed land according to the text of Noble Quran. **Its land was watered with the blood of the martyrs from the Companions, the Followers and others along the ages**. It has also graduated genius scholars such as al-Shafei, al-Nabolosi, al-Ajlouni and others.

The 2nd characteristic: comes from the fact that **the struggle is with the Jews who do not constitute a danger to Palestine alone, but a danger to Arabs and Muslims in their homelands, resources, religion, traditions, influence and political entity**. Due to the Jewish influence in different global nations especially America and Europe, the struggle in Palestine has a degree of entanglement ... (Internal Memo)

422.

The above language of the Committee is eerily similar to language preceding World War II.

"The struggle for world domination will be fought entirely between us, between Germans and Jews. All else is facade and illusion. Behind England stands Israel, and behind France, and behind the United States. Even when we have driven the Jew out of Germany, he remains our world enemy.

73

(Rauschning, Hitler Speaks, p. 234)

423.

Goebbels was not a German civil rights advocate. Hitler was not an Aryan civil rights advocate. There is a war between Hamas and the United States and "all else is facade and illusion".

**OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY**

(18 U.S.C. 1962 (c) & (d))

424.

The conduct against Michael Savage, the unfounded lawsuits and the campaigns against Public / Quasi Public figures are overt acts in furtherance of the conspiracy. Additionally overt acts include the following (but are not limited to the following). Each of these acts was done to further the conspiracy and enterprise in violation of 18 U.S.C. 1962 (c) & (d).

**A. Raising Money for Hamas Through Fraudulent Charities**

425.

CAIR and its Hamas partners raised money under false pretenses, using the mails, and the internet (thus committing wire/mail fraud and IRS fraud).

426.

At all times CAIR and its leadership knew that the charities it supported were sending money to Hamas and to groups affiliated with Hamas, and that such money would be used to fund acts of murder and violence. In doing so, CAIR knowingly supported murder, arson, terror and other criminal conduct. Specific examples follow.

427.

The money from these false charities went primarily to Hamas but also went to Al Qaeda and Hezbollah. Therefore, CAIR knowingly supported the activities of these groups and is legally responsible for their actions including the 9/11 World Trade Center bombings.

428.

Further, CAIR provided support for a terror infrastructure in America which went beyond

74

its support for Hamas and included support for partner organizations including Al Qaeda and Hezbollah.

**B. Defending Bin Laden (1998-2001)**

429.

One of the goals of establishing an American face is to then deceive Americans about the activities of terrorists.

430.

On September 11, 2001, Al Qaeda, murdered close to 3,000 people.

431.

CAIR presently claims to have condemned the attacks from the outset and to have never expressed doubt that Bin Laden was behind the attacks.  The truth is different and historically CAIR has been a strong defender of Bin Laden.

432.

In October 1998, months after Osama bin Laden had issued his first declaration of war against the United States and had been named as the chief suspect in the bombings of two U.S. embassies in Africa, CAIR demanded the removal of a Los Angeles billboard describing Osama bin Laden as "the sworn enemy,".

433.

CAIR came to bin Laden's defense, by denying his responsibility for the twin East African embassy bombings. CAIR's communications Director, Ibrahim Hooper blamed the victims for being partly responsible for their own murders stating that the explosions resulted from "misunderstandings of both sides."   This tactic was discussed in this complaint in terms of the extortion of terror and the need for apologists to dictate the terms by which terror would stop. After the Twin Towers fell, CAIR took on the task of telling Americans how to placate the murderers.  According to CAIR, the explosions were not terrorist acts, they were the sad result of "misunderstandings" e.g. the U.S. misunderstanding its role in the Middle East.

434.

After September 11, 2001, CAIR continued to protect bin Laden, stating only that "if

75

1   [note the "if"] Osama bin Laden was behind it, we condemn him by name."   This position was

2   adhered to for months after the clear identification of Bin Laden as the name behind the murders.

### C. Fomenting Conspiracy Theories re: 9/11

435.

5   CAIR started spinning 9/11 by supporting bizarre conspiracy theories regarding the terror

6   attacks.

436.

8   On 9/11/2001, anti-Israel, strongly pro-Palestinian Congresswomen, Cynthia McKinney,

9   received a series of political contributions from donors with ties to highly questionable groups.

10  These include Yaser Busnaq, one of the founders of the IAP and Ashqar Abdelhaleem, one of the

11  attendees at the 1993 Philadelphia meeting who was arrested in 2004 for terror fundraising.

437.

13  Each of the seven McKinney 9/11 contributors is associated with at least one of six

14  organizations whose offices were searched in late March by the United States Customs Service.

15  These organizations include the Success Foundation, the Safa Trust, Mar Jac Investments, the

16  International Institute of Islamic Thought, the Graduate School of Islamic and Social Sciences,

17  and the York Foundation.

438.

19  Four of the seven contributors-Yaqub Mirza, Jamal Barzinji, Taha Al-Alwani, and

20  Ahmad Totonji- are mentioned by name in a search warrant issued to the Customs Service.  The

21  warrant was signed by Federal Magistrate Theresa Buchanan and it authorized Customs to seize

22  financial records from 21 groups in search of evidence of "material support to foreign terrorist

23  organizations, conspiracy to defraud the United States by impeding the functions of the Internal

24  Revenue Service, and conspiracy to engage in international transfers of money to promote

25  offenses against foreign nations involving murder or destruction of property by means of

26  explosives."

439.

28  **Abdurahman Alamoudi** contributed $ 2000.  Alamoudi was the President of the

76

American Muslim Foundation. Alamoudi was arrested September 28, 2003 for "terrorism" related charges. The arrest affidavit alleged that Alamoudi laundered Libyan cash through Saudi Arabian banks to fund his political and propaganda activities in Washington. Alamoudi has publicly supported both the Hamas and Hezbollah terrorist groups. Almoudi was convicted in the United States District Court after a jury trial and his conviction has been upheld on appeal. His sentence was 276 months in prison.

440.

**Mohamed Omeish** contributed $ 500. He was the Vice President of Alamoudi's American Muslim Foundation. The documents from the Alamoudi trial detail how this organization funded Hamas and other terror groups.

441.

**Ahmed Totonji** contributed $ 1000. Tononji is an Iraqi-born citizen of the kingdom of Saudi Arabia. He acted as a co-founder and officer of the Saudi-founded/Saudi-funded (and now defunct) SAAR Trust. Additionally, he served as Vice President of the Safa Group and the International Institute for Islamic Thought (IIIT).

442.

Customs agent David Kane also uncovered a monetary tie between IIIT and terrorism. Kane claims that, during a raid in Tampa, he found letters that prove IIIT sent at least $50,000 to the World Islamic Studies Enterprise (WISE), a front for Palestinian Islamic Jihad. The same affidavit states Ahmad Totonji personally signed an IIIT check in the amount of $10,000 to Sami al-Arian's Tampa Bay Coalition for Justice and Peace on November 1, 2001. Such fortunes are chump change for the SAAR Trust, founded by Saudi magnate Suleiman Abdul Al-Aziz al-Rajhi. SAAR received $1.7 billion in donations in 1998 alone.

443.

CAIR Executive Director **Nihad Awad** contributed $ 500.

444.

After receiving these contributions McKinney actively led a bizarre and almost hallucinogenic movement to blame 9/11 on the United States and some type of non-Arab

77

conspiracy.

445.

On October 5, 2001, CAIR's New York office echoed the McKinney conspiracy theory when it sent a letter to The New York Times arguing that the paper had misidentified three of the hijackers and suggesting that the attacks may have been committed by people who were impersonating Arab Muslims.

446.

This type of conspiracy theory was not new to CAIR. It was standard operating procedure.

447.

For example, it was Nihad Awad who wrote in the Muslim World Monitor that the 1994 trial which resulted in the conviction of four Islamic terrorists who had perpetrated the previous year's World Trade Center bombing was "a travesty of justice." CAIR sought to generate public support for these terrorists by claiming that the bombings were the work of the Mossad and Egyptian intelligence.

448.

As set forth previously, CAIR responds to terror attacks by blaming the victims for their own murders. When terrorists are caught or when CAIR's Saudi funding sources are ill-at-ease with the Saudi connection to 9/11, CAIR attempts to shift responsibility to the Jews.

449.

With respect to 9/11, it was not until December 2001, when bin Laden was seen on videotape boasting of his involvement in the attack, did CAIR finally acknowledge his role in the 9/11 attacks. As set forth herein, major Saudi funding followed CAIR's defense of "The Kingdom" following 9/11.

**D. Stealing Money Meant for 9/11 Victims and Giving it to Hamas**

450.

At the same time that CAIR and its radical friends were spinning conspiracy yarns about

78

9/11, CAIR was also exploiting the tragedy to raise money for Hamas.

451.

Exhibit 30 is the front page of the CAIR website on September 21, 2001. This contains a column on the right showing the Twin Towers burning and links to help the "victims" of the attacks. These links appear to be legitimate. However, that soon changed.

452.

On September 26, 2001 the website changed (Exhibit 31). The solicitation started out the same reading:

**Help for the Victims** What you can do for the victims of the WTC and Pentagon Attacks".

453.

The advertisement then offered three groups that could receive donations. The first was legitimate. It was the American Red Cross. The next two were not. The first was an Hamas Charity called the Global Relief Foundation (GRF). The second was an Hamas charity called the "Holy Land Foundation" (HLF).   (Exhibit 31)

454.

On December 4, 2001 the Holy Land Foundation was designated as a terrorist organization. (Press release and notice of Treasury Dept. Exhibit 32)

455.

On December 4, 2001 CAIR changed its website and 9/11 donations were no longer solicited for the Holy Land Foundation. Instead, Global Relief was substituted. (Exhibit 33)

456.

On December 14, 2001 the Treasury Department froze the assets of the Global Relief Foundation pending investigation of the group for terror ties.  (Exhibit 34)

457.

In a Press Release dated October 18, 2002, the Treasury Department provided additional details regarding their action.  (Exhibit 35) They cited ties to Bin Laden and other terror groups. The Treasury department also stated that the GRF helped fund a number of al Qaeda-sponsored

1 activities, including bombings of the U.S. embassies in Kenya and Tanzania and armed action
2 against groups who oppose violent extremism.

3                                         458.

4     On December 18, 2001, Global Relief still remained on the CAIR website. (Exhibit 36)
5 Several days later, that link was removed.

6                                         459.

7     The connections between CAIR and Global Relief run deep.

8                                         460.

9     Rabih Haddad, was a CAIR fundraiser.  He also co-founded and served as executive
10 director for the GRF.  He was arrested on terrorism-related charges and deported from the United
11 States due to his work as executive director of the Global Relief Foundation.

12                                         461.

13     Like CAIR, the GRF claimed only charitable purposes.  Exhibit 37 is a page from its
14 1998 tax return.  That return asserts that GRF provides healthcare, education, orphan sponsorship
15 and relief supplies.  The real purpose of the GRF charity is to support terror.  Their "orphan
16 sponsorship" is a code word used by these Islamist charities for money spent on the families of
17 homicide bombers.

