IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CAIR FOUNDATION, INC., d/b/a COUNCIL ON AMERICAN-ISLAMIC RELATIONS & CAIR, <br><br>    Plaintiff, <br><br> v. <br><br> ASMA LORI HAIDRI SAROYA a.k.a. LORI SAROYA, ASMA SAROYA, LORI HAIDRI, LORI HAIDRI-SAROYA, & LH, <br><br>    Defendant. | Civil Action No: 0:21-cv-01267 (SRN/TNL) <br><br> **CAIR'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS** |

Plaintiff, CAIR Foundation, Inc. ("CAIR"), by and through its undersigned counsel, hereby submits the following *Memorandum in Opposition to Defendant Asma Lori Haidri Saroya's ("Saroya") Motion for Partial Judgment on the Pleadings*. For the reasons stated herein, CAIR respectfully requests that this Court deny Saroya's motion or, in the alternative, grant CAIR leave to amend the *Complaint*.

## I.   INTRODUCTION

Saroya's motion misses the mark on both the facts and the law. CAIR's *Complaint* is well pled. Saroya's ignores the numerous, distinct factual allegations that support CAIR's claims, and the law on which she relies largely does not apply to CAIR's allegations. The allegations in the *Complaint* establish each of the necessary elements for timely claims for defamation, defamation per se, tortious interference, and injunctive relief. Numerous acts of defamation and tortious interference occurred after May 21, 2019. Saroya's statements constitute implicit and explicit statements of fact, and any reasonable person reading the

1

statements would assume that Saroya possessed undisclosed factual knowledge to support her claims. If her statements have no basis in reality (which they do not), then it is because they are falsehoods, not because they are subjective opinions. Further, Minnesota expressly allows tortious interference claims based on defamatory statements that severed prospective business ties and injunctive relief that enjoins a defendant from repeating defamatory speech is constitutional. For these reasons, and based on the analysis herein, CAIR respectfully requests that this Court deny Saroya's motion.

## II.   FACTUAL SUPPORT

CAIR's *Complaint* centers on a disgruntled former employee's wrongful, systematic, and continuous attacks against her former employer and the myriad of false accusations that she has publicly and repeatedly heaped upon a non-profit civil rights organization. As explained in exacting detail in the *Complaint*, after Saroya resigned from CAIR in May 2018, she began publishing false statements about CAIR on multiple public social media platforms and websites using various forms of her name, initials, and pseudonyms. Complt. (Docket No. 1) at ¶¶ 11-12. Her defamatory communications began as early as June 21, 2018, and continued through April 29, 2021. Id. at ¶¶ 57 – 157, Exhibits C – P. Her smear campaign evolved over the years; she designed it to reach as broad an audience as possible. Id. at ¶ 69.

First, she published disparaging remarks about CAIR on her personal public Facebook page and the Facebook pages of several CAIR chapters, strategic partners, and donors. Id. She also published disparaging remarks on internet "blogs" and as "comments" to online newspaper articles written about CAIR or quoting CAIR staff members. Id. at ¶¶ 69, 111 – 122. She created email and social media accounts under pseudonyms, including a Gmail account titled "Muslims Documenting Sexism," and used those accounts to send out "anonymous" defamatory

2

material. Id. at ¶¶ 69, 154 – 157. She targeted her communications to CAIR's donors. Id. at

¶¶ 158 – 159. CAIR believes that Saroya has published hundreds of statements against it since

2018. Id. at ¶ 16. Because Saroya successfully waged her war on so many different fronts,

CAIR cannot possibly know the full extent of her misconduct at this point.

To show Saroya's malicious misconduct, CAIR pleaded a variety of examples of

Saroya's defamatory statements in its *Complaint*. These statements occurred both before May

21, 2019 as well as after. Saroya's defamatory statements published after May 21, 2019 include,

*inter alia*:

- In October 2019, Saroya published a statement on Facebook claiming that she "witnessed gender and religious discrimination, sexual harassment, retaliation, hostile work environment…and other serious issues at CAIR," and that CAIR has "a pattern of discriminating and mistreating their own employees, especially women." She further claimed that "when [she] resigned, they asked [her] to sign a non-disparagement agreement" and that when she refused, CAIR "withheld [her] pay, bonus and reimbursements." Finally, she claimed that "there are many people who have been directly harmed by CAIR" and that the "CAIR Sexism Documentation Project" is a group of 35 individuals, "mostly women," "who share their experiences of facing discrimination, and other abuses" by CAIR. Id. ¶ 103.

- In October 2019, Saroya commented on a CAIR event page claiming that CAIR engaged in "abuse." She continued to claim that CAIR "owe[d] [her] over $20,000 in pay and reimbursements, plus attorney's fees." Id. at ¶ 107, Exhibit F.

- In or around January 2020, Saroya published a statement via Facebook to a religious leader who was serving as the Executive Director of "As the Spirit Moves Us" in Portland, Oregon claiming that CAIR "has a pattern of #discriminating against and mistreating their own employees." She stated that "donor funds are directly going to pay for attorneys to suppress, silence, and intimated those who have been treated unjustly." She further claimed that "there are issues of," *inter alia*, "religious #discrimination, sexual #harassment, #retaliation, [and] #hostile work environment." Id. ¶¶ 127-130, Exhibit H.

- In a comment to an article published on March 3, 2020, Saroya stated that CAIR engaged in "sexual abuse and exploitation" and "financial abuse and mismanagement." Id. ¶ 122, Exhibit G.3.

- In or around March 2020, Saroya accused CAIR of having "serious issues of religious and gender discrimination, sexual abuse and exploitation, [and] retaliation…." Id. ¶ 131, Exhibit I.

- In June 2020, Saroya published a statement on the Facebook page of JetPac (one of CAIR's partners) claiming that she was "almost physically assaulted by a male employee at CAIR National," that she, "and other women, were regularly yelled at by male employees at CAIR National," that she "repeatedly heard men make sexist, inappropriate comments about women (including other women employees," that she was "the only woman on the senior leadership team for over a year," and that she and other women were "abuse[d]." Id. ¶¶ 132-134.

- On October 24, 2020, Saroya, sent an email to a representative of CAIR's partner organization, the National Affiliate of Muslim Lawyers, claiming that she has "documented a pattern of discrimination and abuse inside CAIR," that "these incidents were brought to the attention of CAIR's leadership and National Counsel," and that "over 35 former employees and board members have alleged numerous issues inside CAIR, including sexual harassment, abuse, and exploitation…" Id. ¶¶ 143-146.

- Saroya sent near identical communications as the ones outlines above to specific CAIR partners and donors using the "Muslims Documenting Sexism" Gmail amount on the following occasions: October 5, 2020, November 4, 2020, November 9, 2020, November 14, 2020, December 18, 2020, and April 29, 2021. In each of her communications, she asked the recipients of the message to discontinue their support of CAIR. Id. ¶¶ 155 – 161, Exhibits J – P.

- The November 9, 2020 communication was sent to multiple attorneys at Graydon Law, the law firm of Roula Allouch, CAIR's Board of Director Chair. Id. at ¶ 155, Exhibit M. Saroya intended her publication to damage Ms. Allouch's employment at her private law firm. Id.

Saroya published these statements intending to sever the ties between CAIR and its partners, hoping to cripple CAIR's ability to fundraise and carry out its mission. Id. at ¶ 161. As a direct result of her defamatory statements, CAIR has seen a decrease in funding. Id. at ¶¶ 162 – 163.

Saroya's statements are defamatory. CAIR did not owe and does not owe Saroya any unpaid wages, bonuses, or reimbursements. Id. at ¶¶ 76, 79 – 81, 91, 102. CAIR does not "discriminate," "harass," "mistreat," "suppress," "silence," "intimidate," "retaliate" against its employees. Id. at ¶¶ 79 – 81, 102, 104. CAIR does not "sexually abuse," "abuse," or "assault"

its employees. Id. at ¶¶ 88 – 89, 123, 134 – 137.  CAIR does not use "donor funds" "to pay for attorneys to suppress, silences, and intimidate" its employees. Id. ¶¶ 109 – 110.  At the time Saroya published these statements, she knew they were false or made the statements with reckless disregard for their truth or falsity. See e.g., id. at ¶¶ 81, 89, 110, 125.  Saroya has repeatedly uttered that "over 35 former employees and board members have alleged numerous issues inside CAIR, including sexual harassment, abuse, and exploitation," and states that CAIR knew about the allegations and failed to investigate them. Id. at ¶¶ 148 – 153.  Yet, it has not received any complaints of discrimination, harassment, or retaliation from the 35 former employees. Id.  CAIR did not fail to investigate 35 complaints because those complaints did not exist. Id.

Saroya published these false statements online over and over again intending for the allegations to be widely disseminated and repeated. Id. at ¶ 174.  She sent targeted emails to ensure that CAIR's donors would view the false allegations if her public attack failed to reach them. Id. at ¶ 175.  Saroya's statements clearly identified CAIR, and it was apparent on its face to those who read the statements that Saroya's defamatory statements were about CAIR. Id. at ¶ 176.  At the time Saroya made these allegations, she knew they were false or, in the instances where she had no direct or indirect connection to the allegations, she acted in reckless disregard of the truth. Id. at ¶ 177 – 178.  By continuously attacking CAIR with false allegations on different internet fronts, Saroya acted with actual malice. Id. at ¶ 179.  Saroya's false statements harmed CAIR's reputation in the community, subjecting it to hatred and contempt, and discouraged its partners, donors, and religious leaders from associating with and donating to CAIR. Id. at ¶ 181 – 182.

### III.   STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure governs motions for judgment on the

pleadings.  Such motions are subject to the same standard as a motion to dismiss under Rule

12(b)(6).  Smythe v. City of Onamia, No. 12-3149 ADM/LIB, 2014 U.S. Dist. LEXIS 115057, at

*2 (D. Minn. Aug. 19, 2014).  The allegations set forth by the non-moving party must be taken

as true, and "the court will not dismiss the complaint unless it appears beyond doubt that the

plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief."

Russo v. NCS Pearson, Inc., 462 F. Supp. 2d 981, 994 (D. Minn. 2006).  The Court must draw

all reasonable inferences in the plaintiff's favor.  Riley v. Cordis Corp., 625 F. Supp. 2d 769, 775

(D. Minn. 2009).

Both motions for judgment on the pleadings and motions to dismiss are viewed with

disfavor and are rarely granted.  Rule 12(c) is designed to dispose of cases where material facts

are **not** in dispute and questions of law are all that remain.  See United States v. Any & All Radio

Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000).  A motion for judgment on the

pleadings should not be granted except "in the unusual case in which the plaintiff includes

allegations that show on the face of the complaint that there is some insuperable bar to relief."

Bauer v. Ford Motor Credit Co., Civil No. 00-389 (DSD/JGL), 2000 U.S. Dist. LEXIS 20635, at

*3-4 (D. Minn. June 27, 2000) (quoting Frey v. City of Herculaneium, 44 F.3d 667, 671 (8th Cir.

1995) (internal quotations omitted)).  "[B]ecause granting a Rule 12(c) motion 'summarily

extinguish[es] litigation at the threshold and foreclose[s] the opportunity for discovery and

factual presentation,' courts must treat such motions with the 'greatest of care.'"  Wiley v.

Portfolio Recovery Assocs., LLC, No. 20-cv-00737 (SRN/KMM), 2021 U.S. Dist. LEXIS

37230, at *5 (D. Minn. Mar. 1, 2021) (quoting <u>Acosta v. Reliance Tr. Co.</u>, No. 17-CV-4540

(SRN/ECW), 2019 U.S. Dist. LEXIS 134453 (D. Minn. Aug. 9, 2019)).

## IV.   LEGAL REASONING

Saroya's arguments for dismissal fail because they are either legally flawed and/or

contradicted by the detailed factual allegations in the *Complaint*, which must be taken as true

when deciding the instant *Motion*.

### A.   CAIR's Defamation and Tortious Interference Claims were Timely Filed

Minnesota law provides for a two-year statute of limitations.  Minn. Stat.

§ 541.07(1) (1986).  When a tortious interference claim is based on underlying defamatory

conduct, the two-year statute also applies.  <u>Carlson v. Kelly Servs.</u>, No. 05-1860 (DWF/SRN),

2006 U.S. Dist. LEXIS 107106, at *29 (D. Minn. Jan. 9, 2006) ("[A] claim of wrongful

interference with a business relationship by means of defamation is governed by the two-

year statute of limitations under Minn. Stat. § 541.07.").  CAIR filed its *Complaint* on May 21,

2021.  Thus, to satisfy the statute of limitations, it must plead defamatory and tortious conduct

that occurred after May 21, 2019.  CAIR pleaded 13 separate defamatory statements that Saroya

published between October 2019 and April 2021.  Complt. ¶¶ 103, 107, 122, 127 – 134, 143 –

146, 155 – 161, Exhibits F – P.  Each of these publications falls within the applicable statute of

limitations.  CAIR pleaded the lengthy history of Saroya's war against CAIR, which dates back

to June 2018, to show her malicious intent and the full extent of her unlawful actions.  Saroya's

reliance on those defamatory statements that pre-date May 21, 2019 in support her motion for

judgment on the pleadings is misguided and ineffective because CAIR has, without question,

pleaded actionable statements within the statute of limitations.  CAIR's defamation and tortious

interference claims are not time-barred, and her motion on that ground must fail.

**B. CAIR Specifically Identified and Properly Pled Saroya's Defamatory Statements**

CAIR's defamation claims satisfy the plausibility standard of pleading under Ashcroft v.

Iqbal, 556 U.S. 662 (2009) and Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and the

heightened pleading requirements for defamation claims under Minnesota law.  Under Rule

8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain "a short and plain

statement of the claim showing that the pleader is entitled to relief." Twombly, 550 U.S. at 555

(citations omitted).  The primary purpose of a complaint is to put the defendant on notice of the

claims against her. Id.

A defamation claim requires that a plaintiff show the defendant made "(a) a false and

defamatory statement about the plaintiff; (b) in an unprivileged publication to a third party; (c)

that harmed the plaintiff's reputation in the community." Unity Healthcare, Inc. v. Cty. of

Hennepin, No. 14-CV-114 (JNE/JJK), 2014 U.S. Dist. LEXIS 167803, at *26-27 (D. Minn. Dec.