18                            **E. Lying to Congress**

19                                         462.

20     Nihad Awad is the  Executive Director and a co-founder of CAIR.

21                                         463.

22     On September 9, 2003 Nihad Awad lied to Congress about Hamas as a source of CAIR's
23 startup funding.

24                                         464.

25     Nihad Awad submitted written testimony to the Senate Committee on Terrorism,
26 Technology and Homeland Security.  At page 19 of that testimony he addresses the specific
27 allegation that CAIR received money from the HLF.  (Cover page of letter and page cited are
28 Exhibit 38)

                                           80

465.

Nihad Awad categorically denied the receipt of such money stating "This is an outright lie. Our organization did not receive any seed money from HLFRD." (Exhibit 38)

466.

Exhibit 38 was done on CAIR stationary in Nihad Awad's capacity as director of CAIR.

467.

As shown by Exhibit 3 the HLF did send that money to CAIR.

468.

Nihad Awad was one of the founders of CAIR and would have had personal knowledge of its sources of funding.

469.

As Awad was lying to Congress he was of course trumpeting his role as the voice of the Muslim community. Never in the entire document did he disclose CAIR's relationship to Hamas.

470.

In fact at page 20 of that same document (Exhibit 39) Nihad Awad materially misleads to Congress stating that:

"... since our incorporation in 1994, CAIR has never voiced support for Hamas, let alone "disseminate" its "communiqués."

470.

In fact, Nihad Awad was present at the Philadelphia Conference in 1993 when the formation of CAIR was discussed. He was present at this meeting where Hamas was disguised as Samah.

471.

In a deposition in a lawsuit filed by the family of a young man who was killed by a Hamas homicide bomber, Ahwad lied about Philadelphia (even though the FBI has him recorded in attendance at the event). During the 2003 deposition he initially said he didn't think he had attended the Philadelphia meeting. When pushed he replied, "I don't remember." Nor did he

1    remember whether he was invited.

2

3                                     472.

4         Awad is not the only CAIR founder to lie on this point.  CAIR founder and Chairman

5    Emeritus, Omar Ahmad committed perjury in a 1993 civil deposition when he was asked if the

6    HLF gave "you any money to help start CAIR?"    Ahmad lied and answered,  "No".  (Boim v.

7    Quranic Literacy Institute, 00C-2905, "Deposition of Omar Ahmad," 133-134 (E.D. CA May 27,

8    2003).

9                                     473.

10        This pattern of lying about Hamas and CAIR was repeated when Nihad Awad claimed

11   that he had never "voiced" support for Hamas.

12                                    474.

13        In a March 22, 1994 speech at Barry University, Nihad Awad stated that he had once

14   supported the PLO but now, "I'm in support of the Hamas movement more than the PLO."  (A

15   video of this statement is attached as Exhibit 40)

16                                    475.

17        The CAIR support for itself, Hamas, is a repeated pattern seen in its fund raising

18   (especially after 9/11), in its convention speakers, in its distribution of hate commentary filled

19   books etc.

20                **F. Money Laundering and Financial Ties Among Groups**

21                                    476.

22        The finances of CAIR, the IAP and the HLF are inextricably intertwined as they were

23   formed by the same Palestine Committee.  Exhibit 41 is a copy of the tax return of the HLF

24   showing that in the year 2000 its board of directors included Shukri A. Baker, who was an

25   attendee at the Philadelphia meeting along with CAIR founder Omar Ahmad.

26                                    477.

27        The tax return (exhibit 41) lists Ghassan Elashi as Chairman of the HLF.  Elashi was the

28   founder of the Texas CAIR chapter (See Exhibit 42, Articles of Incorporation) and he was

                                       82

strongly supported by CAIR and CAIR-Texas' founding attorney when he was indicted and ultimately convicted of terror related activities.

478.

Riad Abdelkarim served as HLF's Secretary in 2000 and was an HLF Board Member when the organization was shut down in December 2001.  This same person was a major participant in a series of Hamas based charities which were supported by CAIR, including, KindHearts.  Exhibit 43 is a U.S. Treasury bulletin detailing how Kindhearts is an Hamas organization.

479.

Omar Ahmad and Nihad Awad – two of CAIR's incorporators – held leadership positions with IAP prior to founding CAIR.  Both the IAP and the HLF received major funding from Hamas leader Mousa Abu Marzook and former university professor Sami al-Arian, who pleaded guilty last year to conspiracy to provide services to Palestinian Islamic Jihad.

480.

Exhibit 1 is a copy of Government Exhibit 020-0034 from U.S. v. Holy Land Foundation, Case No. 3:04-CR 240-G.  This document shows that from February 11, 1985 - December 4, 1992, Hamas leader Marzook sent $ 858,185.64 to the IAP.

481.

Prior to September 11, 2001, the Hamas organizations were less careful about hiding their Hamas connections.  For example, Exhibit 44 is a page from the 1993 tax return for the HLF.  It shows that Hamas leader, Mousa Abu Marzook gave the organization $ 210,000 cash in 1992.

482.

Exhibit 45 is a letter from the Palestinian National Authority thanking the HLF for its donations including money given to the families of "martyrs and orphans".  The terms "martyrs and orphans" means the families of suicide/murder bombers.

483.

The money sent by the HLF to Palestine supported the families of terrorists as well as terrorist propaganda activities.  The level of hatred in the Hamas propaganda is as vile as any

83

1   propaganda has ever been.

2

3                                        484.

4        For example, Exhibit 46 is a true and correct copy of a small portion of a television

5   broadcast by Hamas which has a child and a large size bunny rabbit.  The bunny rabbit says that

6   they will "finish off the Jews and eat them, Allah willing".  This is where the CAIR fundraising

7   goes.  (One might look for a line item on their tax return saying "Funding for Children's

8   Education Overseas".

9                                        485.

10       When CAIR was raising money for the HLF and Global Relief under the guise of helping

11  the 9/11 victims, it knew that the money was going to support murder.  The use of Michael

12  Savage's work and the attacks on Michael Savage are being used to raise money to support the

13  same network of terror.

14

15

16  **G. Supporting Kindhearts - Another CAIR Affiliated Charity Supporting Hamas**

17                                       486.

18       CAIR's relationship with Kindhearts has been set forth above.  Kindhearts was yet

19  another CAIR supported charity that designed to help Hamas.  Kindhearts and other groups

20  referenced herein were not identical to Hamas the way that CAIR is identical.  The criminal

21  conspiracy is made up of Hamas and in its various forms as well as other organizations that are

22  part of the enterprise but which are not identical to Hamas.  Kindhearts is one of many examples

23  herein.

24                                       487.

25       Writer, journalist and lecturer Stephen Emerson exposed Kindhearts as an Hamas

26  fundraising group.  This is the same Stephen Emerson who exposed the fact that the HLF had

27  given money to CAIR at CAIR's inception, only to have CAIR's co-founder and director, Nihad

28  Awad lie to Congress and deny this fact.

                                          84

488.

As Exhibit 38 shows, CAIR official Nihad Awad personally attacked Stephen Emerson for exposing the HLF/CAIR connection.

489.

When Emerson exposed Kindhearts as being an Hamas front, CAIR defended Kindhearts and like Nihad Awad before Congress, personally attacked Stephen Emerson:

The Dec. 6 front-page story on the Muslim charity KindHearts was biased. The article purports to discuss "suspicious connections" between KindHearts and other now-closed Muslim charities, citing the fact that KindHearts' chief executive once worked for Global Relief. The article, rife with innuendo and guilt by association, is based almost entirely on the work of Steven Emerson, a reckless and biased self-styled terrorism expert.

(December 14, 2005, Cleveland Plain Dealer)

490.

CAIR used its standard Takeyya. It was protecting Hamas but did so using its fake civil rights rhetoric and a fake civil rights persona.

491.

Hamas speaking with the CAIR mask, claimed that Emerson was "an Islamophobe and an anti-Arab bigot on a personal grand inquisition. His work is often touted on virulently hateful anti-Islam Web sites."

492.

The United States closed KindHearts stating:

"KindHearts is the progeny of Holy Land Foundation and Global Relief Foundation, which attempted to mask their support for terrorism behind the facade of charitable giving," said Stuart Levey, Treasury Under Secretary for Terrorism and Financial Intelligence. "By utilizing this specialized designation tool, we're able to prevent asset flight in support of terrorist activities while we further investigate the activities of KindHearts."

85

This action was taken pursuant to E.O. 13224, which is aimed at denying financial and material support to terrorists and their facilitators.  (Exhibit 43)

493.

CAIR and its leadership knew that the HLF raised money for Hamas and they knew of the agenda of Hamas.  Further, CAIR and its leadership knew that when Hamas supported education, it supported education of the type set forth in Exhibit 46, education that was the brainwashing of children to kill.  This ensures that the bloody Jihad will continue long after all those reading this paragraph are gone.

**H. Using CAIR's Civil Rights False Persona to Achieve Illegal Goals**

494.

CAIR's efforts against Michael Savage, Laura Schlessinger and others is simply the building of the false persona necessary to effectively carry out CAIR's terror support in the United States.

495.

The creation of this false persona is/are overt acts of the conspiracy just as buying a "Richard Nixon" mask is an overt act if that mask covers one's face while one robs an armored truck.

496.

A careful tracing of what CAIR actually does rather than what it says it does reveals multiple acts in support of the terror infrastructure.  Each and every one of these is yet another overt act in the terror conspiracy.

***CAIR's SUPPORT GOES BEYOND HAMAS AND ASSISTS***
***OTHER TERROR GROUPS***

497.

As shown by Exhibit 47, in 1991, the Chairman of the IAP urged support of "the Dar".  He wanted to increase coordination between the IAP and the Dar.

498.

86

1    "The Dar" is a mosque in Virginia with a terror related history.  Even before the World

2    Trade Center attacks, the American-born imam of that mosque, Anwar al-Aulaqi drew the

3    attention of federal authorities because of his possible connections to al-Qaeda. After 9/11, it was

4    discovered that three of the hijackers had spent time at his mosques in California and Falls

5    Church.  This Imam was allowed to leave the United States in 2002.

6                                                    499.

7    El-Mezain was a close associate of this Imam, who has been deemed a spiritual advisor to

8    the 9/11 hijackers.  El-Mezain and former CAIR official Ghassan Elashi who are related by

9    marriage were named defendants in the Holy Land Foundation criminal trial.

10                                                   500.

11    It is this inter-relation of terror groups that allows the IAP as a Hamas based organization

12    to aid people involved with Bin Laden.   This amplifies the danger of the Hamas conspiracy

13    because like a traditional Mafia group, it will assist other organized criminal organizations when

14    it suits its purpose.

15                                                   501.

16    Hamas and other terror networks all provide pieces of support which ultimately lead to

17    horrific consequences.