2, 2014) (quoting Pope v. ESA Servs., Inc., 406 F.3d 1001, 1011 (8th Cir. 2005) (citation and

internal quotation marks omitted), *abrogated on other grounds by* Torgerson v. City of

Rochester, 643 F.3d 1031 (8th Cir. 2011)).  If a statement is defamatory per se, meaning that it

accuses the plaintiff of committing a crime or imputes the plaintiff's business conduct, trade or

profession, then damages are presumed and the plaintiff is not required to prove or plead actual

damages. Maethner v. Someplace Safe, Inc., 929 N.W.2d 868, 875 (Minn. 2019).  To survive

dismissal, the plaintiff must allege "who made the allegedly libelous statements, to whom they

were made, and where." Unity Healthcare, Inc., 2014 U.S. Dist. at *27 (quoting Pope, 406 F.3d

at 1011) (internal quotation marks omitted).  Failure to plead exact defamatory statements is not

fatal to a claim, but the statements must be pleaded with enough specificity to provide notice to

defendant of the defamatory statement he or she allegedly made.  Schibursky v. IBM, 820 F.

Supp. 1169, 1181 (D. Minn. 1993).

Saroya argues that CAIR's defamation claims (Count I and II) and its tortious

interference claim (Count III) should be dismissed because CAIR failed to specifically plead the

defamatory statements at issue and because the statements pleaded were "principally" Saroya's

opinion.  Both her assertions are incorrect.

### 1.  **CAIR sufficiently identified Saroya's defamatory allegations.**

CAIR sufficiently pleaded the defamatory statements at issue so as to put Saroya on

notice of its specific allegations against her.  Although it attached and incorporated Saroya's full

publications in its *Complaint*, CAIR also identified the false accusations contained therein.

Saroya published substantially similar defamatory diatribes on a multitude of different occasions

to different audiences, intending to destroy CAIR's reputation to every individual and entity

possible.  It would have been inefficient, if not impossible, for CAIR to repetitively plead the

same falsehoods in each publication.  Instead, CAIR pleaded the following statements, which

apply to each and every publication referenced in and attached to the *Complaint*:

- "CAIR does not currently and did not owe Saroya $30,000 in unpaid wages, bonuses, and reimbursements."  Complt. at ¶ 74.

- "CAIR does not use attorneys to 'suppress, silence, and [intimidate]' its employees, nor does it engage in a pattern of discrimination, harassing, or retaliating against its employees or mistreating them."  Id. at ¶ 80.

- "Saroya falsely accused leaders of CAIR-National of being 'perpetrators of injustice' and claimed that CAIR discriminated against, 'directly harmed,' and 'abused' its employees.  At the time Saroya published the above statements, including the accusation that CAIR 'abuse[d]' its employees (a criminal act), she knew them to be false or made them with reckless disregard for their truth or falsity."  Id. at ¶¶ 88-90.

- Saroya "falsely accused CAIR of discriminated against and mistreating its employees, and reiterate[ed] her lie about being owed $20,000."  Id. at ¶ 102.

9

- "CAIR does not engage in systemic gender discrimination, 'sexual abuse and exploitation,' or financial abuse and mismanagement." Id. at ¶ 123.

- "In her publication, Saroya accused CAIR-National of discrimination, retaliation, and physically threatening conduct." Id. at ¶ 134. "At the time Saroya made these accusations, including these specific communications outlined above, she knew them to be false or acted with reckless disregard to their truth or falsity." Id. at ¶ 137.

- With respect to CAIR allegedly ignoring the complaints of thirty-five victims of sexual harassment, abuse, and exploitation, CAIR pleaded that "Saroya's statement that CAIR was 'aware of a pattern of discrimination and abuse inside CAIR' and did nothing to investigate the allegations, was false." Id. at ¶ 153.

- With respect to the seven publications Saroya sent to CAIR's partners and donors (a Maryland mosque leader, the Pacific Northwest Family Circle, Count Every Vote Maryland, the Executive Committee at Graydon Law, the Florida Counsel on Churches, Indivisible, and the Academy of Muslim Achievement) between October 2020 and April 2021, which CAIR attached to its *Complaint*, CAIR pleaded, "[e]ach of these email communications, sent to the individual representatives of CAIR's partners, donors, and religious leaders, of which there are numerous, repeats the same lies as those contained in her previous public Facebook posts." Id. at ¶ 158.

In addition to pleading the specific defamatory statements at issue in the *Complaint*, CAIR also pleaded that Saroya made the statements, the mode and manner in which she made the statements, and the audience who viewed the statements. Saroya is on notice of what the alleged defamatory statements consist of, who made them, to whom they were made, and in what forum such that her motion on these grounds should be denied. See Unity Healthcare, Inc., 2014 U.S. Dist. at *27.

## 2. Saroya's statements implicitly and explicitly connote statements of fact.

Saroya appears to believe that the First Amendment gives her carte blanche right to defame. She is wrong. Pursuant to the U.S. Supreme Court, there is "no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. They belong to that category of utterances which are no essential part of any exposition of ideas, and are of such

10

slight social value as a step to truth that any benefit that may be derived from them is clearly

outweighed by the social interest in order and morality." Gertz v. Robert Welch, 418 U.S. 323,

341 (1974).  Likewise, no "wholesale defamation exemption" exists for opinions because

expressions of opinion often imply false statements of fact. Milkovich v. Lorain J. Co, 497

U.S. 1, 18-19 (1990);  See also In re MacDonald, 962 N.W.2d 451, 462 (Minn. 2021).  If, in the

light most favorable to CAIR, Saroya's publications connote or imply provably false statements

of fact, CAIR must be allowed to proceed with its defamation claims.

It is well-established that a publication may be defamatory on its face or it may carry a

defamatory meaning by reason of extrinsic circumstances. McKee v. Laurion, 825 N.W.2d 725,

731 (Minn. 2013).  At the motion to dismiss stage, the court must determine whether an alleged

defamatory innuendo is reasonably conveyed by the language used. Id. at 731 (citing Utecht v.

Shopko Department Store, 324 N.W.2d 652, 653-654 (Minn. 1982)).  The alleged defamatory

passages must be considered in the context of the entire work and the words taken as they are

commonly understood. McKee, 825 N.W.2d at 731.  If the words are capable of defamatory

meaning, the finder of fact must decide whether they were so understood. Id. at 731–732.

(citing Utecht, 324 N.W.2d at 654 (Minn. 1982)).

In determining whether a statement is fact or opinion, a court is not constrained "by the

semantic nature of the individual assertion," and must "turn instead to the totality of the

circumstances of the case to determine whether a statement may be actionable." Price v. Viking

Press, Inc., 625 F. Supp. 641, 646 (D. Minn. 1985) (quoting Ollman v. Evans, 750 F.2d 970,

1001-02 (D.C. Cir. 1984)) (internal quotations omitted).  The task of separating opinion from

fact is a difficult one. Price, 625 F. Supp at 647.  At this early stage of the proceedings, any

ambiguity must be viewed in favor of CAIR. See id. at 648 (denying summary judgment of

11

defamation counts before discovery had been conducted "because the dividing line between fact

or opinion is somewhat blurred....[and] where the alleged defamatory statement does not clearly

fit into either category," the plaintiff should be permitted to proceed with discovery on their

claims).

A four-part framework is utilized to distinguish fact from opinion: (1) the specificity of

the statement; (2) its verifiability; (3) the literary context; and (4) the work's public context.

Price v. Viking Penguin, 881 F.2d 1426, 1432 (8th Cir. 1989).  Ultimately, the Court must decide

"whether, when taken in context, the statement functions and would be understood as an

unqualified assertion of fact rather than as an element of an opinion." Id. (citing Janklow v.

Newsweek, Inc., 759 F. 2d 644 (8th Cir. 1985)).  Specificity refers to the extent to which the

alleged defamatory statement actually recites specific events.  Id.  Verifiability refers to the

extent to which the statement can be proven true or false.  Id.  Literary context requires the Court

to examine the condition and tone of the publication as a whole (cautionary or qualifying

language may signal an opinion).  Id.; see also Fagen, Inc. v. Exergy Dev. Grp. of Idaho, L.L.C.,

No. 12- 2703 (MJD/SER), 2015 U.S. Dist. LEXIS 14833, at *25-26 (D. Minn. Feb. 5, 2015)

(finding lack of preface of "in my opinion" or "my lawyers believe" to give credence to the fact

that the alleged defamatory statements were actionable statements of fact); Brodkorb v.

Minnesota, No. 12-1958 (SRN/AJB), 2013 U.S. Dist. LEXIS 19416, at *39 (D. Minn. Feb. 13,

2013) ("'Cautionary language' typically is qualified speech, such as words and phrases that serve

as disclaimers, such as 'basically,' 'probably,' or 'not necessarily.'")  The fourth factor

investigates whether the statement is made in the course of political debate (statements made in

the political arena are more likely to constitute unactionable opinions).  Price, 881 F.2d at 1433.

These factors do not provide a bright-line distinction between assertions of fact and expressions

of opinion. A statement of opinion or belief is still actionable as defamation if, taken in context,

"the statement may still imply a false assertion of fact." Milkovich v. Lorain Journal Co., 497

U.S. 1, 19 (1990).

Actionable statements of fact include, *inter alia*, statements that an individual

"endangered a patient's safety" (Fjelsta v. Zogg Dermatology, PLC, 488 F.3d 804, 811 (8th Cir.

2007)), that a parent "failed to supervise her child" (Forte v. Waterford Green P'ship, No. 01-

1706 (DWF/AJB), 2003 U.S. Dist. LEXIS 3843, at *16-17 (D. Minn. Mar. 4, 2003)), and that

implied that an individual "misrepresented his background" (Jadwin v. Minneapolis Star &

Tribune Co., 390 N.W.2d 437, 443 (Minn. Ct. App. 1986)). Even epithets and adjectives can

constitute defamatory statements of fact if they imply a specific type of reprehensible conduct.

See Weissman v. Sri Lanka Curry House, Inc., 469 N.W.2d 471, 473 (Minn. Ct. App. 1991)

(citing Restatement of Torts § 567 comment a; Uhlman v. Farm, Stock & Home Co., 148 N.W.

102 (1914) (describing plaintiffs as "a precious bunch of crooks" and "as straight as a rail fence

and as honest as Ananias" was libelous); Wilkes v. Shields, 64 N.W. 921 (1895) (statement that

plaintiff was "a dangerous, able and seditious agitator" implied antisocial acts and was

defamatory)); see also Anderson v. Kammeier, 262 N.W2d 366, 372 (Minn. 1977) (statements

that plaintiff "should not be trusted" and would "stab anyone in the back" were defamatory per

se). In Weissman, the Court found an employer's statement that an employee was "dishonest" to

be defamatory. 469 N.W.2d at 473.

In Brodkorb, this Court analyzed whether a Minnesota State Senator's public statements

that the plaintiff, a former Senate employee, was trying to "extort" a payment from and engage in

"blackmail negotiations" with the Senate were defamatory such to survive a motion to dismiss.

Brodkorb was terminated from the Senate after he became romantically involved with a State

Senator. <u>Brodkorb</u>, 2013 U.S. Dist. LEXIS at *4. After his termination, Brodkorb served the Senate with a notice of claims and issued a settlement demand of $500,000. <u>Id</u>. In response, Senator Ludeman issued a press release and made additional statements to the press indicating the Brodkorb was "extort[ing]" a payment from the Senate and engaging in "blackmail negotiations." <u>Id</u>. at *4 – 5. This Court first examined whether the statements were defamatory per se and observed that although "extortion" and "blackmail" have a specific legal meanings, they are each also routinely used colloquially. <u>Id</u>. at *33 – 34. Because the statements were made in a generalized manner immediately after Brodkorb demanded $500,000 from the Senate, this Court found that they could not reasonably be interpreted to be accusing plaintiff of committing the actual criminal offenses of extortion and blackmail. <u>Id</u>.

Turning next to defamation, this Court analyzed the specificity and verifiability factors outlined above. <u>Brodkorb</u>, 2013 U.S. Dist. LEXIS at *38 – 39. Because "extortion" and "blackmail negotiations" lend themselves to multiple interpretations and because the context in which Ludeman used them did not imply that Brodkorb had actually committed a criminal act, this Court held that they lacked the specificity and verifiability required to be proven false. <u>Id</u>. at *39. With respect to the literary and social contexts of the statements, this Court held that by referring to Brodkorb's "so-called claims" and "blackmail negotiations" in the publications, it was clear that the statements were made in the context of heated back and forth negotiations between the parties. <u>Id</u>. at *39 – 40. Additionally, the larger contextual backdrop for the statements was the political arena where speakers often engage in provocative or inflammatory speech in the public forum. <u>Id</u>. at *41 – 42. For all of these reasons, this Court dismissed Brodkorb's defamation claims. <u>Id</u>. at *42.

As this Court acknowledged in Brodkorb, although terms like "extortion" and "blackmail" may have common meanings, Minnesota courts have consistently found statements accusing a plaintiff of sexual misconduct to be defamatory per se. 2013 U.S. Dist. LEXIS at *28 – 29; see also Yang v. Robert Half Int'l, Inc., No. 19-CV-2669 (NEB/DTS), 2020 U.S. Dist. LEXIS 163413, at *14 (D. Minn. Sep. 8, 2020) ("Defamation per se includes falsely accusing the plaintiff of committing a crime and imputing serious sexual misconduct to the subject of the statement"); Longbehn v. Schoenrock, 727 N.W.2d 153, 159 (Minn. Ct. App. 2007); Baufield v. Safelite Glass Corp., 831 F. Supp. 713, 717 (D. Minn. 1993); Trivedi, LLC v. Lang, No. A16-1209, 2017 Minn. App. Unpub. LEXIS 389, at *26 (May 1, 2017) (finding statements accusing plaintiff "of sexual misconduct with former employees and followers" to be capable of defamatory meaning such to survive summary judgment); Molitor v. Molitor, No. A16-1434, 2017 Minn. App. Unpub. LEXIS 364, at *9 (Apr. 24, 2017) (finding statements that can "reasonably interpreted as to convey that [plaintiff] committed sexual abuse…not protected expressions of opinion" and, thus, actionable to support plaintiff's defamation per se claim). Trivedi and Molitor are attached hereto as Exhibits A and B respectively. While unpublished and not precedential, they are nonetheless persuasive in their similarity to the instant matter.

This Court's analysis in Brodkorb and the holdings of Yang, Longbehn, Baufield, Trivedi, and Molitor are both instructive and persuasive with respect to Saroya's defamatory statements. Here, Saroya has published hundreds of defamatory communications related to CAIR since her employment ended. CAIR pleaded over 20 specific statements published between June 2018 and April 21, 2019, 13 of which occurred after May 21, 2019. As a preface to the majority of her communications, Saroya informs her audience that she worked for CAIR-Minnesota and CAIR for over a decade, including serving as CAIR's Chapter Development

Director and as a member of the Board of Directors.  See, e.g., Complt. at ¶ 103.  She then

repeatedly emphasizes that CAIR commits "sexual harassment," "abuse," "sexual abuse," and

"sexual abuse and exploitation" and "assault."  Id. at ¶¶ 103, 107, 122, 128, 131, 134, 146, and

155.  She further claims that CAIR "directly harmed" 35 separate individuals, who all belong to

the same Facebook group, where they, according to Saroya, share depictions of their abuse.  See,

e.g., id. at ¶ 107.