18    ### CAIR VIOLATES 18 USC 1962 (c) & (d) PROVIDING

19    ### ILLEGAL MATERIAL SUPPORT TO TERRORISTS

20    ### USING ITS FALSE CIVIL RIGHTS PERSONA AS COVER

21                                                   502.

22    **A. The World Trade Center** was attacked at 12:17 pm on February 26, 1993, a 1,500lb

23    urea-nitrate fuel-oil bomb hidden inside a rental van caused a massive explosion that ripped

24    through the parking garage of the World Trade Center, killing six people and injuring another

25    1,042.

26                                                   503.

27    The 1993 World Trade Center bombing was the first large-scale terrorist attack on U.S.

28    soil by Islamic extremists. The terrorists had intended to topple one of the buildings onto the

                                                    87

other, potentially killing tens of thousands of innocent Americans.

504.

On Feb. 2, 1995, U.S. Attorney Mary Jo White named Siraj Wahhaj as one of the "unindicted persons who may be alleged as co-conspirators" in the attempt to blow up New York City monuments. Yet CAIR deems him "one of the most respected Muslim leaders in America" and includes him on its advisory board.

505.

Although they now deny it, at the time CAIR condemned the conviction of the perpetrators of the 1993 World Trade Center bombing, as "a travesty of justice."

506.

On June 6, 2006, the Ohio affiliate of the Council on American-Islamic Relations (CAIR-OH) honored Siraj Wahhaj at this fundraising banquet.

507.

Exhibit 48 is a video section of the speech by Wahhaj where he speaks of twelve Muslim women being "twelve shivs".

508.

Following the event, CAIR-OH issued a press release heralding the more than $100,000 that Siraj Wahhaj had helped raise that evening for the organization's "civil liberties work".

509.

CAIR-OH Director Adnan Mirza attributed the fundraiser's success to the popularity of CAIR-OH's agenda with Ohio Muslims. "Our community sent a very clear message that the work we do is vital to the well-being of the Ohio Muslim community and that CAIR-Ohio's efforts are appreciated," she said.

510.

This promotion of terror speakers is done at conventions and in situations where CAIR claims a charitable purpose.

511.

88

**B. Omar Abdel-Rahman** was responsible for the 1993 World Trade Center bombing. CAIR supported him.

512.

In fact, CAIR used money that it raised as a "charity" to feature Rahman as a victim in its 1996 book, entitled 'The Price of Ignorance,'. This terror leader was featured in a section which listed "incidents of anti-Muslim bias and violence". Again, when terrorists are apprehended, CAIR launches an attack on law enforcement and the government. It always, always claims that the arrests and prosecution of terrorists is due to anti-Muslim bias and civil rights violations.

513.

Rahman's history of violence dates to 1982 when he was charged with being a co-conspirator to the October 6, 1981 assassination of Egyptian President Anwar Sadat. Anwar Sadat was killed by a member of the Muslim Brotherhood because of his activities in forging a peace agreement with Israel.

514.

Like CAIR, Rahman did not pull the trigger. His contribution to the murder of Sadat was a written fatwa (religious ruling) that sanctioned the killing[20].

515.

---

[20]Joey Zasa: I have a stone in my shoe, Mr. Corleone. A two-bit punk who works for me. Who thinks he's related to you. A bastard.

Al Neri: He's here. Vincent Mancini. He's at the party.

Michael Corleone: Well, bring him in.

Joey Zasa: I think it's good that we talk. I have a problem. Now I have to find out if it is my problem or your problem.

Michael Corleone: Joey, your business is your business. I have no interest, no percentages. I'm out.

Joey Zasa: Good, then it is my problem.
(The Godfather Movie, Part III, 1990)

89

Abdel-Rahman is serving a life sentence in prison for his role as the spiritual leader of the group responsible for the 1993 bombing of the World Trade Center, the predecessor of Al-Qaeda, Maktab al-Khidmat.

516.

Attorney Lynne Stewart was convicted of "providing material support" to terrorism based upon conduct with respect to her client, Omar Abdel Rahman.

517.

Stewart was found to have violated federal orders forbidding her from helping Rahman communicate with his followers. She passed along a press release from Rahman in which he said he no longer supported a cease-fire between his militant group and the government of Egypt.

518.

To many, this was seen as a call for Rahman's supporters to resume attacks on the government.

519.

Attorney Stewart unsuccessfully asserted the First Amendment as protection for her conduct.

520.

CAIR was designed to use the First Amendment as a shield to hide its real purposes. The plan to have CAIR use CNN and other public and private channels to activate members is a plan to have CNN provide material support for terror in the United States.  If challenged, CAIR has the First Amendment and CAIR's civil rights mask to fall back on.  The question raised by this lawsuit is whether the mere assertion of a First Amendment protected purpose denies plaintiff the right to prove a primary criminal purpose.

521.

**H. Rap Brown**, is now known as Al-Amin.

522.

Al-Amin murdered a police officer.

523.

90

On April 12, 2001, CAIR hosted a fund raiser for Al-Amin. The keynote speaker was the was Siraj Wahhaj, the unindicted co-conspirator in the 1993 World Trade Center bombings who had spoken at a CAIR convention calling twelve women", "twelve shivs". He was also, at that time a member of CAIR's Board of Advisors.

524.

Wahhaj is also a close associate of the leader of the bombers, convicted terrorist Sheik Omar Abdel Rahman.                    525.

Exhibit 26 is a brief video of the speech given at a CAIR banquet by Wahh`aj where he speaks of "twelve women" being "twelve shivs".

526.

**D. Jamil Abdullah Al-Amin**, was convicted in March 2002 of murdering Fulton County (GA) Deputy Sheriff Ricky Kinchen and seriously wounding his partner in an ambush as they were serving an arrest warrant on him. He was convicted on all 13 counts and sentenced to life in prison. Deputy Kinchen had a wife and two small children.

Before Al-Amin's trial, CAIR and several other prominent Islamic organizations championed his innocence. A March 21, 2000 press release jointly-issued by CAIR claimed:

> "The charges of Imam Jamil are especially troubling because they are inconsistent
> with what is known of his moral character and past behavior as a Muslim."

527.

**E. Mousa Marzook** perhaps the most senior Hamas leader in America was arrested and almost immediately, Nihad Awad, CAIR founder called a May 10, 1996 press conference where he opposed the arrest of Marzook, stating:

> "The arrest, detention and extradition is politically motivated... [and] this
> campaign has been orchestrated to serve as a wedge between America and Islamic
> countries." (stated by Nihad Awad at May 10, 1996 press conference organized to
> support U.S. detained Hamas leader Mousa Abu Marzook)

528.

On May 7, 1996, CAIR coordinated a press conference to protest the decision of the U.S.

91

government to extradite Marzook for his connection to terrorist acts performed by Hamas. CAIR characterized the extradition as "anti-Islamic" and "anti-American."

529.

Marzook contributed $ 210,000 to CAIR at its inception.

530.

Marzook helped found the HLF which contributed money by wire transfer (See Exhibit 3) to CAIR's founding.

531.

**F. Hussam Ayloush**, the executive Director of CAIR-Los Angeles (CAIR-California) supported terrorist Wagdy Ghoneim, calling him a highly regarded religious scholar who gives speeches around the country."   Ghoneim is the cleric who led the Brooklyn College students in the song, "Jews Descendants of the Apes".   This statement was made in opposition to U.S. efforts to deport Ghoneim after he was arrested November 4, 2004 for immigration violations.

.                                        532.

**G. Sami Al-Arian** is the co-founder of CAIR partner organization, the Islamic Association for Palestine (IAP).  In 1979, Al-Arian, along with a group of Palestinian students in Cairo, formed a violent group called Palestinian Islamic Jihad (PIJ). Two years later, in November of 1981, Al-Arian founded the IAP, along with Aly A. Mishal and key Hamas member, Mousa Abu Marzook. In 1987, Al-Arian created an entire infrastructure for PIJ, within a house, an office complex and a children's school, all based in Tampa Bay, Florida. On May 1, 2006, Al-Arian was sentenced to 57 months in prison for conspiring to provide material support to PIJ

533.

On April 14, 2006 Al-Arian pleaded guilty to a single count of conspiracy to provide services to Palestinian Islamic Jihad (count 4 of the original indictment.) He also agreed that the government would deport him at the conclusion of his sentence. In return, federal prosecutors agreed to drop the remaining eight charges against him. Al-Arian was sentenced to 57 months in prison and given credit for time served. He was to serve the balance of 19 months and then be

deported.

### 534.

During his term in prison, Al-Arian was held in contempt for failure to testify in another proceeding.

### 535.

In CAIR's newsletter, they asked American Muslims and other people of conscience to write letters in support of Sami Al-Arian's contempt. The same communication provided a link to the "Free Sami Al-Arian - How to Help" website, which itself is associated with numerous Islamo-Fascist groups including the Muslim American Society and the Blue Triangle Network.

### 536.

As recently as July 15, 2008, CAIR was providing support and propaganda for convicted terrorist Al-Arian. (See Exhibit 48)

### 537.

**H. Ahmed Abda Sherf Mohamed and Yousef Samir Megahed** two non-American students from the University of South Florida (USF) decided to blow up a U.S. Naval station.

### 538.

On August 4th, 2007, they were caught speeding near a Naval Weapons Station in South Carolina. It appears that this fortuitous police intervention and the high quality police work that followed, averted a blood bath.

### 539.

The Naval station housed a military prison, where enemy combatants have been held. According to reports, the officers became suspicious, because the men quickly put away a laptop computer and, when questioned, couldn't immediately say what they were doing in the area or where they were headed. Upon searching the trunk of the vehicle, the officers found what appeared to be a number of lead pipe bombs. The two were arrested and soon charged with possession of an incendiary device, which, if convicted, could earn them two to fifteen years each.

540.

Immediately after the story broke, Ahmed Bedier, the Executive Director of the Tampa office of the Council on American-Islamic Relations (CAIR-Tampa) and the Communications Director of CAIR-Florida stated that the arrests were nothing but a case of racism or, as he put it, "racial profiling." He stated, "Obviously their heritage and background is playing a major role in blowing this out of proportion." and "We believe that there's an overreaction that [is] happening here just because of their Middle Eastern and Muslim backgrounds."

541.

A laptop computer deputies found when they pulled over the two students contained a video made by one of the men showing how to use a toy to detonate a bomb remotely. On that video, the student, Ahmed Mohamed, said the detonator could "save one who wants to be a martyr for another day, another battle."

542.

The video was posted by Mohamed on YouTube, a popular Web site. Also on the laptop were 'jihadi' images and footage of rockets used by Hamas.

543.

CAIR's attempt to brand this prosecution as Anti-Muslim is an obstruction of justice. It is a deliberate tactic of violent Jihadists to prevent Muslim Americans from cooperating with law enforcement. This is done to protect the criminal terrorists. This pattern of obstructing justice is repeated virtually every time a major arrest of terrorists takes place in the United States.

544.