Saroya never says that it is her "opinion" or "belief" that CAIR sexually abused, sexually

harassed, and discriminated against its employees.  See, e.g., *Complaint*.  She never qualifies her

accusations with cautionary language such as "basically," "probably," or "not necessarily."  Id.

She does not inform her readers that she has no basis for or independent knowledge of about

which she speaks.  Id.  Instead, she claims to have physically "witnessed" CAIR's alleged

mistreatment of its employees, both as a neutral observer and as a physical victim herself.  Id. at

¶¶ 103, 134.  She specifically claims that "was almost physically assaulted by a male employee

at CAIR National," "regularly yelled at by male employees at CAIR National," that she was the

"only woman on the senior leadership team for over a year," and that she was "abused."  Id. at

¶ 134.  By providing the reader with her extensive history within CAIR *and* stating that she

"witnessed" the aforementioned conduct or that she herself is a victim of the alleged misconduct,

no reasonable person would understand Saroya's statements to constitute a mere "subjective

view," "interpretation," "theory," "conjecture," or "surmise".  Rather, the reasonable

interpretation of Saroya's statements, when taken into context as a whole, is that she has personal

knowledge of the conduct she alleges and both implicitly and explicitly claims that she possesses

objectively verifiable facts to support her claims.

Viewing the facts as pleaded in the light most favorable to CAIR, each of the Price

factors is satisfied. First, Saroya's statements are sufficiently precise for readers to believe that

they are reading an assertion of fact. Accusing an organization of, *inter alia*, sexual abuse,

sexual harassment, and physical assault, are not ambiguous statements, especially here where

Saroya claimed to have witnessed it and been subjected to it herself. Those statements are

accusations of both civil and criminal misconduct. See In re Application for Discipline of Peters,

428 N.W.2d 375, 379 (Minn. 1988); Minn. Stat. § 609.342, et seq. Sexual abuse and sexual

harassment do not have colloquial meanings outside their civil and criminal liability context.

Likewise, claiming to have been almost physically assaulted, yelled at, and retaliated against, are

sufficiently precise.

Second, the defamatory statements are objectively capable of proof or disproof. Saroya

either witnessed sexual abuse, discrimination, harassment, etc. or she did not. She was either

"regularly yelled at" or she was not. Likewise, there are either 35 members of a closed Facebook

all claiming to have been sexually abused by CAIR or there are not. These statements do not

denote Saroya's subjective opinion about CAIR; they accuse CAIR of specific instances of

misconduct, which can be proven true or false.

Third, Price instructs courts consider the full context of the statements, including any

cautionary or interrogative language found in the text. Based on the number and frequency by

which Saroya has made the accusations, Saroya's statements imply years-long rampant sexual

misconduct at CAIR. She does not say that she thinks people were harassed and abused; she

does not say that in her opinion CAIR engages in certain actions; and she does not say that she

believes certain things may have occurred. Instead, she claims to have witnessed the misconduct

herself and to have been subjected to it. Based on the context of the statements, the average

reader would believe that Saroya was stating facts by which she has personal knowledge, not her personal opinion based merely on conjecture.

With respect to the fourth factor, Saroya's statements were not made in the context of a heated political debate.

In addition to the Price factors, Saroya's statements that she observed conduct rising to the level of civil and criminal liability certainly implies that she has knowledge of specific provable instances of individual misconduct that occurred to unnamed individuals and herself. Although Saroya has never disclosed the basis for her "knowledge," either in her defamatory publications or in her responsive pleading, the average reader would nonetheless believe, based on the frequency and voracity at which she made these defamatory comments, that she possesses undisclosed facts which form the basis for her remarks.

CAIR has satisfied its pleading obligations under both federal and Minnesota law. Accordingly, Saroya's motion to dismiss the defamation claims should be denied.

### C. Saroya's Allegations Relating to Her Unpaid Wages Are Not Privileged

Saroya asserts that her false statements that CAIR owes her unpaid wages, bonuses, and reimbursements are protected by an absolute litigation privilege. Litigation privilege applies to statements made in a judicial proceeding by a party or witness. Fredin v. Miller, No. 18-cv-0466 (SRN/HB), 2018 U.S. Dist. LEXIS 209525, at *10 (D. Minn. Oct. 17, 2018). However, it has "no discernible application" to statements made on social media. Id. Additionally, the fact that allegedly defamatory statements may have also been made in a judicial proceeding does not protect them from being actionable if they are also said outside of the judicial setting. Id. at 11. In Fredin, this Court found that statements made on Twitter and to individuals outside of the judicial proceeding were not protected by absolute privilege. Id.

18

None of the three cases cited in Saroya's motion actually stand for the proposition that her extrajudicial social media statements related to her wage claims are protected, a fact that can be gleaned from even the most cursory review of the listed opinions. In <u>Svendsen v. G4S Secure Sols. (USA) Inc.</u>, the Court found that statements made by an employer during a union grievance process were privileged as well as statements made by counsel in a settlement offer pre-suit. No. 16-CV-0583 (PJS/HB), 2018 U.S. Dist. LEXIS 157300, at *17 – 25 (D. Minn. Sep. 13, 2018). In <u>Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Asss'n</u>, the Southern District of New York found that a party's statement advising donors of the existence of a lawsuit was not defamatory because New York recognized the fair and accurate report of a judicial proceedings to be privileged from liability. 796 F. Supp. 2d 458, 471 (S.D.N.Y. 2011).

In <u>Ray v. Hauff</u>, a child with mental disabilities was allegedly physically assaulted by her adopted mother and sexually assaulted by her mother's friend. No. 08-922 (MJD/JJK), 2010 U.S. Dist. LEXIS 32400, at *1 – 5 (D. Minn. Mar. 31, 2010). Hauff was court appointed to be the minor's guardian. <u>Id</u>. at *6. During the course of the guardianship, Hauff learned that the minor's mother was being investigated for neglect and for inappropriately kissing her daughter, conduct which was observed by multiple witnesses. <u>Id</u>. at *7 – 13. During the course of this investigation, Hauff, as the minor's court appointed guardian, informed the minor that her mother had abused her and was not a good mother. <u>Id</u>. at *23 – 24. The mother then sued Hauff for defamation. <u>Id</u>. In dismissing the mother's claim, the court found that statements made by the guardian were protected by absolute privilege because it was "clear that the statements are relevant to her court-appointed duties as guardian to a vulnerable adult, and to the investigation into allegations of abuse by the mother as ordered by the state court." <u>Id</u>. at *26. <u>Svendsen</u>, <u>Alzheimers</u>, and <u>Hauff</u> do not have any plausible applicability Saroya's defamatory statements.

False statements related to CAIR failing to pay Saroya wages, bonuses, and reimbursements are not privileged.

### D. Minnesota Expressly Permits Tortious Interference Claims Based on Defamatory Statements

Saroya claims that Minnesota courts have recognized that a tortious interference claim that is duplicative of a claim for defamation must be dismissed. In support of this contention, she relies on the holding in European Roasterie, Inc. v. Dale, No. 10-53, 2010 U.S. Dist. LEXIS 43523, at *15 (D. Minn. May 4, 2010). But just as her reliance on Svedsen, Alzheimers, and Hauff is, at best, misplaced and, at worst, intentionally misleading, so too is her reliance on European Roasterie. In European Roasterie, the court dismissed plaintiff's defamation claim, finding that it was not pleaded properly. Id. at 14. After dismissing plaintiff's defamation claim, the court then determined that plaintiff's tortious interference claim must fail as well, not because tortious interference is subsumed in the defamation claim, but because the plaintiff alleged defamation as the underlying tortious conduct and, if the statements were not actually defamatory, then the tortious interference claim must fall as well. Id. at 15.

European Roasterie, Inc. cites to and relies on the holding in Wild v. Rarig, 302 Minn. 419 (1975). The Wild court limited its holding to the question of whether wrongful interference with business relationships by means of defamation is included in Minn. St. 541.07, the two-year statute of limitations, or Minn. St. 541.05, the six-year statute of limitations. Wild, 302 Minn. at 443. Although Wild found that the two-year statute of limitations applied to the tortious interference claim, it did not find that a claim for tortious interference cannot stem from defamatory conduct, nor did it dismiss plaintiff's tortious interference claim on that ground. The defendants in Unity Healthcare, Inc. v. County of Hennepin attempted to dismiss a tortious interference claim on grounds that it was duplicative of a defamation claim under Wild. The

district court declined dismissal on that ground, finding that it was "unclear whether the [Wild]

holding has any application outside statute of limitations issues." Id. In maintaining both the

defamation and the tortious interference claims, the Court concluded that tortious interference

was not subsumed into defamation in any event because the plaintiff pled that certain clients

moved from plaintiff after receiving the defamatory publications and the client's act of moving is

not defamatory. Id.

Minnesota permits tortious interference claims based on underlying defamatory conduct.

### E. CAIR has Properly Pleaded its Tortious Interference Claim.

To establish a claim of tortious interference with a prospective business relationship,

CAIR must prove that Saroya intentionally and improperly induced a third party not to enter into

or continue a business relationship with CAIR. Hot Stuff Foods, LLC v. Dornbach, 726 F. Supp.

2d 1038, 1043 (D. Minn. 2010) (citing United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633

(Minn. 1981)). To meet its notice pleading obligations under Twombly and Iqbal, CAIR pleaded

the following:

> Saroya intentionally and improperly interfered with CAIR's prospective business
> relationships by using her defamatory communications to induce CAIR's partners,
> donors, and religious leaders identified above to discontinue their existing relationships
> with CAIR. Complt. at ¶ 190. Saroya used CAIR's Confidential Information to target
> her defamatory communications to individuals and organizations that Saroya knew were
> a part of CAIR's fundraising and outreach efforts. Id. at ¶ 191. In those
> communications, she specifically asked those organizations to discontinue their
> relationships with CAIR. Id. at ¶ 192. As a result of Saroya's statements, CAIR has lost
> multiple partners, donors, and religious leaders. Id. at ¶ 162. The loss of its donors has
> led to a significant decrease in its funding. Id. at ¶ 163.

Although CAIR did not identify the specific donors that have left CAIR due to Saroya's

defamatory accusations in its *Complaint*, CAIR nevertheless satisfies its pleading burden under

Hot Stuff Foods because it "pleaded facts indicating that [it] has been damaged by [Saroya's]

actions." 726 F. Supp. 2d at 1044.

### F.  CAIR's Claim for Injunctive Relief is Proper.

Saroya argues that CAIR's claim for injunctive relief should be dismissed at this stage

because the injunction requested violates Saroya's First Amendment right to free speech.

Specifically, Saroya cites to case law which supports the proposition that prior restraints on

speech are not constitutional.  See Motion for Judgment on the Pleadings, p. 22 (citing Alexander

v. United States, 509 U.S. 544, 550 (1993)).  The fundamental flaw in Saroya's argument is that

CAIR's claim for injunctive relief does not seek a prior restraint on speech not found to be

defamatory as a matter of law.  Although, the old rule was that equity does not enjoin a libel or

slander and that the only remedy for defamation is an action for damages, under the well-

established "modern" approach, an injunction may issue where it is "narrowly tailored, *based

upon a continuing course of repetitive speech*, and granted only after a final adjudication on the

merits that the speech is unprotected."  Auburn Police Union v. Carpenter, 8 F.3d 886, 903 (1st

Cir. 1993) (emphasis added).

In Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, which Saroya cites,

the U.S. Supreme Court observed that it "has never held that all injunctions [against expression]

are impermissible." 413 U.S. 376, 390 (1973).  The Court explained that "[t]he special vice of a

prior restraint is that communication will be suppressed . . . before an adequate determination

that it is unprotected by the First Amendment."  Id.  The injunction at issue was not an

unconstitutional prior restraint because it was based on a continuing course of repetitive conduct

and did not endanger arguably protected speech as the enjoined speech was defamatory as a

matter of law.  Id. at 390-91.

Following Pittsburgh Press, several federal and state courts have distinguished between

requests for preventive relief prior to trial and post-trial remedies to prevent repetition of

statements judicially determined to be defamatory. <u>Balboa Island Village Inn, Inc. v. Lemen</u>, 156

P.3d 339 (Cal. 2007).  With respect to judicially-determined defamatory statements, courts have

repeatedly concluded that, "once a judge or jury has made a final determination that the speech at

issue is defamatory, an injunction prohibiting the defendant from repeating the defamatory

speech does not constitute a prohibited prior restraint on speech." <u>Wagner Equip. Co. v. Wood</u>,

893 F. Supp. 2d 1157, 1161 (D.N.M. 2012) (citing <u>Lothschuetz v. Carpenter</u>, 898 F.2d 1200 (6th

Cir. 1990) (upholding injunction enjoining statements that had been found to be false and

libelous), <u>Balboa Island</u>, 156 P.3d at 349 (holding that the court may issue an

injunction prohibiting a defendant from repeating statements determined at trial to be

defamatory), <u>Advanced Training Sys., Inc. v. Caswell Equip. Co., Inc.</u>, 352 N.W.2d 1, 11 (Minn.

1984) (holding injunction limited to material found either libelous or disparaging after a full jury

trial was not unconstitutional and could stand), <u>O'Brien v. Univ. Cmty. Tenants Union, Inc.</u>, 327

N.E.2d 753, 755 (Ohio 1975) ("Once speech has judicially been found libelous, if all the

requirements for injunctive relief are met, an injunction for restraint of continued publication

may be proper."), <u>Retail Credit Co. v. Russell</u>, 218 S.E.2d 54 (Ga. 1975) (upholding injunction

issued following jury trial in libel case that prohibited repetition of statements found to be

defamatory)).  "As defamatory speech is unprotected speech, the "special vice" of a prior

restraint is non-existent where an injunction is granted only as to statements previously

adjudicated to be false." <u>Wagner Equip. Co.</u>, 893 F. Supp. 2d 1157, 1162 (D.N.M. 2012).

 In <u>Wagner</u>, the defendants moved for judgment on the pleadings, seeking dismissal of

plaintiff's claim for injunctive relief restraining speech.  893 F. Supp. at 1162.  In adopting the

"modern" approach, the court found that the defendants were incorrect that plaintiff's request for

permanent injunctive relief is prohibited as a matter of law.  <u>Id</u>. at 1162.  The court "express[ed]

no view as to whether [plaintiff] ultimately will be able to establish all of the requirements

necessary for an injunction to issue, whether an injunction prohibiting [defendants] from

repeating defamatory statements ultimately could, or should be denied because an award of

damages is an adequate remedy, or whether, indeed, [defendants'] statements will be adjudicated

to be false and defamatory in the first instance." Id. Instead, the court simply rejected

defendants' challenges to the legal validity of plaintiff's request for injunctive relief, stating that

"because an injunction prohibiting a defendant from repeating a statement determined to be

defamatory does not constitute a prohibited prior restraint of speech under the First Amendment,

[plaintiff's] claim seeking injunctive relief is not prohibited as a matter of law." Id.