**I. Sheik Yusuf Qaradawi** was an open supporter of Hamas, Islamic Jihad and Hezbollah, as well as other groups targeting U.S. forces in the mid-east. Qaradawi is barred from entering the U.S. because of his advocacy of violence. In a July 7, 2004 interview with BBC, Ibrahim Hooper, CAIR's spokesman, defended Qaradawi as "respectable," adding: "I don't think there's any incitement of violence on his part."

545.

**J. Ghassan Elashi** is a founding board member of CAIR's Texas chapter. On April 13,

94

2005, Ghassan and two of Ghassan's brothers, were found guilty of supporting terrorism by funneling money to the leader of Hamas. They were convicted in a federal court in Texas of handling and trying to conceal an investment by senior Hamas leader Musa Abu Marzuq. In July 2004, Ghassan Elashi was convicted on separate charges of illegally exporting goods to Syria and of money laundering. At that time, a representative of CAIR's Dallas-Fort Worth chapter, Khalil Meek, argued that the only thing Elashi was guilty of was the "crime of being Muslim in America.

546.

CAIR's Elmougy and their attorney supported Elashi and raised funds for his defense.

547.

During the time that Elmougy raised funds for the defense of Elashi he was an officer of CAIR-Texas but his name was fraudulently left off the tax returns in order to create a distance between the organization and an exposed advocate for a terrorist.

548.

In July of 2004, Bayan, Ghassan, Basman, Hazim and Ihsan Elashi were convicted of selling computer equipment to Libya and Syria in violation of US anti-terrorism laws.

549.

Elashi was convicted of all twenty-one counts with which he was charged, including conspiracy, money laundering, and dealing in the property of a designated terrorist.[30] Third, he was charged in July 2004 with providing more than $12.4 million to Hamas while he was running the Holy Land Foundation for Relief and Development, America's largest Islamic charity.

550.

Ghassan Elashi and two brothers were convicted in April 2005 of knowingly doing business with Mousa Abu Marzook, a senior Hamas leader, whom the U.S. State Department had in 1995 declared a "specially designated terrorist."

551.

**K. Mohamed Elmougy** Chairman, former President and former Spokesman of the

95

Dallas/Ft. Worth chapter of CAIR (CAIR-DFW, CAIR-Texas) was the champion of the Elashi brothers.

552.

Mohamed Elmougy used his post at CAIR to raise funds for their defense.   He stated that: "All I can tell you is the community is behind the Elashi brothers, and they are caught in a kind of political game." (Steve McGonigle, The Dallas Morning News, 'Aid push made for 5 tied to Hamas,' February 15, 2003)

553.

Mohamed Elmougy is himself deeply embedded in radical Jihadist groups.  When Elougy headed CAIR-DFW, the group's website had links to both the Holy Land Foundation for Relief and Development (HLF) and the Islamic Association for Palestine (IAP), prior to them being shut down for their activities with Hamas.

554.

Elmoughy also defended Hamas financier, Mufid Abdulqader.

555.

Elmougy defended the financier stating; "That's called guilty by association. So you're the half brother of someone the government doesn't like. So what? Give me a break!" (2005)

556.

This claim that the charges were brought because Abdulqader was the half-brother of the head of Hamas Khaled Mashaal ignored the fact that Abdulqader personally had been helping HLF to funnel money to Hamas.

557.

Abdulqader was known as a virulent hater of Jews.  He had spent weekends singing in front of crowds songs containing such statements as: "Death to Jews is precious. Jews will not fear threats, only action, so Hamas, hit them with the shoe bottoms of Islam and Hamas!"

558.

Elmougy has spoken in public about his belief in Sharia law and his support of that law when it calls for the murder of homosexuals.

Dreher: Do you believe that homosexuals convicted in a sharia court should be killed, or otherwise punished physically?

Elmougy: I don't condone homosexuality. I have a lot of friends, a lot of people who work for me... I don't go kill them. But, you know, I don't condone what they do outside of work, so long as it's something not in front of me. So do I condone the sharia? We don't apologize for our religion. If that is what our religion says, we certainly accept it open-heartedly.

(Interview, The Dallas Morning News, 'Muslim meeting: the transcript,' December 22, 2006)

559.

**L. Muthanna al-Hanooti** is a director of CAIR.  His Islamic charity gave millions to Human Appeal International, which the FBI has identified as Hamas' Jordanian operation. The organization raises money through vague fundraisers for "Katrina," "Lebanon Relief," and "Afghanistan Wheelchair" fundraisers and is believed to have laundered the money to terrorists.  The FBI alleges al-Hanooti, an ethnic-Palestinian who also emigrated from Iraq, raised money for Hamas. In fact, "Al-Hanooti collected over $6 million for support of Hamas," according to a 2001 FBI report, and was present with CAIR and Holy Land officials at the 1993 Philadelphia meeting of Hamas.   Prosecutors recently added his name to the list of unindicted co-conspirators in the Holy Land case.

560.

**M. Laura Jaghlit** is a so called civil-rights coordinator for CAIR.  Her husband Mohammed Jaghlit, a key leader in the Saudi-backed SAAR network, is a target of the still-active federal probe. Jaghlit sent two letters accompanying donations, one for $10,000, the other for $5,000, from the SAAR Foundation to Sami al-Arian, now a convicted terrorist. In each letter, according to a federal affidavit, "Jaghlit instructed al-Arian not to disclose the contribution publicly or to the media."   In addition, Jaghlit donated a total of $37,200 to the Holy Land Foundation and Jaghlit is an unindicted co-conspirator in the ongoing case.

561.

97

**N. Abdurahman Alamoudi**, a CAIR director, is serving 23 years in federal prison for plotting terrorism. Alamoudi, who was caught on tape complaining bin Laden hadn't killed enough Americans in the U.S. embassy bombings in Africa, was one of al-Qaida's top fund-raisers in America, according to the U.S. Treasury Department.

562.

**O. Nabil Sadoun** is a CAIR board member, who also served on the board of the United Association for Studies and Research, which is an Hamas group established in America. Sadoun co-founded UASR with Hamas leader Marzook. The Justice Department added UASR to the list of unindicted co-conspirators in the Holy Land case.  UASR is one of the four groups listed on the agenda for the Palestine Committee from 1994.

563.

**P. Mohamed Nimer** is CAIR's current research director. He has also served as a board director for UASR, the strategic arm for Hamas in the U.S.

564.

**Q. Rafeeq Jaber** is a founding director of CAIR.  Jaber was the long-time president of the Islamic Association for Palestine. In 2002, a federal judge found that "the Islamic Association for Palestine has acted in support of Hamas." In his capacity as IAP chief, Jaber praised Hezbollah attacks on Israel. He also served on the board of a radical mosque in the Chicago area.

565.

**R. Rabith Hadid**, a CAIR fund-raiser, was a founder of the Global Relief Foundation, which after 9/11 was blacklisted by Treasury for financing al-Qaida and other terror groups. Hadid was arrested on terror-related charges and deported to Lebanon in 2003.  The Global Relief Foundation was one of the charities listed on CAIR's website where donations were solicited to help the survivors of the 9/11 terror attacks.

566.

**S. Randall "Ismail" Royer** was the former CAIR communications specialist and so called civil-rights coordinator.  He is now serving 20 years in prison in connection with the Virginia Jihad Network, which he led while employed by CAIR at its Washington headquarters.

The group trained to kill U.S. soldiers overseas, cased the FBI headquarters, and cheered the space shuttle Columbia tragedy. Al-Qaida operative Ahmed Abu Ali, convicted of plotting to assassinate President Bush, was among those who trained with Royer's Northern Virginia cell.

567.

**T. Bassam Khafagi**, a CAIR official, was arrested in 2003 while serving as CAIR's director of community affairs. He pleaded guilty to charges of bank and visa fraud stemming from a federal counter-terror probe of his leadership role in the Islamic Assembly of North America, which has supported al-Qaida and advocated suicide attacks on America. He was sentenced to 10 months in prison and deported to his native Egypt.

568.

**U. Asthma Ahmad** was the managing Editor and Staff Writer for CAIR-California's monthly tabloid, In Focus, and former website designer and former publicity assistant for CAIR-California (CAIR-Los Angeles). This magazine ran solicitations for charitable contributions to various Hamas based charities.

569.

**V. Nihad Awad (Hammad)** is a co-founder and National Executive Director of CAIR, former Public Relations Director and Spokesman of CAIR's (dissolved) parent organization, the Islamic Association for Palestine (IAP), and former Contributing Editor of IAP's (dissolved) magazine, the Muslim World Monitor. "After I researched the situation inside and outside Palestine, I am in support of the Hamas movement more than the PLO... I know that this movement as an Islamic movement has not been objectively reported in the United States..." (stated by Nihad Awad at symposium at Barry University in Miami Shores, Florida, March 22, 1994)

Nihad Awad opposed the arrest of Hamas Terrorist, Marzook, stating:
"The arrest, detention and extradition is politically motivated... [and] this campaign has been orchestrated to serve as a wedge between America and Islamic countries." (stated by Nihad Awad at May 10, 1996 press conference organized to support U.S. detained Hamas leader Mousa Abu Marzook)

570.

**W. Hussam Ayloush**, the executive Director of CAIR-Los Angeles (CAIR-California) has been a strong supporter of Bin Laden.  Ayloush received a "special thanks" credit, in the July 1999 issue of Al-Talib, a publication of the Muslim Students Association (MSA) at UCLA. The cover of the issue dons a picture of Osama bin Laden, who the publication describes as a "freedom fighter and philanthropist." The issue contains an editorial signed by "The Al-Talib Staff," which states, "When we hear someone refer to the great Mujahid (someone who struggles in Allah's cause) Osama bin Laden as a 'terrorist,' we should defend our brother and refer to him as a freedom fighter, someone who has forsaken wealth and power to fight in Allah's cause and speak out against oppressors. We take these stances only to please Allah." (Al-Talib, 'The Spirit of Jihad,' July 1999)

571.

**X. Khalil Bendib** was the political cartoonist for CAIR-California's monthly tabloid, In Focus.  Among his work is his portrayal of the Jews, represented by an ape with a Star of David (Jewish Star), as attempting to take over the world.

572.

**Y. Alwaleed Bin Talal** is a CAIR Financier who inherited his money by being part of a Saudi ruling family.  Bin Talal gifted $500,000 towards CAIR's library book initiative, called 'Islamic Culture & Civilization,' which began in September of 2002. Through this project, Islamic book packages were distributed to public libraries nationwide. (American Libraries Online, 'Islamic Materials Campaign Funded by Saudi Prince,' December 9, 2002) The books included: Abdullah Yusuf Ali's The Meaning of THE HOLY QURAN, a version of the Quran that has been banned by the Los Angeles public school system for having numerous anti-Jewish commentaries.

573.

In April of 2002, Bin Talal donated $27 million during a three-day telethon sponsored by the Saudi government group, the Committee for Support of the al-Aqsa Intifada. The total amount raised, during the telethon, was close to $110 million; Bin Talal had been the single

100

largest donor. According to Israeli intelligence, this money was the main source of funding that went to 36 families of Palestinian terrorists, including eight families of suicide bombers. (Insight Magazine)

574.