Accordingly, the court held that dismissal of plaintiff's injunctive relief claim pursuant to

12(b)(6) would be inappropriate. Id.

Saroya's reliance on Sindi v. El-Moslimany, 896 F.3d 1 (1st Cir. 2018), is unavailing. In

that case, the court analyzed the constitutionality of an injunction entered into after a finding of

defamation. It specifically declined to rule on whether a federal court could permanently enjoin

republication of oral or written statements in other contexts outside of the instant matter. 896

F.3d 1, 35. It likewise took "no view of the legality of an injunction ordering the removal or

deletion of speech that has been adjudicated defamatory," such as a decree requiring the erasure

of a statement from a website after an adjudication that the statement was unprotected in the

context in which it was made. Id. (internal quotations omitted).

Here, the court need not make a determination of whether CAIR's claim for injunctive

relief should be denied because an award of damages is an adequate remedy, or whether Saroya's

statements will ultimately be adjudicated to be false and defamatory in the first instance, or what

the scope of CAIR's injunctive relief should be if it succeeds on its defamation claims. Because

CAIR's claim is not a prohibited prior restraint of speech as a matter of First Amendment law, Saroya's motion with respect to this cause of action should be denied at this juncture.

> ### G. In the alternative, any dismissal should be without prejudice, and CAIR should be granted leave to amend its claims.

Defendant requests that CAIR's defamation and defamation per se claims be dismissed with prejudice. However, such an extreme remedy at this early stage of the litigation is not warranted under law or fact. Rule 15(a) of the Federal Rules of Civil Procedure states that after a responsive pleading has been filed, a party may amend its pleading with the opposing party's written consent or by leave of court. "The court should freely give leave when justice so requires." See, e.g., Bailey v. Bayer CropScience L.P., 563 F.3d 302, 307 (8th Cir. 2009). "Although there is no absolute right to amend a pleading, the Eighth Circuit Court of Appeals takes a liberal allowance of amendments." Microsource v. Eco World Grp., No. 19-CV-4016-CJW-MAR, 2019 U.S. Dist. LEXIS 234634, at *20 (N.D. Iowa Oct. 30, 2019) (quoting Kozlov v. Associated Wholesale Grocers, Inc., 818 F.3d 380, 394 (8th Cir. 2016) (internal quotations omitted)). "When a motion to dismiss is granted, the usual practice is to grant leave to amend the Complaint." Microsource, 2019 U.S. Dist. LEXIS, at *20.

A district court should only deny a motion for leave to amend "if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith, or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." Foman v. Davis, 371 U.S. 178, 182 (1962)). The burden of demonstrating the existence of these factors is on the party opposing an amendment. Beeck v. Aquaslide 'N' Dive Corp., 562 F.2d 537, 540 (8th Cir. 1977). Prejudice must be shown. Id. (citing Hanson v. Hunt Oil Co., 398 F.2d 578, 582 (8th Cir. 1968).

None of the Foman factors applies to the instant matter.  Pursuant to this Court's Scheduling Order, the parties have until May 1, 2022 to seek to amend the pleadings, and discovery is far from closed.  Accordingly, CAIR requests that any dismissal of Counts I, II, III, or V be without prejudice and with leave to amend.

## V. CONCLUSION

For all the foregoing reasons, CAIR respectfully requests that this Court deny Saroya's *Motion for Partial Judgment on the Pleadings* in its entirety.  In the alternative, CAIR respectfully requests that it be granted leave to amend the *Complaint*.

Dated: November 5, 2021

**CHRISTENSEN LAW OFFICE PLLC**

By  Carl E. Christensen (MN #0350412)
      800 Washington Avenue North, Suite 704
      Minneapolis, MN 55401
      Telephone: (612) 823-4016
      Facsimile: (612) 823-4777
      Email:  carl@clawoffice.com

      and

**RUBIN FORTUNATO & HARBISON, P.C.**

Michael J. Fortunato (*admitted pro hac vice*)
Cynthia B. Morgan (*admitted pro hac vice*)
1200 Liberty Ridge Drive, Suite 220
Wayne, PA  19087
Telephone: (610) 408-2005/2022
Facsimile: (610) 408-9000
Email:  mfortunato@rubinfortunato.com
Email:  cmorgan@rubinfortunato.com

*Attorneys for Plaintiff CAIR Foundation, Inc., d/b/a*
*Council on American-Islamic Relations, & CAIR*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CAIR FOUNDATION, INC., d/b/a
COUNCIL ON AMERICAN-ISLAMIC
RELATIONS & CAIR,

    Plaintiff,

v.

ASMA LORI HAIDRI SAROYA a.k.a. LORI
SAROYA, ASMA SAROYA, LORI HAIDRI,
LORI HAIDRI-SAROYA, & LH,

    Defendant.

Civil Action No.: 0:21-cv-01267 (SRN/TNL)

**PLAINTIFF'S WORD COMPLIANCE
CERTIFICATE (Local Rule 7.1(f))**

    I, Cynthia B. Morgan, certify that Plaintiff CAIR Foundation Inc.'s Memorandum in

Opposition to Defendant Lori Saroya's Motion for Partial Judgment on the Pleadings complies

with the limits of Local Rule 7.1(f) and with the type-size limit of Local Rule 7.1(h).

    I further certify that, in preparation of the above-referenced document, I used Microsoft®

Word, and that this word processing program has been applied to specifically include all text,

including headings, footnotes, and quotations in the following word count. I further certify that

the above-referenced Memorandum contains 8,255 words.

Respectfully,

Dated: November 5, 2021

**CHRISTENSEN LAW OFFICE PLLC**

By  Carl E. Christensen (MN #0350412)
    800 Washington Avenue North, Suite 704
    Minneapolis, MN 55401
    Telephone: (612) 823-4016
    Facsimile: (612) 823-4777
    Email:  carl@clawoffice.com

    and

**RUBIN FORTUNATO & HARBISON, P.C.**

Michael J. Fortunato (*admitted pro hac vice*)
Cynthia B. Morgan (*admitted pro hac vice*)
1200 Liberty Ridge Drive, Suite 220
Wayne, PA  19087
Telephone: (610) 408-2005/2022
Facsimile: (610) 408-9000
Email:  mfortunato@rubinfortunato.com
Email:  cmorgan@rubinfortunato.com

*Attorneys for Plaintiff CAIR Foundation, Inc., d/b/a*
*Council on American-Islamic Relations, & CAIR*

**EXHIBIT A**

 Positive

As of: November 5, 2021 9:59 PM Z

## *Trivedi, LLC v. Lang*

Court of Appeals of Minnesota

May 1, 2017, Filed

A16-1209

**Reporter**

2017 Minn. App. Unpub. LEXIS 389 *; 2017 WL 1548620

Trivedi, LLC, et al., Appellants, vs. Dennis Lang, Respondent.

**Notice:** THIS OPINION WILL BE UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINNESOTA STATUTES.

**Subsequent History:** Review denied by *Trivedi, LLC v. Lang, 2017 Minn. LEXIS 471 (Minn., July 18, 2017)*

**Prior History:** [*1] Ramsey County District Court File No. 62-CV-14-4330.

*Trivedi LLC v. Lang, 2014 Minn. App. Unpub. LEXIS 615 (Minn. Ct. App., June 23, 2014)*

**Disposition:** Affirmed in part, reversed in part, and remanded.

## Core Terms

appellants', public controversy, district court, actual malice, public figure, limited-purpose, actual-malice, defamation, products, media, defamatory, genuine issue of material fact, sexual, sham, business practice, defamation claim, summary judgment, promotion, scientific, publicly, public debate, debated, powers, sexual misconduct, public-figure, accusations, website, online, scientific study, false statement

## Case Summary

**Overview**

HOLDINGS: [1]-In defamation suit brought by alternative health practitioner and his companies against journalist, the district court did not err in granting the journalist summary judgment as to his statements claiming the practitioner and companies entities were shams and were involved in illegal or unethical business practices because the respondent was a journalist, the practitioner was a limited-purpose public figure, and the practitioner failed to provide evidence to support a finding of actual malice by clear and convincing evidence; [2]-The district court improperly granted the journalist summary judgment as to his claims that the practitioner was guilty of sexual improprieties because the practitioner was not a public figure for purposes of sexual assault, the defamatory per se standard applied, and the genuine issue of material fact as to whether the practitioner engaged in improper sexual behavior remained.

**Outcome**

Order affirmed in part, reversed in part, and remanded.

## LexisNexis® Headnotes

Torts > ... > Defamation > Remedies > Damages

Torts > Intentional Torts > Defamation > Elements

Torts > Intentional Torts > Defamation > Defamation Per Se

Torts > Intentional Torts > Defamation > Procedural Matters

*HN1*[⬇] Remedies, Damages

Defamation is communication of a false statement to someone other than the plaintiff that tends to harm the plaintiff's reputation and lower the plaintiff in the estimation of the community, where the recipient of the statement reasonably understood the statement to refer to the plaintiff. Under Minnesota common law, a defamation plaintiff need only show that publication of the statement was intentional; intent to defame is not an element. Certain false statements are per se defamatory, meaning that damages may be presumed and are recoverable without proof of actual harm to reputation. Statements alleging unchastity or that one is a sex offender are per se defamatory.

Constitutional Law > ... > Freedom of Speech > Defamation > Public Figures

Torts > ... > Defamation > Public Figures > Actual Malice

Torts > ... > Defamation > Public Figures > Limited Purpose Public Figure

Torts > ... > Defamation > Public Figures > Voluntary Public Figures

*HN2*[⬇] Defamation, Public Figures

The protection of a person's reputational interest under defamation law must yield to First Amendment rights when a defamation defendant's statements concern a public official; such suits require proof of actual malice. The United States Supreme Court later extended this First Amendment protection to statements concerning public figures. Constitutional protection was further extended to statements concerning persons who thrust themselves to the forefront of particular public controversies and invite attention and comment. This protection for statements concerning limited-purpose public figures is justified in part because such persons are thought to have greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals.

Constitutional Law > ... > Freedom of Speech > Defamation > Public Figures

Torts > ... > Defamation > Public Figures > Actual Malice

Torts > ... > Defamation > Public Figures > Limited Purpose Public Figure

*HN3*[⬇] Defamation, Public Figures

Minnesota courts have adopted the standards set by the United States Supreme Court and have required that, in order to prevail, public officials, public figures, and limited-purpose public figures prove that claimed defamatory statements were made with actual malice.

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Torts > ... > Defamation > Public Figures > Judicial Review

Torts > Intentional Torts > Defamation > Procedural Matters

Torts > ... > Defamation > Public Figures > Limited Purpose Public Figure

*HN4*[ ] Summary Judgment Review, Standards of Review

The appellate court reviews a district court's grant of summary judgment de novo. The appellate court bases its review on the undisputed facts and construes any disputed evidence in favor of the nonmoving party. The appellate court reviews de novo the legal question of whether a party is a limited-purpose public figure. The respondent has the burden of persuasion to show that the petitioner is a limited-purpose public figure.

Torts > ... > Defamation > Public Figures > Actual Malice

Torts > ... > Defamation > Public Figures > Limited Purpose Public Figure

*HN5*[ ] Public Figures, Actual Malice

A defamation plaintiff is regarded as a limited-purpose public figure when (1) a public controversy exists, (2) the plaintiff played a meaningful role in the controversy, and (3) the allegedly defamatory statement related to the controversy. A limited-purpose public-figure plaintiff must also prove that the allegedly defamatory statement was made with actual malice.

Torts > Intentional Torts > Defamation

*HN6*[ ] Intentional Torts, Defamation

A public controversy requires two elements: (1) there must be some real dispute that is being publicly debated, and (2) it must be reasonably foreseeable that the dispute could have substantial ramifications for persons beyond the immediate participants. Even if a controversy generates public interest, courts will not consider it a public controversy when it involves only private individuals enmeshed in personal lives or work which had momentarily caught the attention of the press and public, largely as illustrative of some perceived social ill.

Governments > Legislation > Extension & Revival

Torts > Intentional Torts > Defamation

Torts > ... > Defamation > Public Figures > Limited Purpose Public Figure

Governments > Courts > Judicial Precedent

Torts > ... > Defamation > Public Figures > Judicial Review

*HN7*[ ] Legislation, Extension & Revival

The limited-purpose public-figure test provided by the Minnesota supreme court is well-established, and it is not the appellate court's role to modify it. The task of extending existing law falls to the supreme court or the legislature, but it does not fall to the appellate court. Under existing caselaw, a public controversy exists when a person or thing is being publicly debated; there is no strict requirement of widespread reporting in the legacy public media of television and newspapers, although such reporting may be good evidence of the existence of a public controversy. Neither is it the appellate court's proper role to create a new category of automatic public controversy where a person makes supernatural claims. The appellate court applies the

2017 Minn. App. Unpub. LEXIS 389, *1

established standards for determining whether a public controversy exists.

Torts > Intentional Torts > Defamation

*HN8*[ ] Intentional Torts, Defamation

Product promotion is insufficient in itself to warrant a finding of a public controversy.

Torts > Intentional Torts > Defamation > Defenses

Torts > Intentional Torts > Defamation > Public Figures

Torts > ... > Defamation > Public Figures > Limited Purpose Public Figure

*HN9*[ ] Defamation, Defenses

Defamation defendants cannot create their own defense by pointing to the attention they have themselves visited upon a plaintiff as evidence that the plaintiff is a public figure. But defamation plaintiffs likewise cannot avoid limited-purpose public-figure status by claiming not to have wanted the attention. A plaintiff is a limited-purpose public figure if he voluntarily injects himself into a controversy, but not if he is drawn into the controversy. In reviewing this factor, courts consider whether participation in the controversy was voluntary, whether the person had access to channels of effective communication to counteract false statements, and the prominence of the role the person played in the public controversy.

Torts > ... > Defamation > Public Figures > Actual Malice

Torts > Intentional Torts > Defamation

*HN10*[ ] Public Figures, Actual Malice

Corporate plaintiffs suing media defendants for defamation must show actual malice when the media defendant demonstrates that the allegedly defamatory statements concern matters of legitimate public interest. This rule was created to encourage the media to probe the business world to the depth which is necessary to permit the kind of business reporting vital to an informed public.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Free Press

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech

*HN11*[ ] Standards of Review, De Novo Review

When the material facts are not in dispute, the appellate court reviews the lower court's application of the law de novo. Online journalism is equivalent to print journalism and online journalists are entitled to no less First Amendment protection than other media defendants.