**Z. Mustafaa Carroll**, the executive Director and former Board President of the Dallas/Ft. Worth chapter of CAIR (CAIR-DFW, CAIR-Texas), was also the co-founder and Media Contact of CAIR/HLF Hungry for Justice.  As an officer of Hungry for Justice Coalition, Carroll has chosen to lend his name to an organization that is attempting to gather support for individuals that were involved in raising millions of dollars for Hamas, through the Holy Land Foundation (HLF).

575.

On July 11, 2007, Carroll posted a CAIR-DFW newsletter on the CAFHTA Yahoo Groups site, which included a call for donations to the "charity" Islamic Relief. (CAFHTA, Yahoo Groups, 'Fwd: CAIR Newsletter 7-11-07,' July 11, 2007) According to the Israeli government, Islamic Relief is a Hamas front that has provided funds and assistance to Hamas.

576.

**AA. Zeinab Chami** is a CAIR-Michigan Staffer who was the contact for an August 5, 2006 fundraiser to collect money allegedly for medical relief to Lebanon.  The event was in coordination with American Near East Refugee Aid (ANERA), an NGO founded after the 1967 Arab-Israeli war (Six-Day War) which partners with such "charities" as Islamic Relief, an organization that Israel has labeled a front for Hamas.

577.

**BB. Chris "Abdur Rahman" Cusano** is the former Director of CAIR's Orlando Office Prior to joining CAIR, Cusano was the President of the Muslim Students Association (MSA) at the University of Central Florida (UCF). It was under his leadership that the MSA invited radical imam Ibrahim Dremali to speak at UCF.   Dremali, who is currently the imam of the Islamic Center of Des Moines (Iowa), was formerly the representative of an organization that was asking its followers to give "material support" to groups associated with Al-Qaeda. (official website of

the SouthEast chapter of the Islamic Circle of North America, March 1, 2000-September 27, 2001) As well, Dremali, in October of 2000, told a crowd in Miami, Florida, amidst burning Israeli flags and chants of "With jihad we'll claim our land, Zionist blood will wet the sand," not to be sad for suicide bombers and "to not be afraid to die for what they believe in."

578.

**CC. Karen Dabdoub** executive Director of CAIR-Cincinnati

After a July 2006 fire at a Jordanian-owned restaurant, Dabdoub helped rile up members of the Arab and Muslim community by suggesting that it was an "attack" that might have been "ethnically or religiously motivated." (Cameron Fullam, The Pulse-Journal, "Restaurant blast ruled 'suspicious,'" July 13, 2006) It was later determined that the owner of the business, Musa Shteiwi, had hired someone to set the restaurant ablaze.

579.

**DD. Manal El-Hrisse** is the former Secretary General of the Chicago office of CAIR's (dissolved) parent organization, the Islamic Association for Palestine (IAP), and former Executive Director and former Public Relations Director of IAP's (dissolved) political advocacy division, the United Muslim Americans Association (UMAA) Besides her involvement with the IAP, El-Hrisse was a youth program organizer for the Chicago chapter of the Muslim American Society (MAS). (MAS-Chicago website, Youth Department, Summer Camp 2002, 'Manal El-Hrisse,' September 30, 2002) While she was active in MAS-Chicago, the group had placed on the youth section of its website material stating that "war should be declared" against Christians and Jews, that Christians and Jews are "perverted," and that "G-d will assail them." (Youth Library of MAS-Chicago website, Milestones, 'Jihaad in the Cause of Allah,' July 17, 2002 – April 21, 2005)

580.

Following the arrests of Sami Al-arian, Sameeh Hamoudeh, Ghassan Ballut and Hatim Fariz for their roles in Palestinian Islamic Jihad (PIJ), El-Hrisse joined a media committee, in order to provide "advocacy support" to them. (Muslim Civil Rights Center, 'Community meeting held to provide legal defense to Ghassan and Hatim,' April 2, 2003)

581.

It is this type of person who moves among groups, from CAIR to MAS, and to the defense of terrorist leaders such as Sami Al-arian. It is this fluid integration of groups in the enterprise that adds to its danger as the proliferation of groups and associations makes it difficult for Americans to defend against the pernicious groups without being wary of all Muslim groups.

582.

It is for this very reason that the lawsuit against Jihadist groups like Hamas and CAIR must continue in order that there be protection for Muslim groups with legitimate purposes (regardless of whether plaintiff agrees with that purpose) from infiltration by those with a terror agenda spelled out by Hamas and the enterprise.

583.

**EE. Basim Elkarra** is the executive Director of CAIR-Sacramento Valley. In December of 2006, United States Senator Barbara Boxer rescinded an award her office had given Elkarra, expressing concern that his organization, CAIR, had possible links to terrorism. Elkarra has a history of supporting terrorists in America. When asked about the FBI actions against a Lodi, California man, Hamid Hayat, who had admitted to training for jihad at a terrorist camp in Pakistan, Elkarra stated:

> "Some people thought they were doing this just for the media. People speculate
> different things. Some people are speculating that this was done to coincide with
> the report on the FBI -- how they missed five chances at the 9/11 hijackers. Other
> people speculate that this was done to push the Patriot Act and especially the
> sunset provisions that are coming up. And so people are speculating different
> things. People are not sure why this is happening. Everyone believes that the
> Hayats are innocent -- all their family, their friends. They don't believe that he was
> capable of doing that. And even one of his relatives who was with him in Pakistan
> said that he never left the village -- he'd be playing video games all the time --
> wasn't sure what to do with his time. And so we find it almost as a joke that this is
> all happening." (Basim Elkarra, as stated on Kamran Memon's WVON Radio

Islam show, June 14, 2005)

584.

**FF. Rabih Haddad** is a former fundraiser for CAIR-Michigan. He was arrested on December 14, 2001, the same day the organization he had co-founded, the Global Relief Foundation (GRF), was shut down by the United States for financing Hamas and Al-Qaeda. (Associated Press, 'Rabih Haddad Deported,' July 15, 2003)   On July 14, 2003, Haddad was deported from the United States to Lebanon.

585.

**GG. Ramzy Kilic** is the Civil Rights Coordinator for CAIR-Tampa. In August of 2007, Kilic showed up at a courtroom in Monck's Corner, South Carolina to assist the defense for Youssef Samir Megahed and Abdellatif Sherif Mohamed, who had been charged with transporting explosives across state lines in order to blow up a U.S. Naval Base . In an Associated Press photo, Kilic is pictured conferring with Megahed's and Mohamed's defense attorney, Dennis Rhoad.

586.

CAIR actively supported these students and raised funds for their defense. CAIR claimed that the arrests were racially motivated. When pictures of the students with weapons and YouTube videos appeared with the defendants advocating Jihad, CAIR withdrew its support.

587.

**HH. Eric "Khalil" Meek** was Vice President of the Dallas/Ft. Worth chapter of CAIR (CAIR-DFW, CAIR-Texas) and co-founder and Spokesman of CAIR/HLF's Hungry for Justice. Meek was a major participant in fundraising efforts on behalf of terror suspects Ghassan Elashi and Hamas leader, Mousa Abu Marzook.

588.

**II. Yaser Bushnaq**, a former president of the Islamic Association for Palestine was indicted in Virginia for naturalization fraud.   In applying to become a U.S. citizen in 2000, Bushnaq was accused of failing to disclose his affiliations with a series of organizations that the

104

indictment links to the Muslim Brotherhood and Hamas. The indictment clearly defines the IAP as "an overt arm of the covert organization known as the Muslim Brotherhood." Bushnaq was a donor to Cynthia McKinney on 9/11/2001.

589.

The indictment against Bushnaq also alleged that when Bushnaq applied to become a citizen he failed to disclose:

1. That he worked under the pseudonym Yaser Saleh.

2. He was a board of trustees member for the Al Aqsa Education Fund, "an organization that sought to raise funds for Hamas."

3. He was an authorized signatory for the Marzook Legal Fund, established in 1996 to support Hamas leader Mousa Abu Marzook after his arrest by U.S. authorities.

590.

Yasser Bushnaq also was present at the "Beirut Meeting" in January 2001. The State Department said the meeting included "members of several terrorist organizations" including Hezbollah and Hamas. Bushnaq posed for photographs with Ahmed Yousef, a Hamas spokesman in Gaza and Abdurrahman Alamoudi, former head of the American Muslim Council serving a 23-year prison sentence after pleading guilty to illegal dealings with Libya and aiding a plot to assassinate the Crown Prince of Saudi Arabia.

591.

**JJ. Yasmeen Qadri** is the Executive Committee member of CAIR-Orlando Qadri states on her resume that she has a "professional partnership" with the American Muslim Alliance (AMA). On October 25, 2000, then-candidate for the *U.S. Senate, Hillary Clinton* announced that she was returning $50,000 in campaign donations raised by the AMA, due to the group's support for terrorism against the state of Israel. (See paragraphs 92-94 showing where Senator's *Schumer, Durbin and Boxer* took similar actions with respect to CAIR members)

592.

**KK. Sabri Samirah** is the former National Chairman of the Islamic Association for Palestine (IAP), co-founder and former President of IAP's political advocacy division, the United

105

1  Muslim Americans Association (UMAA), former writer for IAP's (dissolved) newspaper,

2  Al-Zaitonah (The Olive), and former President and board member of the IAP-affiliated Mosque

3  Foundation (a.k.a. Bridgeview Mosque)

4                                    593.

5       On January 25, 2003, while returning from a trip to Jordan, Samirah was refused entry

6  into the United States. According to a document issued from then-Chicago INS director Brian

7  Perryman, Samirah was "a security risk to the United States." ('Samirah v. Ashcroft,' No.

8  03-1085, In the Supreme Court of the United States, July 14, 2004) Samirah had lied about his

9  immigration status, in order to get permission from the U.S. government to travel to Jordan.

10                                   594.

11      **LL. Riad Abdelkarim** is the former Board Chairman of CAIR-Florida, former National

12  Board member of CAIR, former Executive Committee member of CAIR-Los Angeles

13  (CAIR-California), former Coordinator for CAIR's (dissolved) Independent Writers Syndicate

14  (IWS), and former Secretary of IAP's (dissolved) sister organization, the Holy Land Foundation

15  for Relief and Development (HLF)

16                                   595.

17      Abdelkarim served as the Secretary of the Holy Land Foundation for Relief and

18  Development (HLF) in 2000, and shortly after HLF was shut down by the United States

19  government, Abdelkarim founded KinderUSA in May of 2002.  This organization was later shut

20  down by the Treasury Department as a terrorist organization.  On May 5, 2002, Abdelkarim was

21  detained by the Israeli government, which claimed he was using the charity that he founded and

22  Chaired, KinderUSA, to "transfer money to sponsor suicide bombings." (Media Monitors

23  Network, 'My Ordeal as a Captive in Israel,' June 12, 2002)

24                                   596.