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN12*[ ] Summary Judgment Review, Standards of Review

Appellate courts generally review a district court's grant of summary judgment de novo to determine (1) whether there are any genuine issues of material fact, and (2) whether the district court correctly applied the law.

When deciding the first question, the appellate court views the evidence in the light most favorable to the party against whom summary judgment was granted.

Torts > ... > Defamation > Public Figures > Actual Malice

Torts > ... > Defamation > Public Figures > Limited Purpose Public Figure

Torts > ... > Defamation > Public Figures > Summary Judgment

Torts > ... > Defamation > Public Figures > Clear & Convincing Evidence

*HN13*[⤓] Public Figures, Actual Malice

In defamation cases involving limited-purpose public figures, the question on a motion for summary judgment is whether the evidence of record could reasonably support a factual finding of actual malice by clear and convincing evidence. Actual malice is a term of art; it means that the defendant acted with knowledge that the publication was false or with reckless disregard of whether it was false or not. A statement may have been made with actual malice if it is fabricated by the defendant, is the product of his imagination, is based wholly on an unverified anonymous telephone call or if the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. It can also exist if the defendants in fact entertained serious doubts as to the truth of the publication. If the plaintiff presents evidence that the utterer knew the falsity of his statements when published, such bad faith in publishing is relevant evidence of malice.

Torts > ... > Defamation > Public Figures > Actual

Malice

Torts > Intentional Torts > Defamation > Procedural Matters

*HN14*[⤓] Public Figures, Actual Malice

Under the actual-malice standard, appellants must show that respondent thought their abilities or products to be genuine and disseminated statements to the contrary.

Torts > Intentional Torts > Defamation > Elements

*HN15*[⤓] Defamation, Elements

For purposes of a defamation claim, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

Torts > Intentional Torts > Defamation > Elements

*HN16*[⤓] Defamation, Elements

To establish a common-law defamation claim in Minnesota, a plaintiff must show that (1) the defendant communicated the defamatory statement to someone other than the plaintiff, (2) the statement is false, (3) the statement tends to harm the plaintiff's reputation, and (4) the recipient of the false statement reasonably understands it to refer to a specific individual.

Torts > Intentional Torts > Defamation > Defamation Per Se

*HN17*[⤓] Defamation, Defamation Per Se

Claims that a person is a criminal or unchaste, and especially that a person is a sex offender, if false, are defamatory per se.

Torts > ... > Defamation > Public Figures > Actual Malice

Torts > Intentional Torts > Defamation > Procedural Matters

_HN18_[ 📄 ]  Public Figures, Actual Malice

If a respondent is a media defendant, the petitioners must also demonstrate that respondent acted with actual malice to prevail on a defamation claim.

**Counsel:** For Appellants: Nathan J. Knoernschild, Chestnut Cambronne PA, Minneapolis, Minnesota.

For Respondent: Mark R. Anfinson, Minneapolis, Minnesota.

**Judges:** Considered and decided by Ross, Presiding Judge; Rodenberg, Judge; and Toussaint, Judge.[*]

**Opinion by:** RODENBERG

# Opinion

## UNPUBLISHED OPINION

## RODENBERG, Judge

Appellants Mahendra Trivedi (Trivedi), Trivedi Foundation, and Trivedi Companies[1] appeal from a grant of summary judgment dismissing with prejudice their claims against respondent Dennis Lang. Appellants argue that the district court improperly applied the

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

[1] We refer to Trivedi LLC, Trivedi Master Wellness LLC, and Trivedi Products LLC collectively as "Trivedi Companies."

actual-malice standard in dismissing their defamation claims. Alternatively, appellants argue that they raised genuine issues of material fact regarding whether respondent made defamatory statements with actual malice. We affirm in part, reverse in part, and remand.[2]

## FACTS

Trivedi claims to have the power to "promote health and well-being" through "energy transmissions" that "have the potential to transform living organisms and non-living materials." Trivedi calls this process the "Trivedi Effect." Appellants have monetized these claimed abilities [*2] by selling products and admission to seminars related to the Trivedi Effect. Appellants have created a commission-based network of promoters for their products, including radio-show hosts, authors, and alternative-medicine experts. Appellants also promote their businesses through a website containing hundreds of video and written testimonials. Appellants claim that, through these efforts, the Trivedi Effect has "benefited many people." By all accounts, appellants have made millions of dollars from these concerted efforts.

Respondent identifies claims by Trivedi that he has performed 70,000 miracles around the world, and has as many as 200,000 patrons. Appellants claim to have sought validation of the Trivedi Effect through the

---

[2] This is the second appeal involving these parties. In an earlier appeal, we affirmed the district court's order vacating a foreign judgment obtained by appellants against respondent. _Trivedi LLC v. Lang, No. A13-2087, 2014 Minn. App. Unpub. LEXIS 615, 2014 WL 2807981, at *1 (Minn. App. June 23, 2014)_. The district court in that earlier case determined that a default judgment obtained by appellants in Arizona was not entitled to full faith and credit because the Arizona court lacked personal jurisdiction over respondent. _2014 Minn. App. Unpub. LEXIS 615, [WL] at *2._

scientific process and claim some degree of validation by over 4,000 scientific studies at major research institutions throughout the world. They claim that the Trivedi Effect has been mentioned in more than a dozen leading international, peer-reviewed scientific journals. The senior general manager at the Trivedi Science Research Laboratory claims that the Trivedi Effect has been validated by 170 peer-reviewed research publications.

Respondent learned of Trivedi's [*3] extraordinary claims and began researching those claims with an eye toward writing an article about appellants. During his research, respondent found an internet blog or message board called PurQi.com. He claims that PurQi.com was created by one of appellants' former employees as a forum for discussing alternative medicine and that the forum developed into an online meeting place for persons interested in and concerned about appellants' operations. Respondent posted his contact information on PurQi.com and was contacted by multiple people claiming to be familiar with appellants, their businesses, and their claims concerning the Trivedi Effect. After communicating with these people, respondent began making posts critical of appellants on PurQi.com.

Appellants learned of respondent's writings critical of them and sued respondent for defamation, civil conspiracy, and tortious interference with contract and business expectancy. All of appellants' claims are based on 50 allegedly defamatory statements identified in their original complaint. For purposes of this appeal, we consider these general categories of statements identified by the district court:[3] (1) statements that

Trivedi is a "sham," [*4] the Trivedi Effect has no scientific basis, and appellants are marketing this "sham" for financial gain; (2) claims that appellants engaged in unlawful business practices; and (3) claims that Trivedi is guilty of sexual improprieties.[4] Respondent moved for summary judgment, arguing that Trivedi is a limited-purpose public figure, that respondent is a journalist, and that appellants had failed to identify a genuine issue of material fact regarding whether respondent's statements on PurQi.com were made with actual malice. The district court granted summary judgment dismissing appellants' defamation claims. In a very thorough memorandum appended to its order granting summary judgment, the district court dismissed appellants' civil conspiracy and tortious interference claims because they were based solely on the defamation claims.

This appeal followed.

DECISION

Appellants agree on appeal that their claims against respondent for civil conspiracy and tortious interference with contract and business expectancy depend entirely on proof of actionable defamation by respondent. We therefore limit our analysis to the viability of appellants' defamation claims.

I.

_____

categories of identified statements are of no separate analytical significance.

[3] Appellants characterized the statements as falling into six categories, three of which were "general accusations of misbehavior and/or causing harm," "miscellaneous statements not in any other specific category," and "statements that Lang did not make." For purposes of this appeal, these three

[4] Appellants' complaint details a variety of statements allegedly published by respondent concerning Trivedi's improper sexual behavior. It is unnecessary to our analysis that we detail all of the allegedly defamatory statements. Appellants allege that respondent accused Trivedi of "rape," sexual coercion and harassment of employees, "sexual assault," and "molestation."

## Constitutional Dimensions of Defamation [*5]

*HN1*[↑] Defamation is communication of a false statement to someone other than the plaintiff that tends to harm the plaintiff's reputation and lower the plaintiff in the estimation of the community, where the recipient of the statement reasonably understood the statement to refer to the plaintiff. *McKee v. Laurion, 825 N.W.2d 725, 729-30 (Minn. 2013)*. Under Minnesota common law, a defamation plaintiff need only show that publication of the statement was intentional; intent to defame is not an element. *Jadwin v. Minneapolis Star & Tribune Co., 367 N.W.2d 476, 481 (Minn. 1985)*. Certain false statements are per se defamatory, meaning that damages may be presumed and are recoverable without proof of actual harm to reputation. *Longbehn v. Schoenrock, 727 N.W.2d 153, 158, 160 (Minn. App. 2007)*. Statements alleging unchastity or that one is a sex offender are per se defamatory. *Id. at 158-59*.

In the landmark case of *New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*, the United States Supreme Court held that *HN2*[↑] the protection of a person's reputational interest under defamation law must yield to *First Amendment* rights when a defamation defendant's statements concern a public official; such suits require proof of "actual malice." *376 U.S. at 273-75, 279-280, 84 S. Ct. at 722-23, 726; see Britton v. Koep, 470 N.W.2d 518, 520 (Minn. 1991)* (discussing the rule created by *New York Times*). The United States Supreme Court later extended this *First Amendment* protection to statements concerning "public figures." *Curtis Publ'g Co. v. Butts, 388 U.S. 130, 155, 87 S. Ct. 1975, 1991, 18 L. Ed. 2d 1094 (1967)*. In *Gertz v. Robert Welch, Inc.*, the Supreme Court further extended constitutional [*6] protection to statements concerning persons who "thrust themselves to the forefront of particular public controversies" and "invite attention and comment." *418 U.S. 323, 345, 94 S. Ct.*

*2997, 3009, 41 L. Ed. 2d 789 (1974)*. This protection for statements concerning "limited-purpose public figures" is justified in part because such persons are thought to have "greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements [than] private individuals." *Chafoulias v. Peterson, 668 N.W.2d 642, 649 (Minn. 2003)* (citing *Gertz, 418 U.S. at 344, 94 S. Ct. at 3009*).

*HN3*[↑] Minnesota courts have adopted these standards and have required that, in order to prevail, public officials, public figures, and limited-purpose public figures prove that claimed defamatory statements were made with actual malice. *Id. at 648-49*.

II.

## Limited-Purpose Public-Figure Determination

The district court determined that Trivedi is a limited-purpose public figure with respect to all of respondent's statements. Appellants disagree with the district court's limited-purpose public-figure determination, and argue that the district court erred in applying the actual-malice standard.

*HN4*[↑] We review a district court's grant of summary judgment de novo. *Mattson Ridge, LLC v. Clear Rock Title, LLP, 824 N.W.2d 622, 627 (Minn. 2012)*. "We base our review on the undisputed facts and construe any disputed evidence in favor of [*7] the nonmoving party." *Scheffler v. City of Anoka, 890 N.W.2d 437, 449, 2017 WL 474401, at *4 (Minn. App. Feb. 6, 2017)*. We review de novo the legal question of whether a party is a limited-purpose public figure. *Chafoulias, 668 N.W.2d at 649-50*. Respondent has the burden of persuasion to show that Trivedi is a limited-purpose public figure. *Jadwin, 367 N.W.2d at 481*. Here, the undisputed facts

in the record resolve the issue of Trivedi's limited-purpose public-figure status. *See Chafoulias, 668 N.W.2d at 654* (concluding that there was no genuine issue of material fact concerning plaintiff's status as a limited-purpose public figure).

*HN5*[↑] A defamation plaintiff is regarded as a limited-purpose public figure when (1) a public controversy exists, (2) the plaintiff played a meaningful role in the controversy, and (3) the allegedly defamatory statement related to the controversy. *Id.,* (citing *Gertz, 418 U.S. at 352, 94 S. Ct. at 3013*). A limited-purpose public-figure plaintiff must also prove that the allegedly defamatory statement was made with actual malice. *Id. at 648-49.*

A. A public controversy exists concerning the Trivedi Effect and appellants' claims and business activities regarding and promoting the Trivedi Effect.

The district court concluded that all of respondent's statements concerned a "public controversy," relying on two separate lines of reasoning. First, the district court reasoned that a public controversy [*8] existed because of the widespread nature of appellants' claims, including both the number of people appellants claim have been benefitted from the Trivedi Effect and appellants' claims that the Trivedi Effect has been given credibility by widely-disseminated scientific journals and studies. Second, the district court reasoned that appellants' exceptional claims that Trivedi is "Jesus-like or Einstein-like are, by their nature, controversial claims likely to be challenged or refuted;" it therefore concluded that the mere making of such exceptional-ability claims creates a public controversy.

Concerning the district court's first line of reasoning, the widespread nature of appellants' claims, appellants argue that they are not well-known, their website receives minimal Internet traffic, and they have to explain their work to potential clients and business partners. Appellants argue that respondent failed to show a public controversy because he did not show widespread media attention devoted to appellants and their claims. Concerning the district court's second line of reasoning, appellants argue that no binding authority supports the district court's reasoning that some of their claims [*9] may create a public controversy by their very nature.

*HN6*[↑] "A public controversy requires two elements: (1) there must be some real dispute that is being publicly debated; and (2) it must be reasonably foreseeable that the dispute could have substantial ramifications for persons beyond the immediate participants." *Id. at 652.* Even if a controversy generates public interest, courts will not consider it a public controversy when it involves only "private individuals enmeshed in personal lives or work which had momentarily caught the attention of the press and public, largely as illustrative of some perceived social ill." *Jadwin, 367 N.W.2d at 485* (distilling the holdings in *Hutchinson v. Proxmire, 443 U.S. 111, 135, 99 S. Ct. 2675, 2688, 61 L. Ed. 2d 411 (1979)).*

Both parties invite us to go beyond existing case law and create new legal tests for determining when a public controversy exists in cases of Internet publication. Appellants ask us to require proof of widespread print or broadcast media attention in order to find that a dispute or question is being publicly debated. Respondent asks us to endorse the district court's reasoning that some statements can create a public controversy by their very nature.

*HN7*[↑] The limited-purpose public-figure test provided by the Minnesota Supreme Court in *Chafoulias* is well-established, [*10] and it is not our role to modify it. *See Tereault v. Palmer, 413 N.W.2d 283, 286 (Minn. App. 1987)* ("[T]he task of extending existing law falls to the supreme court or the legislature, but it does not fall to

this court."), *review denied* (Minn. Dec. 18, 1987). Under existing caselaw, a public controversy exists when a person or thing is being publicly debated; there is no strict requirement of widespread reporting in the legacy public media of television and newspapers, although such reporting may be good evidence of the existence of a public controversy. *See Chafoulias, 668 N.W.2d at 646-47* (noting that the controversy was reported by local television stations and newspapers). Neither is it our proper role to create a new category of "automatic public controversy" where a person makes supernatural claims. *See Time, Inc. v. Firestone, 424 U.S. 448, 454, 96 S. Ct. 958, 965, 47 L. Ed. 2d 154 (1976)* (rejecting the theory that a statement can automatically become a public controversy for defamation purposes by drawing general or public interest). We apply existing law to the appealed-from summary judgment.[5] We apply the established standards for determining whether a public controversy exists.