25      CAIR provides support for terrorists such as those above.  The legal, logistical and public

26  support of terrorists is valuable to those perpetrating the crimes. If they succeed, the count on

27  CAIR to make the public announcements blaming the victims.  If they want to raise money,

28  CAIR sponsors them as speakers at CAIR conventions.  If they need jobs, money or a title, CAIR

gives it to them. And when they are captured by the United States, CAIR leads the hue and cry claiming "prejudice" and urging Muslims not to cooperate with law enforcement because the prosecutions are unjustified and unfairly "target Muslims".

597.

CAIR intends to provide this assistance in order to further the conspiracy and enterprise. CAIR was established to provide this assistance. CAIR provides this assistance not to promote truth or justice but to protect terrorists and their allies. The charitable face is simply a cover to allow them to give illegal support to terror.

### *DUBAI PORT DEAL - CAIR WORKS FOR DUBAI*

598.

Michael Savage further alleges that the choice to attack him was done in part as payback by CAIR to one of its major financial backers, the royal family of Dubai.

599.

Michael Savage contends that this is part of the racketeering engaged in by CAIR where it uses its American face and American network to cause deliberate harm to those who not only oppose Hamas but to those who interfere with the interests of CAIR's foreign supporters.

600.

The emir of Dubai owns a controlling interest in the Dubai-based company that sought to take over the ports. His name is Gen. Sheik Mohammed Bin Rashid Al-Maktoum. It was his pride and his financial interests that were hurt by the Michael Savage campaign against his ownership of U.S. ports.

601.

Sheik Maktoum has financial interests in CAIR. Until 2005 he had a major recorded interest in CAIR's headquarters located in Washington D.C. (See paragraphs 601, 612-623 of this complaint regarding the illegal real estate transactions of CAIR.

602.

Michael Savage contends that the Dubai port deal controversy began in February 2006

107

and rose to prominence as a national security debate in the United States. At issue was the sale of port management businesses in six major U.S. seaports to a company based in the United Arab Emirates (UAE), and whether such a sale would compromise port security.

603.

U.S. President George W. Bush argued vigorously for the approval of the deal, claiming that the delay sends the wrong message to U.S. allies. Legislation was introduced to the United States Congress to delay the sale.

604.

Michael Savage was the primary media figure bringing this deal to the attention of the American public.  He strongly opposed it and stated that it threatened national security.

605.

After several weeks of major publicity from Michael Savage, the mainstream media also publicized the deal.  Shortly thereafter the deal was scrapped.

606.

CAIR's attack on Michael Savage is yet another example of how CAIR is using its civil rights mask to serve the purpose of foreign entities.

607.

**Hamdan Bin Rashid Al-Makhtoum** from Dubai is a key CAIR Financier.  When the Dubai port deal was defeated, the United Arab Emirates (UAE), (May 21, 2006) announced on its website its decision "to build a property in the United States to serve as an endowment for the Council on American-Islamic Relations (CAIR)."

608.

The United Arab Emirates announced on its official government website that it had set up the endowment serving as a source of income for CAIR. The amount of the funding was reported as being enough to help CAIR finance the construction of a new $24 million office building and a planned $50 million public-relations campaign aimed at repairing Islam's and the UAE's image in America following the Dubai Ports debacle.

609.

108

This proposal was endorsed by Bin Rashid Al-Makhtoum, who holds within the UAE the positions of Deputy Ruler of Dubai, UAE and UAE Minister of Finance and Industry. (See: Paul Sperry, 'The CAIR-U.A.E. Connection, FrontPage Magazine, June 20, 2006)

610.

This is exactly the type of activity and funding that requires registration as a foreign agent.

611.

Michael Savage contends that CAIR's attack on Michael Savage and the use of his copyright material was in part a retaliation for Savage's work opposing the Dubai port deal and that CAIR's conduct was the economic equivalent of a paid Mafia "hit" done for a friendly (and paying) third party.

## CAIR'S ILLEGAL REAL ESTATE TRANSACTIONS

612.

CAIR lists itself as a charity, but it receives major funding from foreign sources.  It hides these sources and criminally launders the money to the Hamas Conspiracy.   One method by which CAIR has received foreign money is through the so called "purchase" of its Washington, D.C. headquarters.

613.

CAIR purchased its national headquarters in 1999 through an unusual lease-purchase transaction with the United Bank of Kuwait.

614.

The bank was the deed holder and leased the building to CAIR; yet despite not owning the building, CAIR recorded the property on its balance sheet as a property asset valued at $2.6 million.

615.

This arrangement changed in September 2002 when CAIR bought out the Kuwaiti bank with funds provided, at least in part, by Al-Maktoum Foundation, based in Dubai and headed by Dubai's crown prince and defense minister, Sheikh Mohammed bin Rashid al-Maktoum.

616.

The markings on the deed indicate that the foundation provided "purchase money to the extent of $978,031.34" to CAIR, or roughly one-third the value of the property.

617.

Further, a lease with Aristotle Publishing provided sufficient income to pay any interest that would normally be due on a loan of $ 978,031.34.  Therefore, according to the paper trail, CAIR received the building with no down payment and with the loan paid for by an existing lease.

618.

In 2005, two corporations, Zahara Investments and Greater Washington LLC of Delaware contributed properties to CAIR which then secured a loan package by Virginia Commerce Bank. The loan totaled $ 3.5 million.

619.

These contributed properties were not listed as donations to CAIR, they just appeared on CAIR's balance sheet without explanation.

620.

The ownership and control of Zahara Investments and Greater Washington LLC of Delaware is unknown.  CAIR has at times listed Zahara as having a relation to CAIR and at other times (in tax returns), Zahara is completely absent.

621.

Therefore, with no money down and with a positive cash flow from the inception, CAIR was able to acquire property and then draw a loan for $ 3.5 million dollars from that property.

622.

CAIR has never provided any accounting as to how this came to be.

623.

The criminal violations involved include money laundering, tax evasion, wire fraud, mail fraud, failure to register as a foreign agent and other financial crimes.

110

### ADDITIONAL RICO ALLEGATIONS

### 18 U.S.C. 1962 (c)

624.

Plaintiff incorporates all of the allegations herein including but not limited to those labeled with reference to a violation of 18 U.S.C. 1962 (c) & (d). The following is a summary of the basis for the RICO pleading.

625.

CAIR operated and/or managed an enterprise through a pattern of racketeering activity as set forth herein. The enterprise exists separate and apart from pattern of terror activity in which it engaged. The groups have diverse goals and interests. Hamas for example has a genuine political presence setting up a type of government in Gaza while Al-Qaeda has not political structure in any country but has its own internal command structure. These groups join together in an enterprise, CAIR conspires primarily with other Hamas members but Hamas itself and CAIR acting as an arm of Hamas, joins with other groups in a common purpose.

626.

The enterprise is an association-in-fact enterprise which consists of CAIR, Hamas, the Muslim Brotherhood and other terrorist groups, terror aiding charities and individuals committing these acts. CAIR's corporate structure and American based activities would still exist even if the enterprise of terror ended. (Management might change and the group might focus on a genuine civil rights purpose but the entity would not itself change if terror ended.)

627.

Hamas, the Muslim Brotherhood and CAIR have an existence separate from the illegal enterprise although they regularly engage in a pattern of racketeering. (*Odom v. Microsoft Corp.* 486 F.3d 541; 549-550 (9th Cir. 2007). The separate existence is alleged herein. Each group has a charter, political goals and an existence separate from the criminal acts set forth herein.

628.

Hamas, the Muslim Brotherhood, CAIR and other participants in this enterprise seek to

111

1  grow the enterprise and achieve its goals by both legal and illegal means.   It is the illegal means

2  which involve the RICO predicates set forth herein that constitute the pattern of racketeering.

3                                                629.

4          The enterprise is a separate enterprise which would exist if the participants did not

5  commit the RICO crimes which constitute the racketeering herein and in fact, the groups engage

6  in both legal and illegal conduct as set forth herein. (*Diamonds Plus, Inc.* 960 F. 2d 770 n.5)

7                                                630.

8          As alleged herein, The Muslim Brotherhood, Hamas, CAIR and other associated groups

9  and terrorists share a common purpose.  The entities then function together in both a formal

10  manner with charters, meetings, resolutions and corporate structures as well as informally but

11  assisting each other in times of need.  The agreement to assist is at times explicit but also tacit.

12                                                631.

13          The criminal enterprise is a distinct entity separate from the individuals and individual

14  groups that comprise it.

15                                                632.

16          While the Muslim Brotherhood, Hamas and CAIR are different subgroups of one entity,

17  they engage with separate and distinct individuals and other organizations in this enterprise.

18  (*Living Designs Inc. v. E.I. Dupont De Nemours and Co.* 431 F.3d 353, 362 (9th Cir. 2005))

19                                                633.

20          As set forth herein, the conduct of the conspiracy is national and international. It involves

21  crimes that have as a factual and jurisdictional element an effect on interstate commerce.

22                                                634.

23          CAIR conducts and participates directly and indirectly in the conduct of the enterprises

24  affairs.  Its founders are founders of related groups such as the IAP.  Its funding and conception

25  was by members of the Muslim Brotherhood and Hamas.  By its nature, CAIR supervises and

26  assists others who carry out the day to day tasks of the enterprise.  CAIR and its management set

27  policy and devise tactics to advance the interests and purpose of the enterprise.  (See also par. 4

28  herein)

                                               112

635.

The criminal conduct of the enterprise has the same (or similar purposes), results, participants and victims as described in the charter of Hamas, the conduct of the parties, the rhetoric of the parties and the resulting actions.  The victims in a broad sense are the United States, Israel and other civilized countries.  The individual victims are the persons killed or maimed by the enterprise.  The more narrow group of victims are those damaged by the aspects of the enterprise which is directly affected by the conduct of CAIR.  This includes the victims named herein, including Michael Savage.

**Corruption of CAIR as a Legitimate Corporate Entity** (18 USC 1962(c))

(An Alternate View of "the Enterprise")

636.

It is further alleged that as another and separate basis for 18 U.S.C. 1962(c), that CAIR as a corporate entity has been used by members of the criminal enterprise (and conspiracy).  It has been taken over by them, its corporate purpose (as stated in its Articles of Incorporation) have been corrupted to make the entity, CAIR, a criminal vehicle to participate in the conspiracy.  (See also par. 4 herein)

637.

The conspirators have unlawfully manipulated CAIR (in the context of CAIR itself as an enterprise), for purposes of engaging in, concealing, or benefiting from a pattern of racketeering activity.

638.

In this context, all of the RICO predicates of CAIR, including those which give Michael Savage standing as well as those that do not, establish the creation of a "CAIR Enterprise" as pled herein.

639.

This is pled as a separate and distinct theory from that of CAIR as a conspirator in a broader conspiracy also called an enterprise.  Plaintiff asserts that each of these theories are valid both individually and when taken together as a whole.

113

640.

The conduct of CAIR as a corrupted corporation and/or CAIR as a member of a conspiracy designed to promote the goals of a broader enterprise include but are not limited to the following.