**1. A publicly debated dispute exists concerning some, but not all of respondent's statements.**

**i. A public controversy exists surrounding the Trivedi Effect and appellants' business [*11] practices.**

We first consider whether respondent's statements concern a real dispute that was publicly debated. *Chafoulias, 668 N.W.2d at 652*. The record establishes widespread discussion of Trivedi's claims of extraordinary powers both online and more broadly in the scientific community. Appellants themselves submitted affidavits proclaiming the attention their products have received in the scientific community, being the subject of more than 4,000 scientific studies at major research institutions throughout the world, with results published in more than 170 peer-reviewed research publications, including over a dozen publications in "leading international, peer-reviewed scientific journals." Appellants also claim to have performed 70,000 miracles around the world and have as many as 200,000 patrons.[6] Appellants claim to have a website showing hundreds of testimonials from people who have benefitted from their work. Appellants have a network of media personalities who promote their products. *HN8*[⬆] Product promotion is insufficient in itself to warrant a finding of a public controversy. *See Jadwin, 367 N.W.2d at 478-79, 485* (holding that a plaintiff was not a public figure, despite that he sent out 13,000 prospectuses, placed ads in newspapers, and issued [*12] press releases to over 30 Minnesota newspapers and magazines). But the record here establishes much more than product promotion. If appellants' claims of thousands of scientific studies regarding the Trivedi Effect are true, then a whirlwind of public debate is already established. And, true or not, the resulting Internet discussion of the accuracy of those claims amounts to a real dispute that is being publicly debated. Either is sufficient as a matter of law to establish a publicly discussed controversy. Respondent's complained-of statements concerning the Trivedi Effect and appellants' business practices concerning and promoting the Trivedi Effect were part of that public debate.

---

[5] We recognize that measuring the likes of "public controversy," "media defendant," and "limited-purpose public figure" by legal standards developed before the widespread availability of the Internet is in some respects anachronistic. But this appeal can be resolved by reference to existing law.

---

[6] At oral argument, appellants sought to walk back these claims as mere "puffery." Whether appellants really meant what they said is not the issue. The question is whether there was a public controversy. Appellants made these claims and made them widely. Others, including respondent, were debating the claims.

ii. The public controversy does not extend to Trivedi's sexual conduct.

Having concluded that respondent's statements concerning the Trivedi Effect, questioning it, and questioning appellants' sale and promotion of products and services, constitute a publicly debated controversy, we next consider whether that public debate extended to Trivedi's alleged sexual improprieties.

We conclude that respondent's statements concerning that subject are unlike the Trivedi-Effect claims. The alleged scientific studies [*13] discussed above are not contained in the record on appeal.[7] But we presume that, if the studies and publications exist, they concern Trivedi's claimed miraculous powers, and not his sexual behavior. Respondent notes that the PurQi.com website contained discussion of Trivedi's sexual conduct. But there is no evidence of record that appellants generated or encouraged public debate concerning Trivedi's sexual propensities. Respondent has produced no information concerning how widely the PurQi.com website is used, or whether it is widely accessed by individuals outside of the small group of appellants' former employees. Nor does the record reveal any active efforts by appellants to engage in public promotion or discussion of Trivedi's sexual conduct.

Although the record reveals some evidence of a claim of Trivedi's celibacy, appellants' essential claims concerning Trivedi and the Trivedi Effect seem not to be based on moral superiority or essential goodness. To the contrary, Trivedi claims to possess awesome power to transmit energy to others, and advertises throughout the world his willingness to transmit some of his awesome power in exchange for money. The public controversy concerns whether [*14] the Trivedi Effect has any basis in fact, and the marketing and business practices of appellants in promoting and monetizing the Trivedi Effect. That former employees questioned the legal and ethical propriety of Trivedi's sexual conduct is insufficient to make that subject one of public debate. It cannot be that every Internet discussion or dispute amounts to a public controversy. Respondent has not demonstrated that his statements concerning Trivedi's sexual propensities and conduct amount to a publicly debated dispute.[8] Therefore, respondent's statements concerning sexual matters are not part of the public controversy.

2. Respondent's statements concerning the "sham" nature of the Trivedi Effect and appellants' business practices were subjects on which there were reasonably foreseeable ramifications beyond the immediate participants.

We next consider whether it is reasonably foreseeable that the public debate concerning the Trivedi Effect and appellants' business practices could have ramifications beyond the immediate participants. *Chafoulias, 668 N.W.2d at 652.*

If appellants' claims are true, the Trivedi Effect will undoubtedly spread and revolutionize the agriculture and health-sciences industries. If appellants' [*15] claims are untrue and appellants are collecting millions

---

[7] Trivedi's affidavit of March 3, 2015, identified three publications in which the "beneficial effects of the Trivedi Companies' services and products" have been demonstrated. The studies or articles themselves are not included in the record. We have not, for that reason, consulted the studies purportedly describing these "beneficial effects."

[8] The record reveals no criminal charges or civil claims arising from Trivedi's claimed sexual misconduct. Trivedi's March 3, 2015 affidavit denies the existence of any "criminal charges for sexual abuse . . . against me." No evidence to the contrary exists in the record.

of dollars based on false claims, public debate will undoubtedly increase. The debate regarding appellants' claims, practices, and products clearly has reasonably foreseeable ramifications beyond the immediate participants.

Even if respondent's statements concerning Trivedi's alleged sexual misconduct with former employees or clients were to be considered part of a public dialogue, those statements do not have similarly broad ramifications. While respondent's accusations of Trivedi's sexual misconduct are serious and troubling, there is no public controversy extending to them. *See Jadwin, 367 N.W.2d at 485-86* (holding that an individual's solicitation of media attention to his business enterprises did not make him a public figure); *see also Time, Inc., 424 U.S. at 454, 96 S. Ct. at 965* (holding that the divorce of a famous socialite was not the type of public controversy contemplated by *Gertz*). And whatever controversy exists concerning these matters affects primarily those persons immediately involved in the conduct.

### B. Appellants placed themselves in the public controversy.

The district court found that "there is no doubt that [appellants] intentionally and deliberately placed themselves into the epicenter [*16] of public debate by affirmatively making the claims to a global audience and seeking out thousands of scientific studies to support those contentions." Appellants argue that, even if there is a public controversy, it was one created by respondent, and he is not entitled to claim protection under the actual-malice standard.

*HN9* ] "[D]efamation defendants cannot create their own defense by pointing to the attention they have themselves visited upon a plaintiff as evidence that the plaintiff is a public figure." *Chafoulias, 668 N.W.2d at*

653 (quotation omitted). But defamation plaintiffs likewise cannot avoid limited-purpose public-figure status by claiming not to have wanted the attention. *Id.* A plaintiff is a limited-purpose public figure if he voluntarily injects himself into a controversy, but not if he is drawn into the controversy. *Id.* In reviewing this factor, courts consider whether participation in the controversy was voluntary, whether the person had "access to channels of effective communication to counteract false statements," and the prominence of the role the person played in the public controversy. *Id.*

The record demonstrates beyond question that appellants injected themselves into the controversy concerning the Trivedi [*17] Effect and their promotion of it long before respondent became involved. Respondent did not create that public controversy. Appellants' claims concerning the Trivedi Effect were voluntary and widespread. Appellants have actively participated in this controversy by creating a foundation to support scientific research that tests the efficacy of Trivedi's energy transmissions, paying radio-show hosts and authors to promote their products, and creating a website with hundreds of purported testimonials regarding their products.[9] Appellants are voluntary and prominent participants in this public controversy.

### C. There is a relationship between some of respondent's statements and the identified public controversy.

Our final inquiry considers whether there is a relationship between the public controversy and the statements made by respondent. *Id. at 651.*

---

[9] The March 3, 2015 affidavit of the "CEO of Trivedi Global, Inc." identifies numerous "affiliates" and "consultants" who were paid large sums of money—and who, in turn, generated substantial profits for appellants—relating to promotion of the Trivedi Effect.

As discussed above, the public controversy is more limited than that identified by the district court. Trivedi's claims of extraordinary powers and widespread publicity about appellants' products are part of a public controversy. Respondent's statements regarding Trivedi's powers, and the products and business practices of all of appellants, are closely [*18] related to that public controversy. Respondent's statements that appellants are "shams" and that their claims are untrue (and similar words critiquing the validity of the Trivedi Effect) are clearly related to the controversy concerning appellants' products. Trivedi is a public figure for the limited purpose of those statements. Respondent's statements that appellants have engaged in unlawful business practices, including questionable financial transactions, visa misuse, questionable employment and bank transactions, IRS violations, green-card violations, and violations of not-for-profit legal status, are all closely related to the products that appellants sell and the claims they make. These statements are closely related to the promotion of the Trivedi Effect. Therefore, the district court properly subjected appellants' defamation claims against respondent for statements in these two categories to the actual-malice standard applicable to statements made about limited-purpose public figures.

Respondent's statements concerning Trivedi's alleged sexual misconduct and improprieties are not related to the controversy surrounding Trivedi's claims of miraculous abilities and appellants' [*19] products. Accusations of sexual assault and other sexual improprieties are materially different than accusations that appellants are charlatans. These statements concern matters beyond those in which appellants have willingly participated in a public forum. Trivedi is not a public figure for the purposes of those statements concerning his sexual conduct, and appellants' legal claims regarding this category of statements are

properly reviewed under common-law defamation standards.

III.

**Respondent is a "Media Defendant"**

As an alternative basis for dismissing the claims of the corporate appellants, the district court found that respondent is a journalist and is therefore entitled to the protection of the actual-malice standard with respect to his statements about the Trivedi Companies. Appellants argue that respondent is simply a person posting statements on an online forum and is not a "media defendant" entitled to the heightened actual-malice standard.

_HN10_ ] Corporate plaintiffs suing media defendants for defamation must show actual malice when the media defendant demonstrates that the allegedly defamatory statements concern matters of legitimate public interest. _Jadwin, 367 N.W.2d at 487-88._ This rule was created to "encourage [*20] the media to probe the business world to the depth which is necessary to permit the kind of business reporting vital to an informed public." _Id. at 488._

Respondent's statements about the claims and business practices of Trivedi Companies and Trivedi Foundation are of the sort protected by _Jadwin_. Respondent identifies himself as a free-lance journalist who has published seven articles. Appellants have submitted no evidence to the contrary. Accordingly, the record contains no factual dispute. See _In re Collier, 726 N.W.2d 799, 803 (Minn. 2007)_ (_HN11_ ] "When the material facts are not in dispute, we review the lower court's application of the law de novo."). Respondent researched appellants' claims and operations. He corresponded with appellants' past employees and with

others who have studied and are interested in appellants' work. While respondent published his statements online, rather than in a traditional media format, we are satisfied that online journalism is equivalent to print journalism and that online journalists are entitled to no less *First Amendment* protection than other media defendants.[10] Respondent's posts on PurQi.com regarding appellants' products, business practices, and illegal activities are of legitimate concern to the public. The district court **[*21]** properly applied the actual-malice standard to the claims of Trivedi Companies and Trivedi Foundation.

## IV.

### Questions of Material Fact Remain Concerning Some of Respondent's Statements

The district court applied the actual-malice standard to all of appellants' claims and determined that appellants failed to identify a genuine issue of material fact concerning actual malice. It therefore dismissed all of appellants' claims. Appellants argue that, even if we find that the district court correctly applied the actual-malice standard to some or all of the statements, the record reveals genuine issues of material fact concerning whether respondent acted with actual malice.

*HN12*[⬆] Appellate courts generally "review a district court's grant of summary judgment de novo to determine (1) whether there are any genuine issues of

material fact, and (2) whether the district court correctly applied the law." *Rochester City Lines, Co. v. City of Rochester, 868 N.W.2d 655, 661 (Minn. 2015)*. When deciding the first question, we "view the evidence in the light most favorable to the party against whom summary judgment was granted." *McKee, 825 N.W.2d at 729*.

*HN13*[⬆] In defamation cases involving limited-purpose public figures, the question on a motion for summary judgment is whether the evidence of record could reasonably support **[*22]** a factual finding of actual malice by clear and convincing evidence. *Foley v. WCCO Television, Inc., 449 N.W.2d 497, 503 (Minn. App. 1989)*, review denied (Minn. Feb. 9, 1990). "'Actual malice' is a term of art; it means that the defendant acted with knowledge that the publication was false or with reckless disregard of whether it was false or not." *Chafoulias, 668 N.W.2d at 654* (quotation omitted). A statement "may have been made with actual malice if it is fabricated by the defendant, is the product of his imagination, . . . is based wholly on an unverified anonymous telephone call or if the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation." *Id.* It can also exist if "the defendants in fact entertained serious doubts as to the truth of the publication." *Jadwin, 367 N.W.2d at 488* (quotation omitted). "[I]f the plaintiff presents evidence that the utterer knew the falsity of his statements when published, such bad faith in publishing is relevant evidence of malice." *Bahr v. Boise Cascade Corp., 766 N.W.2d 910, 922 (Minn. 2009)*.

As discussed, respondent's claimed defamatory statements fall into three categories: (1) statements claiming appellants are "shams," (2) statements claiming appellants are involved in illegal or unethical business practices, and (3) statements claiming that Trivedi engaged in improper **[*23]** sexual behavior. We have determined that the actual-malice standard applies

---

[10] In fact, the prominence and influence of purely online media outlets such as Breitbart News, Drudge Report, Daily Kos, and The Huffington Post demonstrate the current importance and influence of online media. No authority is advanced supporting the notion that *First Amendment* protection only applies when ink and paper are involved.

to the first two categories, but that the third category must be analyzed under common-law defamation standards. Finally, because respondent is a media defendant, we analyze respondent's statements regarding Trivedi Companies and Trivedi Foundation under the actual-malice standard.

### A. No genuine issue of material fact exists concerning respondent's statements claiming that appellants are "shams."

Appellants argue that respondent's statements that appellants are "shams," and similar statements, were made with actual malice. During his deposition, respondent stated "I don't know. . . . [I]t's possible that Mr. Trivedi believes that he has this ability." Appellants argue that a person cannot be a "sham" who believes what is said, and therefore these claims were made with actual malice, or at least there is a fact question concerning respondent's actual malice. Respondent argues that appellants either know that Trivedi does not have the powers he claims, or at least know that their claims of these powers having been scientifically validated are not accurate.