**1. Extortion / Interfering with Commerce**

641.

He is the victim of extortion as he is being forced to either change the content of his radio show or face economic damage as set forth herein.   This is a RICO predicate of both extortion and of interfering with commerce[21].

642.

To change the content or tenor of the show is to change the product so that it does not compete in the marketplace in the same manner as the show absent the extortion.

643.

Having refused to give in to the extortion, CAIR has damaged Michael Savage as set forth herein and this damage exceeds $ 1,000,000.00 in lost advertising revenue.  Lost advertising revenue as used herein includes advertisers who withdrew ads, cancelled contracts, failed to continue to do business with plaintiff and/or would have done business with plaintiff but for the conduct of defendants.

644.

CAIR has further damaged the value of Michael Savage as a business entity, performer and as a  business by damaging his reputation through libel, slander and by placing him in a false light.

---

[21]18 USC 1951 - Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both

114

**2. Mail Fraud / Wire Fraud**

645.

CAIR damaged Michael Savage by making the misrepresentations set forth above and using the internet and mails to raise funds for the enterprise under the guise of opposing Michael Savage.

646.

The persons defrauded were the contributors to CAIR but Michael Savage was directly and necessarily financially damaged as part of this course of conduct. This damage cost him advertisers and advertising revenue and damaged the value of his business in sums in excess of $ 1,000,000. This type of damage is proximately caused damage for purposes of the RICO statute.

647.

**3. Criminal Copyright Infringement**

(Pled to Protect the Appellate Record - Plaintiff Understands that the Court has Ruled on this Issue)

Plaintiff alleges that the use of Michael Savage's performance on the CAIR website was criminal copyright infringement, a RICO predicate act. Savage suffered damages in excess of $ 1,000,000 due to that infringement.[22]

**18 U.S.C. 1962(d)**

648.

CAIR conspired to cause the harm alleged in this complaint. The conspiracy is broader than the specific RICO predicates directed towards Michael Savage and Savage claims that his damages extend to all acts of the conspiracy and enterprise.

645.

Plaintiff incorporates all of the allegations herein including but not limited to those labeled with reference to a violation of 18 U.S.C. 1962 (c).

---

[22]Plaintiff understands that the court has ruled on this and includes it for appellate purposes.

115

646.

Plaintiff alleges that additional harm has been caused by reason of the conduct of the conspiracy as set forth herein.  To the extent that CAIR did not directly do the acts herein, members of the enterprise committed those acts as part of their conduct of the conspiracy.

647.

As set forth herein, in particular paragraphs 10-15, Michael Savage has suffered damages due to the specific conduct of CAIR in relation to Michael Savage and such conduct was done to further the conspiracy and the enterprise.  Such conduct was/were RICO predicates as set forth herein.

**Jury Trial Demand**

648.

Plaintiff demands a jury trial.


**Punitive & Exemplary Damages**

649.

In doing the acts set forth herein, CAIR individually and in conspiracy with others, deliberately, maliciously, willfully violated the constitutional, property and human rights of Michael Savage and all other victims and intended victims of the conspiracy.  Therefore, Savage is entitled to punitive and exemplary damages.


WHEREFORE, Plaintiff prays for damages and relief as follows:


1. General damages according to proof;

2. Special damages according to proof;

3. Treble damages;

4. Attorney's Fees;

5. Punitive and Exemplary Damages;

6. Costs of Suit.

116

1    Dated: August 12, 2008

2                                    _____
                                                Daniel Horowitz
3                                            Attorney for Plaintiff

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

117

Exhibit "B"

**United States District Court**
For the Northern District of California

1

2

3

4               IN THE UNITED STATES DISTRICT COURT

5           FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

MICHAEL SAVAGE,                              No. C 07-6076 SI

7                  Plaintiff,              **ORDER OF DISMISSAL**

8      v.

COUNCIL ON AMERICAN-ISLAMIC
9  RELATIONS, INC., COUNCIL ON
   AMERICAN-ISLAMIC RELATIONS ACTION
   NETWORK, INC., COUNCIL ON
10 AMERICAN-ISLAMIC RELATIONS OF
   SANTA CLARA, INC., and DOES 3-100,
11
                   Defendants.
12 _____/

13

14         By order dated July 25, 2008, this Court granted defendants' motion for judgment on the

   pleadings.  Leave was granted to amend the complaint as to the RICO allegations, provided that an
15
   amended complaint was filed by August 15, 2008.

16         Plaintiff has filed a notice that he will not file an amended complaint as to the RICO cause of

17 action.  See Docket No. 39, "Notice of Plaintiff Michael Savage's Decision *Not to File* an Amended

18 Complaint as to RICO Cause of Action."  In light of plaintiff's decision, the prior order granting

   judgment on the pleadings will become final.
19
           Accordingly, this action is dismissed with prejudice.
20
21         **IT IS SO ORDERED.**

   Dated: August 15, 2008
22                                          _____
                                            SUSAN ILLSTON
23                                          United States District Judge

24

Exhibit "C"



**SAUL EWING ARNSTEIN & LEHR** LLP

Steven C. Kerbaugh
Phone: (612) 225-2792
Steven.Kerbaugh@saul.com
www.saul.com

August 10, 2021

**VIA E-MAIL**
Daniel Horowitz, Esq.
3650 Mount Diablo Blvd, Suite 225
Lafayette, CA 94549
horowitz@physiciandefense.lawyer

      RE:    *CAIR Foundation, Inc. and CAIR v. Lori Saroya*
              Civil Action No. 0:21-cv-01267-SRN-TNL

Dear Mr. Horowitz:

    Thank you for agreeing to accept service via e-mail. Therefore, enclosed herewith and served upon you, please find a Subpoena Duces Tecum for the production of documents in the above-referenced matter. Please feel free to contact me to discuss the manner of production. We are happy to work with you to alleviate any burden or expense involved in responding to the Subpoena.

              Sincerely,

              *s/ Steven C. Kerbaugh*

              Steven C. Kerbaugh

SCK/FJ
Enclosure
cc:    Carl E. Christensen, Esq.
       Michael J. Fortunato, Esq.
       Cindy B. Morgan, Esq.
       Jeffrey S. Robbins, Esq.
       Alain M. Baudry, Esq.
       Joseph D. Lipchitz, Esq.

33 S. 6th Street, Suite 4750 ◆Minneapolis, MN 55402 ◆ Phone: 612-225-2800 ◆ Fax: 612-677-3844

DELAWARE FLORIDA ILLINOIS MARYLAND MASSACHUSETTS MINNESOTA NEW JERSEY NEW YORK PENNSYLVANIA WASHINGTON, DC
A DELAWARE LIMITED LIABILITY PARTNERSHIP
38841485.1

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Minnesota

| | |
|---|---|
| CAIR FOUNDATION, INC. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  0:21-cv-01267 |
| LORI SAROYA | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Daniel Horowitz, Esq.
3650 Mt Diablo Blvd. Ste 225, Lafayette, California 94549

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A, attached.

| Place: Saul Ewing Arnstein & Lehr LLP<br>33 South Sixth Street, Suite 4750<br>Minneapolis, MN 55402 | Date and Time:<br><br>08/24/2021 5:00 pm |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   08/10/2021

*CLERK OF COURT*

OR

_____          /s/ Steven Kerbaugh
*Signature of Clerk or Deputy Clerk*          _____
                                                                            *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
LORI SAROYA _____, who issues or requests this subpoena, are:
Alain Baudry & Steven Kerbaugh, 33 South Sixth Street, Suite 4750 - (612) 225-2946 - skerbaugh@saul.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  0:21-cv-01267

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named person as follows: _____

_____  on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:  _____                        _____
                                                              *Server's signature*

                                                    _____
                                                              *Printed name and title*

                                                    _____
                                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CAIR FOUNDATION, INC., d/b/a
COUNCIL ON AMERICAN-ISLAMIC
RELATIONS, & CAIR,

          Plaintiff,

v.

ASMA LORI HAIDRI SAROYA a.k.a.
LORI SAROYA, ASMA SAROYA,
LORI HAIDRI, LORI HAIDRI-
SAROYA, & LH,

          Defendant.

Civil Action No.:  0:21-cv-01267

## **SCHEDULE A**

### **INSTRUCTIONS**

1.     If, in responding to the Requests, you encounter any ambiguities when construing a request or definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

2.     You shall produce non-duplicative documents and shall organize the produced documents to correspond with the categories in the Request.

3.     Whenever you are asked to identify or produce a document in a Request that is deemed by you to be properly withheld from production for inspection or copying:

        a.     If you are withholding the document under claim of privilege (including, but not limited to, the work product doctrine), please identify the type of document, the general subject matter of the document, the date of the document, and such other information as is sufficient to identify the document, including, where appropriate, the author, addressee,

custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by you.

       b.     If you are withholding the document for any reason other than an objection that it is beyond the scope of discovery or that a request is unduly burdensome, identify as to each document and, in addition to the information requested in Paragraph 3.a above, please state the reason for withholding the document.

      4.     When a document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without thereby disclosing the privileged material.  If a privilege is asserted with regard to the part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed.  When a document has been redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration.  Any redaction must be clearly visible on the redacted document.

      5.     Whenever a request seeks the production of a document which has been destroyed, the response should state the date of destruction, the reason for destruction, the identity of each and every person who destroyed or discarded, or participated in, ordered, or suggested the destruction or discarding of, the document. In addition the response should state whether the documents were destroyed as a result of a destruction policy, and if so, a description of such policy.

## DEFINITIONS

Notwithstanding any definition below, each word, term, or phrase used in the Requests is intended to have the broadest possible meaning. As used in the Requests, the following terms are to be interpreted in accordance with these definitions:

a.      "Person" means any natural person or corporate or governmental entity.

b.      The term "document" means any medium upon which data, information or intelligence can be recorded or retrieved, and translated, if necessary, through detection devices into reasonably useable form, and includes, without limitation, the original, drafts and each copy, in both paper and electronic form, regardless of origin and location, of any and all books, pamphlets, periodicals, letters, telefaxes, e-mail communications (including messages and all attachments thereto), memoranda (including any memorandum, note or report of a meeting or conversation), invoices, bills, contracts, loan applications, credit reports, loan documents, forms, receipts, financial statements, accounting entries, diaries, calendars, telexes, telegrams, cables, reports, records, studies, handwritten notes, drafts, working papers, charts, papers, prints, drawings, sketches, graphs, indices, lists, tapes, photographs, microfilms, data sheets or data processing cards, computer diskettes, CD-ROMs, removable computer media, data files, or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced or reproduced, which is in your possession, custody or control.

c.      The term "communication" means the transmittal of information by any means, including but not limited to any oral or written utterance, notation, or statement of any nature whatsoever, by and to whomsoever made, including, but not limited to, correspondence, conversations, dialogues, discussions, interviews, consultations, conferences, agreements, and other understandings between or among two or more persons.