Calling a thing a "sham" indicates that the thing is not what [*24] it purports to be. *See The American Heritage Dictionary of the English Language* 1599 (4th ed. 2000) (defining "sham" as "[s]omething false or empty that is purported to be genuine"). The record lacks clear and convincing evidence that respondent claimed the Trivedi Effect to be a sham when he thought it to be genuine, or when he thought that appellants' claims concerning it were accurate. If the record reveals anything concerning respondent's mental state regarding his claims, it is that he does *not* believe that the Trivedi Effect is what it purports to be. *HN14*⬆] Under the actual-malice standard, appellants must show that respondent thought their abilities or products to be genuine and

disseminated statements to the contrary. Appellants have not identified a genuine issue of material fact concerning actual malice. The district court did not err in granting respondent's motion for summary judgment concerning these statements.

### B. No genuine issue of material fact exists concerning respondent's statements regarding illegal business activities.

Appellants concede that respondent has a source for all of his claims regarding the statements that appellants were engaged in illegal or unethical business activities. [*25] Appellants argue only that respondent did not properly verify the accuracy of all of those claims, and that respondent had personal doubts about the veracity of one source. Specifically, appellants posit that respondent's source for these claims included a convicted felon who stole from a previous employer, and that respondent did not believe the source, citing emails in which respondent told this source that he lacked proof and that he needed more evidence of the claims.

Appellants are correct that *HN15*⬆] "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 688, 109 S. Ct. 2678, 2696, 105 L. Ed. 2d 562 (1989)* (quotation omitted). Here, the record establishes that respondent relied on more than this one source to support his claims concerning appellants' business activities. Respondent identifies multiple sources supporting his illegal-business-activity claims, including documents he received through a *Freedom of Information Act* request, statements from a past chief executive officer of the Trivedi Companies, and a New York attorney. Respondent also relied on documentary evidence, including a visa application. Viewing the evidence in the light most favorable to appellants, [*26]

respondent's doubt of one informant's reliability is insufficient to create a material fact issue concerning actual malice. The district court did not err in granting summary judgment concerning these statements.

## C. Material fact issues remain concerning respondent's statements regarding sexual misconduct.

In their complaint, appellants alleged that respondent's statements on PurQi.com accusing Trivedi of sexual misconduct with former employees and followers are defamatory. As discussed above, Trivedi is not a public figure for the purpose of accusations of sexual assault. Therefore, actual malice need not be proved regarding this category of defamation claims.

*HN16*[⬆] To establish a common-law defamation claim in Minnesota, a plaintiff must show that (1) the defendant communicated the defamatory statement to "someone other than the plaintiff," (2) "the statement is false," (3) "the statement tends to harm the plaintiff's reputation," and (4) "the recipient of the false statement reasonably understands it to refer to a specific individual." *McKee, 825 N.W.2d at 729-30* (quotations omitted).

As noted, *HN17*[⬆] claims that a person is a criminal or unchaste, and especially that a person is a sex offender, if false, are defamatory per [*27] se. *Longbehn, 727 N.W.2d at 158-59*. The actual-malice standard does not apply to this class of respondent's claims, and the statements, if false, are defamatory per se. The genuine issue of material fact remains: whether Trivedi engaged in the improper sexual behavior alleged by respondent. If true, the statements are not defamatory.

Whether appellants will be able to prove their defamation claim regarding these statements remains to be seen. For present purposes, appellants have produced sufficient evidence to defeat respondent's

summary-judgment motion. We therefore reverse that part of the district court's summary adjudication pertaining to allegations of Trivedi's improper sexual behavior, and remand those claims to the district court for further proceedings.

## D. No genuine issue of material fact exists concerning statements about Trivedi Companies made by respondent as a media defendant.

Because *HN18*[⬆] respondent is a media defendant, Trivedi Companies and Trivedi Foundation must also for that reason demonstrate that respondent acted with actual malice to prevail on a defamation claim. *Jadwin, 367 N.W.2d at 487*. For the reasons discussed above in Parts IV.A. and IV.B., Trivedi Companies and Trivedi Foundation have not presented evidence that [*28] respondent acted with actual malice when he claimed that they are "shams" and that they engage in illegal business practices. The district court properly granted summary judgment concerning the claims of Trivedi Companies and Trivedi Foundation.

V.

Conclusion

The district court properly applied the actual-malice standard to respondent's statements regarding appellants' claims of Trivedi's extraordinary powers, the efficacy of their products, and allegedly illegal activities related to appellants' businesses. It also properly applied the actual-malice standard to the claims of Trivedi Companies and Trivedi Foundation. The record reveals no genuine issue of material fact regarding actual malice on respondent's part in making those statements. Concerning those statements by respondent accusing Trivedi of sexual misconduct,

2017 Minn. App. Unpub. LEXIS 389, *28

however, appellant Trivedi is not a limited-purpose public figure, and he need not prove actual malice as an element of his defamation claims arising from this category of statements. We therefore reverse the district court's dismissal of Trivedi's defamation claims (as an individual) regarding those statements and remand to district court for further proceedings consistent **[*29]** with this opinion.

**Affirmed in part, reversed in part, and remanded.**

---

End of Document

**EXHIBIT B**

No *Shepard's* Signal™
As of: November 5, 2021 10:05 PM Z

## *Molitor v. Molitor*

Court of Appeals of Minnesota

April 24, 2017, Filed

A16-1434

### Reporter

2017 Minn. App. Unpub. LEXIS 364 *; 2017 WL 1436083

Mark Molitor, Appellant, vs. Stephanie Molitor, Respondent.

**Notice:** THIS OPINION WILL BE UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINNESOTA STATUTES.

**Prior History:** [*1] Dakota County District Court File No. 19HA-CV-15-3213.

**Disposition:** Reversed and remanded.

## Core Terms

district court, qualified privilege, defamatory, defamatory meaning, sexual abuse, defamation, summary judgment, genuine issue of material fact, conveying, actual malice, defamation action, false statement, falsity, argues, defeat

## Case Summary

### Overview

HOLDINGS: [1]-The district court's summary judgment order in favor of a mother in defamation suit filed by a father regarding the mother's statements made to a physician that she believed the parties' child may have been sexually abused while in the father's care was reversed, because the mother made statements that could reasonably convey the implication the father may have abused his child and were capable of a defamatory meaning and genuine issues of material fact existed as to the truth or falsity of the mother's statements and whether they conveyed a defamatory meaning; [2]-Remand was appropriate because the district court did not rule on whether the statements were made upon a proper occasion, from a proper motive, and based on reasonable cause, thereby entitling the mother to qualified privilege for her statements, or on whether the mother acted with actual malice.

### Outcome

Judgment reversed, matter remanded.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN1*[⬇] Entitlement as Matter of Law, Genuine Disputes

2017 Minn. App. Unpub. LEXIS 364, *1

Summary judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions on file, together with the affidavits submitted, demonstrate that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law. *Minn. R. Civ. P. 56.03*. The appellate court reviews the district court's grant of summary judgment de novo to determine whether any genuine issues of material fact exist and whether the district court erred in its application of the law. The appellate court examines the evidence in the light most favorable to the party against whom summary judgment was granted.

Torts > ... > Defamation > Remedies > Damages

Torts > Intentional Torts > Defamation > Elements

Torts > Intentional Torts > Defamation > Defamation Per Se

*HN2*[⤓] Remedies, Damages

Under Minnesota law, a statement is actionable as defamation if it is false, was communicated to a third party, and tended to harm the plaintiff's reputation or to lower that person in the estimation of the community. A false statement that a person has committed a crime or sexual misconduct is defamatory per se. If a statement is defamatory per se, damages are presumed and may be recovered without proof of actual harm to the plaintiff's reputation.

Torts > Intentional Torts > Defamation > Elements

*HN3*[⤓] Defamation, Elements

To be actionable in defamation, a defendant's statements must be false statements of fact that are capable of conveying a defamatory meaning. Whether a statement is defamatory depends on how ordinary people would interpret its language in light of the circumstances. A publication may either be defamatory on its face or carry a defamatory meaning only by reason of extrinsic circumstances. Context is critical to meaning because a false statement that is defamatory on its face may not be defamatory when read in context, and a statement that is not defamatory on its face may, in fact, be defamatory when read in context.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Torts > Intentional Torts > Defamation

Torts > Intentional Torts > Defamation > Procedural Matters

*HN4*[⤓] Standards of Review, De Novo Review

Whether a statement is capable of conveying a defamatory meaning presents a question of law, which the appellate court reviews de novo. If words are capable of a defamatory meaning, a jury then must decide whether they were actually defamatory.

Torts > Intentional Torts > Defamation

Torts > Intentional Torts > Defamation > Procedural Matters

*HN5*[⤓] Intentional Torts, Defamation

Courts must interpret the defamatory-meaning element of a defamation action in light of the context surrounding the alleged defamatory statements. Defamation by implication is a theory, which need not be specifically pleaded.

Torts > Intentional Torts > Defamation

Torts > ... > Defamation > Defenses > Fair Comment & Opinion

_HN6_[⬇️] Intentional Torts, Defamation

Generally, only statements of fact that can be proven true or false are actionable as defamatory. If a statement cannot be reasonably interpreted as stating facts and cannot be proven true or false, it qualifies as a statement of pure opinion. Thus, calling someone a "real tool" amounts to a statement of opinion, which cannot be the basis for a defamation claim. In contrast, a statement that implies the existence of a certain kind of reprehensible conduct, such as that a person is "dishonest," is actionable in defamation.

Torts > Intentional Torts > Defamation > Elements

Torts > Intentional Torts > Defamation > Procedural Matters

_HN7_[⬇️] Defamation, Elements

The plaintiff in a defamation action must show that the allegedly defamatory statement is false. A statement is false if it is substantially inaccurate; if a statement is true in substance, minor inaccuracies of detail or expression are immaterial. As a general rule, in a defamation action, the truth or falsity of a statement presents a question for the jury to resolve.

Civil Procedure > Appeals > Summary Judgment Review

_HN8_[⬇️] Appeals, Summary Judgment Review

At the summary-judgment stage, the appellate court must review the evidence in the light most favorable to the party against whom summary judgment was granted.

Torts > Intentional Torts > Defamation > Elements

Torts > ... > Defenses > Privileges > Qualified Privileges

_HN9_[⬇️] Defamation, Elements

Even if a plaintiff has sufficiently alleged material factual issues on the elements of defamation, a defamation action may be defeated on the ground that the defendant is entitled to a qualified privilege for his or her remarks.

Torts > Intentional Torts > Defamation > Procedural Matters

Torts > ... > Defenses > Privileges > Qualified Privileges

_HN10_[⬇️] Defamation, Procedural Matters

The policy behind the assertion of privileges in defamation actions recognizes that the end to be gained by permitting defamatory statements in certain circumstances outweighs the harm that may be done to another's reputation. A qualified privilege applies when a court determines that statements made in certain contexts should be encouraged, despite a risk that the statements might be defamatory. To be protected by a qualified privilege, the statement must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. Thus, appellate courts have held that a qualified privilege applied to reports of child abuse made to a psychologist, and to a physician's notations regarding concerns of child abuse by a parent. Whether a qualified privilege

2017 Minn. App. Unpub. LEXIS 364, *1

applies presents a question of law for the court.

Civil Procedure > Appeals > Remands

Civil Procedure > Appeals > Summary Judgment Review

HN11[⤓]  Appeals, Remands

Remand to the district court to address an additional issue may be appropriate when the district court erred by granting summary judgment on a different ground.

Torts > Intentional Torts > Defamation > Procedural Matters

Torts > ... > Defenses > Privileges > Qualified Privileges

HN12[⤓]  Defamation, Procedural Matters

Minnesota common law defines actual malice as made from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff. Whether a qualified privilege has been defeated through abuse, meaning that the defendant has acted with actual malice, generally presents a question of fact for the jury, but it may be determined at summary judgment if the record is insufficient to create a material factual issue.

Counsel: For Appellant: Zorislav R. Leyderman, The Law Office of Zorislav R. Leyderman, Minneapolis, Minnesota.

For Respondent: Roger H. Gross, Marissa K. Linden, Gislason & Hunter LLP, Minneapolis, Minnesota.

Judges: Considered and decided by Worke, Presiding Judge; Halbrooks, Judge; and Jesson, Judge.

Opinion by: JESSON

## Opinion

UNPUBLISHED OPINION

JESSON, Judge

Appellant Mark Molitor challenges the district court's grant of summary judgment in favor of respondent Stephanie Molitor, now known as Stephanie Saji, in this defamation action, which is based on Saji's statements to a physician regarding her concern that the parties' child may have been sexually abused while in Molitor's care. Because genuine issues of material fact exist on whether Saji's statements were false and conveyed a defamatory meaning, and because the district court failed to address a defense of qualified privilege and whether actual malice exists to defeat such a privilege, we reverse and remand for further proceedings.

## FACTS

Molitor and Saji were married in 2008, and their daughter was born in 2012. The parties separated in November 2013. About a week after the separation, when [*2] the child was staying with Molitor, he brought her to a well-child checkup. The child's physician reported that she was in good health.

The next day, Molitor turned the child over to Saji in a parenting exchange. According to Saji, the child was saying that her "butt hurt" and had a black stool. Saji performed an Internet search for these symptoms, which indicated that they could be related to sexual abuse. She called a sexual abuse hotline, reported the symptoms, and was advised to take the child to the emergency room.

At Fairview Ridges Hospital, Dr. Lucas Mailander examined the child. Mailander noted that Saji brought the child in with "concerns of sexual abuse." Saji told Mailander that the child had stayed at her father's home for the last four nights, even though she was supposed to stay for only one night, and that when Saji picked her up, she appeared unkempt and would not look at her mother. Saji also reported that the child had a black and tarry stool, was pulling at her backside and seemed uncomfortable, and was reluctant to wear a diaper. Saji stated that the child appeared more clingy than usual, but she believed that this was because they had never been separated before [*3] for more than 48 hours. Saji told the doctor that Molitor had sexually abused her during the marriage and had once hit the child on the nose "like a dog," but had not shown any other abusive behavior toward the child.

Mailander performed an exam, which showed normal findings and no signs of sexual abuse. He contacted the Midwest Children's Resource Center, which did not recommend an immediate evaluation, but offered to follow up at Saji's option. The child was then discharged.

The next month, Saji filed a petition to dissolve the parties' marriage. In September 2015, nine months after the dissolution was final, Molitor commenced a district court action, claiming that Saji had made false statements that he had sexually abused the child, which constituted defamation per se because they were circulated to third parties and falsely accused him of committing a crime.