3

d.      The term "company" means any enterprise, corporation, corporate entity, partnership, association, limited liability company or other legal entity of any kind or nature.

e.      The term "concerning" means relating to, referring to, describing, evidencing, comprising, setting forth, showing, supporting, disclosing, explaining, summarizing, memorializing or constituting, whether directly or indirectly.

f.      The present tense includes the past and future tenses. The singular includes the plural, and the plural includes the singular. "All" means "any and all;" "any" means "any and all." "Including" means "including but not limited to." "And" and "or" encompass both "and" and "or."

g.      The term "including" means including but not limited to.

h.      The terms "relate" and "relating to" mean constituting, comprising, containing, setting forth, showing, disclosing, describing, explaining, summarizing, concerning, or referring to, directly or indirectly.

i.      "You" and "Your" refers to Daniel Horowitz as well as any affiliated companies, attorneys, employees, agents, representatives or any other persons acting or purporting to act on your behalf.

j.      "CAIR" refers to CAIR Foundation, Inc. d/b/a Council on American Islamic Relations and CAIR, as well as its predecessors, parents, affiliates, subsidiaries, affiliated companies, agents, officers, employees, directors, investigators, attorneys, representatives or any other persons acting or purporting to act on its behalf.

k.      If the requested documents are maintained in a file, the file folder is included in the request for production of those documents.

## DOCUMENTS REQUESTS

1.      All documents, including but not limited to deposition transcripts and the exhibits to those depositions, relating to litigation in which you are involved in federal court with CAIR, the CAIR Foundation and/or the Council on American Islamic Relations, including, but not limited to, litigation in Washington D.C. under Civil Action No. 09–02030 (CKK).

2.      All documents referring or relating to or reflecting or constituting filings made by or on behalf of CAIR, the CAIR Foundation and/or the Council on American Islamic Relations with any federal or state agency, including but not limited to the Internal Revenue Service, the Department of Justice, the Department of Homeland Security or the Federal Bureau of Investigation.

3.      All documents referring or relating to or reflecting or constituting documents obtained by you or on your behalf under the Freedom of Information Act regarding CAIR, the CAIR Foundation Inc., or the Council on American Islamic Relations, or any of their chapters or affiliates.

4.      All interrogatory answers and documents produced by CAIR, the CAIR Foundation, the Council on American Islamic Relations or any of their affiliates or chapters in response to Rule 33 interrogatories, Rule 34 document requests or third party subpoenas in connection with the litigation in which you are involved in federal court in Washington, D.C. referenced in Request No. 1, supra.

38831304.2

Exhibit "D"

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CAIR FOUNDATION, INC., d/b/a
COUNCIL ON AMERICAN-ISLAMIC
RELATIONS & CAIR,

    Plaintiff,

v.

ASMA LORI HAIDRI SAROYA a.k.a. LORI
SAROYA, ASMA SAROYA, LORI HAIDRI,
LORI HAIDRI-SAROYA, & LH,

    Defendant.

Civil Action No.: 0:21-cv-01267 (SRN/TNL)

**DECLARATION OF LENA F. MASRI,
ESQ. IN SUPPORT OF CAIR'S
OPPOSITION TO DEFENDANT'S
MOTION TO COMPEL**

I, Lena F. Masri, Esq. hereby declare as follows:

I am the General Counsel for CAIR Foundation, Inc., d/b/a Council on American-Islamic

Relations and CAIR ("CAIR").  I have served in this capacity since February 2017.  I have

personal knowledge regarding the matters addressed in this Declaration, all of which are true and

correct to the best of my knowledge and belief.  If called, I would testify to the same:

    1.     CAIR-Foundation, Inc. is a 501(c)(3) tax-exempt and a domestic nonprofit

corporation incorporated under the laws of the District of Columbia.

    2.     CAIR's headquarters and principal place of business is located in Washington,

D.C.  This office is known as "CAIR-National" or "CAIR."

    3.     CAIR has one outreach office located in Maryland.

    4.     CAIR employs 26 individuals at its office Washington, D.C.  It employs one

individual at its outreach office in Maryland.

    5.     CAIR is also affiliated with 22 independent regional organizations nationwide,

which are comprised of 33 individual offices.  These regional organizations are known as

"chapters."  Some of these chapters have multiple branch offices within the particular region. These offices are named after the city or state they represent (i.e., CAIR-Minnesota; CAIR-Philadelphia).

6.      CAIR's relationship with the chapter organizations is governed by individual affiliation and license agreements that CAIR has executed with each of its chapters.

7.      Although each affiliation and license is unique, in general, the agreements operate as follows: in exchange for a fee, CAIR chapter organizations license CAIR's federally registered trademark and conduct chapter business under the auspice of CAIR's name and its central mission.

8.      The chapters themselves are wholly separate legal entities.

9.      Each chapter is required to maintain separate corporate status, status as a 501(c)(3) exempt non-profit organization, separate liability insurance, and separate professional liability insurance for all attorney employees.

10.      Each chapter has its own governance structure, generally consisting of an Executive Director and its own Board of Directors.

11.      A chapter's Executive Director and Board of Directors govern the chapter's day to day operations, and the Board of Directors is charged with legal governance and strategic planning.

12.      CAIR does not employ any individuals at any chapter, and it does not have the power to hire, fire, or alter the employment status of an employee at the chapter level.

13.      CAIR does not have authority to police, manage, or control any employee, or otherwise control the day to day actions of any chapter employees.

14. Chapters lease and/or own their own properties and maintain their own payroll, bookkeeping, profit and loss statements, insurance policies, and operating expenses.

15. CAIR has no control over any chapter organizations' lease, bank accounts, payroll, bookkeeping, insurance policies, or operating expenses.

16. CAIR does provide certain services to the chapters.

17. CAIR does provide @cair.com email addresses to chapter employees and board members.

18. CAIR has access to these email communications; however, its permission to access these emails is restricted and can only be exercised based upon a reasonable suspicion of misuse or wrongdoing by a chapter employee and if certain stringent requirements are met.

19. In the absence of suspected email misuse or wrongdoing or the requisite approvals, CAIR does not have any contractual or other legal basis to access chapter employees email correspondence.

20. CAIR does not have access to any chapters' individual servers, or any documents owned by chapters and stored outside of the @cair.com email platform.

21. CAIR does not have any access to the business, proprietary and confidential information of any chapter.

22. CAIR does not have physical access to any chapter offices.

23. Likewise, CAIR has no independent right of access to documents stored at chapter locations.

24. Washington Trust Foundation, Inc. ("WTFI") is a completely separate corporate entity.

25. CAIR Action Network, Inc. is no longer in existence.

26.    WTFI does not share an address with CAIR, nor does it share any employees with CAIR.

27.    CAIR does not have the authority to hire or fire or otherwise police, manage, or control any employee, or control the day to day activities of WTFI employees.

28.    Although Nihad Awad sits on the Boards of both CAIR and WTFI, Mr. Awad is not a member of WTFI's Board as a representative of CAIR.  His role in each organization is distinct.

29.    Mr. Awad is the only CAIR board member that sits on the Board of both CAIR and WTFI.

30.    Mr. Awad has a fiduciary duty to keep confidential information he learns through his capacity as a WTFI board member; and therefore, does not share that information with CAIR.

31.    Similarly, Mr. Awad has a fiduciary duty to keep confidential information he learns through his capacity as a CAIR board member; and therefore, does not share that information with WTFI.

32.    WTFI's President is Esam Omeish.

33.    WTFI does not use CAIR's email server or any of CAIR's IT services.

34.    CAIR has no independent legal right of access to WTFI's documents.

35.    CAIR does not have any access to the business, proprietary and confidential information of WTFI.

36.    CAIR has no control over WTFI's lease, bank accounts, payroll, bookkeeping, insurance policies, or operating expenses.

37.    CAIR does not have physical access to WTFI's office.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 25, 2021

Lena F. Masri, Esq.

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CAIR FOUNDATION, INC., d/b/a COUNCIL ON AMERICAN-ISLAMIC RELATIONS & CAIR, | |
| Plaintiff, | |
| v. | Civil Action No.: 0:21-cv-01267 (SRN/TNL) |
| ASMA LORI HAIDRI SAROYA a.k.a. LORI SAROYA, ASMA SAROYA, LORI HAIDRI, LORI HAIDRI-SAROYA, & LH, | **PLAINTIFF'S WORD COMPLIANCE CERTIFICATE (Local Rule 7.1(f))** |
| Defendant. | |

I, Cynthia B. Morgan, certify that Plaintiff CAIR Foundation Inc.'s Memorandum in Opposition to Defendant Lori Saroya's Motion to Compel complies with the limits of Local Rule 7.1(f) and with the type-size limit of Local Rule 7.1(h).

I further certify that, in preparation of the above-referenced document, I used Microsoft® Word, and that this word processing program has been applied to specifically include all text, including headings, footnotes, and quotations in the following word count. I further certify that the above-referenced Memorandum contains 8,079 words.

Respectfully,

Dated: October 25, 2021

**CHRISTENSEN LAW OFFICE PLLC**

By  Carl E. Christensen (MN #0350412)
     800 Washington Avenue North, Suite 704
     Minneapolis, MN 55401
     Telephone: (612) 823-4016
     Facsimile: (612) 823-4777
     Email:  carl@clawoffice.com

     and

**RUBIN FORTUNATO & HARBISON, P.C.**

_____
Michael J. Fortunato (*admitted pro hac vice*)
Cynthia B. Morgan (*admitted pro hac vice*)
1200 Liberty Ridge Drive, Suite 220
Wayne, PA  19087
Telephone: (610) 408-2005/2022
Facsimile: (610) 408-9000
Email:  mfortunato@rubinfortunato.com
Email:  cmorgan@rubinfortunato.com

*Attorneys for Plaintiff CAIR Foundation, Inc., d/b/a*
*Council on American-Islamic Relations, & CAIR*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2021 a true and correct copy of the foregoing was served via ECF to:

Alain M. Baudry (MN #186685)
Steven C. Kerbaugh (MN #0390429)
**SAUL EWING ARNSTEIN & LEHR, LLP**
33 South Sixth Street, Suite 4750
Minneapolis, MN 55402
Telephone: (612) 225-2946
Facsimile: (612) 677-3844
Email: alain.baudry@saul.com
Email: steven.kerbaugh@saul.com

Jeffrey S. Robbins (Admitted *Pro Hac Vice*)
Joseph D. Lipchitz (Admitted *Pro Hac Vice*)
**SAUL EWING ARNSTEIN & LEHR, LLP**
131 Dartmouth Street, Suite 501
Boston, MA 02116
Telephone: (617) 723-3300
Facsimile: (617) 723-4151
Email: jeffrey.robbins@saul.com
Email: joseph.lipchitz@saul.com

*Attorneys for Defendant Lori Saroya*

_/s/ Cynthia B. Morgan_
Cynthia B. Morgan
Rubin Fortunato & Harbison PC
1200 Liberty Ridge Drive
Suite 220
Wayne, PA 19087