Saji moved for summary judgment, which Molitor opposed. After a hearing, the district court granted summary judgment in favor of Saji, stating that the record lacked any evidence to support the assertion that she had made false statements that Molitor had sexually abused the child. The district court determined that the

information [*4] that Saji provided to the physician was factually correct and truthful, so that the statements were not actionable. The district court therefore did not reach Saji's additional claim that the statements were protected by a qualified privilege. The district court also declined to consider Molitor's additional argument that the statements constituted defamation by implication, noting that this claim had not been alleged in the complaint, and it would not address a cause of action not pleaded and of which Saji lacked notice. This appeal follows.

## DECISION

*HN1*[⬆] Summary judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions on file, together with the affidavits submitted, demonstrate that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law. *Minn. R. Civ. P. 56.03*. This court reviews the district court's grant of summary judgment de novo to determine whether any genuine issues of material fact exist and whether the district court erred in its application of the law. *Bol v. Cole, 561 N.W.2d 143, 146 (Minn. 1997)*. This court examines the evidence in the light most favorable to the party against whom summary judgment was granted. *Fabio v. Bellomo, 504 N.W.2d 758, 761 (Minn. 1993)*.

Molitor argues that the district court [*5] erred by granting summary judgment in favor of Saji on his claim of defamation. *HN2*[⬆] Under Minnesota law, a statement is actionable as defamation if it is false, was communicated to a third party, and tended to harm the plaintiff's reputation or to lower that person in the estimation of the community. *Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980)* (citing *Restatement (Second) of Torts §§ 558-59* (1977)). A false statement that a person has committed a crime or

sexual misconduct is defamatory per se. _Anderson v. Kammeier, 262 N.W.2d 366, 372 (Minn. 1977)_; _Hammersten v. Reiling, 262 Minn. 200, 206, 115 N.W.2d 259, 264 (1962)_. If a statement is defamatory per se, damages are presumed and may be recovered without proof of actual harm to the plaintiff's reputation. _Schlieman v. Gannett Minn. Broad., Inc., 637 N.W.2d 297, 307 (Minn. App. 2001)_, _review denied_ (Minn. Mar. 19, 2002)..

Molitor argues that he presented genuine issues of material fact concerning whether Saji made false statements to the physician and whether they carried a defamatory meaning. He also alleges that the statements tended to harm his reputation in the community. In its order granting summary judgment, the district court stated that the record referenced only Saji's direct observations about the child's symptoms and that Molitor had presented no evidence that these statements were false. Molitor argues, however, that Saji's statements to the physician, taken both individually and in context, falsely accused [*6] him of sexual misconduct. We examine the substance of Saji's statements to review whether they present material issues of fact regarding a defamatory meaning and truth or falsity. We then address whether a qualified privilege applies to those statements.

_I. The complaint sufficiently alleges factual statements that, taken in context, raise genuine issues of material fact as to whether they carry a defamatory meaning and are false._

HN3[⬆] ] To be actionable in defamation, the defendant's statements must be false statements of fact that are capable of conveying a defamatory meaning. _Jadwin v. Minneapolis Star & Tribune Co., 390 N.W.2d 437, 441 (Minn. App. 1986)_. Whether a statement is defamatory depends on how ordinary people would interpret its language in light of the circumstances. _Gadach v. Benton Cnty. Co—Op. Ass'n, 236 Minn. 507, 510, 53 N.W.2d 230, 232 (1952)_; _see Utecht v. Shopko Dep't Store, 324 N.W.2d 652, 653 (Minn. 1982)_ (noting that a publication may either be defamatory on its face or "carry a defamatory meaning only by reason of extrinsic circumstances"). "Context is critical to meaning because a false statement that is defamatory on its face may not be defamatory when read in context, and a statement that is not defamatory on its face may, in fact, be defamatory when read in context." _Schlieman, 637 N.W.2d at 304_.

HN4[⬆] ] Whether a statement is capable of conveying a defamatory [*7] meaning presents a question of law, which we review de novo. _Id. at 307_. If words are capable of a defamatory meaning, a jury then must decide whether they were actually defamatory. _LeDoux v. Northwest Publishing, 521 N.W.2d 59, 68 (Minn. App. 1994)_, _review denied_ (Minn. Nov. 16, 1994).

We conclude that, taken in context, as reflected in the medical record created at the emergency-room visit, Saji made statements that are capable of a defamatory meaning. The medical record begins with the phrase that the child "presents with mother due to concerns of sexual abuse." It states that Saji reported that Molitor had "lightly hit [the child] on the nose 'like a dog'"; had "kept her for the last 4 nights" when she was only supposed to stay for one night; and had returned her "unkempt." Saji stated that once at home, the child was "more clingy than usual", had a "dark and tarry" bowel movement, and kept "pulling at her backside." The physician ends the medical record by noting that "[Saji] was concerned that the patient may have been abused in some way."

Collectively and in context, Saji's detailed statements to the physician about the child's unusual behavior and condition immediately after returning from Molitor's

2017 Minn. App. Unpub. LEXIS 364, *7

home could reasonably convey the implication that he [*8] may have abused the child during her stay with him. Saji argues that she never directly accused Molitor of sexually abusing the child. But the medical record reflects that she told the physician that Molitor had been sexually abusive of her during the parties' marriage and that she brought the child in "due to concerns of sexual abuse" after a stay with Molitor. Therefore, a jury question exists as to whether these statements actually conveyed a defamatory meaning, and the district court erred by concluding that Molitor failed to present the existence of a genuine issue of material fact on this issue.[1] *See Schlieman, 637 N.W.2d at 304.*

Saji further argues that her statements to the physician

_____

[1] We note Molitor's additional argument that the district court erred by failing to address a theory of defamation by implication, which was not pleaded specifically in the complaint. In 1990, the Minnesota Supreme Court articulated the principle that if a defendant juxtaposes facts, implying a defamatory connection between them, or omits facts to create a defamatory implication, he may be held responsible for that implication, unless it qualifies as an opinion, even though the specific facts are correct. *Diesen v. Hessburg, 455 N.W.2d 446, 450 (Minn. 1990).* In *Diesen*, the supreme court held that a public-official defamation plaintiff could not base a defamation action on true statements that carried allegedly false implications. *Id. at 451-52.* This court has recognized, however, that "*Diesen* does not modify the general principle that HN5[↑] courts must interpret the defamatory-meaning element of a defamation action in light of the context surrounding the alleged defamatory statements." *Schlieman, 637 N.W.2d at 304.* Although Saji argues that defamation by implication is a separate cause of action, which must be particularly alleged, we agree with Molitor that defamation by implication is a theory, which need not be specifically pleaded. And we note that, even if we were to address a theory of defamation by implication, based on our contextual analysis of the allegedly defamatory statements, we would reach the same result. *See id.*

do not carry a defamatory meaning because they are "pure opinion," which is protected from defamation claims by the *First Amendment. McKee v. Laurion, 825 N.W.2d 725, 733 (Minn. 2013).* HN6[↑] Generally, only statements of fact that can be proven true or false are actionable as defamatory. *Lund v. Chicago & Nw. Transp. Co., 467 N.W.2d 366, 369 (Minn. App. 1991), review denied* (Minn. June 19, 1991). If a statement cannot be reasonably interpreted as stating facts and cannot be proven true or false, it qualifies as a statement of pure opinion. Thus, calling someone a "real tool" amounts to a statement of opinion, which cannot be the basis for a defamation [*9] claim. *McKee, 825 N.W.2d at 733.* In contrast, a statement that implies the existence of a certain kind of reprehensible conduct, such as that a person is "dishonest," is actionable in defamation. *Weissman v. Sri Lanka Curry House, Inc., 469 N.W.2d 471, 473 (Minn. App. 1991).* Here, because Saji's statements can be reasonably interpreted to convey that Molitor committed sexual abuse, they are not protected expressions of opinion. *See id.* Thus, they may be actionable to support his claim of defamation per se. *Anderson, 262 N.W.2d at 372.*

We next examine the issue of falsity. HN7[↑] The plaintiff in a defamation action must show that the allegedly defamatory statement is false. *Stuempges, 297 N.W.2d at 255.* A statement is false if it is substantially inaccurate; if a statement is true in substance, minor inaccuracies of detail or expression are immaterial. *McKee, 825 N.W.2d at 730.* As a general rule, in a defamation action, the truth or falsity of a statement presents a question for the jury to resolve. *Id.*

The district court determined that Saji's statements, taken individually, were true and that the record did not present a material factual issue on the issue of truth or falsity. But in an affidavit, Molitor challenged the substantial truth of Saji's statements, alleging that she

made false accusations to further her attempt to gain custody of the child. He alleged [*10] that the week before the child's emergency-room visit, Saji had told him that she would do "whatever it takes" to remove him from the child's life. He alleged, in contrast to Saji's statement to the physician, that he had not kept the child for longer than scheduled. He produced evidence showing that the day before the emergency-room visit, he had taken the child for a scheduled 15-month well-child visit, which showed that she was in good health. And he alleged that Saji had unexpectedly failed to attend that appointment, which, he believed, allowed her to fabricate a reason to take the child to the emergency room the next day.

_HN8_[⬆] At this summary-judgment stage, we must review the evidence in the light most favorable to Molitor, the party against whom summary judgment was granted. _Fabio, 504 N.W.2d at 761_. Taken as a whole and in context, Saji's statements were capable of conveying the defamatory meaning that Molitor had sexually abused the child. Molitor's affidavit disputes this general allegation, as well as several other statements in the medical report, such as the status of the child's health based on the well-child visit on the previous day. We therefore disagree with the district court and conclude that [*11] Molitor has presented a genuine issue of material fact as to the truth or falsity of Saji's statements to the emergency-room physician.

_II. Issues of whether a qualified privilege protects Saji's statements to the physician, and whether actual malice defeats that privilege, are properly addressed by the district court._

Our examination of the elements of defamation does not, however, end the inquiry. _HN9_[⬆] Even if a plaintiff has sufficiently alleged material factual issues on the elements of defamation, a defamation action may be

defeated on the ground that the defendant is entitled to a qualified privilege for his or her remarks.[2] _Bol, 561 N.W.2d at 149_. Because the district court determined that no genuine issue of material fact existed on whether Saji's statements were defamatory, it did not reach the issue of whether a qualified privilege protected those statements.

_HN10_[⬆] The policy behind the assertion of privileges in defamation actions recognizes that the end to be gained by permitting defamatory statements in certain circumstances outweighs the harm that may be done to another's reputation. _Zutz v. Nelson, 788 N.W.2d 58, 61-62 (Minn. 2010)_. A qualified privilege applies when a court determines that statements made in certain contexts should be encouraged, [*12] despite a risk that the statements might be defamatory. _Bol, 561 N.W.2d at 149_. To be protected by a qualified privilege, the statement must be "made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause." _Stuempges, 297 N.W.2d at 256-57_ (quotation omitted). Thus, appellate courts have held that a qualified privilege applied to reports of child abuse made to a psychologist, _Bol, 561 N.W.2d at 145_, and to a physician's notations regarding concerns of child abuse by a parent. _Strauss v. Thorne, 490 N.W.2d 908, 911-12 (Minn. App. 1992)_, review denied (Minn. Dec. 15, 1992). Whether a qualified privilege applies presents a question of law for the court. _Bol, 561 N.W.2d at 149_.

Here, the parties dispute whether the statements were

_____

[2] Courts also recognize a defense of absolute privilege, which applies only in limited circumstances, such as to statements of government officials in certain contexts. _Zutz v. Nelson, 788 N.W.2d 58, 62 (Minn. 2010)_. Absolute privilege grants immunity even for intentionally false statements coupled with malice, while qualified privilege applies only if the privilege is not abused and defamatory statements are published in good faith and without malice. _Id._

made "upon a proper occasion, [and] from a proper motive." *Stuempges, 297 N.W.2d at 256-57*. Because the district court did not rule on the issue of privilege, it is appropriate to remand this matter to the district court for an examination of whether a qualified privilege applies to Saji's remarks. *See Bol, 561 N.W.2d at 149*, *see also Taylor v. LSI Corp. of Am., 796 N.W.2d 153, 157 (Minn. 2011)* (*HN11*[↑]) remanding for district court to address additional issue when district court erred by granting summary judgment on different ground).

We further note that, even if the district court determines as a matter of law that a qualified privilege exists, it must then address whether there is any issue [*13] of fact regarding whether the statements were published with actual malice, which will defeat the privilege. *See Strauss, 490 N.W.2d at 912*. *HN12*[↑]) Minnesota common law defines actual malice as made from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff. *Frankson v. Design Space Int'l, 394 N.W.2d 140, 144 (Minn. 1986)*.[3] Whether a qualified privilege has been defeated through abuse, meaning that the defendant has acted with actual malice, generally presents a question of fact for the jury, but it may be determined at summary judgment if the record is insufficient to create a material factual issue. *Id.*; *see Bol, 561 N.W.2d at 143*.

We therefore remand to the district court for further proceedings to address the issue of a qualified privilege and, if a privilege is determined to exist, whether a jury

question remains on actual malice. In its review, the district court may wish to reopen the record to receive additional evidence, such as information from the parties' dissolution, and other material, at the court's discretion.

**Reversed and remanded.**

---

End of Document

---

[3] Common law malice differs from the standard of constitutional malice applicable to public-figure plaintiffs, which requires proof that the defendant published the statements with knowledge that they were false or with reckless disregard for their truth or falsity. *Jadwin v. Minneapolis Star & Tribune Co., 367 N.W.2d 476, 481 n.5 (Minn. 1985)* (citing *New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 726, 11 L. Ed. 2d 686 (1964)*).

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2021 a true and correct copy of the foregoing was served via ECF to:

Alain M. Baudry (MN #186685)
Steven C. Kerbaugh (MN #0390429)
**SAUL EWING ARNSTEIN & LEHR, LLP**
33 South Sixth Street, Suite 4750
Minneapolis, MN 55402
Telephone: (612) 225-2946
Facsimile: (612) 677-3844
Email: alain.baudry@saul.com
Email: steven.kerbaugh@saul.com

Jeffrey S. Robbins (Admitted *Pro Hac Vice*)
Joseph D. Lipchitz (Admitted *Pro Hac Vice*)
**SAUL EWING ARNSTEIN & LEHR, LLP**
131 Dartmouth Street, Suite 501
Boston, MA 02116
Telephone: (617) 723-3300
Facsimile: (617) 723-4151
Email: jeffrey.robbins@saul.com
Email: joseph.lipchitz@saul.com

*Attorneys for Defendant Lori Saroya*

*/s/ Cynthia B. Morgan*
Cynthia B. Morgan
Rubin Fortunato & Harbison PC
1200 Liberty Ridge Drive
Suite 220
Wayne, PA 19087